Paul J. Keenan Jr. (*pro hac vice* pending)
John R. Dodd (*pro hac vice* pending)
Reginald Sainvil (*pro hac vice* pending)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: paul.keenan@bakermckenzie.com
         john.dodd@bakermckenzie.com
         reginald.sainvil@bakermckenzie.com

Blaire Cahn
Kevin Whittam
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4100
Facsimile: 212-310-1695
Email: blaire.cahn@bakermckenzie.com
         kevin.whittam@bakermckenzie.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MERCON COFFEE CORPORATION, *et al.*,[1] | Case No. 23-11945 |
|     Debtors. | |
| _____/ | |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Mercon Coffee Corporation (1844); Mercon B.V. (N/A); Mercon Brasil Comércio de Café Ltda. (N/A); Agro International Holding B.V. (N/A); Mercapital de Nicaragua, S.A. (N/A); Distribuidora de Granos de Nicaragua S.A. (N/A); Cisa Export S.A. (N/A); Comercial Internacional de Granos de Honduras, S.A. de C.V. (N/A); Mercon Guatemala, S.A. (N/A); Mercafe Vietnam LTD. (N/A); Comercial Internacional Exportadora, S.A. (N/A). The Debtors' mailing address is: 999 Ponce de Leon Blvd, Suite 910, Coral Gables, FL 33134

**MOTION OF DEBTORS FOR (I) AUTHORITY
TO (A) OBTAIN POSTPETITION FINANCING,
(B) USE CASH COLLATERAL, (C) GRANT LIENS AND
PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(D) GRANT ADEQUATE PROTECTION, (E) MODIFY THE AUTOMATIC
STAY, AND (F) SCHEDULE A FINAL HEARING AND (II) RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**")
hereby move the Court (the "**Motion**") , pursuant to sections 105, 361, 362, 363, 364, 507, and
552 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy
Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure
(the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-2, 9006-1, and 9013 of the Local Bankruptcy
Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") for (i) entry of an
interim order, substantially in the form annexed hereto as **Exhibit A** (the "**Interim Order**"), and
(ii) following the Final Hearing (as defined herein), entry of a final order granting the relief
requested herein (the "**Final Order**" and, together with the Interim DIP Order, the "**DIP Orders**"),
authorizing the Debtors to obtain postpetition financing (the "**DIP Financing**") as more fully set
forth below. In support of this Motion, the Debtors respectfully state as follows:

**Preliminary Statement**

1.      By this Motion, the Debtors seek authorization to obtain DIP Financing and
approval of their entry into a superpriority senior secured debtor-in-possession credit facility in an
aggregate principal amount of up to $40.0 million (the "**DIP Facility**"), provided by certain of the
Debtors' prepetition secured lenders (solely in such capacity, the "**DIP Lenders**") and agented by
Coöperatieve Rabobank U.A., New York Branch (solely in such capacity, the "**DIP Agent**"), with
an interim availability of $10.0 million under the proposed DIP Financing, subject to entry of the
Interim Order (as defined herein).

2.       As described herein, the DIP Financing provides the Debtors with necessary liquidity, on reasonable terms and customary budget covenants.  The relief sought in this Motion is critical for the Debtors to pay their ordinary-course operating expenses, finance these Chapter 11 Cases, and pursue the Liquidation Plan (as defined below). Importantly, the DIP Facility provides emergency liquidity to fund margin calls which cannot be forecasted in the Budget (as defined below).  In support of this Motion, the Debtors filed the following declarations with the Court:

- the *Declaration of Harve Light, Chief Restructuring Officer, (I) in Support of the Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "**First Day Declaration**"), filed contemporaneously herewith; and

- the *Declaration of Harve Light in Support of Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, Grant Liens and Provide Superpriority Administrative Expense Status, Grant Adequate Protection, (C) Modify the Automatic Stay, and (D) Schedule a Final Hearing and (II) Related Relief*, sworn to the date hereof (the "**Light Declaration**") and annexed hereto as **Exhibit B**.

3.       The Debtors' initial budget (the "**Initial DIP Budget**" and, any budget thereafter, a "**Budget**") reflecting the anticipated cash receipts, anticipated cash disbursements and anticipated net cash flow for each calendar week during the period from the Petition Date (as defined herein) through and including the end of the thirteenth week following the Petition Date is annexed hereto as **Exhibit C**.

4.       As of the Petition Date (defined below), the Debtors have less than $11.8 million in cash on hand and an aggregate principal amount of at least $362.47 million in outstanding funded debt obligations, and thus require immediate access to the DIP Financing and authority to use Cash Collateral (as defined herein) to ensure that they have sufficient liquidity to effect the liquidation plan (the "**Liquidation Plan**") agreed to with the DIP Agent and the majority DIP Lenders, and

operate their business during the consummation of such Liquidation Plan. The DIP Lenders have committed to provide the Debtors with DIP Financing in an aggregate amount of up to $40.0 million to finance these Chapter 11 Cases and support the Liquidation Plan.

5.    Several reasons justify the relief requested herein:

- The Debtors are entering chapter 11 with limited cash on hand and a large amount of outstanding liabilities. Immediate access to DIP Financing is therefore critical to ensure the Debtors' smooth entry into chapter 11 and their ability to prudently operate their business during the pendency of these Chapter 11 Cases, including consummating the Liquidation Plan.

- The Debtors, with assistance from experienced financial and legal advisors, engaged with their prepetition secured lenders—who have substantial experience with the Debtors and familiarity with their business—to solicit an initial proposal to provide debtor-in-possession financing.

- Negotiations with the proposed DIP Lenders were conducted at arm's length and were rigorous. The robust nature of this negotiation process is demonstrated by the terms of the DIP Facility. The Debtors believe the DIP Facility provides sufficient liquidity with customary budget restrictions, all at reasonable rates and market fees.

- The Debtors propose a limited, initial availability of $10.0 million on the terms set forth herein.

- Although the Debtors propose a dollar-for-dollar "roll-up" of $20.0 million of the Debtors' outstanding obligations under the Prepetition First Lien Credit Agreement (as defined herein) held by the DIP Lenders (the "**DIP Roll Up**"), the DIP Roll Up is subject to approval of the Final Order (as defined herein).

- The Debtors expect that vendors, customers, and their employees will be highly focused on whether these Chapter 11 Cases are appropriately funded to maximize the value to creditors of the Debtors' estate.

## Status of Case

6.      On the date hereof (the "**Petition Date**"), the Debtors commenced these cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7.      The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      No request has been made for the appointment of a trustee or examiner and a creditors' committee has not yet been appointed in these Chapter 11 Cases.

## Jurisdiction, Venue and Statutory Predicates

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.

10.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The Debtors confirm their consent, pursuant to Rule 7008 of the Bankruptcy Rules, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.     The statutory and other bases for the relief sought herein are sections 105(a), 363, 364, 553, 1107 and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004(h) and Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## Background

13.     The Debtors are a vertically integrated global supplier of green coffee, with roots tracing back over 150 years. As a leading coffee company, the Debtors have been involved in

virtually every aspect of the coffee supply chain, including farming, sourcing, milling, selling, and exporting coffee around the world. The Debtors also generate value across the supply chain by providing services such as financing (including coffee and consumer loans and mortgages), market information, and sustainability. The Debtors have contributed significantly to the development of coffee farming and financing—particularly in Nicaragua, where the Debtors led the production of Robusta coffee that spawned a new industry and created thousands of jobs.

14.      The Debtors have faced many headwinds in recent years, including the global impact of the COVID-19 pandemic and a decline in the market price for coffee. Labor shortages and supply chain disruptions caused by the COVID-19 pandemic resulted in highly volatile coffee prices, high transportation costs, logistical bottlenecks, and a detrimental delay or postponement of coffee orders. In response to the supply chain disruptions, the Debtors ramped up coffee inventory to meet coffee demand and avoid any delays in the import process. By January 2021, the Debtors had ramped up coffee inventory to 2.4 million bags in an attempt to meet demand, incurring bilateral debt through bilateral loans to finance this inventory. But an unexpected inversion in the coffee market in June 2021 caused immediate and near-term delivery prices to surpass those of future delivery, leaving the Debtors with excess coffee inventory that they then sold at a loss. An increase in interest rates in March 2022 caused the Debtors difficulties in meeting obligations under their bilateral loans. These financial difficulties were further exacerbated by the steep decline in global coffee prices beginning in October 2022, including the longest losing streak for coffee futures in nine years. These developments have impacted the financial performance of the Debtors' business and led to breaches under the Debtors' financing arrangements. After considering recent events and conducing a strategic review of its business, the Debtors decided to

exit the coffee business and intend to pursue an orderly sale of their assets and confirm a plan

providing for the orderly resolution of the Debtors' estates.

15.     A detailed factual background of the Debtors' business and operations, as well as

the events precipitating the commencement of these Chapter 11 Cases, is more fully set forth in

the First Day Declaration.

## **Relief Requested**

16.     By this Motion, pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2),

364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003(b),

6004(a), and 6004(h), and 9014, and Rule 4001-2 of the Local Bankruptcy Rules, the Debtors

request (i) entry of the Interim Order and (ii) following the Final Hearing (as defined herein), entry

of the Final Order and the relief as provided therein:

- authority to enter into the superpriority secured debtor-in-possession credit agreement, a substantially final form of which is attached to the Interim Order as Exhibit A (the "**DIP Credit Agreement**") and any other agreements, instruments, pledge agreements, security agreements, guarantees, security agreements and all related or ancillary documents and agreements (collectively, the "**DIP Documents**"), providing for a DIP Facility that will provide availability of up to $10.0 million on an interim basis (the "**Initial Availability**"), up to an additional $10.0 million on a final basis (together with the Initial Availability, the "**New Money DIP Loans**"), and a dollar-for-dollar "roll-up" of $20.0 million in respect of the Debtors' outstanding obligations under the Prepetition First Lien Credit Agreement held by the DIP Lenders (the "**Roll-Up DIP Loans**");

- authority to pay the following interest and fees: (a) cash or payment-in-kind interest at the Base Rate plus 9.00% *per annum* and (b) certain fees, including (i) an upfront fee of 3.00%, which shall be payable on the aggregate amount of available New Money DIP Loans (but not, for the avoidance of doubt, payable on the Roll-Up DIP Loans); (ii) an arrangement fee of 1.00%, which shall be payable on the aggregate amount of available New Money DIP Loans (but not, for the avoidance of doubt, payable on the Roll-Up DIP Loans); and (iii) an unused commitment fee of 0.50% per

annum of such DIP Lender's average daily unused commitment for each calendar month;

- grant, in each case subject to the Carve Out and certain other exceptions set forth in the Interim Order, security interests, liens and superpriority claims to the DIP Agent and the DIP Lenders to secure all obligations of the Debtors under and with respect to the DIP Facility in the order of priority and as provided in the DIP Orders (as defined here) and the DIP Documents;

- authority to use Cash Collateral within the meaning of section 363(a) and 363(c) of the Bankruptcy Code;

- approval of the form and manner of adequate protection to be provided to the Prepetition First Lien Secured Parties (as defined below), including (a) payment in kind interest at the non-default rate on account of obligations outstanding under the Prepetition First Lien Credit Agreement (as defined herein), *provided* that if the DIP Roll Up is approved by the Court pursuant to the Final Order, accrual of such interest shall cease and shall no longer be provided as adequate protection on the portion converted to the DIP Roll Up; (b) cash payment of the reasonable and documented costs and expenses of the Prepetition First Lien Secured Parties; (c) adequate protection liens and superpriority claims; (d) 506(c) and 552(b) waivers (in each case subject to entry of the Final Order); (e) stipulations as to the liens and claims held by such parties; (f) receipt of proceeds upon the sale of Prepetition Collateral, subject to the conditions set forth in the DIP Credit Agreement and (g) certain financial reporting and inspection requirements;

- modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders, subject to the Remedies Notice Period (as defined herein), as applicable;

- waiver of any applicable stay, including (to the extent applicable) under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

- scheduling a date for a hearing on this Motion to consider entry of the Final Order (the "**Final Hearing**") no later than 35 days after the Petition Date.

**Concise Statements Regarding DIP Facility**
**Pursuant to Bankruptcy Rule 4001(b) and Local Bankruptcy Rule 4001-2**[4]

17.     The following chart contains a summary of the material terms of the proposed DIP

Facility, together with references to the applicable sections of the relevant source documents, as

required by Bankruptcy Rule 4001(b)(1)(B) and 4001(c)(1)(B) and Local Bankruptcy Rule 4001-

2:

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | LOCATION |
|---|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Mercon B.V. ("**Parent**") and Mercon Coffee Corporation (collectively, the "**Borrowers**") | Preamble to the DIP Credit Agreement; Interim Order, p. 1 |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Comercial Internacional Exportadora, S.A., Comercial Internacional de Granos de Honduras S.A de C.V., Mercon Guatemala, S.A., Mercafe Vietnam Ltd., Mercon Brasil Comercio de Café Ltda., Mercapital de Nicaragua S.A., CISA Export, S.A., Distribuidora de Granos de Nicaragua S.A., and Agro International Holding B.V. (f/k/a Agro International Corp.). | Preamble to the DIP Credit Agreement; Interim Order, p. 1 |
| **Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Cooperatieve Rabobank U.A., New York Branch and the other lenders from time to time party to the DIP Credit Agreement which are also Prepetition First Lien Lenders | Preamble to the DIP Credit Agreement; Interim Order, p. 1 |
| **Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Cooperatieve Rabobank U.A. | Preamble to the DIP Credit Agreement; Interim Order, p. 1 |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Bankruptcy Rule 4001-2(a)(1), (3) and (7). | Up to $40.0 million, comprised of (1) a senior secured revolving credit facility of up to an aggregate maximum amount of $200 million, and (2) a dollar-for-dollar roll-up of $20.0 million in respect of outstanding loans under the Prepetition First Lien Credit Agreement.<br><br>Upon entry of the Interim DIP Order, an amount not to exceed $10.0 million shall be made available to the Borrowers, of which $7.5 million will be available to pay margin calls via a swingline loan, advanced at the DIP Agent's discretion. The full amount of the $20.0 million DIP commitment shall be made available to the Borrowers upon the entry of the Final | DIP Credit Agreement, §§ 2.1, 3.1 and 3.2; Interim Order, p. 1 |

|  | DIP Order and certain other customary conditions precedent under the DIP Credit Agreement, provided that $5.0 million of such amount will be available to pay margin calls via a swingline loan, advanced at the DIP Agent's discretion. The DIP Roll Up of $20 million shall occur on the date of the entry of the Final DIP Order, subject to the terms of the Final DIP Order. |  |
|---|---|---|
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(3) | DIP Loan Interest Rate: Base Rate + 9.0% per annum, payable, at the Borrowers' discretion, in cash or payment-in-kind subject to the limitations in the DIP Credit Agreement.<br><br>Default Rate: 2.0% per annum. | DIP Credit Agreement, §§ 2.8; Interim Order, p. 1 |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | Upfront fee of 3.0% on the New Money Loan (but not, for the avoidance of doubt, on the Roll-Up Loans), of which 1% is due upon entry of the Interim Order and the closing of the DIP Facility, and the remaining 2% is due upon entry of the Final Order.<br><br>Arrangement fee of 1.0% on the New Money Loan (but not, for the avoidance of doubt, on the Roll-Up Loans)<br><br>Commitment fee equal to 0.50% per annum of a DIP Lenders average daily unused commitment for each calendar month | DIP Credit Agreement, §§ 2.7; Interim Order, p. 1 |
| **Expenses** Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(16) | The Borrowers, jointly and severally, shall pay (a) all reasonable out-of-pocket expenses of the DIP Agent associated with the preparation, execution, delivery and administration of the DIP Loan Documents and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other expenses of external counsel (limited to one primary counsel and local counsel in each applicable jurisdiction and any specialty counsel), financial advisors and other specialty consultants) and (b) all out-of-pocket expenses of the DIP Agent and the DIP Lenders (including the fees, disbursements and other charges of external counsel in connection with the enforcement of the DIP Loan Documents or protection of their rights in connection therewith, without the need or requirement of filing any application with the Bankruptcy Court). | DIP Credit Agreement, §§ 9.1; Interim Order, p. 31 |
| **Superpriority Claim** Bankruptcy Rule 4001(b)(1)(b)(iv), 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii); Local Bankruptcy Rule 4001-2(a)(4) | The granting to the DIP Agent on behalf of the DIP Lenders the DIP Secured Parties of allowed superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code payable from and having recourse to any and all administrative expenses, subject only to the Carve Out. | DIP Credit Agreement, §§ 2.23; Interim Order, p. 7 |

| Use of DIP Proceeds Bankruptcy Rule 4001(b)(1)(B), 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(6)-(a)(7) | For (i) working capital and general corporate purposes of the DIP Loan Parties, (ii) to fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses) and the liquidation of the DIP Collateral and the collateral under the Prepetition First Lien Credit Agreement, and (iii) for fees and other expenses due and payable under the DIP Facility, in each case strictly in accordance with the Approved Budget (including Permitted Variances); provided that proceeds of swingline loans may only be used to pay margin calls. | DIP Credit Agreement, §§ 2.23 |
|---|---|---|
| **Maturity Date** Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(10) | The earliest to occur of (a) the date that is 6 months after the Petition Date, (b) the date that any sale of all or substantially all of the assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code is consummated; provided that the liquidation of the DIP Collateral in accordance with the Liquidation Plan shall not constitute the occurrence of the Maturity Date pursuant to this clause (b), (c) the date that is 35 days after the Petition Date if the Final DIP Order has not been entered by such date; (d) the date that a chapter 11 plan becomes effective in any of the Chapter 11 Cases; (e) the date of any acceleration of the Loans hereunder or the termination of the revolving credit commitments in accordance with the terms hereunder; and (f) the date that an order is entered by the Bankruptcy Court in any of the Chapter 11 Cases either (i) dismissing or converting to one or more cases under chapter 7 of the Bankruptcy Code or appointing or (ii) a chapter 11 trustee or an examiner with expanded powers (namely, beyond the powers set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), in each case, unless otherwise consented to by the Majority Lenders. | DIP Credit Agreement, Definition of "Maturity Date" |
| **Prepayments** Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(13) | Voluntary Prepayments: The New Money Loan may be prepaid in full by the Borrowers at any time without premium. Mandatory Prepayments: The DIP Facility will be subject to customary or appropriate (in the context of a proposed DIP Facility) mandatory prepayments, including payment of proceeds from asset sales, extraordinary receipts, and indebtedness not permitted to be incurred under the DIP Loan Documents, in each case on terms to be agreed in the DIP Credit Agreement. Asset Dispositions Waterfall: Subject to the terms of the DIP Orders and other than DIP Collateral that constitutes Bi-Lateral Prepetition Collateral, in the event that on or after the closing date (I) any Borrower or any DIP Loan Party shall make a disposition of all or substantially all of the DIP Collateral or a sale of all or substantially all of a business division or unit of any DIP Loan Party, (II) any Borrower or any DIP Loan Party shall make a | DIP Credit Agreement, §§ 2.5 and 2.6 |

disposition of DIP Collateral that is also not Shared First Lien Collateral, or (III) a recovery event in respect of DIP Collateral shall occur, in each case an amount equal to 100% of the net cash proceeds from such disposition or recovery event shall be applied by the Borrowers to prepay the loans in accordance with the DIP Documents.

In the event that on or after the closing date the Borrowers or any DIP Loan Party shall make a disposition of DIP Collateral that constitutes Shared First Lien Collateral, the net cash proceeds shall be distributed as follows:

(a) if the DIP Loan Parties' liquidity is less than the Minimum Balance, all such net cash proceeds shall be deposited into the DIP Deposit Account until the Minimum Balance is met (and such net cash proceeds may be used in strict accordance with the Approved Budget).

(b) if the DIP Loan Parties' liquidity exceeds the Minimum Balance, but is less than the Full Paydown Balance, (a) (x) for periods prior to the final order effective date, 25% of such net cash proceeds and (y) for periods on and after the final order effective date, the percentage identified in the Final DIP Order of such net cash proceeds, shall be deposited into the DIP Deposit Account and may be used in strict accordance with the Approved Budget; and (b) the remaining net cash proceeds shall be distributed in accordance with the Proceeds Waterfall.

(c) if the Loan Parties' liquidity exceeds the Full Paydown Balance, such net cash proceeds shall be distributed in accordance with the Proceeds Waterfall.

Notwithstanding anything to the contrary, (i) if the net cash proceeds of any disposition of DIP Collateral exceeds the amount required to be deposited in order for the DIP Loan Parties to meet the Minimum Balance, any excess beyond the amount required to be deposited to meet the Minimum Balance shall be applied in accordance with subclause (b) above, and (ii) the above provisions shall not apply to any Dispositions of DIP Collateral that constitutes Bi-Lateral Prepetition Collateral.

"Full Paydown Balance" means an amount needed to pay all obligations under the DIP Facility (assuming for such purpose that all revolving credit commitments have been drawn and are outstanding).

| | | |
|---|---|---|
| | "Minimum Balance" means $10,000,000.<br><br>"Proceeds Waterfall" means distribution of net cash proceeds as follows: (a) *first*, to the payment of any amounts outstanding under the DIP Facility until the DIP Facility has been paid in full; (b) *second*, to the payment of any amounts outstanding owed to the Prepetition Secured Parties as adequate protection pursuant to DIP Orders until all such amounts have been paid in full; and (c) *third*, any amounts remaining shall be deposited into the DIP Deposit Account and earmarked as reserves for the payment of (a) any future amounts owed to the Prepetition Secured Parties as adequate protection under the DIP Orders or (b) to the payment of any Prepetition Obligations outstanding under the Prepetition Facility Documents in accordance therewith. | |
| **Affirmative and Negative Covenants**<br>Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(8) | Affirmative Covenants: Customary or appropriate in the context of the proposed DIP Facility<br><br>Negative Covenants: Customary or appropriate in the context of the proposed DIP Facility, including, without limitation: negative covenants prohibiting incurrence of additional indebtedness and the incurrence of any lien not currently existing on assets and properties, and otherwise restricting fundamental changes, loans and other investments, restricted payments, debt prepayments (other than repayments of the DIP Facility), asset sales, sale and leasebacks, affiliate transactions, restrictive agreements, business activities, bankruptcy related matters, use of proceeds, amendments to material documents and fiscal year and accounting changes (subject to exceptions to be agreed); *provided* that (i) the covenants on the incurrence of additional indebtedness and incurrence of any lien not currently existing shall not allow the DIP Loan Parties to incur any debtor-in-possession financing (other than in connection with the DIP Facility) without the consent of the Requisite Lenders (as defined in the DIP Credit Agreement) and (ii) the negative covenants shall prohibit any asset purchases (including any purchases of coffee inventory) and shall prohibit any investments (including any advances to coffee growers) other than as permitted by the Approved Budget or otherwise consented to by the Requisite Lenders. | DIP Credit Agreement, §§ 6 and 7 |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(2) | The Initial Approved Budget is attached as Exhibit A to the Interim DIP Order.<br><br>Following the delivery of the Initial Approved Budget on the closing date, (i) by 5:00 p.m. New York City time on Wednesday December [▪], 2023 and by 5:00 p.m. New York City time on each Wednesday thereafter until payment in full of the obligations and all commitments have been terminated, | DIP Credit Agreement, §§ 5.2(r); Interim DIP Order, Exhibit A ¶ |

|  | the Borrowers' shall provide the DIP Agent with an updated cash flow forecast for the DIP Loan Parties, with line item detail of projected sales, disbursements, collections, net cash flow, and the other items set forth in the Initial Approved Budget for the then-upcoming thirteen (13) week period (or such shorter, or longer, period, as applicable, to coincide with the life of the case), in each case, in substance satisfactory to and approved by the DIP Agent (at the direction of the Majority Lenders) and substantially consistent with the form of the Initial Approved Budget delivered on the closing date (the "**Weekly Cash Flow Forecast**"); and (ii) by 5:00 p.m. New York City time beginning on Wednesday December [▪], 2023, and by 5:00 p.m. New York City time on each Wednesday thereafter, the Borrowers' shall provide the DIP Agent with a variance report (the "**Variance Report**") setting forth, on a consolidated basis, actual cumulative aggregate cash receipts, disbursements (including margin calls for informational purposes only, but excluding margin calls for purposes of variance testing) and cash flows of the DIP Loan Parties for the most recent four-week period (and for the first three test periods following the closing date, tested on a rolling 2-week, 3-week, and 4-week basis, respectively) covered by such Variance Report and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the Initial Approved Budget or the most recently Approved Budget delivered prior to such Variance Report on a weekly and cumulative basis for the period from the week commencing December [▪], 2023 through the end of the week in regard to which such variance report is being delivered, and each such Variance Report shall include explanations for all unfavorable variances in excess of 7.5% for the most recent period in regard to which such variance report is being delivered and shall be certified by the chief restructuring officer of the DIP Loan Parties; provided that, for the first four weeks following the closing date, variance is to be measured against the Initial Approved Budget.<br><br>"**Approved Budget**" means the Initial Approved Budget as amended and supplemented by any Weekly Cash Flow Forecast and approved by the DIP Agent acting at the direction of the Majority Lenders (as defined in the DIP Credit Agreement). |  |
| **Budget Covenant** Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(8) | The DIP Loan Parties will not, and will not permit any subsidiary thereof to, directly or indirectly, (a) use any cash, including the proceeds of any DIP Loans, in a manner or for a purpose other than those permitted under the DIP Credit Agreement or contemplated by the DIP Orders or the Approved Budget, (b) permit a disbursement causing any variance from the Approved Budget other than Permitted | DIP Credit Agreement, §§ 6.17 |

Variances without the prior written consent of the DIP Agent (at the direction of the Majority Lenders, in their sole discretion), (c) make any Prepetition Payment or application for authority to make any Prepetition Payment, other than those permitted by this Agreement, the DIP Orders or the Approved Budget, (d) make or commit to make payments to critical vendors (other than those critical vendors set forth in the DIP Orders or in the Approved Budget, in each case as approved in writing by the DIP Agent at the direction of the Majority Lenders) in respect of any prepetition amount in excess of the amount included in the Approved Budget, (e) determined as of each Test Date, permit the aggregate cumulative amount of actual cash disbursements (including Professional Costs, but excluding the payment of margin calls) as reported in the Variance Reports delivered with respect to the applicable Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period, (f) determined as of each Test Date, permit the aggregate cumulative amount of actual cash receipts (which shall exclude, for the avoidance of doubt, proceeds from borrowings of Loans) as reported in the Variance Reports delivered with respect to the applicable Testing Period to be less than, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount (which shall exclude professional costs and payment of margin calls and, for the avoidance of doubt, proceeds from borrowings of Loans) forecast in the Approved Budget for the same such period, (g) determined as of each Test Date, permit the aggregate cumulative amount of actual net cash flow (excluding professional costs and payment of margin calls and which shall exclude, for the avoidance of doubt, proceeds from borrowings of Loans) as reported in the Variance Reports delivered with respect to the applicable Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount (which shall exclude, for the avoidance of doubt, proceeds from borrowings of Loans) forecast in the Approved Budget for the same such period, and (h) determined as of each Test Date, permit the aggregate cumulative amount of actual cash disbursements of professional costs (excluding the fees and expenses of the chief commodities liquidation officer appointed by the DIP Loan Parties) as reported in the Variance Reports delivered with respect to the applicable Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period.

"**Permitted Variances**" means, with respect to determining compliance relating to the Borrowers' aggregate cumulative

| | cash receipts, cash disbursements and net cash flow, (i) all variances favorable to the Borrowers and their subsidiaries and (ii) an unfavorable aggregate cumulative variance of (x) for the first four Testing Periods following the closing date, less than 15% and (y) for each Testing Period thereafter, less than 10% thereafter (in each case, compared to the relevant amounts forecast for the same period in the Approved Budget); provided variances of professional fees shall be subject to a 10% variance.<br><br>"**Testing Period**" means (a) with respect to the first Variance Report delivered after the closing date, the two-week period ending on [\_\_], 2023; (b) with respect to the second Variance Report delivered after the closing date, the three-week period ending on [\_\_], 2023; and (c) with respect to each Variance Report delivered thereafter, the four-week period ending on the Friday immediately preceding the applicable test date. | |
|---|---|---|
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(10) | Usual and customary events of default for financings of this type, including, among other things:<br><br>1. payment failure; false representation or warranties; breach of certain covenants; invalidity of security and credit documents; cross-default; bankruptcy and insolvency (except for the Chapter 11 Cases); adverse judgement; condemnation; termination events (ERISA); multiemployer plan withdrawals (ERISA); change of control; breach of material contracts; sanctions; exceeding Permitted Variances under the Approved Budget, and<br><br>2. The occurrence of any of the following in any Chapter 11 Case:<br><br>    a.  the reversal, vacatur or stay of the effectiveness of the Interim DIP Order or the Final DIP Order except to the extent stayed or reversed within three (3) business days or without the express prior written consent of the DIP Agent (acting at the direction of the Majority Lenders) (and, other than, in respect of the Interim DIP Order, the entry of the Final DIP Order);<br><br>    b.  without the written consent of the DIP Agent acting at the direction of the Majority Lenders, (A) an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court ordering dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to chapter 7 cases, or appointment of a chapter 11 trustee or examiner with enlarged powers (i.e., powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Borrower or any guarantor in any of the Chapter 11 | DIP Credit Agreement, §§ 7.1(r)¶ |

Cases, which dismissal, conversion or appointment shall not have been reversed, stayed or vacated within three (3) business days, (B) an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court ordering termination of the exclusive period for the DIP Loan Parties to file a plan in any of the Chapter 11 Cases, or (C) the DIP Loan Parties shall seek or request (or support another party in the filing of) the entry of any order to effect any of the events described in subclause (A) of this clause (b);

c.  the entry by the Bankruptcy Court of an order granting relief from the automatic stay imposed by Section 362 of the Bankruptcy Code sought by any party that affects the DIP Loan Parties' property (including, without limitation, to permit foreclosure or enforcement on the DIP Collateral, but excluding any Shared Bi-Lateral Collateral (subject to such order containing customary protections (reasonably acceptable to the Majority Lenders) for the benefit of the DIP Lenders as junior lien holders) and the exercise of any set-off rights by any prepetition lender under its prepetition bi-lateral secured lending facility) and loans to growers held by any DIP Loan Party with a fair market value in excess of $500,000 without the written consent of the DIP Agent;

d.  five (5) business days after written notice to the DIP Loan Parties of the failure by the DIP Loan Parties to deliver to the DIP Agent any of the documents or other written information required to be delivered pursuant to the DIP Orders when due (during which time the DIP Loan Parties may cure) or any such documents or other written information shall contain a misrepresentation of a material fact when made so as to make the written information provided to the DIP Agent and the DIP Lenders, taken as a whole, materially misleading, provided, however, that this subclause (d) shall not operate to supersede an event of default, or otherwise extend any applicable cure or grace period;

e.  except as set forth herein, the failure by the Loan Parties to observe or perform any of the material terms or provisions contained in the DIP Orders in any respect adverse to the interests of the Lenders that is not cured within three (3) days; provided, however, that this subclause (e) shall not operate to

supersede an Event of Default, or otherwsie extend any applicable cure or grace period;

f.  the entry of an order of the Bankruptcy Court granting any lien on or security interest in any of the DIP Collateral (other than Shared Bi-Lateral Collateral) that is pari passu with or senior to the DIP Liens held by the DIP Agent (other than Shared Bi-Lateral Collateral) on or as security interests in the DIP Collateral, the First Lien Adequate Protection Liens (as defined in the DIP Orders), the DIP Superpriority Claims or the Prepetition First Lien Loan Liens (as defined in the DIP Order), or the DIP Loan Parties and any of their subsidiaries shall seek or request (or support another party in the filing of) the entry of any such order;

g.  the DIP Loan Parties' creating or permitting to exist any other superpriority claim which is pari passu with or senior to the claims of the DIP Agent and the Lenders, the First Lien Adequate Protection Liens (as defined in the DIP Orders), the DIP Superpriority Claims or the Prepetition First Lien Loan Liens (as defined in the DIP Orders), except for the Carve- Out and permitted liens;

h.  the Parent or any of its subsidiaries filing a pleading, or in any way support another party's pleading, seeking to modify or otherwise alter any of the terms and conditions set forth in any DIP Order in any respect adverse (other than with respect to any loans to growers held by any DIP Loan Party) to the interests of the Lenders without the prior written consent of the DIP Agent (acting at the direction of the Majority Lenders), such consent to be given in its sole discretion;

i.  the entry of an order of the Bankruptcy Court amending, supplementing or otherwise altering any of the terms and conditions set forth in any DIP Order (other than in respect to the Interim DIP Order, the entry of the Final DIP Order) in any respect adverse to the interests of the DIP Lenders without the prior written consent of the DIP Agent (acting at the direction of the Majority Lenders), such consent to be given in its sole discretion;

j.  the Parent or any of its subsidiaries using the proceeds of the DIP Facility for any item other than in compliance herein other than the Carve-Out (but subject to the limits on the Carve-Out contained

herein or in any DIP Order), or makes any Prepetition Payment (other than as contemplated by the DIP Orders or under the Approved Budget), in each case except as agreed in writing in advance by the DIP Agent (acting at the direction of the Majority Lenders);

k.  any of the DIP Loan Parties or their subsidiaries (or any party with the support of any of the DIP Loan Parties) shall file a plan in any of the Chapter 11 Cases that does not propose to indefeasibly repay the obligations in full in cash and terminate all revolving credit commitments, unless otherwise consented to by the DIP Agent (acting at the direction of the Majority Lenders) (such consent to be given in its sole discretion);

l.  the failure of the DIP Loan Parties to meet any of the milestones unless extended or waived by the prior written consent of the DIP Agent and the Majority Lenders except to the extent such failure is reasonably the result of Bankruptcy Court unavailability.

m.  any DIP Loan Party asserts a right of subrogation or contribution against any other DIP Loan Party prior to the date upon which all DIP Loans under the DIP Facility have been paid in full and all revolving credit commitments have been terminated;

n.  any DIP Loan Party shall seek to sell any of its assets that are DIP Collateral outside the ordinary course of business, unless (i) the proceeds of such sale are distributed in accordance with the DIP Credit Agreement and the DIP Orders,(ii) such sale is pursuant to bidding procedures approved by the DIP Agent (acting at the direction of the Majority Lenders) or (iii) such sale is in accordance with a liquidation plan agreed to by the Majority Lenders;

o.  the Parent or any of its subsidiaries (or any party with the support of any of the Parent or any of its Subsidiaries) shall challenge the validity or enforceability of any of the DIP Documents or the Prepetition First Lien Credit Agreement and associated documents;

p.  upon the consummation of a sale of all or substantially all of the DIP Loan Parties' assets pursuant to Section 363 of the Bankruptcy Code, unless (i) the proceeds of such sale are applied to

| | | |
|---|---|---|
| | indefeasibly satisfy in full in cash the obligations and all revolving credit commitments are terminated or (ii) such sale is consented to by the DIP Agent (acting at the direction of the Majority Lenders); or<br><br>q.  payment of or granting adequate protection with respect to any debt that was existing prior to the Petition Date other than as expressly provided in the DIP Orders or as consented to by the DIP Agent (acting at the direction of the Majority Lenders) or for any Shared Bi-Lateral Collateral (subject to certain protections for the benefit of the Lenders as junior lien holders and provided that any additional adequate protection in the form of a cash payment granted to a Bi-Lateral Lender not consented to by the Majority Lenders shall constitute an event of default). | |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi); Local Bankruptcy Rule 4001-2(a)(10) and (12) | a.  On or prior to December 11, 2023, the Interim Order shall have been entered by the Court;<br><br>b.  On or prior to January 10, 2024, the Final Order shall have been entered by the Court;<br><br>c.  No later than 45 calendar days after the Petition Date, the Court shall have entered an order setting the date (the "Bar Date") by which proofs of claim for general unsecured creditors must be filed;<br>d.<br>  No later than 80 calendar days following the Petition Date, the Bar Date shall have occurred;<br><br>e.  No later than 80 calendar days following the Petition Date: the DIP Loan Parties shall have provided the DIP Lenders and Prepetition First Lien Lenders a substantially complete draft of a plan of liquidation in form and substance acceptable to the DIP Lenders and the Prepetition First Lien Lenders in their sole discretion (the "Liquidating Plan");<br><br>f.  No later than 90 calendar days following the Petition Date: the DIP Loan Parties shall have filed with the Court the Liquidating Plan and accompanying motion seeking approval of the related disclosure statement and approval of solicitation procedures; and<br><br>g.  No later than 140 calendar days following the Petition Date: the Court shall have entered a final order confirming a Liquidating Plan acceptable to the | Interim DIP Order, p. 15 |

| | DIP Lenders and the Prepetition First Lien Lenders in their sole discretion. | |
|---|---|---|
| **Liens and Priorities** Bankruptcy Rule 4001(b)(1)(b)(iv) 4001(c)(1)(B)(i) | The DIP Facility shall be secured by: <br><br> a. subject to the Carve Out, pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Debtors, whether existing on the petition date of the Chapter 11 Cases (the "Petition Date") or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens and any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any; <br><br> b. subject to the Carve Out, pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected junior lien on all property of the Debtors that was subject to a valid, perfected and non-avoidable lien held by a lender under a prepetition bi-lateral secured lending facility (such lender, a "**Bi-Lateral Lender**") on or as of the Petition Date (the "**Bi-Lateral Prepetition Collateral**"); and <br><br> c. subject to the Carve Out, pursuant to Section 364(d)(1) of the Bankruptcy Code, a senior secured priming lien on all property of the Debtors that was subject to a valid, perfected and non-avoidable lien on or as of the Petition Date, excluding the Bi-Lateral Prepetition Collateral, but including, without limitation, the Prepetition First Lien Collateral. The property referenced in (i), (ii) and (iii) shall be referred to herein as the "**DIP Collateral**." Any DIP Collateral that is also Bi-Lateral Prepetition Collateral shall be referred to herein as "**Shared Bi-Lateral Collateral**". Any DIP Collateral of the type set forth in clause (iii) above that is also Prepetition First Lien Collateral shall be referred to herein as "**Shared First Lien Collateral**". | Interim DIP Order, p. 8 |
| **Carve-Out** Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(5) | The "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $300,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) all unpaid fees and expenses, solely | Interim DIP Order, p. 10 |

| | | |
|---|---|---|
| | to the extent payable or allowed at any time, whether by interim or final order of this Court, procedural order, or otherwise, but not to exceed the amounts set forth for each Professional Person (as defined below) in the Approved Budget (subject to any Permitted Variance) as of the delivery of the Carve Out Trigger Notice (as defined below) (collectively, the "**Allowed Professional Fees**") incurred by persons or firms (other than the fees and expenses of the CCLO) retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "**Committee Professionals**," and together with the Debtor Professionals, the "**Professional Persons**") at any time before the delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by this Court prior to or after delivery of such Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $750,000 incurred on and after the Termination Declaration Date (as defined below), to the extent allowed at any time, whether by interim or final order of this Court, procedural order or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors' counsel of record, the U.S. Trustee, and counsel to any Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility or if all commitments under the DIP Facility have been terminated and the DIP Loan Parties use of cash collateral has been terminated, stating that the Post-Carve Out Trigger Notice Cap has been invoked. | |
| **Challenge Period** Bankruptcy Rule 4001(c)(1)(B), 4001(c)(1)(B)(viii) | The Committee (to the extent one is appointed) shall have a maximum of sixty (60) calendar days from entry of the Final DIP Order and, to the extent a Committee is not appointed, any party in interest (other than the Debtors) shall have a maximum of seventy-five (75) calendar days from entry of the Final DIP Order to investigate and commence an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, and | Interim DIP Order ¶ 12 |

| | challenge the findings, the Debtors' stipulations, or any other stipulations contained in the DIP Orders | |
|---|---|---|
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii) and (viii) | The stipulations and admissions, including the debtors' stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent and validity of the claims, liens, and interests of the Prepetition First Lien Secured Parties contained in the Interim DIP Order shall be of full force and effect and forever binding upon each Debtor, each of their estates, and all creditors, interest holders, and other parties interested in these Cases and any successor cases., subject to the Challenge Period | Interim DIP Order ¶ 41 |
| **Waivers/ Modifications of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Modification of the automatic stay the extent necessary, to perform all acts and to make, execute, and deliver all instruments and documents and to pay all fees and expenses (including all fees and expenses owed to the DIP Secured Parties under the DIP Documents) that may be reasonably required or necessary for the DIP Loan Parties' performance of their obligations under the DIP Facility | Interim DIP Order ¶ 3 |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Each Borrower jointly and severally agrees to indemnify and hold harmless each secured party and each of their affiliates and their respective officers, directors, partners, employees, agents, and advisors (each, an "**Indemnified Party**") from and against any and all obligations, penalties, actions, judgments, suits, claims, damages, losses, liabilities, costs, expenses or disbursements (including, without limitation, reasonable attorneys' fees) that may be incurred by or asserted or awarded against any indemnified party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation, or proceeding or preparation of defense in connection therewith) the credit documents, any of the transactions contemplated herein or the actual or proposed use of the proceeds of the loans, including such indemnified party's own negligence, and including, without limitation, environmental liabilities, except to the extent such claim, damage, loss, liability, cost, or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such indemnified party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 9.2 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any loan party, its directors, shareholders or creditors or an indemnified party or any other person or any indemnified party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Each borrower agrees not to assert any claim against any secured party any of their affiliates, or any of their respective directors, officers, employees, attorneys, agents, and advisers, on any theory of liability, for special, indirect, consequential, or punitive damages arising out of or | DIP Credit Agreement, §§ 9.1; Interim Order, p. 31 |

| | | |
|---|---|---|
| | otherwise relating to the credit documents, any of the transactions contemplated herein or the actual or proposed use of the proceeds of the loans. Without prejudice to the survival of any other agreement of any loan party hereunder, the agreements and obligations of each borrower contained in this Section 9.2 shall survive the payment in full of the loans and all other amounts payable under this agreement. | |
| **Cross-Collateralization** Local Bankruptcy Rule 4001-2(a)(7) | Pursuant to Section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected junior security interest in and lien upon all property of the DIP Loan Parties that is subject to an Excepted Lien and/or a DIP Permitted Encumbrance, including, the Bi-lateral Collateral; provided that such junior liens shall be immediately junior to any Excepted Liens; provided, further, that, for the avoidance of doubt and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

"**Bi-lateral Collateral**" includes collateral under the Secured Bi-lateral Facilities (as defined below) consisting of certain advances made by the Debtors to coffee growers, certain fixed assets of the Debtors and certain accounts receivable of the Debtors that have been sold to a discounting bank | Interim DIP Order ¶ 8 |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt** Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(7) | Upon the entry of the Final DIP Order, the Roll-Up Loan shall occur, which Roll-Up Loan shall be deemed used to satisfy and discharge the corresponding portion of the outstanding loans held by such Lenders under the Prepetition First Lien Credit Agreement. | DIP Credit Agreement, §§ 2.1(d); Interim DIP Order - Opening Paragraph ¶ i |
| **Entities with Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B) | Prepetition First Lien Lenders, the Prepetition First Lien Agent, the DIP Agent and the DIP Lenders | Interim DIP Order ¶ iv |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to the entry of a Final Order, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Collateral (except to the extent of the Carve Out) or the DIP Secured Parties or (b) the Prepetition Collateral (except to the extent of the Carve Out) or the Prepetition First Lien Secured Parties, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code | Interim DIP Order ¶ 17 |

| | | |
|---|---|---|
| | or any similar principle of law or equity, without the prior written consent of the DIP Secured Parties, in the case of the DIP Collateral, and the Majority Prepetition Lenders, in the case of the Prepetition Collateral, and no such consent shall be implied from any other action, inact | |
| **Conditions to Closing Dates** Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(2) | Usual and customary for financings of this type, including, without limitation:<br><br>a.  the preparation, authorization, execution and delivery by the Borrowers and the Guarantors of loan and (as applicable) security and perfection documentation, borrowing notices, closing certificates, fee letters, organizational documents, evidence of authorization and good standing, lien searches, UCC filings and the Approved Budget in each case in customary form and acceptable to the DIP Agent and the Requisite Lenders;<br><br>b.  entry by the Bankruptcy Court of an order, in form and substance satisfactory to the Requisite Lenders, approving the DIP Facility on an interim basis, which shall include approval of the granting of the liens securing the DIP Facility to the DIP Agent;<br><br>c.  the representations and warranties of the Borrowers and Guarantors under the DIP Loan Documents shall be true and correct (subject to materiality qualifiers to be agreed);<br><br>d.  the Borrowers shall have given the Lenders three business days' notice of any requests for any drawing under the DIP Facility;<br><br>e.  no default under the DIP Loan Documents shall have occurred and be continuing or would result therefrom;<br><br>f.  the Borrowers shall have appointed an officer to advise the Chief Restructuring Officer on the liquidation of the DIP Collateral, which the identity and scope of responsibilities of such officer shall be mutually acceptable to the Requisite Lenders and the Debtors<br><br>g.  other than the Interim DIP Orders, the DIP Loan Parties shall have received all needed third party consents, licenses and approvals in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents, and shall have all consents, licenses and approvals required in | DIP Credit Agreement, §§ 3.1 and 3.1 |

|  | connection with the continued operation of the Loan Parties; |  |
|  | h. other than the Chapter 11 Cases and the Cross-Border Proceedings, no Material Adverse Change shall have occurred since the Petition Date; |  |
|  | i. all material motions and other material documents to be filed with and submitted to the Bankruptcy Court related to the DIP Facility and the approval thereof shall be in form and substance reasonably satisfactory to the DIP Agent and the Requisite Lenders; and |  |
|  | j. compliance with U.S. PATRIOT Act and beneficial ownership laws |  |

## **Prepetition Indebtedness**

18.     As described in the First Day Declarations, the Debtors have a complicated capital structure involving approximately twenty six (26) different debt facilities and debt obligations (the "**Mercon Credit Facilities**"). The Mercon Credit Facilities are both secured and unsecured and are guaranteed by certain of the Debtors. There is no cross collateralization and no intercreditor agreement among the Mercon Credit Facilities. As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $363,339,800.00 in United Stated dollars ("**USD**") or USD-equivalent debt obligations, which amount consisted of not less than (i) $203,532,929.89 in secured borrowings under the Prepetition First Lien Credit Facility (as defined herein); (ii) $25,000,000.00 in secured borrowings under the 2022 FMO Facility (as defined herein); (iii) $2,448,657.00 in secured borrowings under the 2016 BFP Facility (as defined herein); (iv) $500,000.00 in secured borrowings under the 2018 BFP Facility (as defined herein); (v) $4,000,000.00 in secured borrowings under the 2020 BFP Facility (as defined herein); (vi) $3,333,802.00 in secured borrowings under the 2019 FMO Facility (as defined herein); (vii) $7,500,000.00 in secured borrowings under the Starbucks Coffee Facility (as defined herein); (viii)

$1,474,419.24 in unsecured borrowings under the BAC Nicaragua Facility (as defined herein); (ix) $2,000,000.00 in unsecured borrowings under the BDF Facility (as defined herein); (x) $3,500,000.00 in unsecured borrowings under the BICSA Facility (as defined herein); (xi) $19,490,776.00 in unsecured borrowings under the Lafise Nicaragua Facility (as defined herein); (xii) $3,000,000.00 in unsecured borrowings under the BAC Panama Facility (as defined herein); (xiii) $4,000,000.00 in unsecured borrowings under the CFC Facility (as defined herein); (xiv) $13,000,000.00 in unsecured borrowings under the London Forfaiting Notes (as defined herein); (xv) $1,207,729.00 in unsecured borrowings under the ABC Bank Facility (as defined herein); (xvi) $3,000,000.00 in unsecured borrowings under the Banco Safra Facility (as defined herein); (xvii) $800,000.00 in unsecured borrowings under the Banco Santander Facility (as defined herein); (xviii) $9,000,000.00 in unsecured borrowings under the Banco Agromercantil Facility (as defined herein); (xix) $3,640.00 of unsecured indebtedness owing under the ABC Bank Non-Deliverable Forward Contract (as defined herein); (xx) $(262,031.00) of unsecured indebtedness owing under the Banco Santander Non-Deliverable Forward Contract (as defined herein); (xxi) $0.00 of unsecured indebtedness owing under the Bank of America Non-Deliverable Forward Contract (as defined herein); (xxii) $(22,974.00) of unsecured indebtedness owing under the Voiter Non-Deliverable Forward Contract (as defined herein); (xxiii) $0.00 of unsecured indebtedness owing under the Marex Non-Deliverable Forward Contract (as defined herein); (xxiv) $5,000,000.00 in subordinated debt borrowings under the 2018 FMO Facility (as defined herein); (xxv) $8,900,000.00 in subordinated debt borrowings under the Mercon Ventures Facility (as defined herein); (xxvi) $2,000,000.00 in subordinated debt borrowings under the Horizon Overseas Facility (as defined herein); (xxvii) $20,000,000.00 in subordinated debt borrowings under the Stichting Facility (as defined herein); and (xxviii) $20,000,000.00 in subordinated debt borrowings under the

Crowdout Facility (as defined herein). The Debtors financing obligations are described in greater detail below.

**Secured Debt Obligation*s***

19.    <u>Prepetition First Lien Credit Facility</u>. Debtors, Mercon B.V., a Dutch private company with limited liability, registered with the Dutch commercial register under number 61741140 ("**Mercon B.V.**"), and Mercon Coffee Corporation, a New York corporation ("**Mercon US**"), as borrowers, and the other Debtors, as guarantors, are party to that certain *Third Amended and Restated Credit Agreement*, dated as of June 30, 2023 (as amended, the "**Prepetition First Lien Credit Agreement**"), with the lenders party thereto from time to time (each, a "**Prepetition First Lien Lender**" and collectively, the "**Prepetition First Lien Lenders**"), and Coöperatieve Rabobank U.A., New York Branch, as administrative agent, collateral agent, swingline lender and issuing lender (the "**Prepetition First Lien Agent**" and, collectively with the Prepetition First Lien Lenders, the "**Prepetition First Lien Secured Parties**"). The Prepetition First Lien Credit Agreement provides for revolving credit commitments in an aggregate principal amount of up to $325,000,000.00, maturing on June 28, 2024 (as amended, the "**Prepetition First Lien Credit Facility**"). Proceeds of the loans were used to refinance existing debt and to pay for general working capital expenses of the loan parties in the ordinary course of business. As of the Petition Date, the aggregate amount outstanding under the Prepetition First Lien Credit Facility is approximately $203,532,929.89 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

20.    The obligations under the Prepetition First Lien Credit Facility are guaranteed by certain subsidiaries of Mercon B.V. and are secured in accordance with the terms of certain local law security documents and that certain Amended and Restated Security Agreement, dated as of November 30, 2017 (as amended, restated, amended and restated, supplemented, or otherwise

modified from time to time, the "**Prepetition First Lien Security Agreement**"), by among Mercon B.V., Mercon US, Comercial Internacional Exportadora Sociedad Anónima, a corporation existing under the laws of Nicaragua ("**CISA**"), Comercial Internacional de Granos de Honduras, Sociedad Anonima de Capital Variable, existing under the laws of Honduras ("**CIGRAH**"), Mercon Guatemala S.A., a sociedad anonima, existing under the laws of Guatemala ("**Mercon Guatemala**"), Mercafe Vietnam Ltd., a corporation existing under the laws of the British Virgin Islands ("**Mercafe Vietnam BVI**"), Mercon Brasil Comercio de Café Ltda., a limited liability company existing under the laws of Brazil ("**Mercon Brazil**"), Mercapital de Nicaragua S.A., a corporation existing under the laws of Nicaragua ("**Mercapital Nicaragua**"), CISA Export S.A., a corporation existing under the laws of the British Virgin Islands ("**Cisa Export**"), Distribuidora de Granos de Nicaragua S.A., a corporation existing under the laws of Nicaragua ("**Digranisa**") and Agro International Holding B.V. (f/k/a Agro International Corp.) a corporation existing under the laws of Curacao ("**AIC**" and, together with Mercon B.V., Mercon US, CISA, CIGRAH, Mercon Guatemala, Mercafe Vietnam BVI, Mercon Brazil, Mercapital Nicaragua and Cisa Export, each a "**Grantor**" and, collectively the "**Grantors**"), and the Prepetition First Lien Agent. Pursuant to the Prepetition First Lien Security Agreement, each Grantor granted a first priority lien on (i) each and every contract, contract rights and contract documents associated with such contract granting a security to such Grantor; (ii) each and every receivable; (iii) all letter-of-credit rights; (iv) all inventory; (v) all equipment; (vi) all general intangibles; (vii) all investment property; (viii) all bills of lading, dock warrants, dock receipts, warehouse receipts or orders for the delivery of goods, instruments and chattel paper; (ix) all fixtures; (x) all commodities accounts; (xi) all deposit accounts; (xii) all securities accounts; (xiii) any license or permit issued by any governmental authority now or hereafter held by such Grantor; (xiv) any right to receive payment under any hedging arrangement in connection with a termination

thereof; (xv) all policies of insurance and insurance contracts and proceeds thereof; (xvi) any and all liens and security interest (together with the documents evidencing such security interest) granted to any Grantor by an obligor to secure such obligor's obligations owing under any instrument, chattel paper or contract which are pledged pursuant to the Prepetition First Lien Security Agreement; (xvii) any and all guaranties by any person to the benefit of such Grantor; (xviii) all other personal property, goods instruments, chattel paper, documents, fixtures, credit claims, demands and assets of such Grantor; and (xix) any and all additions, accessions and improvements to, all substitutions and replacements for and all products and proceeds of or derived from the foregoing items mentioned, but excluding certain specified excluded property (collectively, the "**Prepetition Collateral**").

21.    *2022 FMO Facility*. Debtors, CISA, as borrower, and Mercon B.V., Mercon US, Mercapital Nicaragua, Mercon Brasil and Mercon Guatemala, as guarantors, are party to that certain *Term Facility Agreement*, dated as of May 19, 2022 (the "**2022 FMO Credit Agreement**"), with Nederlandse Financierings- Maatschappij Voor Ontwikkelingslanden N.V. ("**FMO**"), as lender. The 2022 FMO Credit Agreement provides for a USD term facility in an aggregate principal amount of $25,000,000.00, maturing on March 15, 2029 (the "**2022 FMO Facility**"). The 2022 FMO Facility is secured by certain real property of CISA. Proceeds of the loan were used to prepay the entire outstanding balance owed in respect of certain existing credit facilities with FMO. As of the Petition Date, the aggregate amount outstanding under the 2022 FMO Facility is approximately $25,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

22.    The obligations under the 2022 FMO Facility are guaranteed by CISA, Mercon B.V., Mercon US, Mercapital Nicaragua, Mercon Brazil and Mercon Guatemala (each a "**2022 FMO Grantor**" and, collectively the "**2022 FMO Grantors**") and are secured in accordance with the

terms of that certain *Contrato de Constitucion de Prenda Mercantil Sobre Contrato de Arrendamiento* dated as of October 12, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**FMO Commercial Pledge**"), between CISA and FMO as lender. Pursuant to the FMO Commercial Pledge, CISA granted a first priority lien on (i) one or more mortgage agreements over the improvements made at the San Carlos mill, located at Comarca El Guayacan, Kilometer 120 on the Sebaco-Matagalpa road, Department of Matagalpa, Republic of Nicaragua, property of CISA; (ii) one or more pledge agreements over lease agreements executed by CISA, particularly over the lease of the property where the San Carlos mill is located; and (iii) one or more assignments of insurance policies contracted by CISA in favor of FMO.

23.     *2016 BFP Facility*. Debtors, Digranisa, as borrower, and CISA, as guarantor, are party to that certain *Credit Agreement* (*Escritura Publica Numero Doscientos Veintidos (No. 222). Otorgamiento de Linea de Credito Garantizado con Hipoteca, Prenda y Fianza Solidaria*), dated as of November 4, 2016 (the "**2016 BFP Credit Agreement**"), with Banco de Fomento a la Producción ("**BFP**"), as lender. The 2016 BFP Credit Agreement provides for a USD term facility in an aggregate principal amount of $6,700,000.00, maturing on November 4, 2026 (the "**2016 BFP Facility**"). The 2016 BFP Facility is secured by certain fixed and biological assets. Proceeds of the loan were used for the investment plan presented by the loan parties. As of the Petition Date, the aggregate amount outstanding under the 2016 BFP Facility is approximately $2,448,657.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

24.     The obligations under the 2016 BFP Facility are guaranteed by CISA in favor of BFP, as lender and are secured in accordance with the terms of the 2016 BFP Credit Agreement.

Pursuant to the 2016 BFP Credit Agreement, CISA granted a first priority lien on certain fixed and biological assets.

25.    *2018 BFP Facility*. Debtors, Mercapital Nicaragua, as borrower, and CISA, as guarantor are party to that certain *Credit Agreement* (*Escritura Publica Numero Treinta y Siete (No. 37). Contrato de Línea de Crédito no Revolvente con Obligación de Constitución de Garantía Mobiliaria Sobre Cartera de Crédito y Fianza Solidaria*), dated as of April 4, 2018 (the "**2018 BFP Credit Agreement**"), with BFP, as lender. The 2018 BFP Credit Agreement provides for a credit facility in an aggregate principal amount of $1,000,000.00, maturing April 4, 2028 (the "**2018 BFP Facility**"). The 2018 BFP Facility is a fixed assets secured facility. Proceeds of the loan were used for working capital for the business of coffee production. As of the Petition Date, the aggregate amount outstanding under the 2018 BFP Facility is approximately $500,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

26.    The obligations under the 2018 BFP Facility are guaranteed by CISA in favor of BFP, as lender and are secured in accordance with the terms of the 2018 BFP Credit Agreement. Pursuant to the 2018 BFP Credit Agreement, CISA granted a first priority lien on mortgages of certain real property of CISA, located in Nicaragua.

27.    *2020 BFP Facility*. Debtors, Mercapital Nicaragua, as borrower, and CISA, as guarantor, are party to that certain *Credit Agreement* (*Escritura Publica Numero Noventa y Nueve (No. 99). Otorgamiento de Línea de Crédito Revolvente Garantizado con Fianza Solidaria y con Obligación de Constituir Garantía Mobiliaria Sobre Cartera de Crédito*), dated as of November 27, 2020 (the "**2020 BFP Credit Agreement**"), with BFP, as lender. The 2020 BFP Credit Agreement provides for a revolving credit facility in an aggregate principal amount of $5,000,000.00, maturing November 27, 2030 (the "**2020 BFP Facility**"). The 2020 BFP Facility is secured by certain fixed

assets. Proceeds of the loan were used for working capital for the business of coffee production. As of the Petition Date, the aggregate amount outstanding under the 2020 BFP Facility is approximately $4,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

28.     The obligations under the 2020 BFP Facility are guaranteed by CISA in favor of BFP, as lender and are secured in accordance with the terms of the 2020 BFP Credit Agreement. Pursuant to the 2020 BFP Credit Agreement, CISA granted a first priority lien on mortgages of certain real property, located in Nicaragua.

29.     *2019 FMO Facility*. Debtors, Mercapital Nicaragua, as borrower, and Mercon B.V., Mercon US, and CISA, as guarantors, are party to that certain *Term Facility Agreement,* dated as of November 1, 2019 (the "**2019 FMO Credit Agreement**"), with FMO, as lender. The 2019 FMO Facility provides for a credit facility in an aggregate principal amount of $5,000,000.00, maturing June 15, 2025 (the "**2019 FMO Facility**"). The 2019 FMO Facility is secured by certain assets of the Debtors. Proceeds of the loan were used to make loans to coffee producers in Nicaragua. As of the Petition Date, the aggregate amount outstanding under the 2019 FMO Facility is approximately $3,333,802.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

30.     The obligations under the 2019 FMO Facility are guaranteed by Mercon B.V., Mercon US and CISA (each a "**2019 FMO Grantor**" and, collectively the "**2019 FMO Grantors**") in favor of FMO, as lender and are secured in accordance with the terms of the 2019 FMO Credit Agreement on certain assets of the Debtors.

31.     *Starbucks Coffee Facility*. Debtors, Mercon US, as borrower and Mercon B.V., as guarantor are party to that certain *Third Amendment to Amended and Restated Credit Agreement*, dated as of May 12, 2020 (the "**Starbucks Coffee Credit Agreement**"), with Starbucks Coffee

Trading Company Sarl, as lender. The Starbucks Coffee Credit Agreement provides for a credit facility in an aggregate principal amount of $7,500,000.00, maturing May 11, 2029 (the "**Starbucks Coffee Facility**" and, collectively with the 2022 FMO Facility, 2016 BFP Facility, 2018 BFP Facility, 2020 BFP Facility and 2019 FMO Facility, the "**Secured Bi-Lateral Credit Facilities**"). The Starbucks Coffee Facility is a secured facility. Proceeds of the loan were used to make advances to farmers. As of the Petition Date, the aggregate amount outstanding under the Starbucks Coffee Facility is approximately $7,500,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

## Unsecured Debt Obligations

32.     _BAC Nicaragua Facility_. Debtor, CISA, as borrower, is a party to that certain _Revolving Credit Facility_ (_Contrato de Apertura de Línea de Crédito Revolvente No Comprometida en Cuenta Corriente_), dated as of September 3, 2020 (the "**BAC Nicaragua Credit Agreement**"), with Banco de America Central, S.A., as lender. The BAC Nicaragua Credit Agreement provides for a revolving credit facility in an aggregate principal amount of $2,000,000.00, maturing November 2, 2023 (the "**BAC Nicaragua Facility**"). The BAC Nicaragua Facility is an unsecured facility. Proceeds of the loan were used for working capital expenses. As of the Petition Date, the aggregate amount outstanding under the BAC Nicaragua Facility is approximately $1,474,419.24 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

33.     _BDF Facility_. Debtor, CISA, as borrower, is a party to that certain _Credit Agreement_ (_Credito Abierto en Cuenta Corriente con Limitacion de Suma_), dated as of May 9, 2022 (the "**BDF Credit Agreement**"), with Banco de Finanzas, S.A., as lender. The BDF Credit Agreement provides for a revolving credit facility in an aggregate principal amount of $2,000,000.00, maturing April 30, 2026 (the "**BDF Facility**"). The BDF Facility is an unsecured facility. Proceeds of the loan were

used for coffee gathering expenses. As of the Petition Date, the aggregate amount outstanding under the BDF Facility is approximately $2,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

34.    *BICSA Facility*. Debtors, CISA, as borrower and Mercon B.V., as guarantor, are party to that certain *Revolving Credit Facility* (*Contrato de Apertura de Line de Crédito Revolvente*), dated as of February, 25 2021 (the "**BICSA Credit Agreement**"), with Banco Internacional de Costa Rica, S.A., as lender. The BICSA Credit Agreement provides for a revolving credit facility in an aggregate principal amount of $4,500,000.00, maturing July 30, 2025 (the "**BICSA Facility**"). The BICSA Facility is an unsecured facility. Proceeds of the loan were used for the purchase of raw material (pre-exportation of coffee). As of the Petition Date, the aggregate amount outstanding under the BICSA Facility is approximately $3,090,776.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

35.    *Lafise Nicaragua Facility*. Debtors, CISA, as borrower, and Mercon B.V., as guarantor, are party to that certain *Credit Agreement*, dated as of February 15, 2022 (the "**Lafise Nicaragua Credit Agreement**"), with Banco Lafise Bancentro, S.A., as lender. The Lafise Nicaragua Credit Agreement provides for a revolving credit facility in an aggregate principal amount of $26,000,000.00 (the "**Lafise Nicaragua Facility**"). The Lafise Nicaragua Facility is an unsecured facility. Proceeds of the loan were used for working capital expenses. As of the Petition Date, the aggregate amount outstanding under the Lafise Nicaragua Facility is approximately $19,490,776.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses, which is composed of that certain (i) promissory note, dated April 25, 2023, with an outstanding principal amount of $3,000,000.00 and maturing on October 25, 2023, (ii) promissory note, dated July 11, 2023, with an outstanding principal amount of $4,400,000.00 and maturing on January 11, 2024, (iii) promissory

note, dated August 17, 2023, with an outstanding principal amount of $1,500,000.00 and maturing

on February 17, 2024, (iv) promissory note, dated August 25, 2023, with an outstanding principal

amount of $3,500,000.00 and maturing on October 9, 2023; and (v) promissory note, dated

September 8, 2023, with an outstanding principal amount of $7,500,000.00 and maturing on October

9, 2023.

36.    *BAC Panama Facility*. Debtor, Mercon B.V., as borrower, is a party to that certain

*Revolving Credit Facility*, dated as of March 21, 2022 (the "**BAC Panama Credit Agreement**"),

with BAC International Bank Inc., as lender. The BAC Panama Credit Agreement provides for a

revolving credit facility in an aggregate principal amount of $3,000,000.00 (the "**BAC Panama**

**Facility**"). The BAC Panama Facility is an unsecured facility. Proceeds of the loan were used for

payment of vendors and working capital loans. As of the Petition Date, the aggregate amount

outstanding under the BAC Panama Facility is approximately $3,000,000.00 in unpaid principal,

plus accrued and unpaid interest, fees, and other expenses.

37.    *CFC Facility*. Debtors, Mercon B.V., as borrower, CISA, CIGRAH, Mercon

Guatemala, Mercafe Vietnam, Mercon Brazil, Mercapital Nicaragua, CISA Export, Digranisa, AIC,

and Mercon US, as guarantors, are party to that certain *USD 5,000,000 Working Capital Loan*

*Agreement*, dated as of May 24, 2022 (the "**CFC Credit Agreement**"), with Common Fund for

Commodities, as lender. The CFC Credit Agreement provides for a working capital loan in an

aggregate principal amount of $5,000,000.00 (the "**CFC Facility**"). The CFC Facility is an

unsecured facility. Proceeds of the loan were used for working capital expenses for coffee trading in

Brazil, Guatemala, Honduras and Nicaragua. As of the Petition Date, the aggregate amount

outstanding under the CFC Facility is approximately $4,000,000.00 in unpaid principal, plus

accrued and unpaid interest, fees, and other expenses.

38.    _London Forfaiting Notes_. Debtor, Mercon B.V., is a party to certain _Promissory Notes_, dated as of June 8, 2022, and December 8, 2022, respectively, with London Forfaiting Company Ltd., as issuer. The London Forfaiting Notes provides for promissory notes in the principal amounts of $3,000,000.00 and $10,000,000.00, respectively, each maturing on December 15, 2023 (the "**London Forfaiting Notes**"). The London Forfaiting Notes are unsecured. The London Forfaiting Notes were issued to finance the purchase, processing and sale of green coffee beans. As of the Petition Date, the aggregate amount outstanding under the London Forfaiting Notes is approximately $13,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

39.    _ABC Bank Facility_. Debtor, Mercon Brazil, is a party to certain _Foreign Exchange Agreement No.314235737_, dated as of August 4, 2022 (the "**ABC Bank Agreement**"), with ABC Brasil S.A. ("**ABC Bank**"), as financial institution/bank. The ABC Bank Agreement provides for the purchase of Brazilian Reais in the principal amount of USD $1,089,866.16, converted at the exchange rate of USD $1.0000/ R $ 5.2300, maturing January 31, 2023 (the "**ABC Bank Facility**"). The ABC Bank Facility is an unsecured facility. Proceeds were used for the exports of goods/ merchandise. As of the Petition Date, the aggregate amount outstanding under the ABC Bank Facility is approximately $1,207,729.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

40.    _Banco Safra Facility_. Debtor, Mercon Brazil, as borrower, is a party to certain _Foreign Exchange Agreement No. 318242573_, dated as of September 8, 2022 (the "**Banco Safra Agreement**"), with Banco Safra SA, as financial institution/bank. The Banco Safra Agreement provides for the purchase of Brazilian Reais in the principal amount of USD $3,000,000.00, converted at the exchange rate of USD $1.0000/ R $ 5.2010 (the "**Banco Safra Facility**"). The

Banco Safra Facility is an unsecured facility. Proceeds were used for the exports of goods/ merchandise. As of the Petition Date, the aggregate amount outstanding under the Banco Safra Facility is approximately $3,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

41.    _Banco Santander Facility_. Debtor, Mercon Brazil, as borrower, is a party to that certain Credit Agreement, dated as of September 21, 2023 (the "**Banco Santander Agreement**"), with Banco Santander ("**Banco Santander**"), as financial institution/bank. The Banco Santander Agreement provides for a credit facility in an aggregate principal amount of $800,000.00, maturing September 16, 2024 (the "**Banco Santander Facility**"). The Banco Santander Facility is an unsecured facility. Proceeds of the loan were used for the export of goods. As of the Petition Date, the aggregate amount outstanding under the Banco Santander Facility is approximately $800,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

42.    _Banco Agromercantil Facility_. Debtors, Mercon Guatemala, as borrower, and Mercon B.V., as guarantor, are party to that certain _Revolving Credit Facility_, dated as of December 17, 2021 (the "**Banco Agromercantil Agreement**"), with Banco Agromercantil de Guatemala, SA ("**Banco Agromercantil**"), as lender. The Bani Agromercantil Agreement provides for a revolving credit facility in an aggregate principal amount of $9,000,000.00, maturing December 14, 2024 (the "**Banco Agromercantil Facility**" and, collectively with the BAC Nicaragua Facility, the BDF Facility, the BICSA Facility, the Lafise Nicaragua Facility, the BAC Panama Facility, the CFC Facility, the London Forfaiting Notes, the ABC Bank Facility, the Banco Safra Facility and the Banco Santander Facility, the "**Unsecured Bi-Lateral Credit Facilities**"). The Banco Agromercantil Facility is an unsecured facility. Proceeds of the loan were used for working capital expenses. As of the Petition Date, the aggregate amount outstanding under the Banco Agromercantil

Facility is approximately $9,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses, which composed of that certain (i) promissory note, dated June 9, 2023, with an outstanding principal amount of $3,000,000.00 and maturing on March 5, 2024, and (ii) promissory note, dated June 20, 2023, with an outstanding principal amount of $6,000,000.00 and maturing on June 16, 2024.

43.    *Unsecured Non Deliverable Forwards*. Debtor, Mercon Brazil, has unsecured indebtedness in the amount of (i) $3,640.00 owing under that certain non-deliverable forward contract, dated as of September 27, 2021 (the "**ABC Bank Non-Deliverable Forward Contract**"), between Mercon Brazil and ABC Bank, (ii) $(262,031.00) owing under that certain non-deliverable forward contract, dated as of August 9, 2021 (the "**Banco Santander Non-Deliverable Forward Contract**"), between, Mercon Brazil and Banco Santander, (iii) $0.00 of unsecured indebtedness owing under the non-deliverable forward contract, dated as of October 7, 2015 (the "**Bank of America Non-Deliverable Forward Contract**"), between, Mercon Brazil and Bank of America; (iv) $(22,974.00) of unsecured indebtedness owing under the non-deliverable forward contract, dated as of September 8, 2022 (the "**Voiter Non-Deliverable Forward Contract**"), between, Mercon Brazil and Banco Voiter S.A., and (v) $0.00 of unsecured indebtedness owing under the non-deliverable forward contract, dated as of June 10, 2020 (the "**Marex Non-Deliverable Forward Contract**" and, the ABC Bank Non-Deliverable Forward Contract, the Banco Santander Non-Deliverable Forward Contract, the Bank of America Non-Deliverable Forward Contract and the Voiter Non-Deliverable Forward Contract, the "**Unsecured Non Deliverable Forwards Obligations**"), between, Mercon Brazil and Marex Financial.

**Subordinated Debt Obligations**

44.     *2018 FMO Facility*. Debtors, Mercapital Nicaragua, as borrower, and Mercon B.V.,

Mercon US, and CISA, as guarantors, are party to that certain *Term Facility Agreement- Micro and*

*Small Enterprise Fund* ("**MASSIF**"), dated as of December 17, 2018 (the "**2018 FMO Credit**

**Agreement**"), with FMO as lender. The 2018 FMO Credit Agreement provides for a USD term

facility in an aggregate principal amount of $5,000,000.00, maturing on June 15, 2025 (the "**2018**

**FMO Facility**"). The 2018 FMO Facility is subordinated to the obligations of the Debtors under the

Prepetition First Lien Credit Facility. Proceeds of the loan were used to make loans to eligible

growers in line with Mercapital Nicaragua's credit policy. As of the Petition Date, the aggregate

amount outstanding under the 2018 FMO Facility is approximately $5,000,000.00 in unpaid

principal, plus accrued and unpaid interest, fees, and other expenses.

45.     *Mercon Ventures Facility* Debtor, Mercon B.V., as borrower, is a party to that

certain Uncommitted Credit Agreement, dated as of November 1, 2021 (the "**Mercon Ventures**

**Credit Agreement**"), with Mercon Ventures, S.A., as lender. The Mercon Ventures Credit

Agreement provides for a USD loan in an aggregate principal amount of $8,900,000.00, maturing

December 31, 2024 (the "**Mercon Ventures Facility**"). The Mercon Ventures Facility is

subordinated to the obligations of the Debtors under the Prepetition First Lien Credit Facility. As of

the Petition Date, the aggregate amount outstanding under the Mercon Ventures Facility is

approximately $8,900,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other

expenses.

46.     *Horizon Overseas Facility*. Debtor, Mercon B.V., as borrower, is a party to that

certain *Promissory Note*, dated as of September 30, 2023 (the "**Horizon Overseas Promissory**

**Note**"), with Horizon Overseas, Inc., as lender. The Horizon Overseas Promissory Note provides for

a USD loan in an aggregate principal amount of $2,000,000.00, maturing December 28, 2024 (the "**Horizon Overseas Facility**"). The Horizon Overseas Facility is subordinated to the obligations of the Debtors under the Prepetition First Lien Credit Facility. As of the Petition Date, the aggregate amount outstanding under the Horizon Overseas Facility is approximately $2,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

47.    *Stichting Facility*. Debtor Mercon B.V., as borrower, is a party to that certain *Facility Agreement*, dated as of December 15, 2022 (the "**Stichting Facility Agreement**"), with Stichting and Green Fund, as lender. The Stichting Facility Agreement provides for a USD loan in an aggregate principal amount of $20,000,000.00, maturing December 31, 2024 (the "**Stichting Facility**"). The Stichting Facility is subordinated to the obligations of the Debtors under the Prepetition First Lien Credit Facility. Proceeds of the loan were used for its coffee value chain in Vietnam. As of the Petition Date, the aggregate amount outstanding under the Stichting Facility is approximately $20,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

48.    *Crowdout Facility*. Debtors, Mercon B.V. and Mercon US, as borrowers, are a party to that certain *Credit Agreement*, dated as of February 23, 2022 (the "**Crowdout Credit Agreement**"), with Crowdout Capital LLC, as lender. The Crowdout Credit Agreement provides for a USD loan in an aggregate principal amount of $30,000,000.00, maturing December 30, 2024 (the "**Crowdout Facility**" and, collectively with the 2018 FMO Facility, the Mercon Ventures Facility, the Horizon Overseas Facility and the Stichting Facility, the "**Subordinated Debt Obligations**"). The Crowdout Facility is subordinated to the obligations of the Debtors under the Prepetition First Lien Credit Facility. Proceeds of the loan were used for working capital expenses and other general business purposes. As of the Petition Date, the aggregate amount outstanding under the Crowdout

Facility is approximately $20,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

### Debtors' Immediate Need for DIP Financing and Access to Cash Collateral

49.     As stated in the First Day Declarations, the Debtors require immediate access to debtor-in-possession financing to ensure (i) sufficient working capital to operate their business and to administer their estates during the Chapter 11 cases, (ii) the timely payment of administrative expenses to be incurred, (iii) the consummation of the Liquidation Plan, (iv) sufficient liquidity exists to pay margin calls, and (v) a positive message to the Debtors' vendors, suppliers, and customers that these Chapter 11 Cases are sufficiently funded.  The Debtors are entering chapter 11 with limited available liquidity, which is significantly below the optimal level required to preserve the value of the Debtors' business during the Chapter 11 cases.  Prior to the Petition Date, the Debtors, in consultation with their advisors, reviewed and analyzed the Debtors' projected cash needs and prepared the Initial DIP Budget outlining the Debtors' postpetition cash need in the initial thirteen weeks of the Chapter 11 Cases.  The DIP Financing will provide the Debtors with the liquidity necessary to, among other things, make payroll, satisfy their other working capital and general corporate purposes, including essential payments to vendors and service providers during the Chapter 11 Cases, and effect the Liquidation Plan.

50.     In addition, the Debtors will require access to the Prepetition First Lien Collateral, including cash collateral (the "**Cash Collateral**") currently subject to the liens of the Prepetition First Lien Secured Parties.  As discussed in greater detail in the First Day Declarations and the Cash Management Motion, the Debtors operate a centralized cash management system.  Without the ability to access such cash, the Debtors will not be able to continue operations during the

Chapter 11 Cases, which cessation would detrimentally impact the return to the Debtors' creditors in connection with the implementation of the Liquidation Plan.

**Debtors' Efforts to Obtain Postpetition Financing**

51.    As further detailed in the First Day Declarations, in large part due to the decline in the market price for coffee, the Debtor hedging strategy and operating pressures, there has been a rapid decline in the Debtors' cash flow which has led to a liquidity strain on the business. The Debtors have an immediate and critical need to obtain credit on an interim basis pursuant to the DIP Facilities in order to, among other things, enable the orderly continuation of their operations and administer and preserve the value of their estates during the Chapter 11 Cases. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses during the Chapter 11 cases without the DIP Facilities.

52.    Due to the Debtors' financial position, financing arrangements and existing capital structure, as well as the expedited timeline leading up to the Petition Date, the Debtors have been and continue to be unable to secure adequate amount of financing. In light of the Company's financial position and leveraged capital structure, unsecured financing would not have been a viable option. Further, any senior financing that does not involve the Prepetition First Lien Secured Parties would require non-consensual priming liens. Commencing these Chapter 11 Cases with a priming dispute with a third-party and litigation with the agent over adequate protection (with the attendant destruction of value) was not a risk the Debtors, in their business judgment, were willing to take. The DIP Facilities are the best source of debtor-in-possession financing available to the Debtors.

## Relief Requested Should Be Granted

**A.    Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment**

53.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in- interest.").

54.    Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah. Oct 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc*., No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

55.    In determining whether the Debtors have exercised sound business judgment in entering into the DIP Documents, the Court should consider the economic terms of the DIP Financing under the totality of circumstances. *See* Hr'g Tr. at 734-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as otherwise); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). Moreover, the Court may appropriately take into consideration noneconomic benefits to the Debtors offered under the proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor

> constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

56.     The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment.  Keeping in mind the advantages and disadvantages of the proposed DIP Financing, the Debtors ultimately decided that moving forward with the proposed DIP Financing was appropriate and in the Debtors' best interests.  Put simply, the DIP Financing represents the only financing available to the Debtors, and given the Debtors' current cash position, absent access to the proceeds of the DIP Financing, immediate and irreparable harm to the Debtors' estate would occur if the DIP Financing were not available  Thus, in light of the above, the Debtors and their advisors determined that the DIP Financing was the best path forward under the totality of circumstances, and the Debtors believe that they have obtained the best financing available under the circumstances.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of their business judgment.

**B.      Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

57.     The Debtors propose to obtain DIP Financing by providing security interests and liens as set forth in the DIP Documents and described above.  The Debtors satisfy the requirements for relief under Section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court,

after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:

> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

> (3) secured by a junior lien on property of the estate that is subject to a lien . . . .

11 U.S.C. § 364(c).

58.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (finding that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused to grant unsecured loans was sufficient to support the conclusion that the requirements of section 364 were met); *In re Ames Dep't Stores*,

115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

59.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (i.e., by allowing a lender only an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the  circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

60.    Furthermore, in the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit. Thus, the Debtors determined that the DIP Facility provided the best opportunity available to the Debtors under the circumstances to fund these Chapter 11 Cases.  Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

61.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. See *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition First Lien Secured Parties support the priming or (b) the Prepetition First Lien Secured Parties' interests in collateral are adequately protected.

62.     Here, the Prepetition First Lien Secured Parties' interests in the Prepetition Collateral are adequately protected. On account of the priming of their liens the Prepetition First Lien Secured Parties are entitled to, among other things, a portion of any proceeds received from the liquidation of DIP Collateral that also constitutes Prepetition Collateral, subject to the terms of the DIP Credit Agreement.

63.     The Debtors are not aware of any available financing on equal or better terms from the DIP Lenders absent the granting of first priority liens on the Prepetition Collateral. Therefore, the Debtors submit that the requirement of Section 364 of the Bankruptcy Code—that alternative credit on more favorable terms be unavailable to the Debtors—is satisfied.

**C.     Interests of Prepetition First Lien Secured Parties Are Adequately Protected**

64.     Parties with an interest in cash collateral are entitled to adequate protection. *See* 11 U.S.C. § 363(e). Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative

claims.  Thus, what constitutes adequate protection is decided on a case-by-case basis.  *See, e.g.*,

*In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate

protection is a fact specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*,

140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr.

S.D.N.Y. 1986) (finding that the application of adequate protection "is left to the vagaries of each

case, but its focus is protection of the secured creditor from diminution in the value of its collateral

during the reorganization process" (citation omitted)).  The critical purpose of adequate protection

is to guard against the diminution of a secured creditor's collateral during the period when such

collateral is being used by the debtor in possession.  *See 495 Cent. Park*, 136 B.R. at 631 ("The

goal of adequate protection is to safeguard the secured creditor from diminution in the value of its

interest during the chapter 11 reorganization."); *accord In re Beker Indus. Corp.*, 58 B.R. 725, 736

(Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y.

1996).

65.    The adequate protection package provided to the Prepetition First Lien Secured

Parties, as described above, appropriately safeguards the Prepetition First Lien Secured Parties

from the diminution in the value of their interests in the Prepetition Collateral, if any.  The Debtors

submit that their provision of adequate protection to the Prepetition First Lien Secured Parties is

fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the

Bankruptcy Code.

**D.**    **Debtors Should Be Authorized to Use Cash Collateral**

66.    For the reasons set forth herein, the Debtors require use of the Cash Collateral for

working capital and to fund their Chapter 11 Cases.  Section 363(c) of the Bankruptcy Code governs

a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part,

that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)   each entity that has an interest in such cash collateral consents; or
>
> (B)   the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

67.   Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).   Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See, e.g., In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).   While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993)(explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

68.   As noted above, the Prepetition First Lien Secured Parties have or are deemed to have consented to the use of Cash Collateral as the "Majority Lenders" (as defined in the

Prepetition First Lien Credit Agreement) have directed the Prepetition First Lien Agent to consent to the use of Cash Collateral, and the Debtors are providing the Prepetition First Lien Secured Parties with adequate protection that (i) is fair and reasonable and (ii) adequately protects the Prepetition First Lien Secured Parties' interests in the Prepetition Collateral.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

E.    **Debtors' Proposed Repayment of Prepetition Indebtedness Should Be Approved Upon Entry of Final Order**

69.    As set forth above, the DIP Credit Agreement provides that upon entry of the Final DIP Order, the Debtors shall be authorized to "roll-up" of $20.0 million of the prepetition obligations outstanding under the Prepetition First Lien Credit Facilities, with such amounts deemed to have been converted into an equal aggregate principal amount of Roll-Up DIP Loans. The DIP Roll Up is a material component of the structure of the DIP Facility and was a condition precedent to the DIP Lenders' commitment to provide the DIP Financing.  The Debtors were unable to obtain an offer for debtor-in-possession financing on similar terms from the DIP Lenders that did not provide for the refinancing of certain amounts outstanding under the Prepetition First Lien Credit Facilities.

70.    The Debtors have determined that satisfying these prepetition claims as part of the DIP Facility is necessary to obtain access to the liquidity necessary to preserve the value of their business for the benefit of the Debtors' estates.  The DIP Roll Up obligations merely affects the timing, not the amount or certainty, of the Prepetition First Lien Lenders' recovery. Indeed, all Prepetition First Lien Lenders are being offered the ability to participate in the DIP Financing on a pro rata basis, and therefore are equally able to participate in the Roll-Up DIP Loans. Additionally, the DIP Roll Up does not adversely affect junior creditors because the DIP Roll Up

does not increase the amount of senior secured debt. Indeed, only the Prepetition First Lien Credit Facilities are part of the DIP Roll Up, and the Prepetition First Lien Credit Facilities are the Debtors' senior-most tranches of prepetition funded debt and are already entitled to priority over all other prepetition funded debt. Importantly, because the Debtors are seeking the approval of the DIP Roll Up on a *final* basis only, the DIP Roll Up remains subject to review by a creditors' committee or another party in interest with requisite standing. Accordingly, the Debtors submit that the Court should approve the Debtors' decision to enter into the DIP Facility, including the DIP Roll Up.

71.     Recognizing exigent circumstances like those described above, courts in this district, as well as elsewhere, have approved repayments of prepetition debt ("roll-ups") funded by the proceeds of debtor-in-possession financing in recent chapter 11 cases. *See, e.g.*, *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) (approving roll up of $50 million); *In re Aéropostale, Inc.*, No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (approving roll up of $78 million); *In re Chassix Holdings, Inc.*, No. 15-10578 (MEW) (Bankr. S.D.N.Y. Mar. 13, 2015) (approving roll up of $135 million); *In re United Retail Grp, Inc.*, No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 3, 2012) (approving roll up of $11.5 million); *In re Uno Rest. Holdings Corp.*, No. 10-10209 (MG) (Bankr. S.D.N.Y. Feb. 18, 2010) (approving roll up of $33.9 million) *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 6, 2009) (approving roll up of $2.1 billion).

**F.     Carve Out Is Appropriate**

72.     The liens granted pursuant to the DIP Facility, replacement liens, and the superpriority claims of all secured lenders are subject and subordinate to the Carve Out. The Carve Out contains similar terms to others that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See In re Avaya,* Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) [Docket No. 61]; *In re Ames*

*Dep't Stores*, 115 B.R. at 40–41; *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del.

Aug. 19, 2016) [Docket No. 130]; *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y.

May 6, 2016) [Docket No. 99]; *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D.

Del. Nov. 2, 2015) [Docket No. 248]; *In re Reichold Holdings US, Inc.*, No. 14-12237 (MFW)

(Bankr. D. Del. Oct. 2, 2014) [Docket No. 54]; *In re Bear Island Paper Co., LLC*, No. 10-31202

(DOT) (Bankr. E.D. Va. Feb. 26, 2010) [Docket No. 66]; *In re The Great Atl. & Pac. Tea Co.,

Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) [Docket No. 43].

73.     Without the Carve Out, the Debtors' estates may be deprived of possible rights and

powers because the services for which professionals may be paid in these cases is restricted. *See

In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals

representing parties in interest because "[a]bsent such protection, the collective rights and

expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve Out protects

against administrative insolvency during the course of these cases by ensuring that assets remain

for the payment of U.S. Trustee fees and professional fees.

## G.    Debtors Should Be Authorized to Pay the Fees Due Under the DIP Documents

74.     As described herein, the Debtors have agreed, subject to Court approval, to pay

certain fees to the DIP Lenders and the DIP Agent (collectively, the "**DIP Fees**") in exchange for

their providing, agenting, and/or arranging the DIP Facility. As set forth in the Light Declaration,

the terms of the DIP Documents, including the fees imposed thereunder, constitute the best terms

on which the Debtors could obtain the postpetition financing necessary to maintain their ongoing

business operations and fund their Chapter 11 Cases. Moreover, the DIP Fees are customary and

usual and in line with DIP Financings of this kind. The Debtors considered the DIP Fees when

determining in their sound business judgment whether the DIP Documents constituted the best

terms on which the Debtors could obtain sufficient DIP Financing. The Debtors believe paying

these fees in order to obtain the DIP Financing is in the best interests of the Debtors' estates.

Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

**H.    DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e)**

75.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or the grant of such liens is later reversed or modified on appeal.

Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect
> the validity of any debt so incurred, or any priority or lien so granted,
> to an entity that extended such credit in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such
> priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

76.    Here, the Debtors believe the DIP Financing embodies the most favorable terms on

which the Debtors could obtain postpetition financing.  As described in the Light Declaration, all

negotiations of the DIP Documents with the DIP Lenders were conducted in good faith and at arms'

length.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds

of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code,

in accordance with the DIP Orders and the DIP Documents and in accordance with the Budget

(subject to permitted variances).  Further, no consideration is being provided to any party to the

DIP Documents other than as described herein and in the Light Declaration. Accordingly, the Court

should find that the DIP Lenders are "good faith" lenders within the meaning of Section 364(e) of

the Bankruptcy Code and that the DIP Lenders thus are entitled to all of the protections afforded

by that section.

## I.    Modification of Automatic Stay Is Warranted

77.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things, (a) grant the security interests, liens, and superpriority claims described above with respect to the Prepetition First Lien Secured Parties, as applicable, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default (as defined in the DIP Documents), subject to the "Remedies Notice Period" as set forth in the proposed DIP Orders, for the DIP Agent and/or DIP Lenders to exercise any remedies available to them; and (c) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Documents.

78.    Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances. *See, e.g., In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88]; *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MEW) (Bankr. S.D.N.Y. Mar. 13, 2015) [Docket No. 67]; *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26]; *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) [Docket No. 59].

### Request for a Final Hearing

79.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.  *See In re Ames Dep't Stores*, 115 B.R. at 36.  The Debtors request a date which is no later than thirty-five (35) days after

the Petition Date, to hold a hearing to consider entry of the Final Order and the final approval of the relief requested in this Motion.

**Bankruptcy Rule 4001(a)(3) Should Be Waived**

80.     The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3).  Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise."  As explained herein, access to the DIP Facilities is essential to prevent irreparable damage to the Debtors' estates.  Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such applies.

**Reservation of Rights**

81.     Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Debtors Have Satisfied Bankruptcy Rule 6003(b)**

82.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use,

sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition.  Fed. R. Bankr. P. 6003(b).  The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).  As described herein and in the First Day Declarations and in the Light Declaration, the Debtors risk a significant disruption in business operations and substantial harm to their enterprise absent an immediate infusion of liquidity via the DIP Financing.  The Debtors have an immediate need for access to liquidity to, among other things, finance these Chapter 11 Cases, pursue the Liquidation Plan, meet payroll, and satisfy working capital and operational needs during the Chapter 11 Cases, all of which provide value for the benefit of all parties in interest.

83.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances.  *See, e.g., In re Avaya, Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) (finding that relief was necessary to avoid immediate and irreparable harm); *In re SunEdison, Inc.,* Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. June 9, 2016) (same); *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 23, 2014) (same); *In re United Retail Grp., Inc.*, No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 2, 2012) (same); *In re Sbarro, Inc.*, No. 11-11527 (SCC) (Bankr. S.D.N.Y. Apr. 5, 2011) (same); *In re MSR Resort Golf Course LLC*, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Mar. 16, 2011) (same); *In re Insight Health Servs. Holdings Corp.*, No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011).  Accordingly, the Debtors submit that

the relief requested herein is necessary to avoid immediate and irreparable harm and that, therefore, Bankruptcy Rule 6003(b) is satisfied.

### **Bankruptcy Rules 6004(a) and (h)**

84.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the First Day Declarations and in the Light Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### **Notice**[2]

85.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the Southern District of New York; (b) creditors holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (c) Coöperatieve Rabobank U.A., New York Branch, as administrative agent under the Debtors' prepetition senior credit facility and debtor-in-possession financing facility, Cadwalader, Wickersham & Taft LLP (Attn: Ingrid Bagby and Andrew Greenberg); (d) the Office of the United States Attorney for the Southern District of New York; and (e) the Internal Revenue Service. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

---

[2] Capitalized terms used in the Notice section but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

**No Prior Request**

86.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

**Conclusion**

WHEREFORE, the Debtors respectfully request that this Court enter interim and final orders, substantially in the forms annexed hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as is just and proper.

Dated: December 7, 2023                    **BAKER & McKENZIE LLP**

                    By: /s/ *Blaire Cahn*
                    _____
                    Paul J. Keenan Jr. (*pro hac vice* pending)
                    John R. Dodd (*pro hac vice* pending)
                    Reginald Sainvil (*pro hac vice* pending)
                    1111 Brickell Avenue, 10th Floor
                    Miami, FL 33131
                    Telephone: (305) 789-8900
                    Facsimile: (305) 789-8953
                    Email: paul.keenan@bakermckenzie.com
                        john.dodd@bakermckenzie.com
                        reginald.sainvil@bakermckenzie.com

                    Blaire Cahn
                    Kevin Whittam
                    452 Fifth Avenue
                    New York, NY 10018
                    Telephone: 212-626-4875
                    Facsimile: 212-310-1695
                    Email: blaire.cahn@bakermckenzie.com
                        kevin.whittam@bakermckenzie.com

                    *Proposed Counsel for the Debtors and Debtors-in-Possession*