Paul J. Keenan Jr. (*pro hac vice* pending)
John R. Dodd (*pro hac vice* pending)
Reginald Sainvil (*pro hac vice* pending)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: paul.keenan@bakermckenzie.com
        john.dodd@bakermckenzie.com
        reginald.sainvil@bakermckenzie.com

Blaire Cahn
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4695
Facsimile: 212-310-1695
Email: blaire.cahn@bakermckenzie.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MERCON COFFEE CORPORATION, *et al.*,[1] | Case No. 23-11945 (  ) |
| Debtors. | |
| _____/ | |

**DECLARATION OF HARVE LIGHT, CHIEF RESTRUCTURING OFFICER**
**(I) IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY**
**PLEADINGS AND (II) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

I, Harve Light, hereby declare, under penalty of perjury, as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Mercon Coffee Corporation (1844); Mercon B.V. (N/A); Mercon Brasil Comércio de Café Ltda. (N/A); Agro International Holding B.V. (N/A); Mercapital de Nicaragua, S.A. (N/A); Distribuidora de Granos de Nicaragua S.A. (N/A); Cisa Export S.A. (N/A); Comercial Internacional de Granos de Honduras, S.A. de C.V. (N/A); Mercon Guatemala, S.A. (N/A); Mercafe Vietnam LTD. (N/A); Comercial Internacional Exportadora, S.A. (N/A). The Debtors' mailing address is: 999 Ponce de Leon Blvd, Suite 910, Coral Gables, FL 33134.

1.      I am a Managing Director at Riveron ("**Riveron**"), a business advisory firm founded in Dallas, Texas, with offices nationwide. I have more than twenty years of business advisory experience helping both healthy and distressed companies by providing them with strategic services including crisis management, strategic planning, and financial analysis. Prior to joining Riveron, I worked with middle market companies across a range of industries throughout North America including agriculture, real estate, technology, automotive, retail and consumer products. Over the course of my career I have assisted in managing and advising companies as debtors-in-possession through the chapter 11 process.

2.      I serve as Chief Restructuring Officer ("**CRO**") of Mercon Coffee Corporation, one of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**" and together with its non-Debtor affiliates, collectively, the "**Company**"). I was appointed as the Debtors' CRO shortly prior to and in anticipation of the Debtors' voluntary chapter 11 petitions with this Court (the "**Chapter 11 Cases**"). Prior to my appointment as CRO, in April 2023, I was retained through Riveron to assist the Debtors with, among other things, liquidity management, operational issues, financial restructuring needs, communications and negotiations with creditors, evaluation of strategic restructuring alternatives including potential sale alternatives, and the preparation and filing of these Chapter 11 Cases. The Debtors will be filing an application to retain me as their CRO in these Chapter 11 Cases, subject to approval of the Court.

3.      In my capacity as the Debtors' outside consultant, I became familiar with the Debtors' financial affairs, the circumstances giving rise to the Debtors' financial distress, and the Debtors' liquidation prospects.

4.      I submit this declaration (the "**Declaration**") in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") to assist the

Court, as well as creditors and other parties in interest, in understanding the circumstances that compelled the commencement of these Chapter 11 Cases and also in support of: (a) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the relief that the Debtors have requested from the Court in the form of various motions and applications filed on or about the Petition Date and described herein (collectively, the "**First Day Motions**").

5.     Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.     Part I of this Declaration provides an overview of the Debtors and a summary of these Chapter 11 Cases. Part II of this Declaration describes in more detail the Debtors' business, the developments which led to the Debtors' chapter 11 filings, and the Debtors' goals in these Chapter 11 Cases. Part III sets forth the relevant details of the various First Day Motions. Part IV sets forth additional information about the Debtors, as required by Local Rule 1007-2.

# I.    BACKGROUND

**A.    The Debtors' Business[2]**

    *i.    The Debtors*

    7.    Mercon Coffee Group is a global, green coffee supplier with the purpose of building a better coffee world. The company's history began 150 years ago, when ███████ became one of the most prominent coffee growers in Nicaragua's Pacific region. In 1952, continuing with the family tradition, ████████████    ███████'s grandson, founded CISA Exportadora, a coffee export company, which eventually became the first company of the Mercon Group.

    8.    In 1982, ██████████, launched the Mercon brand when he founded Mercon Coffee Corporation. The name "Mercon" is a combination of the two words "merchant" and "consultant." As of the Petition Date, the Debtors are vertically integrated in the coffee industry with businesses all over the world. The Debtors have a presence throughout the coffee supply chain—from sourcing and sales and exporting to farming and nursery businesses.

    9.    The Debtors are a vertically integrated global green coffee supplier. As one of the leading coffee companies in the world, the Debtors have broad experience from farming and production to trading, logistics, and risk management. Over the years, the Debtors have created solutions from the producer to the roaster that rely on the innovation and technology of the entire organization. With global access to the coffee supply chain, the Debtors strive for continuous improvement to deliver the best customer experience. This means sourcing coffee (Arabica and Robusta) from farmers, cooperatives, local exporters and international traders, to milling and selling green coffee to roasters, brokers and importers. The Debtors also provide a vast range of

---

[2] All figures given as of the Petition Date are approximate.

4

services such as financing, market information, and sustainability to generate value for the upstream and downstream actors in the supply chain.

10.    Prior to the Petition Date, the Debtors pioneered the development of coffee-specific farming, nurseries, and farming financing. More specifically, the Debtors led the production of Robusta coffee in Nicaragua—creating a whole new industry in the country. By expanding their production and providing technical assistance and financing to other producers, the Debtors created thousands of jobs in Nicaragua. In addition, the Debtors have made financing available to farmers through Mercapital. Mercapital provides financial services, including coffee and consumer loans and mortgages, and offers a currency exchange service that allows producers to access a competitive rate in the exchange market of Nicaragua.

11.    Over the years, the Debtors continued to grow. In 2019, the Debtors became one of the first commodity suppliers in the US -- and the first coffee-only company -- to close a $450 million sustainability linked senior secured revolving credit facility. Since then, however, the Debtors have faced several market challenges.

ii.    *Debtors' Prepetition Capital Structure*

a.    *Outstanding Debt Obligations*

12.    As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $363,339,800.00 in United Stated dollars ("**USD**") or USD-equivalent debt obligations, which amount consisted of not less than (i) $202,552,000.00[3] in secured borrowings under the Rabobank Facility (as defined herein); (ii) $25,000,000.00 in secured borrowings under the 2022 FMO Facility (as defined herein); (iii) $2,448,657.00 in secured borrowings under the 2016 BFP Facility (as defined herein); (iv) $500,000.00 in secured

---

[3] **NTD:** Rabo to provide updated number.

borrowings under the 2018 BFP Facility (as defined herein); (v) $4,000,000.00 in secured

borrowings under the 2020 BFP Facility (as defined herein); (vi) $3,333,802.00 in secured

borrowings under the 2019 FMO Facility (as defined herein); (vii) $7,500,000.00 in secured

borrowings under the Starbucks Coffee Facility (as defined herein); (viii) $1,474,419.24 in

unsecured borrowings under the BAC Nicaragua Facility (as defined herein); (ix) $2,000,000.00 in

unsecured borrowings under the BDF Facility (as defined herein); (x) $3,500,000.00 in unsecured

borrowings under the BICSA Facility (as defined herein); (xi) $19,490,776.00 in unsecured

borrowings under the Lafise Nicaragua Facility (as defined herein); (xii) $3,000,000.00 in

unsecured borrowings under the BAC Panama Facility (as defined herein); (xiii) $4,000,000.00 in

unsecured borrowings under the CFC Facility (as defined herein); (xiv) $13,000,000.00 in

unsecured borrowings under the London Forfaiting Notes (as defined herein); (xv) $1,207,729.00

in unsecured borrowings under the ABC Bank Facility (as defined herein); (xvi) $3,000,000.00 in

unsecured borrowings under the Banco Safra Facility (as defined herein); (xvii) $800,000.00 in

unsecured borrowings under the Banco Santander Facility (as defined herein); (xviii)

$9,000,000.00 in unsecured borrowings under the Banco Agromercantil Facility (as defined herein);

(xix) $3,640.00 of unsecured indebtedness owing under the ABC Bank Non-Deliverable Forward

Contract (as defined herein); (xx) $(262,031.00) of unsecured indebtedness owing under the Banco

Santander Non-Deliverable Forward Contract (as defined herein); (xxi) $0.00 of unsecured

indebtedness owing under the Bank of America Non-Deliverable Forward Contract (as defined

herein); (xxii) ($22,974.00) of unsecured indebtedness owing under the Voiter Non-Deliverable

Forward Contract (as defined herein); (xxiii) $0.00 of unsecured indebtedness owing under the

Marex Non-Deliverable Forward Contract (as defined herein); (xxiv) $5,000,000.00 in

subordinated debt borrowings under the 2018 FMO Facility (as defined herein); (xxv)

$8,900,000.00 in subordinated debt borrowings under the Mercon Ventures Facility (as defined

herein); (xxvi) $2,000,000.00 in subordinated debt borrowings under the Horizon Overseas Facility

(as defined herein); (xxvii) $20,000,000.00 in subordinated debt borrowings under the Stichting

Facility (as defined herein); and (xxviii) $20,000,000.00 in subordinated debt borrowings under the

Crowdout Facility (as defined herein). The Debtors financing obligations are described in greater

detail below.

       *b.*     Secured Debt Obligations

       *i.*     *Rabobank Facility*

13.     As of the Petition Date, Debtors, Mercon B.V., a Dutch private company with limited

liability, registered with the Dutch commercial register under number 61741140 ("**Mercon B.V.**"),

and Mercon Coffee Corporation, a New York corporation ("**Mercon US**"), as borrowers, and the

other Debtors, were party to that certain *Third Amended and Restated Credit Agreement*, dated as of

June 30, 2023 (as amended, the "**Rabobank Credit Agreement**"), with the lenders party thereto

from time to time, and Coöperatieve Rabobank U.A., New York Branch ("**Rabobank**"), as

administrative agent, collateral agent, swingline lender and issuing lender. The Rabobank Credit

Agreement provides for revolving credit commitments in an aggregate principal amount of up to

$325,000,000.00, maturing on June 28, 2024 (the "**Rabobank Facility**"). The Rabobank Facility is

secured by substantially all of the personal property of the Debtors (subject to certain customary

exceptions). Proceeds of the loans were used to refinance existing debt and to pay for general

working capital expenses of the loan parties in the ordinary course of business. As of the Petition

Date, the aggregate amount outstanding under the Rabobank Facility is approximately

$202,552,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

*ii.      2022 FMO Facility*

14.     As of the Petition Date, Debtors, Comercial Internacional Exportadora S.A.,
("**CISA**") a corporation existing under the laws of Nicaragua, as borrower and Mercon B.V., Mercon
US, Mercapital de Nicaragua S.A., a corporation existing under the laws of Nicaragua ("**Mercapital
Nicaragua**"), Mercon Brasil Comercio de Café Ltda, a limited liability company existing under the
laws of Brazil ("**Mercon Brazil**"), and Mercon Guatemala, a sociedad anonima, existing under the
laws of Guatemala ("**Mercon Guatemala**"), as guarantors, were party to that certain *Term Facility
Agreement*, dated as of May 19, 2022 (the "**2022 FMO Credit Agreement**"), with Nederlandse
Financierings- Maatschappij Voor Ontwikkelingslanden N.V. ("**FMO**"), as lender. The 2022 FMO
Credit Agreement provides for a USD term facility in an aggregate principal amount of
$25,000,000.00, maturing on March 15, 2029 (the "**2022 FMO Facility**"). The 2022 FMO Facility
is secured by certain real property of CISA. Proceeds of the loan were used to prepay the entire
outstanding balance owed in respect of certain existing credit facilities with FMO. As of the Petition
Date, the aggregate amount outstanding under the 2022 FMO Facility is approximately
$25,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

*iii.      2016 BFP Facility*

15.     As of the Petition Date, Debtors, Distribuidora de Granos de Nicaragua S.A., a
corporation existing under the laws of Nicaragua ("**Digranisa**"), as borrower, and CISA, as
guarantor, were party to that certain *Credit Agreement* (*Escritura Publica Numero Doscientos
Veintidos (No. 222). Otorgamiento de Linea de Credito Garantizado con Hipoteca, Prenda y Fianza
Solidaria*), dated as of November 4, 2016 (the "**2016 BFP Credit Agreement**"), with Banco de
Fomento a la Produccion ("**BFP**"), as lender. The 2016 BFP Credit Agreement provides for a USD
term facility in an aggregate principal amount of $6,700,000.00, maturing on November 4, 2026 (the
"**2016 BFP Facility**"). The 2016 BFP Facility is secured by certain fixed and biological assets.

Proceeds of the loan were used for the investment plan presented by the loan parties. As of the Petition Date, the aggregate amount outstanding under the 2016 BFP Facility is approximately $2,448,657.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

*iv.      2018 BFP Facility*

16.      As of the Petition Date, Debtors, Mercapital Nicaragua, as borrower, and CISA, as guarantor were party to that certain *Credit Agreement* (*Escritura Publica Numero Treinta y Siete (No. 37). Contrato de Linea de Credito no Revolvente con Obligacion de Constitucion de Garantia Mobiliaria Sobre Cartera de Credito y Fianza Solidaria*), dated as of April 4, 2018 (the "**2018 BFP Credit Agreement**"), with BFP, as lender. The 2018 BFP Credit Agreement provides for a credit facility in an aggregate principal amount of $1,000,000.00, maturing April 4, 2028 (the "**2018 BFP Facility**"). The 2018 BFP Facility is a fixed assets secured facility. Proceeds of the loan were used for working capital for the business of coffee production. As of the Petition Date, the aggregate amount outstanding under the 2018 BFP Facility is approximately $500,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

*v.      2020 BFP Facility*

17.      As of the Petition Date, Debtors, Mercapital Nicaragua, as borrower, and CISA, as guarantor were party to that certain *Credit Agreement* (*Escritura Publica Numero Noventa y Nueve (No. 99). Otorgamiento de Linea de Credito Revolvente Garantizado con Fianza Solidaria y con Obligacion de Constituir Garantia Mobiliaria Sobre Cartera de Credito*), dated as of November 27, 2020 (the "**2020 BFP Credit Agreement**"), with BFP, as lender. The 2020 BFP Credit Agreement provides for a revolving credit facility in an aggregate principal amount of $5,000,000.00, maturing November 27, 2030 (the "**2020 BFP Facility**"). The 2020 BFP Facility is secured by certain fixed assets. Proceeds of the loan were used for working capital for the business of coffee production. As of the Petition Date, the aggregate amount outstanding under the 2020 BFP Facility is

9

approximately $4,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

<em>vi.        2019 FMO Facility</em>

18.    As of the Petition Date, Debtors, Mercapital Nicaragua, as borrower, and Mercon B.V., Mercon US, and CISA, as guarantors, were party to that certain *Term Facility Agreement,* dated as of November 1, 2019 (the "**2019 FMO Credit Agreement**"), with FMO, as lender. The 2019 FMO Facility provides for a credit facility in an aggregate principal amount of $5,000,000.00, maturing June 15, 2025 (the "**2019 FMO Facility**"). The 2019 FMO Facility is secured by certain assets of the Debtors. Proceeds of the loan were used to make loans to coffee producers in Nicaragua. As of the Petition Date, the aggregate amount outstanding under the 2019 FMO Facility is approximately $3,333,802.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

<em>vii.        Starbucks Coffee Facility</em>

19.    As of the Petition Date, Debtors, Mercon US, as borrower and Mercon B.V., as guarantor were party to that certain *Third Amendment to Amended and Restated Credit Agreement*, dated as of May 12, 2020 (the "**Starbucks Coffee Credit Agreement**"), with Starbucks Coffee Trading Company Sarl ("**Starbucks Coffee**"), as lender. The Starbucks Coffee Credit Agreement provides for a credit facility in an aggregate principal amount of $7,500,000.00, maturing May 11, 2029 (the "**Starbucks Coffee Facility**"). The Starbucks Coffee Facility is a secured facility. Proceeds of the loan were used to make advances to farmers. As of the Petition Date, the aggregate amount outstanding under the Starbucks Coffee Facility is approximately $7,500,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

10

c.      *Unsecured Debt Obligations*

i.      *BAC Nicaragua Facility*

20.     As of the Petition Date, Debtor, CISA, as borrower, was a party to that certain *Revolving Credit Facility* (*Contrato de Apertura de Línea de Crédito Revolvente No Comprometida en Cuenta Corriente*), dated as of September 3, 2020 (the "**BAC Nicaragua Credit Agreement**"), with Banco de America Central, S.A. ("**BAC Nicaragua**"), as lender. The BAC Nicaragua Credit Agreement provides for a revolving credit facility in an aggregate principal amount of $2,000,000.00, maturing November 2, 2023 (the "**BAC Nicaragua Facility**"). The BAC Nicaragua Facility is an unsecured facility. Proceeds of the loan were used for working capital expenses. As of the Petition Date, the aggregate amount outstanding under the BAC Nicaragua Facility is approximately $1,474,419.24 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

ii.      *BDF Facility*

21.     As of the Petition Date, Debtor, CISA, as borrower, was a party to that certain *Credit Agreement* (*Crédito Abierto en Cuenta Corriente con Limitación de Suma*), dated as of May 9, 2022 (the "**BDF Credit Agreement**"), with Banco de Finanzas, S.A. ("**BDF**"), as lender. The BDF Credit Agreement provides for a revolving credit facility in an aggregate principal amount of $2,000,000.00, maturing April 30, 2026 (the "**BDF Facility**"). The BDF Facility is an unsecured facility. Proceeds of the loan were used for coffee gathering expenses. As of the Petition Date, the aggregate amount outstanding under the BDF Facility is approximately $2,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

iii.      *BICSA Facility*

22.     As of the Petition Date, Debtors, CISA, as borrower and Mercon B.V., as guarantor were party to that certain *Revolving Credit Facility* (*Contrato de Apertura de Line de Crédito*

*Revolvente*), dated as of February, 25 2021 (the "**BICSA Credit Agreement**"), with Banco Internacional de Costa Rica, S.A. ("**BICSA**"), as lender. The BICSA Credit Agreement provides for a revolving credit facility in an aggregate principal amount of $4,500,000.00, maturing July 30, 2025 (the "**BICSA Facility**"). The BICSA Facility is an unsecured facility. Proceeds of the loan were used for the purchase of raw material (pre-exportation of coffee). As of the Petition Date, the aggregate amount outstanding under the BICSA Facility is approximately $3,500,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

*iv.       Lafise Nicaragua Facility*

23.      As of the Petition Date, Debtors, CISA, as borrower and Mercon B.V., as guarantor were party to that certain *Credit Agreement*, dated as of February 15, 2022 (the "**Lafise Nicaragua Credit Agreement**"), with Banco Lafise Bancentro, S.A. ("**Lafise Nicaragua**"), as lender. The Lafise Nicaragua Credit Agreement provides for a revolving credit facility in an aggregate principal amount of $26,000,000.00 (the "**Lafise Nicaragua Facility**"). The Lafise Nicaragua Facility is an unsecured facility. Proceeds of the loan were used for working capital expenses. As of the Petition Date, the aggregate amount outstanding under the Lafise Nicaragua Facility is approximately $19,490,776.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses, which is composed of that certain (i) promissory note, dated April 25, 2023, with an outstanding principal amount of $3,000,000.00 and maturing on October 25, 2023, (ii) promissory note, dated July 11, 2023, with an outstanding principal amount of $4,400,000.00 and maturing on January 11, 2024, (iii) promissory note, dated August 17, 2023, with an outstanding principal amount of $1,500,000.00 and maturing on February 17, 2024, (iv) promissory note, dated August 25, 2023, with an outstanding principal amount of $3,090,776.00 and maturing on October 9, 2023; and (v) promissory note, dated September 8, 2023, with an outstanding principal amount of $7,500,000.00 and maturing on October 9, 2023.

<em>v.        BAC Panama Facility</em>

24.    As of the Petition Date, Debtor, Mercon B.V., as borrower, was a party to that certain *Revolving Credit Facility*, dated as of March 21, 2022 (the "**BAC Panama Credit Agreement**"), with BAC International Bank Inc. ("**BAC Panama**"), as lender. The BAC Panama Credit Agreement provides for a revolving credit facility in an aggregate principal amount of $3,000,000.00 (the "**BAC Panama Facility**"). The BAC Panama Facility is an unsecured facility. Proceeds of the loan were used for payment of vendors and working capital loans. As of the Petition Date, the aggregate amount outstanding under the BAC Panama Facility is approximately $3,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

<em>vi.        CFC Facility</em>

25.    As of the Petition Date, Debtors, Mercon B.V., as borrower, CISA, CIGRAH, Mercon Guatemala, Mercafe Vietnam Ltd., a corporation existing under the laws of the British Virgin Islands ("**Mercafe Vietnam BVI**"), Mercon Brazil, Mercapital Nicaragua, CISA Export S.A. ("**Cisa Export**"), a corporation existing under the laws of the British Virgin Islands, Digranisa, Agro International Corp., a corporation existing under the laws of Curacao ("**AIC**"), and Mercon US, as guarantors, were party to that certain *USD 5,000,000 Working Capital Loan Agreement*, dated as of May 24, 2022 (the "**CFC Credit Agreement**"), with Common Fund for Commodities ("**CFC**"), as lender. The CFC Credit Agreement provides for a working capital loan in an aggregate principal amount of $5,000,000.00 (the "**CFC Facility**"). The CFC Facility is an unsecured facility. Proceeds of the loan were used for working capital expenses for coffee trading in Brazil, Guatemala, Honduras and Nicaragua. As of the Petition Date, the aggregate amount outstanding under the CFC Facility is approximately $4,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

13

*vii.*      *London Forfaiting Notes*

26.      As of the Petition Date, Debtor, Mercon B.V., was a party to certain *Promissory Notes*, dated as of June 8, 2022, and December 8, 2022, respectively (the "**London Forfaiting Promissory Notes**"), with London Forfaiting Company Ltd. ("**London Forfaiting**"), as issuer. The London Forfaiting Notes provides for promissory notes in the principal amounts of $3,000,000.00 and $10,000,000.00, respectively, each maturing on December 15, 2023 (the "**London Forfaiting Notes**"). The London Forfaiting Notes are unsecured. The London Forfaiting Notes were issued to finance the purchase, processing and sale of green coffee beans. As of the Petition Date, the aggregate amount outstanding under the London Forfaiting Notes is approximately $13,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

*viii.*      *ABC Bank Facility*

27.      As of the Petition Date, Debtor, Mercon Brazil, was a party to certain *Foreign Exchange Agreement No. 314235737*, dated as of August 4, 2022 (the "**ABC Bank Agreement**"), with ABC Brasil S.A. ("**ABC Bank**"), as financial institution/bank. The ABC Bank Agreement provides for the purchase of Brazilian Reais in the principal amount of USD $1,089,866.16, converted at the exchange rate of USD $1.0000/ R $ 5.2300, maturing January 31, 2023 (the "**ABC Bank Facility**"). The ABC Bank Facility is an unsecured facility. Proceeds were used for the exports of goods/merchandise. As of the Petition Date, the aggregate amount outstanding under the ABC Bank Facility is approximately $1,207,729.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

*ix.*      *Banco Safra Facility*

28.      As of the Petition Date, Debtor, Mercon Brazil, as borrower, was a party to certain *Foreign Exchange Agreement No. 318242573*, dated as of September 8, 2022 (the "**Banco Safra Agreement**"), with Banco Safra SA ("**Banco Safra**"), as financial institution/bank. The Banco Safra

Agreement provides for the purchase of Brazilian Reais in the principal amount of USD $3,000,000.00, converted at the exchange rate of USD $1.0000/ R $ 5.2010 (the "**Banco Safra Facility**"). The Banco Safra Facility is an unsecured facility. Proceeds were used for the exports of goods/ merchandise. As of the Petition Date, the aggregate amount outstanding under the Banco Safra Facility is approximately $3,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

x.    *Banco* Santander Facility

29.    As of the Petition Date, Debtor, Mercon Brazil, as borrower, was a party to that certain Credit Agreement, dated as of September 21, 2023 (the "**Banco Santander Agreement**"), with Banco Santander ("**Banco Santander**"), as financial institution/bank. The Banco Santander Agreement provides for a term loan credit facility in an aggregate principal amount of $800,000.00, maturing September 16, 2024 (the "**Banco Santander Facility**"). The Banco Santander Facility is an unsecured facility. Proceeds of the loan were used for the export of goods. As of the Petition Date, the aggregate amount outstanding under the Banco Santander Facility is approximately $800,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

xi.    *Banco Agromercantil Facility*

30.    As of the Petition Date, Debtors, Mercon Guatemala, as borrower, and Mercon B.V., as guarantor, were party to that certain *Revolving Credit Facility*, dated as of December 17, 2021 (the "**Banco Agromercantil Agreement**"), with Banco Agromercantil de Guatemala, SA ("**Banco Agromercantil**"), as lender. The Banco Agromercantil Agreement provides for a revolving credit facility in an aggregate principal amount of $9,000,000.00, maturing December 14, 2024 (the "**Banco Agromercantil Facility**"). The Banco Agromercantil Facility is an unsecured facility. Proceeds of the loan were used for working capital expenses. As of the Petition Date, the aggregate amount outstanding under the Banco Agromercantil Facility is approximately $9,000,000.00 in

unpaid principal, plus accrued and unpaid interest, fees, and other expenses, which composed of

that certain (i) promissory note, dated June 9, 2023, with an outstanding principal amount of

$3,000,000.00 and maturing on March 5, 2024, and (ii) promissory note, dated June 20, 2023, with

an outstanding principal amount of $6,000,000.00 and maturing on June 16, 2024.

> d.    Unsecured Non Deliverable Forwards

31.    As of the Petition Date, Debtor, Mercon Brazil, has unsecured indebtedness in the

amount of (i) $3,640.00 owing under that certain non-deliverable forward contract, dated as of

September 27, 2021 (the "**ABC Bank Non-Deliverable Forward Contract**"), between Mercon

Brazil and ABC Bank, (ii) $(262,031.00) owing under that certain non-deliverable forward

contract, dated as of August 9, 2021 (the "**Banco Santander Non-Deliverable Forward**

**Contract**"), between, Mercon Brazil and Banco Santander, (iii) $0.00 of unsecured indebtedness

owing under the non-deliverable forward contract, dated as of October 7, 2015 (the "**Bank of**

**America Non-Deliverable Forward Contract**"), between, Mercon Brazil and Bank of America;

(iv) $(22,974.00) of unsecured indebtedness owing under the non-deliverable forward contract,

dated as of September 8, 2022 (the "**Voiter Non-Deliverable Forward Contract**"), between,

Mercon Brazil and Banco Voiter S.A., and (v) $0.00 of unsecured indebtedness owing under the

non-deliverable forward contract, dated as of June 10, 2020 (the "**Marex Non-Deliverable**

**Forward Contract**"), between, Mercon Brazil and Marex Financial.

> e.    Subordinated Debt Obligations

>> i.    2018 FMO Facility

32.    As of the Petition Date, Debtors, Mercapital Nicaragua, as borrower, and Mercon

B.V., Mercon US, and CISA, as guarantors, were party to that certain *Term Facility Agreement-*

*Micro and Small Enterprise Fund* ("**MASSIF**"), dated as of December 17, 2018 (the "**2018 FMO**

**Credit Agreement**"), with FMO as lender. The 2018 FMO Credit Agreement provides for a USD

term facility in an aggregate principal amount of $5,000,000.00, maturing on June 15, 2025 (the "**2018 FMO Facility**"). The 2018 FMO Facility is a subordinated debt facility. Proceeds of the loan were used to make loans to eligible growers in line with Mercapital Nicaragua's credit policy. As of the Petition Date, the aggregate amount outstanding under the 2018 FMO Facility is approximately $5,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

ii.    Mercon Ventures Facility

33.    As of the Petition Date, Debtor, Mercon B.V., as borrower was a party to that certain Uncommitted Credit Agreement, dated as of November 1, 2021 (the "**Mercon Ventures Credit Agreement**"), with Mercon Ventures, S.A., as lender. The Mercon Ventures Credit Agreement provides for a USD loan in an aggregate principal amount of $8,900,000.00, maturing December 31, 2024 (the "**Mercon Ventures Facility**"). The Mercon Ventures Facility is a subordinated debt facility. As of the Petition Date, the aggregate amount outstanding under the Mercon Ventures Facility is approximately $8,900,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

iii.    Horizon Overseas Facility

34.    As of the Petition Date, Debtor, Mercon B.V., as borrower was a party to that certain *Promissory Note*, dated as of September 30, 2023 (the "**Horizon Overseas Promissory Note**"), with Horizon Overseas, Inc., as lender. The Horizon Overseas Promissory Note provides for a USD loan in an aggregate principal amount of $2,000,000.00, maturing December 28, 2024 (the "**Horizon Overseas Facility**"). The Horizon Overseas Facility is a subordinated debt facility. As of the Petition Date, the aggregate amount outstanding under the Horizon Overseas Facility is approximately $2,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

iv.     Stitching Facility

35.     As of the Petition Date, Debtor Mercon B.V., as borrower, was a party to that certain *Facility Agreement*, dated as of December 15, 2022 (the "**Stichting Facility Agreement**"), with Stichting and Green Fund, as lender. The Stichting Facility Agreement provides for a USD loan in an aggregate principal amount of $20,000,000.00, maturing December 31, 2024  (the "**Stichting Facility**"). The Stichting Facility is a subordinated debt facility. Proceeds of the loan were used for its coffee value chain in Vietnam. As of the Petition Date, the aggregate amount outstanding under the Stichting Facility is approximately $20,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

v.     Crowdout Facility

36.     As of the Petition Date, Debtors Mercon B.V. and Mercon US, as borrowers, were a party to that certain *Credit Agreement*, dated as of February 23, 2022 (the "**Crowdout Credit Agreement**"), with Crowdout Capital LLC, as lender. The Crowdout Credit Agreement provides for a USD loan in an aggregate principal amount of $30,000,000.00, maturing December 30, 2024 (the "**Crowdout Facility**"). The Crowdout Facility is a subordinated debt facility. Proceeds of the loan were used for working capital expenses and other general business purposes. As of the Petition Date, the aggregate amount outstanding under the Crowdout Facility is approximately $20,000,000.00 in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

f.     Equity Ownership

37.     The Debtors' ultimate parent, Mercon Ventures International Corp. B.V. ("**Mercon Ventures International**"), was formed in Curacao on October 20, 2022. Yet the Debtor's subsidiaries commenced operations in Amsterdam on October 23, 2014.

38.     Collectively, the shareholders, Sunloved Java Holdings LLC, a Cayman limited liability company ("**Sunloved Java**"), and Mercon Ventures, S.A., a sociedad anónima, existing

under the laws of Panama  ("**Mercon Ventures**"), own 100% of Mercon Ventures International, with Sunloved Java owning approximately 70% and Mercon Ventures owning approximately 30%. As illustrated in the Debtor's Consolidated Ownership Statement, Mercon Ventures International owns 100% of the equity in Mercon Coöperatief U.A., a Co-operative U.A., existing under the laws of the Netherlands ("**Mercon Coöperatief**") and Mercon Coöperatief owns 100% of the equity in Mercon B.V. As of the Petition Date, there were 25 entities in the Debtors' organizational structure. Attached as **Exhibit A** is a chart summarizing the Debtors' corporate structure.

**B.**    Events Leading up to these Chapter 11 Cases

39.    As noted above, in recent years the Debtors have faced several challenges, including the global effects of the COVID -19 pandemic and the decline in the market price for coffee. The COVID-19 pandemic resulted in steep job losses and pushed the unemployment rate in the United States to a high of 13.0 percent in the second quarter of 2020, causing many people to leave the labor force as a result. The coffee growing business experienced labor shortages causing coffee prices to be highly volatile as a result of the supply chain disruptions. Shortages in drivers led the Debtors to incur high transport costs and logistic bottlenecks which caused the consequent delay or postponement of orders.

40.    In response to the supply chain disruptions, the Debtors ramped up coffee inventory, totaling 2.4 million bags by January 2021 in order to meet coffee demand and avoid any delays in the import process. In order to finance the inventory, the Debtors incurred bilateral debt in the form of bilateral loans, totaling approximately $119,589,866.00. Yet by June 2021, the coffee market experienced an unexpected inversion causing the immediate and near term delivery prices of coffee to surpass those set for future delivery. This so-called backwardation caused the Debtors to remain with excess coffee inventory, which they in turn sold at a loss.

41.    Further, around March 2022, the Federal Reserve began raising the federal funds rate to curb high inflation levels, which caused the cost of borrowing to become more expensive. These elevated interest rate levels in turn caused the Debtors financial difficulties in meeting the debt obligations under their bilateral loans.

42.    Additionally, around October 2022 global coffee prices experienced one of their most significant declines in the past decade. Specifically, in October 2022, the price of Arabica coffee fell significantly, as coffee futures declined for thirteen consecutive trading sessions, which represented the longest losing streak for coffee futures in nine years.[4] This decrease was largely due to large crops in both Brazil and Indonesia, which flooded the market with supply, thereby diminishing the market price. Moreover, Rabobank and Goldman Sachs both stated that they anticipated that increased Brazilian coffee production will result in Arabica coffee prices remaining significantly below the $2.58 per pound high in February 2022.[5] By January 2023, the price per pound of Arabica coffee had dropped to less than $1.44, a collapse of more than 40% from the February 2022 high.

43.    These developments have impacted the financial performance of the Debtors' business. Notably, they have led to breaches under the Debtors' financing arrangements, beginning with the Second Amended and Restated Uncommitted Credit Agreement, which Mercon B.V. and Mercon US entered into as of April 30, 2021, as borrowers, with the lenders party thereto and Rabobank, as administrative agent, collateral agent, swingline lender and issuing lender (the "**Second A&R Rabobank Credit Agreement**"). In particular, the loan parties were in breach of certain covenants related to tangible net worth and consolidated leverage ratios under the Second

---

[4] Kirk Maltais, *Coffee Market Goes Cold as Brazilian Weather Normalizes*, WALL ST. J. (Nov. 14, 2022, 5:30 AM), https://www.wsj.com/articles/coffee-market-goes-cold-as-brazilian-weather-normalizes-11668385027.

[5] Benjamin Mitchell, *Why coffee prices will continue falling in 2023*, COFFEE INTELLIGENCE (Jan. 19, 2023), https://intelligence.coffee/2023/01/coffee-prices-falling-2023/.

A&R Rabobank Credit Agreement, for which the borrowers requested a waiver from the Agent. In late April and early May, 2023 the parties entered into a series of waivers and amendments to the Second A&R Rabobank Credit Agreement, to provide the Debtors breathing room to source additional debtor or equity financing, and restructure their balance sheets.

44.     In June 2023, Sunloved Java Holdings LLC ("**SJH**") closed on the purchase of a 70% interest in Mercon Ventures International, the Debtors' ultimate parent, for approximately $27 million. This investment by SJH provided a critical equity injection to support the working capital needs of the business and the SJH funds were used to pay down outstanding amounts and create availability under the Second A&R Rabobank Credit Agreement. Shortly afterwards, on June 30, 2023 Mercon B.V. and Mercon US, as well as the other Debtors, entered into an amendment and restatement of the Second A&R Rabobank Credit Agreement (the "**Rabobank Credit Agreement**").

45.     Unfortunately, the Debtors soon found themselves in renewed financial difficulties. For the period commencing on July 1, 2023 and ending on October 9, 2023, the borrowers notified the Agent and the Lenders that there were or may have been breaches under the Rabobank Credit Agreement, including a breach of the minimum consolidated tangible net worth covenant. In order to address any such breaches, the borrowers requested a waiver from the Agent and the Lenders. Accordingly, the first amendment and waiver to the Rabobank Credit Agreement was entered into on August 30, 2023 (the "**First Amendment**"). Section 3(b) of the First Amendment provided that its waivers of the covenant breaches and cross defaults would terminate and be of no further force and effect upon the occurrence of certain events of default, including a default due to the failure to pay principal or interest when due.

46.     Shortly after the First Amendment was entered into towards the end of August 2023, the Debtors encountered additional difficulty with the Rabobank Credit Agreement. Given the persistence of the negative macroeconomic factors and, specifically, a deterioration in the value of the borrowing base collateral, the revolving credit facility was overdrawn by approximately $[5.6 million] and the Debtors were accordingly required to make a mandatory prepayment in the amount of the excess. However, the Debtors did not have sufficient liquidity in order to make this mandatory prepayment due under the Rabobank Credit Agreement, necessitating a negotiation with the Agent and Lenders for an agreement on a second amendment and waiver to the Rabobank Credit Agreement. However, while such negotiations were ongoing, the value in the borrowing base collateral, which primarily consists of coffee inventory, accounts receivable, net liquidating value of the brokerage accounts continued to deteriorate. By late October the revolving credit facility was overdrawn by approximately $[16.0 million].

47.     In addition, the Debtors had breached certain other covenants under the Rabobank Credit Agreement and certain other events of default occurred under the Rabobank Credit Agreement, including, breach of the negative covenant bi-lateral collar, the tangible net worth financial covenant, the Debtors cash and cash equivalents held in deposit accounts not subject to a deposit account control agreement in favor of Rabobank, as agent, exceeding $2.0 million, and cross default occurring as the result for the failure to pay principal on certain bi-lateral credit agreements. As a result of the foregoing events of default, on November 3, 2023, the Debtors received an acceleration notice from Rabobank, at the direction of the "Majority Lenders", terminating the commitments and accelerating the outstanding loans under the Rabobank Credit Agreement.

C.     **Debtors' Goals in These Chapter 11 Cases**

48.     Through these Chapter 11 Cases, the Debtors intend to use the benefits of the worldwide automatic stay to pursue an orderly sale of its assets in a manner designed to maximize

value of the Debtors' estates and confirm a plan providing for the orderly resolution of the Debtors'

estates. In an effort to maximize value for the benefit of all stakeholders, the Debtors intend to

continue operations for purposes of (a) winding down the Debtors' business and affairs as

expeditiously as reasonably possible, (b) resolving any possible claims, (c) filing appropriate tax

returns, (d) complying with their continued business obligations, and (e) administering the asset

sale in an efficacious manner; and thereafter liquidate and dissolve the Company.

## II.    FIRST DAY MOTIONS

49.    Concurrently with and shortly after the filing of these cases (the "**Chapter 11**

**Cases**"), the Debtors will be filing a number of First Day Motions.[6] The Debtors anticipate that

the Bankruptcy Court will conduct a hearing within a business day or two after the commencement

of the Chapter 11 Cases (the "**First Day Hearing**"), during which the Bankruptcy Court will

entertain the arguments of counsel with respect to the relief sought in each of the First Day

Motions.

50.    Generally, the First Day Motions have been designed to meet the immediate goals

of (i) establishing procedures for the efficient administration of these Chapter 11 Cases;

(ii) continuing the Debtors' operations during these Chapter 11 Cases with as little disruption and

loss of productivity as possible; and (iii) maintaining the confidence and support of the Debtors'

key constituencies. I have reviewed each of the First Day Motions, including the exhibits attached

thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to

meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve

success in these Chapter 11 Cases. The First Day Motions are summarized below.

---

[6] Capitalized terms used in Part III but not otherwise defined in this Declaration shall have the meanings ascribed to
them in the relevant First Day Motion.

A.    **Motion of the Debtors for Entry of an Order Authorizing and Directing the Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes Only (the "Joint Administration Motion")**

51.    By the Joint Administration Motion, the Debtors request the joint administration of these Chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for the Chapter 11 Cases under the Mercon Coffee Corporation case and also request that the caption of each of the Chapter 11 Cases be modified to reflect the joint administration of the Chapter 11 Cases. Additionally, the Debtors request that the Court authorize the Debtors to use a combined service list for the jointly administered Chapter 11 Cases for purposes of noticing creditors of the Debtors' estates. Finally, the Debtors seek to file their monthly operating reports required by the *Operating Guidelines and Reporting Requirements for Chapter 11 Debtors and Trustees*, issued by the Office of the United States Trustee (rev. 03/01/2023), by consolidating the information required for each debtor in one report that tracks and breaks out all of the specific information (*e.g.*, receipts, disbursements, etc.) on a debtor-by-debtor basis in each monthly operating report.

52.    The Debtors are direct and indirect affiliates of each other and constitute "affiliates" within the meaning of section 101(2) of the Bankruptcy Code. Joint administration of the Chapter 11 Cases will avoid the unnecessary administrative burden on the Court and parties-in-interest in these Chapter 11 Cases.  Joint administration will permit the Clerk to use a single general docket for the Debtors' Chapter 11 Cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates. Joint administration will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in each of the Chapter 11 Cases.

53.    I understand that if the Court approves joint administration of the Debtors' Chapter 11 Cases, the Debtors will be able to reduce fees and costs resulting from the administration of

these Chapter 11 Cases and ease the onerous administrative burden of having to file multiple documents. I have also been advised that joint administration will ease the administrative burden for the Court and all parties to the Chapter 11 Cases and obviate the need for duplicative notices, motions, applications and orders, thereby saving time and expense for the Debtors and their estates.

54.     Based on the foregoing, I believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates and all parties-in-interest, and should be granted in all respects.

**B.    Motion of the Debtors for Entry of an Order (I) Enforcing the Protections of 11 U.S.C. §§ 362, 365, 525, and 541, (II) Approving the Form and Manner of Notice, and (II) Granting Related Relief (the "Automatic Stay Enforcement Motion")**

55.     By the Automatic Stay Enforcement Motion, the Debtors seek entry of an order (a) restating and enforcing the protections afforded to them by sections 362, 365, 525, and 541(c) of the Bankruptcy Code; (b) approving the form and manner of notice related thereto, and (c) authorizing the Debtors to translate the Notice as needed to better inform creditors, governmental units, and interested parties of the relief requested herein. The Debtors and their non-debtor affiliates operate in numerous countries with different legal systems. The Debtors engage with numerous non-U.S. customers, suppliers, and other vendors, as well as non-U.S. regulators and other governmental units. As a result, I understand that that a specific order from this Court will help to protect the Debtors and their estates from improper actions, particularly by parties in foreign jurisdictions who are not familiar with the Bankruptcy Code or its protections and who might otherwise violate those sections.

56.     Notwithstanding the self-executing and global nature of sections 362, 365, 525, and 541 of the Bankruptcy Code, not all parties affected, or potentially affected, by the commencement of these Chapter 11 Cases are aware of these statutory provisions or their significance and impact. Therefore, I believe it is prudent to obtain an order confirming and

reinforcing the relevant provisions of the aforementioned sections of the Bankruptcy Code. I understand that the relief requested in this Motion is fully consistent with the terms of the Bankruptcy Code, will facilitate a smooth and orderly transition of the Debtors' operations into chapter 11, and will help ensure that the Debtors' global business operations are not disrupted.

57.     Based on the foregoing, I believe that entry of an order restating and enforcing the protections of sections 362, 365, 525, and 541 of the Bankruptcy Code would aid in the administration of these Chapter 11 Cases and is in the best interests of the Debtors, their estates and all parties-in-interest, and should be granted in all respects.

**C.    Motion of the Debtors for Entry of an Order (I) Waiving the Requirement that Each Debtor File a List of Creditors and Authorizing the Debtors to File a Consolidated Master List of Creditors, (II) Authorizing Debtors to File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (III) Authorizing the Debtors to Redact Personally Identifiable Information, (IV) Approving Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases, and (V) Granting Related Relief (the "<u>Consolidated Creditor List Motion</u>")**

58.     By the Consolidated Creditor List Motion, the Debtors seek entry of an order (a) waiving the requirement that each Debtor file a list of creditors and authorizing the Debtors to (i) file a consolidated master list of creditors (the "**Consolidated Creditor Matrix**") in lieu of submitting a separate mailing matrix for each Debtor and (ii) file a consolidated list of the Debtors' thirty (30) largest unsecured creditors; (b) authorizing the Debtors to redact personally identifiable information for certain individual creditors; (c) approving the form and manner of notifying creditors of the commencement of these Chapter 11 Cases; and (d) granting related relief.

59.     I believe that it is appropriate to waive the requirement that each Debtor file a list of creditors because requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and would result in duplicate mailings. Concurrently with the Motion, the Debtors have also filed an application for an order authorizing the retention and employment of Kroll Restructuring

Administration LLC ("**Kroll**") as claims and noticing agent (the "**Claims Agent Application**"). If the Claims Agent Application is granted, Kroll will, among other things, complete the mailing of the applicable notices to the parties in the Consolidated Creditor Matrix, as required by Bankruptcy Rule 2002. After consultation with Kroll, the Debtors believe that filing a Consolidated Creditor Matrix will enable Kroll to provide notice most efficiently to all entitled parties.

60.    In addition, because certain of the Debtors share many creditors and the Debtors operate as a single business enterprise, the Debtors request authority to file a single, consolidated list of their thirty largest general unsecured creditors. Compiling separate top-twenty creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time and resources. Further, the Debtors believe a single, consolidated list of the Debtors' thirty largest unsecured, non-insider creditors will aid the United States Trustee for the Southern District of New York in its efforts to communicate with these creditors. As such, the Debtors believe that filing a single, consolidated list in these Chapter 11 Cases is appropriate and in the best interests of the Debtors and their estates.

61.    The Debtors also request authority to redact personally identifiable information for certain individual creditors. The Debtors respectfully submit that it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases, including the Consolidated Creditor Matrix and lists of potentially interested parties, information for certain individuals, including: (a) individual growers of coffee beans who routinely sell their product to the Debtors (the "**Producers**"); (b) local employees of the Debtors (the "**Employees**");

(c) the Debtors' existing directors and senior management (the "**Senior Management**");[7] and

(d) ultimate beneficial owners (the "**UBOs**"). Specifically, the Debtors request authority to redact

the names, addresses, and other personal data of the Producers, Employees, Senior Management,

and UBOs, because (a) public disclosure of such information could be used to identify these

individuals, thereby exposing them to the risk of unlawful injury or harm, and (b) disclosure risks

violating the European General Data Protection Regulation ("**GDPR**"), exposing the Debtors to

potential civil liability and significant financial penalties.

62.    The Debtors are concerned that, given geopolitical sensitivities in certain Central

American jurisdictions, the filing of these Chapter 11 Cases could potentially result in unrest

and/or extrajudicial action, subjecting the Producers, Employees, Senior Management, and UBOs

to the risk of injury to themselves and/or their property. Indeed, due to such concerns, the Debtors

have engaged security and other protective measures for certain Employees. Thus, the concerns

about releasing individuals' information are particularly acute. Absent such relief, the Debtors

could jeopardize the safety of individuals by publishing their names and/or home addresses without

any advance notice. Shielding these individuals from the publication of their personal information

is necessary and appropriate to safeguard their privacy and security, as well as to comply with the

strict requirements of the GDPR.

63.    The Debtors have over 14,000 creditors, a substantial portion of whom reside in

non-U.S. jurisdictions, including without limitation Brazil, Nicaragua, Ethiopia, and Guatemala

(the "**Foreign Creditors**"). The Debtors do not have mailing addresses for many of the Foreign

Creditors in two specific categories: (a) the Producers and (b) the Employees. The Producers and

---

[7] The Court's Local Bankruptcy Rules require that the Debtors file an affidavit setting forth "the names of individuals who comprise the debtor's existing Senior Management, their tenure with the debtor, and a brief summary of their relevant responsibilities and experience." Local Bankruptcy Rule 1007-2(a)(12).

Employees constitute over 11,000 of the creditors. Identifying mailing addresses for all Producers and Employees and copying, printing, and mailing Notices to all creditors would impose an extraordinary administrative burden and cost on the Debtors and their estates, to the detriment of all creditors. Accordingly, the Debtors seek authority to (i) have Kroll undertake the mailing of the Notice of Commencement to all creditors except for the Producers and Employees; and (ii) provide the Notices to the Producers and Employees by public dissemination or alternative means only. Specifically for the Producers and Employees, the Debtors propose to, with the assistance of Kroll, serve the Notice of Commencement via public dissemination and similar means, as soon as practicable after entry of the Proposed Order, by (i) posting and making Notices available at the Debtors' in-country places of business, including, without limitation, local offices and (ii) distributing Notices by hand to Employees.

64.    Based on the foregoing, I believe that entry of an order (a) waiving the requirement that each Debtor file a list of creditors and authorizing the Debtors to (i) file a consolidated master list of creditors in lieu of filing separate mailing matrices for each Debtor and (ii) file a consolidated list of the Debtors' thirty (30) largest unsecured creditors; (b) authorizing the Debtors to redact personally identifiable information for certain individual creditors; (c) approving the form and manner of notifying creditors of the commencement of these Chapter 11 Cases; and (d) granting related relief would aid in the administration of these Chapter 11 Cases and is in the best interests of the Debtors, their estates and all parties-in-interest, and should be granted in all respects.

**D.    Motion of the Debtors for Entry of Interim and Final Orders Authorizing (A) the Debtors to Pay Prepetition Claims Foreign Vendors, Foreign Section 503(b)(9) Claimants, and Critical Vendors in the Ordinary Course of Business and (B) Financial Institutions to Honor and Process Related Checks and Transfers ("Critical and Foreign Vendor Motion")**

65.    By the Critical and Foreign Vendor Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors, subject in all respects to the terms and

conditions provided in the interim and final orders, to (i) pay critical vendors and service providers located outside of the United States (the "**Foreign Vendors**," whose claims are "**Foreign Vendor Claims**"), collectively not to exceed an aggregate amount of $301,370 on an interim basis and $7,403 on a final basis (for both interim and final periods, the "**Foreign Vendor Claims Cap**"), (ii) pay claims for certain inventory, goods, or materials from various foreign vendors within the 20-day period immediately preceding the Petition Date (the "**Foreign 503(b)(9) Claimants**," whose claims are the "**Foreign 503(b)(9) Claims**"), collectively not to exceed an aggregate amount of $300,000, all of which approximately will be due and owing within thirty days after the Petition Date (the "**Foreign 503(b)(9) Claims Cap**"), (iii) pay domestic critical vendors (the "**Critical Vendors**," whose claims are the "**Critical Vendor Claims**"), collectively not to exceed an aggregate amount of $35,000, all of which approximately will be due and owing within thirty days after the Petition Date (the "**Critical Vendor Claims Cap**"); (b) authorizing financial institutions to honor and process checks or electronic transfers used by the Debtors to pay the foregoing; and (c) granting any additional relief as is necessary to effectuate the foregoing.

66.    I believe that continuing to receive goods and services from the Vendor Claimants is necessary. If granted discretion to satisfy Foreign Vendor Claims and Foreign 503(b)(9) Claims (together, the "**Foreign Creditor Claims**") and the Critical Vendor Claims (all together, the "**Vendor Claims**"), as requested in this Motion, the Debtors will assess, case by case and in real time, the benefits to their estates of paying Vendor Claims and pay such claims only to the extent their estates will benefit. Without this relief, I believe that the Vendor Claimants would cease providing goods and services to the Debtors or otherwise take action to impede the Debtors' operations in the short term.

67.    **Foreign Vendors:** Given the global nature of their operations, the Debtors must necessarily procure a significant amount of goods and services from vendors with little to no connection with the United States. In the ordinary course of their businesses, and to maintain their foreign operations, the Debtors make payments to various Foreign Vendors from whom the Debtors purchase crucial goods and services, among others. Indeed, while the Debtors have significant customer relationships and sales in the United States, the Debtors do not grow or process the majority of their coffee domestically. The goods and services provided by the Foreign Vendors are necessary for the operation of the Debtors' businesses.

68.    The Debtors are highly reliant on the Foreign Vendors to provide goods and services reliably and on time, including for processing coffee, preparing it for shipment, and repairs and maintenance of essential equipment. The Foreign Vendors could not be replaced within a reasonable time and on terms as beneficial to the Debtors as those already in place. If the Foreign Vendors are not paid, they could withhold vital goods and services from the Debtors and thereby disrupt the Debtors' business operations. Moreover, there is a risk that Foreign Vendors could sue the Debtors in foreign courts and attempt to recover prepetition amounts owed to them if the Foreign Vendor Claims remain unpaid. If the Foreign Vendors were successful in obtaining judgments against the Debtors, the Foreign Vendors could seek to exercise post-judgment remedies, including seeking to attach the Debtors' foreign assets or withholding vital supplies from the Debtors. The Debtors would have no practical ability to remedy this situation (absent payment of amounts sought) and their business operations would be irreparably harmed to the detriment of their estate and their creditors.

69.    Further, given geopolitical sensitivities in certain Central American jurisdictions with a significant number of Foreign Vendors, the Debtors are concerned that failure to pay the

Foreign Vendor Claims could result in some Foreign Vendors taking extrajudicial action, potentially including inciting unrest at the Debtors' collection sites and facilities in these countries. This could endanger the property of the Debtors' estate and/or put the Debtors' local employees at risk. As a result, the Debtors seek authority to make payments to the Foreign Vendors, in the amounts and to the extent necessary to satisfy non-disputed prepetition Foreign Vendor Claims and to satisfy potential asserted or actual possessory liens, if any, on the Goods or products that may be held by such Foreign Vendors pending the payment of such charges. The Debtors represent that they will only pay Foreign Vendor Claims where they believe, in their business judgment, benefits to their estates and creditors from making such payments would exceed (a) the costs that their estates would incur by bringing an action to compel the turnover of such goods and (b) the delays associated with such actions.

70.    **Foreign 503(b)(9) Claims:** The Debtors may have received certain materials or goods from various vendors within the 20-day period immediately preceding the Petition Date, thereby giving rise to prepetition claims under section 503(b)(9) of the Bankruptcy Code. In particular, the Debtors receive large volumes of coffee from producers in Nicaragua periodically in order to ensure sufficient inventory. The Foreign 503(b)(9) Claimants are exclusively Foreign Vendors. The Debtors' relationships with the Foreign 503(b)(9) Claimants are not governed by long-term contracts. Rather, the Foreign 503(b)(9) Claimants deliver coffee at collection points on a rolling basis. In certain instances, the price of the coffee is not fixed at the time that the Foreign 503(b)(9) Claimants deliver their goods. The Foreign 503(b)(9) Claimants will deliver the coffee and, at a later point, fix the price and receive payment. In addition, certain collection points only receive coffee and do not handle payments, so the producers will deliver coffee at the collection points and then later go to one of the Debtors' offices to receive payment. As a result, there may

be Foreign 503(b)(9) Claimants who delivered coffee within the 20-day period immediately preceding the Petition Date but who have not yet received payment — comprising the Foreign 503(b)(9) Claims. If the Debtors do not pay the Foreign 503(b)(9) Claims, the Foreign 503(b)(9) Claimants may seek to exercise creditor remedies that as a practical matter may not be subject to the automatic stay notwithstanding its global reach, or take extrajudicial action that might cause harm to the Debtors' employees or property of their estates. Such actions would significantly harm the business and interrupt the Debtors' ability to continue operations.

71.    Accordingly, the Debtors request the authority, but not the direction, to pay certain of the 503(b)(9) Claims on a case-by-case basis, up to an aggregate amount of $300,000, all of which approximately will be due and owing within thirty days after the Petition Date. The Debtors intend to pay prepetition Foreign 503(b)(9) Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs to their estates.

72.    **Critical Vendors:** The Debtors rely on certain domestic vendors, in addition to the Foreign Vendors, for services that are essential to their operations. The Debtors have thoroughly reviewed their business relationships and identified the Critical Vendors, the loss of whose particular goods or services would cause immediate and irreparable harm to the Debtors' businesses. If the Critical Vendors are not paid, their resulting unwillingness to continue to provide products or services would cause an interruption of the Debtors' operations that could jeopardize the Debtors' ability to operate their business in the ordinary course. Paying the Critical Vendors would permit the Debtors to maintain the value of the businesses, maximizing value for the benefit of creditors and stakeholders. Therefore, the Debtors seek authorization to make payments to the Critical Vendors in the amounts and to the extent necessary to satisfy non-disputed prepetition

Critical Vendor Claims, and to ensure the Debtors' continued receipt of goods and services and favorable credit terms from the Critical Vendors.

73.     **Customary Trade Terms:** The Debtors propose where practicable to condition the payment of Vendor Claims on the agreement of the Vendor Claimants to provide services to the Debtors on the most favorable trade terms that such Vendor Claimant offered to the Debtors in the twelve months prior to the Petition Date (the "**Customary Trade Terms**"), or such other terms as may be agreed upon between the parties. If any Vendor Claimant accepts payment on account of the Vendor Claim and does not continue to provide postpetition services to the Debtors on Customary Trade Terms, any payments made to such Vendor Claimant hereunder may be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code and may be recoverable by the Debtors.  In addition, the Debtors request that upon any refusal by a third party to release any products being held as security for such party's unsatisfied prepetition claim, the Debtors shall be entitled to seek an expedited hearing, on no fewer than five (5) days' notice, to compel the release of such property.

74.     The Debtors estimate that, as of the Petition Date, the aggregate amount of the Foreign Vendor Claims is approximately $308,773, approximately $301,370 of which will be due and owing within thirty days after the Petition Date.

75.     The Debtors estimate that, as of the Petition Date, the aggregate amount of the Foreign 503(b)(9) Claims is approximately $300,000, approximately all of which will be due and owing within thirty days after the Petition Date.

76.     The Debtors estimate that, as of the Petition Date, the aggregate amount of the Critical Vendor Claims is approximately $35,000, approximately all of which will be due and owing within thirty days after the Petition Date.

77.     Based on the foregoing, I believe that entry of an order to (i) pay the Foreign Vendor Claims, collectively in an amount not to exceed the Foreign Vendor Claims Cap, (ii) pay the Foreign 503(b)(9) Claims, collectively in an amount not to exceed the Foreign 503(b)(9) Claims Cap, (iii) pay the Critical Vendor Claims, collectively in an amount not to exceed the Critical Vendor Claims Cap; and (b) authorizing financial institutions to honor and process checks or electronic transfers used by the Debtors to pay the foregoing, is in the best interests of the Debtors, their estates and all parties-in-interest, and should be granted in all respects.

**E.     Motion of the Debtors for Entry of Interim and Final Orders Authorizing (A) the Debtors to Pay Certain Prepetition Claims of Shippers, Warehousemen, and Service Providers, and (B) Financial Institutions to Honor and Process Related Checks and Transfers ("<u>Lien Claimants Motion</u>")**

78.     By the Lien Claimants Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors, in their sole discretion, to pay in the ordinary course of business prepetition claims held by certain Lien Claimants in an amount not to exceed $1,589,821 on an interim basis; and (b) authorizing financial institutions to honor and process checks or electronic transfers used by the Debtors to pay the foregoing.  I believe the Debtors have strong business purposes for paying claims asserted by Lien Claimants. If the claims are not paid, I believe the Lien Claimants likely will halt shipments or take other actions that will disrupt the Debtors' operations. This could jeopardize the Debtors' ability to smoothly transition to Chapter 11.

79.     As part of their business operations, I understand the Debtors rely extensively and continually on a variety of common carriers and shippers (collectively, the "**Shippers**") to ship, transport, and deliver the Debtors' coffee (the "**Goods**") through national and international channels. This includes transporting the Goods by ocean freight from the origin country to the final destination country in either North America, Europe, or Asia, in accordance with scheduled

delivery periods. The Debtors typically contract with customers for delivery of the Goods three to four months in advance, but sometimes contract with customers for delivery of the Goods one to two years in advance. The shipment of such Goods is typically booked with the shipper one to two months in advance of the Goods' anticipated departure from the origin destination. Invoices for such ocean freight services are typically sent within ten days of receiving the Bill of Lading or shipment departure confirmation. Once the Goods arrive in the final destination country, the Goods are transported to various warehouses by truck, where the Goods are stored for final delivery to the customer. The Debtors rely on trucking companies in North America and Europe to deliver the coffee to the warehouses and then to the ultimate customer.

80.    Additionally, the Debtors are also reliant on a number of third-party warehousemen and storage facilities in North America and Europe (collectively, the "**Warehousemen**") to store the Goods and engage in inbound and outbound services. In certain instances, such as for specialty coffee companies with smaller orders, the customer may pick up the Goods once delivered to the final warehouse.

81.    For several reasons, the Debtors seek to pay the prepetition amounts owed to the Shippers and Warehousemen. The services the Shippers provide are critical to the Debtors' day-to-day operations. Without the Shippers, the Debtors would not be able to deliver the Goods to their customers. If the Shippers and Warehousemen are not paid, they may refuse to perform additional services for the Debtor. Further, because of the commencement of these Chapter 11 Cases, certain Shippers in various jurisdictions may refuse to book shipments for Goods that are already scheduled to be delivered, or may refuse to ship Goods that have already been booked but have not yet left the port for delivery. Warehousemen that hold the Goods may also refuse to release the Goods that are scheduled for delivery or pick-up by the customer, pending receipt of

payment for their services. In such event, the Debtors would incur significant additional expenses, such as premium replacement costs, that could exceed the amount of the prepetition charges that the Debtors seek authority to pay herein.

82.    Moreover, I understand that under certain nonbankruptcy laws, to the extent the Debtors have not paid for such services, a Shipper or Warehouseman may have a lien on the goods in its possession, which secures the charges or expenses incurred in connection with the transportation or storage of the Goods.[8] Accordingly, certain Shippers or Warehousemen may argue that they are entitled to possessory liens for transportation on the Goods in their possession, and may refuse to deliver or release such Goods before their claims have been satisfied and their liens redeemed. Pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

83.    To the extent that any Lien Claimant has perfected a lien on any of the Debtors' Goods or, in the Debtors' estimation, could assert and perfect a lien on the Goods, it is imperative that the Debtors be authorized to pay such Lien Claimants, regardless of whether their claims arose prior to or after the Petition Date. Such payment will secure the release of any such lien and the Debtors' continued uninterrupted access to their Goods. Further, if amounts owed to the Lien Claimants are not paid, certain of the Lien Claimants may be able to assert and perfect liens against certain of the Debtors' Goods, notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code.

---

[8] For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." U.C.C. § 7-307(a).

84.     In the ordinary course of their business, the Debtors make payments through third-party customs brokers, (the "**Customs Brokers**"), of customs duties to the U.S. Customs and Border Protection Agency (the "**U.S. Customs Service**") in connection with the import of the Goods to the United States. Similarly, the Debtors incur customs costs in connection with the export of the Goods from various jurisdictions. The Debtors rely on their Customs Brokers to facilitate and assist them with the payment of applicable customs duties ("**Customs Duties**"). With respect to the import of the Goods in Europe, the Warehousemen in Europe also act as the customs brokers to pay relevant customs duties to customs authorities in Europe.

85.     If any prepetition customs duties, import-related taxes, and other incidental import and related expenses and charges are not timely paid, the U.S. Customs Service may demand liquidated damages, assess interest, or impose other sanctions, including by asserting liens against the Goods under 19 C.F.R. § 141.1 (2005). Non-U.S. customs authorities could assert similar liens or take other actions against the Debtors in their respective jurisdictions. Further, the Customs Brokers may, in some instances, assert shippers' and warehousemen's liens against the Goods. Any liens or sanctions would be costly to the Debtors and their estates and inhibit the Debtors' receipt of the Goods. Accordingly, to facilitate continuous operations and avoid unnecessary costs and expenses, I believe it is necessary to pay the Customs Duties and Customs Brokers.

86.     As of the Petition Date, the Debtors owe certain Lien Claimants prepetition claims related to the transport or storage of the Goods. The Debtors estimate that as of the Petition Date, the amount of outstanding obligations owed to the Shippers is approximately $994,421, the amount of outstanding obligations owed to the Warehousemen is approximately $520,654, and the amount of outstanding obligations owed to the Customs Brokers is approximately $74,746. Of these

amounts, approximately $1,589,821 will come due within the first 30 days of these Chapter 11

Cases. As such, the Debtors seek to pay $1,589,821 on an interim and final basis.

87.     Based on the foregoing, I believe that granting the relief requested in the Lien

Claimants Motion is appropriate and in the best interests of the Debtors, their estates, and all other

parties in interest.

**F.    Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors
        to Maintain Existing Insurance Policies, Pay All Insurance Policy Premiums Arising
        Thereunder, and Renew or Enter Into New Insurance Policies ("Insurance Motion")**

88.     By the Insurance Motion, the Debtors request that the Court authorize the Debtors

to maintain existing insurance policies, pay all policy premiums arising thereunder, whether

prepetition or postpetition, and renew or enter into new policies as needed.

89.     The Debtors historically maintain numerous insurance policies with various

insurance companies (collectively, the "**Insurance Companies**") providing coverage for, *inter*

*alia*, general liability, excess liability, automobiles, property, and workers' compensation

(collectively, the "**Policies**"). I believe the continuation of the Policies and the renewal of and entry

into new insurance policies in the ordinary course is essential to the preservation of the value of

the Debtors' properties and assets.

90.     I understand that coverage provided by the Policies is required by the regulations,

laws, and contracts governing the Debtors' commercial activities, including the requirement of the

United States Trustee for the Southern District of New York (the "**U.S. Trustee**") that a debtor

maintain adequate coverage. While other alternatives exist, such alternatives likely require

considerable additional cash expenditures that could thwart the Debtors' efforts to preserve and

maximize the value of their estates. Accordingly, I believe that it is necessary and appropriate to

permit the Debtors to honor their obligations under their current Policies. The Debtors estimate

that as of the Petition Date, the obligations under their current Policies is approximately $232,299,

approximately $105,389 of which will come due within the first 30 days of these Chapter 11 Cases. As such, the Debtors seek to pay $232,299 on an interim and final basis.

91.    Based on the foregoing I believe that granting the relief requested in the Insurance Motion is appropriate and in the best interest of the Debtors, their estates, and all parties in interest.

**G.    Motion of the Debtors for Entry of Interim and Final Orders Authorizing (A) the Debtors to Pay Prepetition Use, Franchise, and Similar Taxes and Regulatory Fees in the Ordinary Course of Business and (B) Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto ("Taxes Motion")**

92.    By the Taxes Motion, the Debtors seek entry of interim and final orders, pursuant to sections 105(a), 363, 507(a) and 541(d) of the Bankruptcy Code, authorizing, but not directing, the Debtors, in their sole discretion to pay prepetition Taxes and Fees owed to the Taxing and Regulatory Authorities, provided that the aggregate amount of such payments shall not exceed $1,350,000. Of this amount, the Debtors are requesting authority to pay approximately $1,313,791 on an interim basis prior to the final hearing on the relief requested herein. In addition, the Debtors also seek authorization to honor (a) all checks that remain uncashed prior to the Petition Date or that are otherwise returned by a Taxing or Regulatory Authority, as well as (b) those Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date.

93.    To the extent any accrued Taxes and Fees of the Debtors were unpaid as of the Petition Date, I understand the Debtors' officers and directors may be subject to lawsuits in such jurisdictions during these Chapter 11 Cases. Such potential lawsuits would prove extremely distracting for (a) the Debtors, (b) the named officers and directors whose attention to the Debtors' Chapter 11 Cases is required, and (c) this Court, which might be asked to entertain various motions seeking injunctions with respect to the potential state court actions. Thus, I believe it is in the best interest of the Debtors and their estates to eliminate the possibility of the foregoing distraction.

94.     The Debtors also seek authority to pay all Withholding Obligations.  These amounts principally represent the Employees' earnings that governments, the Employees and the judicial authorities have designated for deduction from the Employees' paychecks. I have been advices that federal, state, and foreign laws require the Debtors to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authority. *See* 26 U.S.C. §§ 6672 and 7501(a).  The failure to make such payments may also subject the Debtors and their officers to federal or state liability. The failure to transfer these withheld funds could result in hardship to certain Employees or others. Furthermore, if the Debtors cannot remit these amounts, the Employees may face legal action due to the Debtors' failure to submit these payments.

95.     The Debtors also seek to pay certain Taxes and Fees to, among other things, forestall authorities in foreign jurisdictions from taking actions that may interfere with the operation of the Debtors' business or the administration of their Chapter 11 Cases. Such interference could include assessing penalties and/or significant interest on past-due taxes, closing down or denying entry to the Debtors' premises, seizing the Debtors' assets, or limiting the Debtors' ability to operate. This is of particular concern in the many jurisdictions outside of the United States where the Debtors do business where local governments may not respect or give recognition to the rights afforded to the Debtors by virtue of the automatic stay.

96.     For these reasons, I believe that authorizing the Debtors to pay, in their discretion, the prepetition Taxes and Fees will help the Debtors avoid serious disruption to their operations that would result from the nonpayment of such Taxes and Fees, including the distraction and adverse effect on morale that could result from liability for nonpayment imposed upon the Debtors' directors and officers. Furthermore, nonpayment of these obligations may cause Taxing and Regulatory Authorities to take precipitous action, including, but not limited to, filing liens,

preventing the Debtors from conducting business in applicable jurisdictions, and seeking to lift the

automatic stay, all of which could disrupt the Debtors' day-to-day operations, impose significant

costs on the Debtors' estates, destroy the going concern value of the Debtors' business, and disrupt

any efforts to pursue a sale of their assets and liabilities.

97.     Based on the foregoing, the payment of prepetition Taxes and Fees will help the

Debtors avoid serious disruption to their operations that would result from the failure to pay such

Taxes and Fees. I therefore submit that the relief requested is necessary and appropriate, is in the

best interests of the Debtors estates, and should be granted in all respects.

**H.     Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment ("Utilities Motion")**

98.     By the Utilities Motion, the Debtors seek entry of interim and final orders

(a) determining that their Utility Providers have been provided with adequate assurance of

payment within the meaning of Section 366 of the Bankruptcy Code; (b) approving the Debtors'

proposed offer of adequate assurance and procedures governing Utility Providers' requests for

additional or different adequate assurance; (c) prohibiting the Utility Providers from altering,

refusing, or discontinuing the Utility Services on account of prepetition amounts outstanding or on

account of any perceived inadequacy of the Debtors' proposed adequate assurance; (d) establishing

procedures for the Utility Providers to seek to opt out of the Debtors' proposed adequate assurance

procedures; and (e) determining that the Debtors are not required to provide any additional

adequate assurance beyond what is proposed by this Motion.

99.     In connection with the operation of their businesses and management of their

estates, the Debtors obtain electricity, internet, telephone, and other similar services (collectively,

the "**Utility Services**") from a number of U.S. utility companies (collectively, the "**Utility**

**Providers**"). The Debtors' aggregate average monthly cost for Utility Services is approximately $4,667.

100.    I believe that preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operation. Any interruption in Utility Services—even for a brief period of time—I believe would severely disrupt the Debtors' operation and could jeopardize the Debtors' ongoing efforts to stabilize its business and, ultimately, liquidate. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to preserve the value of their respective estates could be severely and irreparably harmed.  It is therefore critical that the Utility Services continue uninterrupted.

101.    The Debtors intend to pay all postpetition obligations and expect that revenues generated from their business operations and/or funds from their cash collateral and debtor-in-possession financing will be sufficient to pay all undisputed postpetition obligations owed to the Utility Providers in a timely manner. However, to provide adequate assurance of payment for future services to the Utility Providers  as set forth in section 366(c) of the Bankruptcy Code, the Debtors propose to deposit an initial sum equal to the Debtors' estimated average cost for two (2) weeks of Utility Services (the "**Adequate Assurance Deposit**"), into an existing, segregated bank account (the "**Adequate Assurance Account**") within fourteen (14) days of the entry of an interim order and only after approval of the Debtors' use of cash collateral and debtor-in-possession financing; *provided, however*, that no Adequate Assurance Deposit shall be made for any Utility Provider that already holds a deposit or prepayment equal to or greater than two (2) weeks of Utility Services.

102.    The Debtors also request authority, in consultation with the DIP Agent, to adjust periodically the amount in the Adequate Assurance Account to reflect  the  following  factors:

(a) the termination of Utility Services by the Debtors; (b) the entry into any agreements between the Debtors and the applicable Utility Providers; and (c) the removal of any amount spent on Utility Services from Utility Providers that hold postpetition deposits or other security from the Debtors for such services.

103.    The Debtors have not included providers whose services are exclusively internationally provided (the "**Foreign Utility Providers**") as Utility Providers for purposes of their Motion. However, the Debtors are seeking authority to propose a procedure whereby Foreign Utility Providers can consent to the jurisdiction of this Court and receive the treatment proposed for Utility Providers in the Motion.

104.    I believe the Debtors will have sufficient resources to pay, and intend to pay, all valid postpetition obligations for Utility Services in a timely manner. Further, I believe the Debtors' reliance on Utility Services for the operation of their business and preservation of value of their assets provides a powerful incentive to stay current on their utility obligations.

105.    Based on the foregoing, I believe that granting the relief requested in the Utilities Motion is appropriate and in the best interests of the Debtors, their estates, and all other parties in interest.

## I.    Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay (A) Prepetition Employee Obligations and (B) Maintain and Continue Employment Benefits and (II) Granting Related Relief ("Employee Obligations and Benefits Motion")

106.    By the Employee Obligations and Benefits Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) pay prepetition wages, salaries, and other compensation to their employees and (ii) maintain and continue employee benefits and other associated obligations in the ordinary course, including payment of certain prepetition obligations

related thereto, (b) authorizing the Debtors to honor certain obligations in connection with an anticipated reduction in their workforce, and (c) granting related relief.

107.    As of December 5, 2023 the Debtors employ approximately 803 employees, of which five are part-time or hourly and 798 are full-time or salaried employees (the "**Employees**").

108.    In the ordinary course of business, the Debtors incur payroll obligations for salaries or wages owed to their Employees. Salaries and wages for the Employees are paid either monthly or bi-weekly, based upon a schedule that varies depending on where the Employee is located. The average total monthly payroll obligations are approximately $1,334,447 for the Employees. As of the Petition Date, the Debtors estimate that they owe approximately $222,408 to their Employees on account of unpaid Wages earned by Employees prior to the Petition Date.  The entirety of this amount was earned in the 180 days prior to the Petition Date.  The Debtors are seeking authority, but not direction, to pay Wages in the ordinary course of business as they become due.

109.    The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Employee Compensation and Employee Benefits, including, among other things, wages, salaries, payroll processing costs, health insurance plans, life insurance, retirement plans, paid-time off, allowances, severance obligations, and certain other benefits that the Debtors have historically provided in the ordinary course and as further described in the Employee Obligations and Benefits Motion.

110.    Pursuant to the Employee Obligations and Benefits Motion, the Debtors also seek authority to honor and continue their programs, policies and practices with respect to Employee Compensation, Employee Benefits, and Termination-Related Payments in the ordinary course of business and in the same manner and on the same basis as the Debtors honored and continued such programs, policies and practices before the Petition Date, irrespective of whether such obligations

arose prepetition or postpetition. The Debtors believe that continuing and honoring these obligations in the ordinary course will be critical to retaining the Debtors workforce through the closure of the business. Additionally, I understand that certain non-U.S. laws require the payment of the Bonus Obligations, Termination-Related Payments, and other amounts such as PTO, that may come due as a result of the resignation or termination of an Employee. Failure to make these payments could result in fines to the Debtors or distracting and costly litigation in certain jurisdictions. Further, I understand that "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) of the Debtors are excluded from the relief requested in the Employee Obligations and Benefits Motion with respect to any Termination-Related Payments.

111.    The Debtors' ability to successfully operate depends on the services and dedication of the hundreds of men and women that make up their workforce. These Employees have worked tirelessly to sustain the Debtors' operations and prepare them for these Chapter 11 Cases. Although the Debtors plan to effectuate a 71% reduction in force on or about December 15, 2023, it is critical that the Debtors retain the remaining 29% of their Employees to provide support for the proper, responsible, and value-maximizing clearance of inventory, capital goods, technology, and other assets. Retention of these Employees will ensure that operations cease in a smooth and orderly manner.

112.    Thus, I believe it is essential to assure the Employees that the Debtors will honor the prepetition obligations with respect to Employee Compensation, Employee Benefits, and Termination-Related Payments, and continue to maintain the ordinary course of business with respect thereto throughout these Chapter 11 Cases. A failure to promptly do so may create concern and discontent among the Employees and could hinder the Debtors' operations and the administration of their estates. Loss of even a few key personnel, both the initial days of these

Chapter 11 Cases and after the initial reduction in force, could immediately and irreparably harm the Debtors' ability to maintain operations and maximize the value of its assets, all to the detriment of the Debtors and their estates.

113.   I believe that payment of all prepetition Employee Obligations in accordance with the Debtors' prepetition business practices will enable the Debtors to retain their employees and is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**J.   Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Cash Management System, (C) Waiving Certain Operating Guidelines and (D) Granting Administrative Expense Status to Postpetition Intercompany Claims ("Cash Management Motion")**

114.   By the Cash Management Motion, the Debtors seek entry of an order (a) authorizing, but not directing, the maintenance of Bank Accounts and continued use of existing Business Forms; (b) authorizing, but not directing, continued use of the Cash Management System; (c) waiving certain of the investment and deposit Guidelines set forth by the United States Trustee for the Southern District of New York; (d) granting administrative expense status to postpetition intercompany claims and permitting only those intercompany transfers that comply with the terms and conditions provided in the interim and final orders; and (e) providing any additional relief required in order to effectuate the foregoing.

115.   The continued use of the cash management system and the bank accounts during the pendency of these Chapter 11 Cases is essential to the Debtors' business operations. The Debtors believe that the bank accounts and related cash management system mechanisms are well-suited to the Debtors' business needs and operations. To require the Debtors to close over 78 bank accounts and reestablish new accounts would not result in greater administrative controls and would require considerable time and expense to the Debtors' estates. Moreover, permitting the Debtors to continue using their existing bank accounts is essential to a smooth and orderly

47

transition of the Debtors into chapter 11 and to avoid disruption of their businesses and operations, including the disruption that could result if checks written but not negotiated or cashed prior to the Petition Date were dishonored.

116.    Here, the Debtors' Cash Management System constitutes a customary and essential business practice that was created and implemented by the management of the Debtors in the exercise of their business judgment. The Cash Management System is a practical mechanism that allows the Debtors to transfer their revenues to the payment of their obligations, which decreases the burdens on the Debtors, and that provides several important benefits, including the ability to: (a) control and monitor corporate funds; (b) ensure cash availability and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. All of these benefits will assist the Debtors in their efforts to maintain their operations and the disposition of their assets, making the relief requested herein appropriate under section 105(a) of the Bankruptcy Code.

117.    As part of the requested relief, the Debtors also seek a waiver of the requirement to establish specific bank accounts for tax payments. The Debtors believe that tax obligations can be paid most efficiently out of the existing Bank Accounts, that the United States Trustee can adequately monitor the flow of funds into, among and out of the Bank Accounts, and that the creation of new debtor-in-possession accounts designated solely for tax obligations would be unnecessary and inefficient.

118.    In the ordinary course of business, the Debtors utilize a variety of business forms, including, checks, invoices, envelopes, promotional materials and other business forms (the "**Business Forms**").  To minimize administrative expense and delay, the Debtors request authority

to continue to use their Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' "Debtor-in-Possession" status.

119.    In the ordinary course of business, the Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts certain service charges and other related fees, costs, and expenses charged by the Banks (collectively, the "**Bank Fees**"). The Debtors incur Bank Fees on account of, among other things, initiating ACH payments, wires, or checks. The Bank Fees collectively average approximately $24,000 per month.  As of the Petition Date, the Debtors do not believe that they have any outstanding or unpaid Bank Fees. Out of an abundance of caution, and to ensure continued access to the Bank Accounts and related banking services, the Debtors seek authority to pay any prepetition Bank Fees that may have been incurred and to continue to pay the Bank Fees in accordance with past practices.

120.    As part of the Cash Management System, and in the ordinary course of business, the Debtors maintain various company paid credit cards (collectively, the "**Corporate Charge Card**") that are utilized to pay for certain work-related expenses, fuel, supplies, and other small, non-recurring purchases made on behalf of the Debtors. In general, Corporate Charge Cards are issued to specific employees, who file expense reports for the Debtors' payment of business-related expenses incurred on the Corporate Charge Cards. The Debtors directly incur certain business-related expenses through the Corporate Charge Cards, without the Debtors' employees incurring any reimbursable expenses. The Debtors receive monthly statements for purchases (the "**Corporate Card Expenses**") made with the Corporate Charge Cards in the preceding month. Once the Debtors determine that the Corporate Card Expenses comply with the Debtors' policies and procedures, the Debtors typically pay at least part of the outstanding Corporate Card Expenses within 30 days of receipt of such statements. As of the Petition Date, the Debtors estimate that

there are $108,000 of accrued but unpaid Corporate Card Expenses that will become due and owing within the first 30 days of these Chapter 11 Cases.

121.    Use of the Corporate Charge Cards is essential to maintaining the Debtors' business. The Debtors' inability to maintain the Corporate Cards could impose a hardship on its employees. Because certain Corporate Charge Cards are issued directly to certain employees, such employees may be held personally liable for any unpaid obligations even though the obligations were incurred for the Debtors' benefit. Thus, the Debtors' inability to pay Corporate Card Expenses likely would impose significant hardship on the employees. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue using the Corporate Charge Cards in the ordinary course of business and to pay any prepetition or postpetition Corporate Card Expenses or fees with respect to the Corporate Charge Cards.

122.    In the ordinary course of business, Mercon BV maintains business relationships and consummates transactions with each of the Debtor entities (excluding Mercafe Vietnam and Mercapital de Nicaragua, S.A.). These relationships generate intercompany receivables and payables (the "**Intercompany Claims**") from the various types of transactions (the "**Intercompany Transactions**"). The Debtors often enter into Intercompany Transactions in connection with revenue generated from coffee sales. Specifically, such revenue is automatically deposited into the Key Bank Accounts. Each of the Debtors that provide services associated with this revenue issue fund requests to Mercon BV for operating expenses attributable to their respective operations. These fund requests generate Intercompany Claims owing from Mercon BV to the applicable Debtor. Accordingly, the Debtors request authority to continue the Intercompany Transactions in the ordinary course consistent with past practice. The Debtors do not seek authority to transfer funds to, or make payments on behalf of, any non-Debtor affiliates during the pendency

of these Chapter 11 Cases, but the Debtors reserve the right to seek such relief by separate motion if needed.

123.    Without the relief requested, I believe the Debtors would be unable to effectively and efficiently maintain their financial operations. Such a result would cause significant harm to the Debtors' businesses and the value of their estates. Accordingly, I believe that the relief requested is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

**K.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Prepetition Hedging Practices, (B) Commence Postpetition Hedging Practices, (C) Grant Superpriority Claims, and (D) Pay Prepetition Hedging Obligations, and (II) Granting Related Relief ("Hedging Motion")**

124.    By the Hedging Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (a) continue the Prepetition Hedging Practices, (b) commence Postpetition Hedging Practices, (c) grant Superpriority Claims on account of the Postpetition Hedging Obligations, and (d) pay Hedging Obligations, whether they arose prepetition or postpetition, in the ordinary course of business.

125.    I believe it is necessary to continue the Debtors' customary practices regarding the Hedging Contracts in order to assure their counterparties and incentivize them not to close out the Debtors' hedging positions to the detriment of their estates. Accordingly, I have been advised that continuing the Prepetition Hedging Practices and honoring Hedging Obligations, including posting margin calls, as necessary, is within the ordinary course of business and consistent with standard industry practice. The Debtors submit that authority to continue or enter into the Hedging Practices is appropriate and in the best interests of the Debtors and their estates and should be permitted. Even if continued performance under the Hedging Practices were not in the ordinary course of business, the Court should authorize the Debtors to perform under the Hedging Practices pursuant to

section 363(b) of the Bankruptcy Code because continued performance of the Hedging Practices is a sound exercise of the Debtors' business judgment.

126.    I believe the decision to continue providing services under the Hedging Practices, including the posting of daily margin calls and granting of Superpriority Claims, is in the Debtors' sound business judgment because it is essential to continuing the Debtors' operations. By contrast, a limitation on the Debtors' ability to commence the Postpetition Hedging Practices will: (a) cause disruption to the Debtors' operations; (b) require the immediate attention of the Debtors' management at a time when their resources are limited and better spent on the Chapter 11 Cases; (c) effectively prevent the Debtors from entering into any new contracts and agreements under the Hedging Practices because Hedging Counterparties may require credit support in the form of unduly burdensome collateral and security requirements; and (d) compromise the Debtors' ability to make progress in the Chapter 11 Cases because of their new exposure to previously-hedged fluctuations in coffee prices and foreign currency exchange rates.

127.    The relief sought herein is intended to preserve the value of assets of these Chapter 11 Cases.  To effectively manage the financial risks inherent to the Debtors' business and fluctuating price of coffee and foreign currency exchange rates, the Debtors must be able to continue the Hedging Practices.  The Debtors believe that the Court's authorizing the Debtors to continue the Hedging Practices will underscore the Debtors' intent and ability to continue performing under any contracts or agreements entered into under the Hedging Practices, minimize disruption by premature, unilateral termination of such contracts or agreements by certain of the Hedging Counterparties, and avoid the risks associated with Hedging Counterparties refusing to deal with the Debtors on a postpetition basis.

128.    Termination of the Debtors' Hedging Contracts would (a) cause disruption to the Debtors' operations; (b) require the immediate attention of the Debtors' management at a time when their resources are extremely stressed; and (c) unnecessarily expose the Debtors to fluctuations in coffee prices and foreign currency exchange rates.  In light of these foreseeable risks, the Court should authorize the Debtors to continue performing under their Hedging Contracts, and, where necessary, provide credit support.

129.    Based on the foregoing, I believe that granting the relief requested in the Hedging Motion is appropriate and in the best interests of the Debtors, their estates, and all parties in interest.

**L.    Application of the Debtors for Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent ("Kroll Retention Application")**

130.    By the Kroll Retention Application, the Debtors request entry of an order appointing Kroll as the Claims and Noticing Agent for the Debtors and their Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases.

131.    I understand Kroll is comprised of leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases. I believe that Kroll's professionals have experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases and that Kroll's rates are competitive and reasonable given Kroll's quality of services and expertise.

132.    I believe the Debtors' selection of Kroll to act as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)* (the "**Claims Agent Protocol**"), in that the Debtors obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection

through a competitive process.  Based on all engagement proposals obtained and reviewed, that

Kroll's rates are competitive and reasonable given Kroll's quality of services and expertise.

133.    Although the Debtors have not yet filed their schedules of assets and liabilities, they

anticipate that there will be in excess of 14,000 entities to be noticed.  In view of the number of

anticipated claimants and the complexity of the Debtors' businesses, I have been advised that the

appointment of a claims and noticing agent is required by Local Rule 5075-1(b) and is otherwise

in the best interests of both the Debtors' estates and their creditors.  Based on the foregoing, I

believe that the relief requested in the Kroll Retention Application should be approved.

## M.    Motion of the Debtors to Assume that Certain Executory Contract Between Debtor Mercon B.V. and V2 Global, Inc. ("Motion to Assume")

134.    By the Motion to Assume, the Debtors seek to assume the V2 Agreement.  The V2

Services are necessary to protect the Debtors' assets and employees. I understand that assumption

of the V2 Agreement is a proper exercise of the Debtors' business judgment. The V2 Services

supplied by V2 are critical to the Debtors' smooth transition into Chapter 11. If the Debtors lost

access to the V2 Agreement, V2's personnel would be withdrawn and the Debtors' ability to

safeguard their employees protect and preserve their assets during the pendency of these Chapter

11 Cases would be diminished. More importantly, certain employees could become subject to

physical harm in the course of local creditors engaging in self-help. Thus, the additional security

capability provided by V2 is required to safeguard the Debtors employees and property of the

estates. Any interruption in the V2 Services could be highly value-destructive to the Debtors'

business by materially impairing the Debtors' opportunity and ability to preserve assets and

liquidate in an orderly fashion.

135.    Based on the foregoing, I believe that granting the relief requested in the Motion to

Assume is appropriate and in the best interests of the Debtors, their estates, and all parties in

interest.

**O.    Debtors' Motion for Entry of an Order (I) Authorizing Harve Light to Act on Behalf of Their Estates in Foreign Countries, and (II) Granting Related Relief**

136.    By way of this 1505 Motion, the Debtors seek to establish my authority to act on behalf of the Debtors' estates in any foreign country in which property of their estates may exist, such acts including (but not necessarily limited to) direction of the commencement and prosecution of any preventive restructuring proceedings under the *Wet Homologatie Onderhands Akkoord* in The Netherlands (the **"Dutch WHOA Proceeding"**), and such other concurrent foreign proceedings (collectively with the Dutch WHOA Proceeding the **"Foreign Proceedings"**),[9] as may be deemed necessary in any other foreign country or countries in conjunction with these Chapter 11 Cases

137.    The first-described component of the relief requested in this 1505 Motion is intended to eliminate any uncertainty surrounding my authority to act, and direct others to act, for and on behalf of the Debtors' estates in the foreign countries in which they hold assets and/or conduct business operations.  As those operations often involve dealings and interactions with counterparties and other persons and entities who are unlikely to be familiar with the concept of a debtor in possession and its authority to continue to operate the business of the Debtors in the ordinary course, this 1505 Motion seeks to designate me as "responsible person" to act as may be necessary to direct their internal administration, business operations and disposition of assets in foreign countries, as may be consistent with the rights, powers and duties of debtors in possession under section 1107(a) of the Code, 11 U.S.C. §1107(a).

---

[9] It is initially contemplated that the Debtors shortly will commence the Dutch WHOA Proceeding as a concurrent proceeding in The Netherlands. By separate Motion the Debtors have requested authority for Debtor Mercon Coffee Corporation to act as foreign representative in the filing of an ancillary proceeding for Debtor Mercon Brasil Comércio de Café Ltda. in Brazil, and other ancillary proceedings in other countries as may be deemed necessary in aid and enforcement of these Chapter 11 Cases.

138.    The second component of this 1505 Motion is more specific and seeks to authorize me in the capacity as "responsible person" to initiate and direct the Dutch WHOA Proceeding for Debtor Mercon B.V.  As The Netherlands has not adopted the UNCITRAL Model Law on Cross Border Insolvency and it is uncertain at best whether and to what extent the Dutch Court would grant recognition and relief in aid of these Chapter 11 Cases, the Debtors' Dutch counsel have advised that the best legal option to ensure the protection of Mercon B.V.'s assets and continue its operations in The Netherlands is through commencement of the Dutch WHOA Proceeding.  The Debtors and I are further advised that the commencement of a public Dutch WHOA Proceeding will be recognized automatically in all other European Union member states under the provisions of the European Insolvency Regulation (Regulation (EU) 2015/848 of 20 May 2015), and thereby protect any assets and operations of Mercon B.V. in those countries as well.

139.    The third component of the relief sought in this 1505 Motion is derived from the authority sought as described above for the Dutch WHOA Proceeding, in the event the Debtors determine that it is necessary or advisable to commence other concurrent plenary proceedings under the insolvency, restructuring or bankruptcy laws of other countries in which they may hold assets or transact business.  In order to eliminate the need for piecemeal proceedings before this Court and better address any exigent circumstances that may arise in such countries, this Motion seeks authority for me to direct the filing of such proceedings in other foreign countries where the need may arise.

140.    All of the relief sought in this 1505 Motion is consistent with, and intended to advance, the goals and objectives of these Chapter 11 Cases.  For that reason, and for avoidance of doubt, the Motion also seeks authority for me to initiate efforts to facilitate court-to-court communications between this Court and the Dutch Court in the Dutch WHOA Proceeding, and if

necessary with any other foreign courts in which other concurrent proceedings may be initiated.

**P.    Debtors' Motion Pursuant to Section 1505 of the Bankruptcy Code for Authorization of Mercon Coffee Corporation to Act as Foreign Representative of the Debtors**

141.    By way of this 1505 Motion, the Debtors seek to authorize Debtor Mercon Coffee Corporation (previously defined herein as "**Mercon US**") to act as foreign representative to initiate the Brazil Ancillary Proceeding, and such other ancillary proceedings as may be deemed necessary and appropriate to seek recognition and relief in aid of this Court's administration of these Chapter 11 Cases.

142.    I am advised that unlike The Netherlands, Brazil has adopted the UNCITRAL Model Law, on terms that are virtually identical to Chapter 15 and related provisions of the United States Bankruptcy Code.  Among those terms are the requirement that an ancillary proceeding seeking such recognition and relief be filed by a "foreign representative" authorized to act in such capacity by the court in which the underlying foreign proceeding is pending.  As described more particularly in this 1505 Motion I am advised that in several other Chapter 11 cases filed in this District the debtors have sought and obtained an order authorizing one of the debtors to act in the capacity of foreign representative so as to satisfy the requirements of applicable foreign law.

143.    I am further advised that unlike the requirement of the US Bankruptcy Code that each member of a corporate group file a separate petition for relief, Brazilian law permits the filing of a single petition and action on behalf of all or multiple members of a related corporate group. Accordingly, this 1505 Motion seeks to appoint and authorize Mercon US to serve as foreign representative to initiate the Brazilian Ancillary Proceeding on behalf of the Debtors.  I am advised that this form of filing is best calculated to lead to a finding that the COMI of the Debtors on a collective basis is in the United States, and thereby to the recognition of these Chapter 11 Cases as a foreign main proceeding by the Brazilian Court.

144.    As with the prior 1505 Motion, this Motion also contemplates the possibility that additional proceedings may be required in the courts of other countries in which the Debtors hold assets or conduct operations.  In order to eliminate the need for piecemeal proceedings before this Court and better address any exigent circumstances that may arise in such countries, this Motion seeks authority for Mercon US to act as foreign representative in such other ancillary proceedings as may arise.

### III.    INFORMATION PROVIDED PURSUANT TO LOCAL RULE 1007-2(a)

> The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

### A.    Consolidated List of the Holders of the Debtors' Thirty Largest Unsecured Claims[10]

145.    Pursuant to Local Rule 1007-2(a)(4), the attached **Schedule 1** is a consolidated list of the Debtors' creditors holding the thirty largest unsecured claims (the "**Consolidated Creditor List**") based on the Debtors' unaudited books and records as of the Petition Date. The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the thirty largest unsecured claims.

### B.    Consolidated List of the Holders of the Debtors' Largest Secured Claims

146.    Pursuant to Local Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.[11]

---

[10] While the Local Bankruptcy Rule require disclosure of the holders of the twenty largest unsecured claims, the Debtors have included a list of the holders of the thirty largest unsecured claims.

[11] As of the Petition Date, there are only 4 secured creditors.

| Creditor | Contact Information | Approximate Amount of Claim | Type of Collateral |
|---|---|---|---|
| Cooperatieve Rabobank U.A. | Haydn Scarr Haydn.Scarr@rabobank.com; Naoko Kojima Naoko.Kojima@rabobank.com | $203,532,930 | Accounts Receivables / Net Forward Book and Inventory |
| FMO: Dutch Entrepreneurial Development Bank | Carlos Guadamuz Mejia C.Guadamuz.Mejia@fmo.nl; Soledad Jiron Hernandez S.Jiron@fmo.nl | $28,333,802 | Advances to Growers / Real Estate |
| Starbucks Coffee | Peter De Neumann pdeneuma@starbucks.com | $7,500,000 | Advances to Growers |
| Banco de Fomento a la Producción | Guillermo Ramon Gutierrez Prado guillermo.gutierrez@bfp.com.ni | $6,948,657 | Advances to Growers / Real Estate |

## C.    Summary of the Debtors' Assets and Liabilities

147.    Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis. The following financial data is the latest available information and reflects the Debtors' financial condition as of the Petition Date.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets (Book Value as of December 6, 2023) | $359,000,000 |
| Total Liabilities (Book Value as of December 6, 2023) | $357,000,000 |

## D.    Summary of Publicly Held Securities of the Debtors

148.    Pursuant to Local Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the approximate number of holders thereof as of the Petition Date.

None.

## E.    Summary of the Debtors' Property Held by Third Parties

149.    Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

150.    Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians,

public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

151.    The following is a list of certain real property currently in the possession of third parties:

| Mercon Company | Asset Type | Property Name | Address |
|---|---|---|---|
| Mercapital de Nicaragua S.A. | Farm | Berman Guillermo Chavarria Martinez | Comarca El Zarayal, del Acopio El Zarayal 2 Km al fondo y 200 vrs al norte, carretera a Abisinia. Jinotega, Nicaragua |
| Mercapital de Nicaragua S.A. | Farm | Federico Eslter | Comunidad Ayapal, Sn José de Bocay, El Cua, Nicaragua |
| Mercapital de Nicaragua S.A. | Farm | Federico Michael Elster Chavarria | Comunidad Ayapal, Sn José de Bocay, El Cua, Nicaragua |
| Mercapital de Nicaragua S.A. | Land | Francisco Cordero Castillo | Comunidad El Galope, de la Iglesia de Dios de la profecía 300mtrs al norte, 30 metros al oeste. El Cua, Jinotega, Nicaragua |
| Mercapital de Nicaragua S.A. | Land | Iris Isabel Ortiz | Comarca Santa Maria del Cedro, número 4. El Cua, Jinotega, Nicaragua |
| Mercapital de Nicaragua S.A. | Farm | Raymundo Martinez Peralta | Comaca San Jose del Ojoche, frente a Escuela Cristo Rey. San Juan del Rio Coco, Nicaragua |

## F.    Summary of the Debtors' Property From Which the Debtors Operate Their Businesses

152.    Pursuant to Local Rule 1007-2(a)(9), the attached **Schedule 2** lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

G.    **Location of the Debtors' Substantial Assets, Books and Records, and the Nature and Location of the Debtors' Assets Outside the United States**

153.    Pursuant to Local Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

154.    The vast majority of the Debtors' assets are located outside of the United States. The Debtors have assets in numerous locations throughout the world. The Debtors' assets located outside of the United States include cash, contract rights, equipment, and coffee inventory. The aggregate net book value of all assets located outside the United States as of the Petition Date is approximately $293 million.

155.    The Debtors have assets of approximately $66 million in the United States, consisting of cash, accounts receivable, and other current assets.

156.    The Debtors' books and records are primarily located in Nicaragua.

H.    **Summary of Legal Actions against the Debtors**

157.    Pursuant to Local Rule 1007-2(a)(11), the Debtors hereby provide a list of material actions and proceedings pending or threatened against the Debtors or its properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date. This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these Chapter 11 Cases.

158.    The Debtors have received a notice from Common Fund for Commodities ("**CFC**") of its intention to file a petition for declaration of bankruptcy against Debtor Mercon B.V. in the District Court of Amsterdam, The Netherlands (the "**Dutch Court**"), in the event that certain amounts claimed as due from Mercon B.V. are not paid by December 13, 2023. The Debtors believe

that the claim asserted by CFC falls within the scope of the worldwide automatic stay established

under section 362(a) of the Bankruptcy Code, but nevertheless are taking additional steps to ensure

that the CFC petition does not proceed to adjudication in the Dutch Court.

**I.      The Debtors' Senior Management**

159.    Pursuant to Local Rule 1007-2(a)(12), the attached **Schedule 3** provides the names

of the individuals who constitute the Debtors' existing senior management, their tenure with the

Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition

Date.

**J.      The Debtors' Payroll for the 30 Day Period Following the Filing of the Debtors'
        Chapter 11 Petitions**

160.    Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for

the 30-day period following the Petition Date, the estimated amount of payroll to the Debtors'

employees (exclusive of officers, directors, and stockholders), the estimated amount paid or

proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be

paid to financial and business consultants retained by the Debtors.

| | |
|---|---|
| **Payments to Employees (Not including Officers, Directors, and Stockholders)** | $844,165 |
| **Payments to Officers, Directors, and Stockholders** | $115,577 |
| **Payments to Financial and Business Consultants** | $2,300,000 |

**K.      The Debtors' Estimated Cash Receipts and Disbursements for the Thirty (30) Day
        Period Following the Filing of the Chapter 11 Petitions**

161.    Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period

following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain

or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Category | 30 Day Period Post-Petition |
|---|---|
| Cash Receipts | $20,596,332 |
| Cash Disbursements | $10,249,584 |
| Net Cash Gain / (Loss) | $10,346,748 |
| Unpaid obligations | $3,088,197 |
| Uncollected receivables | $25,855,027 |

## V.    CONCLUSION

For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Bankruptcy Court grants the relief requested in each of the First Day Motions and respectfully request the Bankruptcy Court to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 6, 2023

/s/ *Harve Light*
Harve Light
Chief Restructuring Officer

**Exhibit A**

**Organizational Chart**

**(Attached)**

# Organizational Chart



**Schedule 1**

**Consolidated List of the Holders of the Debtors' Thirty Largest Unsecured Claims**

**(Attached)**

Fill in this information to identify the case

Debtor name Mercon Coffee Corporation

United States Bankruptcy Court for the: Southern District of New York

Case number (If known): _____

☐ Check if this is an
amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders

12/15

**A list of creditors holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1. | Stichting andgreen.fund (&Green) Basisweg 10, 1043AP, Amsterdam, The Netherlands | Johnny Brom +31 (0)70 744 8884 brom@sailventures.com | Subordinated Loan | | | | $20,000,000 |
| 2. | Crowdout Capital LLC 812 San Antonio St Suite 105 Austin, TX 78701 | Adam R. Weber 512.538.1883 aweber@crowdoutcapital.com | Subordinated Loan | | | | $20,000,000 |
| 3. | LaFise Nicaragua Centro Financiero LAFISE, Km. 5 1/2 Carretera Masaya Codigo Postal 14187 Managua, Nicaragua | Manuel Jerez (505) 2255-8888 Ext. 4244. mjerez@lafise.com | Bank Loan | | | | $19,490,776 |
| 4. | London Forfaiting 15 Austin Friars London, EC2N 2HE United Kingdom | Carlos Lunardini (+1) 212 377-2016 Carlos.Lunardini@forfaiting.com | Bank Loan | | | | $13,000,000 |
| 5. | Banco Agromercantil 7a. Avenida 7-30 Zona 9 Codigo Postal 01009 Ciudad de Guatemala Guatemala | Felipe Alfonso Galvez Berganza +502 2338- 6565 Ext.: 97691 felipe.galvez@bam.com.gt | Bank Loan | | | | $9,000,000 |
| 6. | Nederlandse Financierings-Maatschappij voor Ontwikkelingslanden N.V. (FMO) Anna van Saksenlaan 71 I P.O. Box 93060 2509 AB The Hague The Netherlands | Anton Timpers +31 (0)70 314 9778 a.timpers@fmo.nl | Subordinated Loan | | | | $5,000,000 |

Debtor Mercon Coffee Corporation _____    Case number (*if known*)_____
_____ Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 7. Common Fund for Commodities Rietlandpark 301 1019 DW Amsterdam Netherlands | Ms. Tia Sudjarwo 0031 20 5754967 tia.sudjarwo@common-fund.org | Bank Loan | | | | $4,000,000 |
| 8. Banco Internacional de Costa Rica Avenida Balboa y Calle Aquilino De La Guardia Código Postal: 081607810 Ciudad de Panamá Panamá | Karla Castillo - Ejecutivo Corporativo +505 8884-2096 kcastillo@bicsa.com | Bank Loan | | | | $3,500,000 |
| 9. Banco Safra S.A. Av. Paulista 2100 6 Andar Sao Paulo Zip Code 01310-930 | Thiago de Castro Santos 55 11 2472-4133 castro.thiago@safra.com.br | Bank Loan | | | | $3,246,500 |
| 10. BAC Panama Calle Aquilino De La Guardia Edificio BAC Credomatic Código Postal: 081906536 Ciudad de Panamá Panamá. | Ramiro Jesus Aguilar Ochoa (507) 6151-8196, (507) 6439-5496 RamiroAguilarO@pa.bac.net | Bank Loan | | | | $3,000,000 |
| 11. BAC Nicaragua Centro Financiero BAC Km 4 1/2 Carretera a Masaya Código Postal 14125 Managua, Nicaragua | Myriam Caldera Gurdian (505) 2274-4444. (505) 8871 1314 mcaldera@baccredomatic.ni | Bank Loan | | | | $2,000,000 |
| 12. Banco de Finanzas S.A. Centro Corporativo BDF Del Club Terraza 440m. al este Código Postal 14114 Managua, Nicaragua | Maria Felicia Otero Castilblanco +(505) 2276-8600 Ext 2075 +(505) 8720-1129 maria.otero@bdfnet.com | Bank Loan | | | | $2,000,000 |
| 13. Zenith Group Advisors 445 Park Avenue 9th Floor New York, NY 10022 | Cole Reifler - 310 382 0211 creifler@zenithgroupadvisors.com | Trade | | | | $1,800,000 |
| 14. Banco ABC Brasil S.A. AV. Cidade Jardim 803 2O Andar Sao Paulo/SP Zip Code 01453-000 | Michelle Amorim de Araujo Cunha 55 (31) 99885-9464 michelle.cunha@abcbrasil.com.br | Bank Loan | | | | $1,227,524 |
| 15. Banco Santander (Brasil) S.A. Av. Pres. Juscelino Kubitschek 2041 - CJ 281, Bloco A, Cond. Wtorre JK - Vila Nova Conceição São Paulo-Sp Zip: 04543-011 | Rafael Carvalho de Souza 55 (35) 999507388 rafael.carvalho.de.souza@santander.com.br | Bank Loan | | | | $807,556 |

Debtor __Mercon Coffee Corporation_____     Case number *(if known)*_____
        Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 16. | Blendcoffee Comercio Exportacao E I Avenida Cerejeiras, 395 - Bairro Movelar. Linhares/ES | Julio Cesar Galon Moro (27) 99984-1250 Diretoria@blendcoffee.ind.br | Trade | | | | $589,804 |
| 17. | Expocaccer – Matriz Av Faria Pereira. Patrocinio Minas Gerais 38740-514, Brasil | Rubstein 55 34 3839-9300 rubstein@expocaccer.com.br | Trade | | | | 585,283 |
| 18. | Aklilu Kassa Chirrissa (Nardos Coffee Export) Akaky Kality Subcity, Woreda 05, House No. 9999, Addis Ababa, Ethiopia | Dessalegn Jena +251114667545/0298 dessalegnjena@gmail.com; info@nardoscoffee.com | Trade | | | | 350,266 |
| 19. | Banapiña de Nicaragua, S.A. Oficina Asesores Legales Consortium, De donde fue el Hospital Militar, 1C. Al lago, 10 varas abajo, Managua, Nicaragua. | Carlos Taboada +505 2254-5454 ctaboada@consortiumlegal.com | Trade | | | | $179,124 |
| 20. | Nova Safra Transportes Ltda Av. Otto Salgado, 700 Distrito Industrial Claudio Galvão De Nogueira, Varginha - MG 37026-690 | Viviane Maselli Spinola 55 (35) 3222-7676 (35) 99229-3913 comercial@novasafralog.com.br | Trade | | | | $169,570 |
| 21. | Commodity Supplies AG 7975 NW 154th St Suite 200. Miami Lakes, FL 33016 United States | Kornelia Tiede +1 305-207-2954 kornelia.tiede@commodity.ch | Trade | | | | $146,322 |
| 22. | Kerchanshe Trading plc 6th Floor, Africa Insurance Building, South African Street P.O. Box 19891 Addis Ababa, Ethiopia | Yigezu Legesse +251-11-3716370/+251-96-2414141 info@kerchanshe.com | Trade | | | | 143,519 |
| 23. | Revolucao Transportes Ltda F Alameda Do Cafe, 195 - Jardim Andere – Varginha/ MG - Zip Code: 37026-400 | Lincoln Moreira Gabriel 55 (35) 3015-2706 (33) 99921-9561 lincoln.gabriel@revolucaotransportes.com.br | Trade | | | | $134,080 |
| 24. | Jorge Luiz Maiolini Faz Cruz De Moisés, S/N, Zona Rural, Eloi Mendes - Mg. Zip Code: 31110-000 | Jorge Luiz Maiolini (35) 99988-2522 | Trade | | | | $129,326 |

Debtor _Mercon Coffee Corporation_____        Case number (*if known*)_____

Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 25. Detech Coffee To dan pho Thap, Phuong Di Su, Thi xa My Hao, Tinh Hung Yen, Vietnam | Mr. Sinh - To dan pho Thap, Phuong Di Su, Thi xa My Hao, Tinh Hung Yen, Vietnam Mr Sinh - 0221 730 6688 sinh@detechcoffee.com | Trade | | | | $111,386 |
| 26. M&M Cafe Ltda Avenida Melo Viana, 604. Manhuaçu, Minas Gerais 36902-290 | M&M Cafe Ltda 55 33 3331-1879 escritaservicoscontabeis@gmail.com; mbr.voucher@merconcorp.com | Trade | | | | $106,603 |
| 27. Agroindustrias Unidas de México S.A. de C.V. (AMSA) Bosques de Alisos No 45-A 2do piso, Bosques las Lomas, Ciudad de México, DF, México. | Alfredo Bojalil +52 55 52576500 alfredo.bojalil@ecomtrading.com | Trade | | | | $86,321 |
| 28. Revolucao Transportes Ltda BA Rua Maximo Matos, 6 SL1. Encruzilhada, Bahía 45150-000 | Lucas Moreira 55 3333316736 lucas.gabriel@revolucaotransportes.com.br | Trade | | | | $83,010 |
| 29. Federacion Nacional de Cafeteros de Colombia Calle 73 Numero 8-13, Bogotá, Colombia | Germán Bahamón 3136700313600/3137317 german.bahamon@cafedecolombia.com | Trade | | | | $81,991 |
| 30. Finca Churupampa Perú S.A.C. Cal Chinchipe SN Centro Chirinos. San Ignacio, Perú | Finca Churupampa Perú S.A.C. +51 949 605 978 contacto@fincachurupampa.com | Trade | | | | $75,905 |

**Schedule 2**

**Summary of the Debtors' Property From Which the Debtors Operate Their Businesses**

| Debtor Entity | Address |
|---|---|
| **Owned Properties or Assets** | |
| Cisa Exportadora SA | Km 120 Comarca Guayacan, Carrereta Sébaco-Matagalpa, banda norte Sébado, Matagalpa |
| Cisa Exportadora SA | Comarca La Sardina, Km 286.4 carretera Nueva Guinea – Bluefields, Nueva Guinea, RACCS |
| Cisa Exportadora SA | Km 227.2 Carretera Panamericana Norte, Caseta de control 70 mts al norte, banda Este Ocotal, Nueva Segovia |
| Cisa Exportadora SA | Km 38 carretera Panamericana Sur, entrada Finca El Carmen 1.2 km al oeste, Diriamba, Carazo. |
| Cisa Exportadora SA | Km 226.5 Carretera Panamericana Norte, costado norte de Servicentro Las Segovias, Ocotal, Nueva Segovias |
| Mercafe Vietnam LTD | No.3 Street, Long Thanh Industrial Zone, Long Thanh Dong Nai Province, Vietnam |
| **Leased Properties** | |
| Mercafe Vietnam LTD | No.3 Street, Long Thanh Industrial Zone, Long Thanh Dong Nai Province, Vietnam |
| Mercafe Vietnam LTD | Floor 9, AP Tower, 518B Dien Bien Phu St., Ward 21th.  Binh Thanh District, Ho Chi Minh City, Vietnam |
| Mercafe Vietnam LTD | Road 7, Long Thanh IZ, Long Thanh District, DongNai Province |
| Mercafe Vietnam LTD | G243 Bui Van Hoa Street, Long Binh Ward, Bien Hoa City, Dong Nai Province |
| Cisa Exportadora SA | Km 120 Comarca Guayacan, Carrereta Sébaco-Matagalpa, banda norte Sébado, Matagalpa |
| Cisa Exportadora SA | Km 38 carretera Panamericana Sur, entrada Finca El Carmen 1.2 km al oeste, Diriamba, Carazo. |
| Cisa Exportadora SA | Km 105.5 Carretera Sébaco - Matagalpa, banda oeste, Sébaco, Matagalpa, TRANSPLANTA. |
| Cisa Exportadora SA | Bodega - Bodega en NG| Comercial,  DE  CLARO, 25 varas AL OESTE. |

| | |
|---|---|
| Cisa Exportadora SA | Oficinas comerciales - Comercial \| Matagalpa, Banco FICOHSA 2 cuadras al este |
| Cisa Exportadora SA | Oficinas comerciales - Comercial \| Costado este BANPRO, Nueva Guinea, RAAS. |
| Cisa Exportadora SA | Del hotel Aguilar 50 vrs al sur 80 vrs al oeste, Nueva Guinea, RAAS. |
| Cisa Exportadora SA | Predio - Parqueo de furgones \| Pachanga, patio pachanga km 122 carretera sebaco matagalpa. |
| Cisa Exportadora SA | Convenio - Convenio comercial Matagalpa, remuneracion mensual donado al ejercito, KM 125 carretera seba matagalpa, frente al hotel los cocos. |
| Cisa Exportadora SA | Barrio San Pedro, de la policia 4c al este. Oficina \| Agencia  - Agencia El Rama |
| Cisa Exportadora SA | Oficina \| Agencia  - Agencia Bocay, salida a ayapal 50 varas antes de llegar al PAT, donde fue vision mundial, Bocay, Jinotega. |
| Cisa Exportadora SA | Bodega - Agencia Matagalpa, matagalpa salida a san ramon  frente ferreteria las marias. |
| Cisa Exportadora SA | Bodega - Bodega de sacos \| Coyotepe kms 123 carretera sebaco matagalpa. |
| Cisa Exportadora SA | Agencia - Agencia Wiwili, costado sur escuela diriangen, Wiwili Jinotega. |
| Cisa Exportadora SA | Del hotel Aguilar 10 vrs al sur 20 vrs al oeste NG |
| Cisa Exportadora SA | Acopio - Agencia Boaco , frente Restaurante Borbon, Boaco. |
| Cisa Exportadora SA | Agencia  - Agencia La Dalia , Carretera La Dalia-Waslala, frente iglesia la hermosa, La Dalia, Matagalpa |
| Cisa Exportadora SA | Agencia - Agencia Jinotega , contiguo a Gasolinara Apanas, Jinotega. |
| Cisa Exportadora SA | Bodega - Bodega Huriva, Km 105 Carretera Sebaco - Matagalpa, Matagalpa. |
| Cisa Exportadora SA | Bodega - Bodega Cornap Km 103 Carretera hacia Esteli , Sebaco, Matagalpa. |
| Cisa Exportadora SA | Oficinas Centrales - Avenida Jean Paul Genie, Edificio Avanz, 3er piso, Managua, Nicaragua |
| Mercapital de Nicaragua | Oficina - Oficinas Centrales - Avenida Jean Paul Genie, Edificio Avanz, 4to piso, Managua, Nicaragua |
| Mercapital de Nicaragua | Archivo Mercapital, Agencia Cisa Comercial 20 varas al sur, Matagalpa. |
| Cigrah | Avenida Circunvalación 12 calle, S.O. , Edificio Yude Canahuati., 16 Avenida 1er Nivel, San Pedro Sula, Honduras |
| Mercon Guatemala S.A. | Edificio Interamericas, Diagonal 6, 10-50, Zona 10, Torre Norte, Nivel 15, Of. 1501, Cd. de Guatemala, Guatemala |
| Mercon Brasil Comercio de Café | Alameda do Café, 209 – CEP 37.026-400 – Varginha/MG, Brasil |
| Mercon Brasil Comercio de Café | Rodovia Anhanguera, s/nº, Km 186, Prédio B, Centro, CEP 13610-970, cidade de Leme, Estado de São Paulo |

| | |
|---|---|
| Mercon Brasil Comercio de Café | Avenida Prefeito Samuel Batista Cruz nº 9300, Area 1–F– 02, Sala 2, Bairro Canivete, CEP 29909-010, na Cidade de Linhares, Estado do Espírito Santo |
| Mercon Brasil Comercio de Café | Rua Siqueira Campos, nº 1320, anexo IV, Bairro Recreio na cidade de Vitória da Conquista, Estado da Bahia |
| Mercon BV | De Ruijterkade 142, 1011 AC Amsterdam |
| Mercon BV | P.H. Oceanía Business Plaza, Oficina 39B, Torre 2000, Corregimiento de San Francisco, Provincia de Panamá. |
| Mercon Coffee Corp | 999 Ponce de Leon Blvd. Suite 910, Coral Gables, Florida 33134 |
| Mercon Coffee Corp | 208 South Mead Street, Seattle, WA 98108 |

**Schedule 3**

**The Debtors' Senior Management**

| Hiring Company | Full Name | Job Title | Responsibilities | Experience |
|---|---|---|---|---|
| AGRO INTERNATIONAL CORP | ██████ | Country Manager Ethiopia | In charge of the rep office management. | Agricultural Engineer |
| CIGRAH | ██████ | Commercial Manager Honduras | In charge of the commercial side of the business (sourcing of coffee, growers relationship)as well as coordination of the whole operation. | Experience in administrative roles and procurement in the sugar cane business. Plus recent commercial experience in coffee |
| CISA | ██████ | Sustainable Production Manager | In charge of LIFT platform and certifications in Central American Operations and Brazil. | More than 5 years as agricultural engineer with focus on certification and sustainable programs |
| CISA | ██████ | Quality Control Manager | In charge of the Quality Control department in Central American Operations | More than 20 years in quality control in coffee |
| CISA | ██████ | Production Manager | In charge of Production ( processing of the coffee) in the Nicaraguan mills. | More than 10 years as industrial engineer in processing business |

| Hiring Company | Full Name | Job Title | Responsibilities | Experience |
|---|---|---|---|---|
| CISA | ███ | Agency Manager | In charge of the all the commercial agencies (10+) and buying stations (120) in Nicaragua. Direct contact to offer  services to  POA growers. | Experience in managing all commercial process and services |
| CISA | ███ | Commercial Manager Ocotal | In charge on the commercial branch in Ocotal (one of the coffee regions in Nicaragua) Provide services to growers through the agency. | Experience in coffee, managing growers services and relationship |
| CISA | ███ | Robusta Commercial Manager | In charge on the commercial branch in Nueva Guinea and el Rama (Robusta coffee) Provide services to growers through the agency. | Experience in coffee, managing growers services and relationship |
| CISA | ███ | Gold Commercial Manager | In charge of the Oro growers branch  (Oro growers are bigger growers). Provide services to growers | Experience in coffee, managing growers services and relationship, plus  banking experience in credit for the agricultural sector. |
| CISA | ███ | Nicaragua & Honduras Financial Manager | Finance Business Partner for the central American operations | More than 20 years in finance in the retail sector |
| CISA | ███ | Commercial Manager Nicaragua | In charge of all commercial activities in Nicaragua Includes all the branches such as Ocotal, Pacific and Nueva Guinea | More than 15 years in the commercial sector of coffee |

| Hiring Company | Full Name | Job Title | Responsibilities | Experience |
|---|---|---|---|---|
| CISA | ███████ ███ ████ | Operations Manager | In charge of the operations for Central American business. Manage all processing (receptions, solar and mechanical drying, warehouses, logistics and processing) | More than 8 years in managing mill operations. Prior experience as plant manager |
| DIGRANISA | ██████ █████ | Farm Manager | In charge of the farming business | Experience as Head of the technical assistance team managing LIFT programs |
| MERCAPITAL | ████████ ████ ████ | Manager of Mercapital | In charge of the financing unit (Mercapital). Finance unit that provide credit to growers as one of the main services. Scope: Nicaragua. | Experience in commercial side of the business for more than 8 years. Last 3 years as head of the financing unit |
| MERCON BRASIL | ██████ █████ | Country Manager Brazil | In charge of the Brazil operation plus management of the book | Experience an export manager in coffee |
| MERCON BRASIL | █████ █████ ████ | Quality Control & Processing Manager | In charge of the QC department as well as oversee the third party mills | Experience in coffee in the quality , processing and purchasing |
| MERCON BRASIL | ████ ████ █████ ████ | Commercial Manager | In charge of the commercial side  (sourcing of coffee) | Experience in the commercial side of coffee |
| MERCON BV - AMSTERDAM | ███████ | Sustainability Director | In charge of the sustainable initiatives group wide. | More than 20 years in the coffee sector in different roles. |
| MERCON BV - AMSTERDAM | ██████ ████ | Commercial Manager Europe | In charge of commercial operations for MBV | More than 15 years in the coffee sector |

| Hiring Company | Full Name | Job Title | Responsibilities | Experience |
| --- | --- | --- | --- | --- |
| MERCON COFFEE CORPORATION | ████████ | Managing Director Mercon Specialty | In charge of the Specialty unit for USA | More than 30 years in the coffee sector in different roles |
| MERCON COFFEE CORPORATION | ████████ | Information Technology & Commercial Operations Director | In charge of Information Technology department as well as commercial operations (contract execution and customer service to roasters clients) | More than 20 years in the technology field and project management. |
| MERCON COFFEE CORPORATION | ██████ | Sales & Operations Director | In charge of sales and operations | Experience in operations and sales in coffee |
| MERCON COFFEE CORPORATION | ████████ | Sales Director America | In charge of marketing and sales for Americas. | More than 10 years in sales in coffee, Couple of years in sales in the perfume business |
| MERCON COFFEE CORPORATION | ████████ | Director - Specialty Coffee | In charge of Sales | More than 25 years in Specialty coffee |
| MERCON COFFEE CORPORATION | ████████ | Managing Director Origins | In charge of origins operations in Latin America ( Honduras, Nicaragua, Guatemala and Brazil), plus agricultural division in Nicaragua. | More than 26 years in the coffee sector in different roles, CFO, Corporate Director ( in charge of all support functions) |
| MERCON COFFEE CORPORATION | ████████ | Position & Risk Manager | In charge of position management group wide | More than 12 year managing the hedges and position |
| MERCON COFFEE CORPORATION | ████████ | Chief Operating Officer | In charge of supports functions and new business development | Experience in project management, Finance and a COO for the last 10 years |

| Hiring Company | Full Name | Job Title | Responsibilities | Experience |
|---|---|---|---|---|
| MERCON COFFEE CORPORATION | ███ | Chief Financial Officer | In charge of core and non-core finance | More than 20 years as CFP in different industries including commodities |
| MERCON COFFEE CORPORATION | ███ | Chief Executive Officer | In charge of Mercon operations as CEO | Moran than 25 years in the coffee trading sector, sales, marketing and risk management |
| MERCON GT | ███ | Guatemala Country Manager | In charge of the Guatemala export business. | More than 25 years in the coffee sector |