Paul J. Keenan Jr. (*pro hac vice*)
John R. Dodd (*pro hac vice*)
Reginald Sainvil (*pro hac vice*)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: paul.keenan@bakermckenzie.com
        john.dodd@bakermckenzie.com
        reginald.sainvil@bakermckenzie.com

Blaire Cahn
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4695
Facsimile: 212-310-1695
Email: blaire.cahn@bakermckenzie.com

*Proposed Counsel for the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| MERCON COFFEE CORPORATION, *et al.*,[1] | Case No. 23-11945 (MEW) |
| Debtors. | |
| _____/ | |

**NOTICE OF FILING REVISED PROPOSED INTERIM ORDER
(I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

PLEASE TAKE NOTICE THAT, on December 7, 2023, Mercon Coffee and its debtor

subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Mercon Coffee Corporation (1844); Mercon B.V. (N/A); Mercon Brasil Comércio de Café Ltda. (N/A); Agro International Holding B.V. (N/A); Mercapital de Nicaragua, S.A. (N/A); Distribuidora de Granos de Nicaragua S.A. (N/A); Cisa Export S.A. (N/A); Comercial Internacional de Granos de Honduras, S.A. de C.V. (N/A); Mercon Guatemala, S.A. (N/A); Mercafe Vietnam LTD. (N/A); Comercial Internacional Exportadora, S.A. (N/A). The Debtors' mailing address is: 999 Ponce de Leon Blvd, Suite 910, Coral Gables, FL 33134.

(collectively, the "**Debtors**"), filed the *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay, and (F) Schedule a Final Hearing and (II) Related Relief* (the "**Motion**")[Doc. No. 5], with a proposed interim order granting the relief requested in the Motion attached thereto as Exhibit A (the "**Proposed Interim Order**").

**PLEASE TAKE FURTHER NOTICE THAT**, the Debtors hereby file a revised proposed *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Claims, (D) Granting Adequate Protection, (E) Modifying Automatic Stay, and (F) Scheduling a Final Hearing, and (II) Granting Related Relief*, attached hereto as **Exhibit A** (the "**Revised Proposed Interim Order**").

**PLEASE TAKE FURTHER NOTICE THAT**, a redline, of the Revised Proposed Interim Order marked against the Proposed Interim Order [Doc. No. 5] is attached hereto as **Exhibit B** (the "**Redline**").

[This space intentionally left blank]

Dated: December 11, 2023

**BAKER & McKENZIE LLP**

By: /s/ *Blaire Cahn*
    Paul J. Keenan Jr. (*pro hac vice* pending)
    John R. Dodd (*pro hac vice* pending)
    Reginald Sainvil (*pro hac vice* pending)
    1111 Brickell Avenue, 10th Floor
    Miami, FL 33131
    Telephone: (305) 789-8900
    Facsimile: (305) 789-8953
    Email: paul.keenan@bakermckenzie.com
           john.dodd@bakermckenzie.com
           reginald.sainvil@bakermckenzie.com

    Blaire Cahn
    452 Fifth Avenue
    New York, NY 10018
    Telephone: 212-626-4875
    Facsimile: 212-310-1695
    Email: blaire.cahn@bakermckenzie.com

    *Proposed Counsel for the Debtors and Debtors-in-Possession*

## Exhibit A

**Revised Proposed Interim Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| MERCON COFFEE CORPORATION, *et al.*,[1] | Case No. 23-_____ (   ) |
| Debtors. | **Ref. Docket No. _____** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING AUTOMATIC STAY, (V) SCHEDULING A FURTHER INTERIM HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Cases**") for entry of an interim order (this "**Interim Order**"), a further interim (the "**Further Interim Order**") and a final order (the "**Final Order**"), pursuant to sections 105, 361, 362, 363, 364, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 2002-1(b), 4001-2, 9006-1, and 9013 of the Local Rules of Bankruptcy Practice and Procedure (the "**Local Rules**") of the United States Bankruptcy Court for the Southern District of New York (the "**Court**"):

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Mercon Coffee Corporation (1844); Mercon B.V. (N/A); Mercon Brasil Comércio de Café Ltda. (N/A); Agro International Holding B.V. (N/A); Mercapital de Nicaragua, S.A. (N/A); Distribuidora de Granos de Nicaragua S.A. (N/A); Cisa Export S.A. (N/A); Comercial Internacional de Granos de Honduras, S.A. de C.V. (N/A); Mercon Guatemala, S.A. (N/A); Mercafe Vietnam LTD. (N/A); Comercial Internacional Exportadora, S.A. (N/A); Mercafe Agri Products, Inc. (N/A); Mercafe Vietnam Co. LTD. (N/A); Transplanta S.A. (N/A). The Debtors' mailing address is: 999 Ponce de Leon Blvd, Suite 910, Coral Gables, FL 33134

[2] Capitalized terms used but not defined herein have the meaning given to such terms in the Motion.

(i)    immediately authorizing Mercon Coffee Corporation, a corporation existing under the laws of the State of New York ("**Mercon US**"), Mercon B.V., a corporation existing under the laws of the Netherlands ("**Parent**"), Comercial Internacional Exportadora S.A., a corporation existing under the laws of Nicaragua ("**CISA**"), Comercial Internacional de Granos de Honduras, Sociedad Anonima de Capital Variable, existing under the laws of Honduras ("**CIGRAH**"), Mercon Guatemala S.A., a sociedad anonima, existing under the laws of Guatemala ("**Mercon Guatemala**"), Mercafe Vietnam Ltd., a corporation existing under the laws of the British Virgin Islands ("**Mercafe Vietnam BVI**"), Mercon Brasil Comercio de Café Ltda., a limited liability company existing under the laws of Brazil ("**Mercon Brazil**"), Mercapital de Nicaragua S.A., a corporation existing under the laws of Nicaragua ("**Mercapital Nicaragua**"), CISA Export S.A., a corporation existing under the laws of the British Virgin Islands ("**CISA Export**"), Agro International Holdings B.V., a corporation existing under the laws of Curacao ("**Agro International**"), and Distribuidora de Granos de Nicaragua S.A. ("**Distribuidora**" and, together with Mercon US, Parent. CISA, CIGRAH, Mercon Guatemala, Mercafe Vietnam BVI, Mercon Brazil, Mercapital Nicaragua, CISA Export, and Agro International, the "**CC Parties**") to use the Cash Collateral (as defined below), in accordance with the Approved Budget (as defined below) (subject to Permitted Variances (as defined below)) for the purposes set forth in this Interim Order;

(ii)    granting adequate protection to the Prepetition First Lien Secured Parties (as defined below) to the extent of any Diminution in Value (as defined below) of their respective interests in the Prepetition Collateral, including Cash Collateral;

(iii)    pursuant to Bankruptcy Rule 4001, holding an interim hearing (the "**Interim Hearing**") on the Motion before this Court to consider entry of this Interim Order, among other things, (1) authorizing the CC Parties' use of Cash Collateral, (2) granting the adequate

2

protection described in this Interim Order, and (3) authorizing the CC Parties to perform their respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(iv)    modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and to provide for the immediate effectiveness of this Interim Order; and scheduling another interim hearing (the "**Further Interim Hearing**") to consider entry of a Further Interim Order, and approving the form of notice with respect to the Further Interim Hearing; and

(v)    granting related relief.

This Court having considered the Motion, including the exhibits thereto, the *Declaration of Harve Light, Chief Restructuring Officer (I) In Support Of The Chapter 11 Petitions and First Day Pleadings and (II) Pursuant To Local Bankruptcy Rule 1107-2* (the "**Declaration**"), and the other evidence submitted or adduced and the arguments of counsel made at the Interim Hearing held pursuant to Bankruptcy Rule 4001(b)(2) on December _____, 2023; and this Court having heard and resolved or overruled any objections, reservations of rights, or other statements with respect to the relief requested in the Motion; and it appearing sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors and their estates, and is essential to the Debtors' business and the preservation of the value of the Debtors' assets; and it appearing that the CC Parties' agreement for the use of Cash Collateral is a sound and prudent exercise of the Debtors' business judgment; and the Debtors having provided notice of the Motion and the relief provided for herein as set forth

in the Motion, and except as otherwise provided for herein, it appearing that no other or further notice of the Motion and the relief provided for herein need be given under the circumstances; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.      *Petition Date*. On December 6, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in this Court, thereby commencing the Cases.

B.      *Debtors in Possession*. The Debtors continue to be authorized to manage and operate their business and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.      *Jurisdiction and Venue*. This Court has jurisdiction over the Motion, the Cases, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, dated January 31, 2012. Venue for the Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Court may enter a final order consistent with Article III of the United States Constitution.

D.      *Committee*. As of the date hereof, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has not yet appointed an official committee of unsecured

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

creditors in the Cases pursuant to section 1102 of the Bankruptcy Code (any such committee, the "**Committee**").

E. _Debtors' Stipulations_. Without prejudice to the rights of parties in interest other than the Debtors, including any Committee as set forth in this Interim Order, and subject to the limitations thereon contained in in this Interim Order, the Debtors stipulate and agree that (collectively, Paragraphs E(i) through (vi) below are referred to herein as the "**Debtors' Stipulations**"):

(i)     Prepetition First Lien Loans.

(a)     _Prepetition First Lien Credit Agreement_. Under that certain Third Amended and Restated Credit Agreement, dated as of June 30, 2023 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified, the "**Prepetition First Lien Credit Agreement**," and collectively with all agreements, documents, notes, letters of credit, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, including, without limitation, the Security Agreement (as defined below), the "**Prepetition First Lien Loan Documents**"), by and among Mercon US and Parent (in such capacity, each a "**Borrower**" and collectively, the "**Borrowers**"), the lender parties thereto from time to time (the "**Prepetition First Lien Lenders**"), and Rabobank, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Agent**"), swingline lender and issuing lender, the Prepetition First Lien Lenders provided certain loans, advances, letters of credit and other extensions of credit (collectively, the "**Prepetition First Lien Loans**"). The Prepetition First Lien Agent, the Prepetition First Lien Lenders and Rabobank as swingline lender and issuing lender under the

Prepetition First Lien Loan Documents are collectively referred to herein as the "**Prepetition First Lien Secured Parties**" and Prepetition First Lien Lenders in an amount constituting "Majority Lenders" under the Prepetition First Lien Credit Agreement are referred to herein as "**Majority Prepetition Lenders**."

(b)     *Prepetition First Lien Obligations*. All indebtedness, liabilities, and obligations owing from time to time under the Prepetition First Lien Loan Documents, specifically to the extent constituting "Obligations" (as defined in the Prepetition First Lien Credit Agreement), are collectively referred to herein as "**Prepetition First Lien Obligations**". As of the Petition Date, the applicable Debtors were indebted and liable under the Prepetition First Lien Loan Documents, without defense, counterclaim, or offset of any kind to the Prepetition First Lien Lenders in respect of the Prepetition First Lien Obligations for an aggregate amount of not less than $203,532,929.89 in respect of the Prepetition First Lien Loans, including outstanding principal and accrued and unpaid interest, cash collateral obligations, fees, costs, expenses (including any attorneys' and financial advisors' fees), charges, indemnities and all other unpaid Prepetition First Lien Obligations.

(ii)     *First Lien Loan Guarantees and Collateral*. The Prepetition First Lien Obligations were guaranteed on a joint and several basis pursuant to the terms of that certain Amended and Restated Guarantee, dated as of November 30, 2017, between, the Debtors party thereto, as guarantors, and the Prepetition First Lien Agent. To secure the Prepetition First Lien Obligations, the applicable Debtors entered into (a) that certain Security Agreement, dated as of November 30, 2017 (as amended, supplemented or otherwise modified from time to time, the "**U.S. Security Agreement**") by and between the Borrowers, the Guarantors (as defined in the Prepetition First Lien Credit Agreement), and the Prepetition First Lien Agent and (b) those certain

foreign security agreements listed on **Schedule A** hereto (the "**Foreign Security Agreements**," and together with the U.S. Security Agreement, the "**Security Agreements**"). Pursuant to the Security Agreements and the other Prepetition First Lien Loan Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected, and enforceable first-priority security interests in and liens on (the "**Prepetition First Lien Loan Liens**") the "Collateral" (as defined in the U.S. Security Agreement) and any equivalent term indicating the assets of the Debtors subject to the Prepetition First Lien Loan Liens in any of the Foreign Security Agreements, consisting of substantially all of the applicable Debtors' assets (collectively, the "**Prepetition Collateral**"), subject only to liens senior by operation of law or otherwise expressly permitted by the Prepetition First Lien Loan Documents to rank senior to the Prepetition First Lien Loan Liens (in each case, solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition First Lien Loan Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, collectively, the "**First Lien Permitted Encumbrances**"). For the avoidance of doubt, the Prepetition Collateral does not include "**Excluded Property**" as defined in the Prepetition First Lien Credit Agreement, including any Excluded Property serving as collateral under the Secured Bi-lateral Facilities (as defined below) consisting of certain advances made by the Debtors to coffee growers, certain fixed assets of the Debtors and certain accounts receivable of the Debtors that have been sold to a discounting bank (the "**Bi-lateral Collateral**"). As used herein, (a) the term "**Secured Bi-lateral Facilities**" shall refer to the prepetition bi-lateral secured lending facilities governed by the following documentation: that certain (i) Term Facility Agreement, dated as of May 19, 2022, between, Debtors, CISA, as borrower, and Mercon B.V., Mercon US, Mercapital Nicaragua, Mercon Brasil

and Mercon Guatemala, as guarantors, and Nederlandse Financierings- Maatschappij Voor Ontwikkelingslanden N.V. ("**FMO**"), as lender, (ii) Credit Agreement (Escritura Publica Numero Doscientos Veintidos (No. 222). Otorgamiento de Linea de Credito Garantizado con Hipoteca, Prenda y Fianza Solidaria), dated as of November 4, 2016, between, Digranisa, as borrower, CISA, as guarantor, and Banco de Fomento a la Produccion, as lender ("**BFP**"), (iii) Credit Agreement (Escritura Publica Numero Treinta y Siete (No. 37). Contrato de Linea de Credito no Revolvente con Obligacion de Constitucion de Garantia Mobiliaria Sobre Cartera de Credito y Fianza Solidaria), dated as of April 4, 2018, between, Mercapital Nicaragua, as borrower, CISA, as guarantor, and BFP, as lender, (iv) Credit Agreement (Escritura Publica Numero Noventa y Nueve (No. 99). Otorgamiento de Linea de Credito Revolvente Garantizado con Fianza Solidaria y con Obligacion de Constituir Garantia Mobiliaria Sobre Cartera de Credito), dated as of November 27, 2020, between, Mercapital Nicaragua, as borrower, CISA, as guarantor, and BFP, as lender, (v) Term Facility Agreement, dated as of November 1, 2019, between, Mercapital Nicaragua, as borrower, Mercon B.V., Mercon US, and CISA, as guarantors, and FMO, as lender, and (vi) Third Amendment to Amended and Restated Credit Agreement, dated as of May 12, 2020 (as amended, restated, amended and restated or otherwise modified from time to time), between, Mercon US, as borrower, Mercon B.V., as guarantor, and Starbucks Coffee Trading Company Sarl, as lender, and (b) the term "**Bi-lateral Liens**" shall refer to the liens granted in the Bi-lateral Collateral in connection with the Secured Bi-lateral Facilities and (iii) the term "**Prepetition Liens**" shall refer to, collectively, the Prepetition First Lien Loan Liens, the Bi-lateral Liens and other and any other liens, if any, on the CC Parties' property in existence as of the Petition Date.

(iii)    *Cash Collateral*. Any and all of the Debtors' cash, including the CC Parties' cash and other amounts on deposit or maintained in the Pledged Accounts (as defined below) by the Debtors, and any amounts generated by the collection of accounts receivable or other

disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing, including, without limitation, any refunds of margin or other proceeds of swap transactions, securitization transactions and repurchase transactions which are required to be deposited into accounts controlled by the Prepetition First Lien Secured Parties, but excluding, in each case, cash on deposit in Excluded Accounts (as defined in the First Lien Prepetition Credit Agreement) to the extent such cash does not constitute proceeds of Prepetition Collateral, is the Prepetition First Lien Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("**Cash Collateral**"). A schedule of all "**Pledged Accounts**" is attached hereto as **Schedule B**.

(iv)    *Consent to Use of Cash Collateral.* Pursuant to Section 7(a) of the U.S. Security Agreement, the Prepetition First Lien Agent consents to the CC Parties' use of Cash Collateral on the terms and conditions set forth in this Interim Order. No other or further consents to the use of Cash Collateral need be provided.

(v)    *Bank Accounts*. The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has opened or maintains any bank accounts other than the Pledged Accounts and the other accounts listed in the exhibit attached to the Debtors' motion filed with this Court for relief to continue to use the Debtors' existing cash management system (collectively, the "**Debtors' Accounts**").

(vi)    *Validity, Perfection, and Priority of Prepetition First Lien Loan Liens and Prepetition First Lien Obligations*. Subject to the Challenge Period (as defined below), each of the Debtors acknowledges and agrees that, in each case as of the Petition Date: (A) the Prepetition First Lien Loan Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (B) the Prepetition First Lien Loan Liens are

subject and subordinate only to the First Lien Permitted Encumbrances that, in each case, are senior in priority to the Prepetition First Lien Loan Liens; (C) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (D) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition First Lien Loan Liens and Prepetition First Lien Obligations exist, no portion of the Prepetition First Lien Loan Liens and Prepetition First Lien Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (E) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code) arising out of, based upon, or related to the Prepetition First Lien Loan Liens and Prepetition First Lien Obligations.

   F. *Findings Regarding the Use of Cash Collateral*.

    (i) The CC Parties have an immediate need to use Cash Collateral (to the extent compliant with the Approved Budget, subject to Permitted Variances) to, among other things, (A) preserve the value of the CC Parties' assets and their business; (B) pay the costs of administration of their estates (including professional fees and expenses of the CC Parties) and satisfy other working capital and general corporate purposes of the CC Parties, and (C) pay certain adequate

protection amounts and pay the Carve Out, in each case, in accordance with the this Interim Order. The use of Cash Collateral will provide the CC Parties with the ability to fund day-to-day operations, meet administrative obligations during the Cases and preserve the value of their assets. The CC Parties' authority to use Cash Collateral will also reassure the CC Parties' constituents that the CC Parties will continue to have access to liquidity during the Cases. The ability of the CC Parties to have sufficient working capital and liquidity through the use of Cash Collateral is vital to the preservation and maintenance of the value of the CC Parties' assets, including the Prepetition Collateral. The CC Parties will not have sufficient sources of working capital and financing to fund the anticipated administrative expenses associated with the Cases without the authorized use of Cash Collateral.

(ii)    *Adequate Protection for Prepetition First Lien Secured Parties*. To the extent provided for herein, each of the Prepetition First Lien Secured Parties are entitled, pursuant to sections 105, 361, 362, and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, for any postpetition diminution in the value thereof. Based on the Motion, the Declaration, and other evidence filed in support of the Motion, and the record presented to the Court in connection with the Interim Hearing, under the circumstances, the terms of the adequate protection arrangements and the use of Cash Collateral as provided for herein are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and are otherwise sufficient to adequately protect the Prepetition First Lien Secured Parties against any Diminution in Value of the Prepetition Collateral (including Cash Collateral). Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of Cash Collateral are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably

equivalent value and fair consideration for the use of Cash Collateral; provided, however, nothing in this Interim Order shall (a) be construed as the affirmative consent by the Prepetition First Lien Secured Parties for the use of Cash Collateral, other than on the terms set forth in this Interim Order, (b) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior), or (c) prejudice, limit or otherwise impair the rights of the Prepetition First Lien Secured Parties to seek new, different or additional adequate protection or assert the interests of any of the Prepetition First Lien Secured Parties.

G.      _Good Faith_. The Debtors and the Prepetition First Lien Agent have negotiated at arms' length and acted in good faith regarding (a) the CC Parties' use of the Cash Collateral, as provided for in this Interim Order, and (b) the other terms of this Interim Order, including, without limitation, the terms of the adequate protection provided for herein.

H.      _Good Cause Shown; Best Interest_. Good cause has been shown for entry of this Interim Order, and entry of this Interim Order is in the best interests of the Debtors' estates as its implementation will, among other things, allow for the preservation of the value of the CC Parties' assets. Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

I.      _Notice_. In accordance with Bankruptcy Rules 2002, 4001(b), and 9014 and the applicable Local Rules, notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors. Under the circumstances, the notice given by the Debtors of the Motion, the relief provided for herein, and the Interim Hearing complies with Bankruptcy Rules 2002, 4001(b), and 9014 and the applicable Local Rules.

Based upon the foregoing findings and conclusions, the Motion, and the record before this Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.    <u>Motion Approved</u>. The Motion is granted on an interim basis as set forth herein.

2.    <u>Objections Overruled</u>. Any objections, reservations of rights, or other statements with respect to entry of this Interim Order, to the extent not withdrawn or resolved, are overruled on the merits. This Interim Order shall become effective immediately upon its entry.

3.    <u>Authorization of Use of Cash Collateral</u>.

(a)    The CC Parties are hereby authorized to use all Cash Collateral of the Prepetition First Lien Secured Parties, for the purposes set forth in this Interim Order and in accordance with the Approved Budget (subject to Permitted Variances as set forth in this Interim Order), from the date of this Interim Order through and including the earlier of (i) January 12, 2024 and (ii) the CC Termination Date (as defined below), subject to Paragraph 8 of this Interim Order in the case of the CC Termination Date; provided, however, (i) the Prepetition First Lien Secured Parties are granted the adequate protection set forth in this Interim Order; (ii) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court (to the same extent and not greater than the rights provided pursuant to Section 363(c)(2) of the Bankruptcy Code); and (iii) the CC Parties and the Prepetition First Lien Secured Parties reserve all rights with respect to the use of Cash Collateral for the exclusive benefit of property other than the Prepetition Collateral and allocation of costs in connection with the liquidation or disposition thereof.

(b)    It shall be an Event of Default (as defined below) if Cash Collateral or proceeds of the Prepetition Collateral are used other than for the purposes as permitted under this

Interim Order, and in accordance with the Approved Budget, subject to Permitted Variances as set forth in this Interim Order. Attached as **Schedule C** hereto and incorporated herein by reference is a budget prepared by the CC Parties, weeks 1 through 5 of which are in form and substance acceptable to, and approved by the Prepetition First Lien Agent (such initial weeks shall be the "**Initial Approved Budget**") (together with any subsequent budget approved from time to time in accordance with Paragraph 4 of this Interim Order, an "**Approved Budget**").

(c)     Subject to Paragraph 19, the CC Parties may use Cash Collateral to pay margin calls solely to the extent that by no later than 8:00 p.m. (EST) the day before the margin call, the CC Parties provide written notice (which may be delivered via email) to the Prepetition First Lien Agent that the CC Parties intend to pay a margin call, which such notice shall contain sufficient detail regarding the margin call to be paid, including setting forth the basis for, and the amount of, the margin payment owed and the Loan Parties' current cash on hand. Subject to Paragraph 19, the CC Parties shall be authorized to make such margin call payment with Cash Collateral if it does not receive a written objection (which may be delivered via email) from the Prepetition First Lien Agent by 10:00 a.m. (EST) the following business day.

4.     Budget and Variance Reporting.

(a)     The CC Parties shall adhere to the Initial Approved Budget attached hereto as **Schedule C**. The CC Parties shall provide an updated proposed Approved Budget in accordance with the following procedures:

(1)     following entry of this Interim Order, (i) by 5:00 p.m. New York City time on Wednesday December 20, 2023 and by 5:00 p.m. New York City time on each Wednesday thereafter, the CC Parties shall provide the Prepetition First Lien Agent with an updated cash flow forecast for the CC Parties, with line item detail of projected

sales, disbursements, collections, net cash flow, and the other items set forth in the Initial Approved Budget for the then-upcoming thirteen (13) week period, in each case, in substance satisfactory to and approved by the Prepetition First Lien Agent (at the direction of the Majority Prepetition Lenders) and substantially consistent with the form of the Initial Approved Budget attached to this Interim Order (the "Weekly Cash Flow Forecast"); and (ii) by 5:00 p.m. New York City time beginning on Wednesday December 20, 2023, and by 5:00 p.m. New York City time on each Wednesday thereafter, the CC Parties shall provide the Prepetition First Lien Agent with a variance report (the "Variance Report") setting forth, on a consolidated basis, actual cumulative aggregate cash receipts, disbursements (including margin calls, which shall be for informational purposes only) and net cash flows of the CC Parties for the most recent four-week period (and for the first three test periods following the date of the Interim Order, tested on a rolling 2-week, 3-week, and 4-week basis, respectively) covered by such Variance Report and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the Initial Approved Budget or the most recently Approved Budget delivered prior to such Variance Report on a weekly and cumulative basis for the period from the Petition Date, through the end of the week in regard to which such variance report is being delivered, and each such Variance Report shall include explanations for all unfavorable variances in excess of 7.5% for the most recent period in regard to which such variance report is being delivered and shall be certified by the chief restructuring officer of the CC Parties; provided that, for the first four weeks following the Petition Date, variance is to be measured against the initial Approved Budget;

(2)     The CC Parties hereby acknowledge and agree that any Weekly Cash Flow Forecast provided to the Prepetition First Lien Agent shall not amend and supplement the applicable Approved Budget until the Prepetition First Lien Agent delivers a notice (which may be delivered by electronic mail) to the CC Parties stating that the Majority Prepetition Lenders have approved of such Weekly Cash Flow Forecast; provided, that if the Prepetition First Lien Agent does not deliver a notice of approval to the CC Parties, then the existing Approved Budget shall continue to constitute the applicable Approved Budget until such time as the subject Weekly Cash Flow Forecast is agreed to among the CC Parties and the Majority Lenders in accordance with this Paragraph 4. Once such Weekly Cash Flow Forecast is so approved in writing by the Majority Prepetition Lenders, it shall supplement or replace the prior Approved Budget, and shall thereafter constitute the Approved Budget.

(b)     The use of Cash Collateral shall be in accordance with the Approved Budget, subject to the Permitted Variances. Except as otherwise provided herein or approved by the Administrative Agent (at the direction of Majority Prepetition Lenders, in their sole discretion), the CC Parties will not, directly or indirectly, (i) use any Cash Collateral or any other property constituting Prepetition Collateral in a manner or for a purpose other than those permitted under this Interim Order or the Approved Budget, (ii) permit the aggregate cumulative amount of actual cash disbursements (excluding Professional Costs and the payment of margin calls) as reported in the Variance Reports delivered with respect to the applicable Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period, (iii) permit the aggregate cumulative amount of actual cash receipts as reported in the Variance Reports delivered with respect to the applicable

Testing Period to be less than, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period, (iv) permit the aggregate cumulative amount of actual net cash flow (which shall exclude Professional Costs and the payment of margin calls) as reported in the Variance Reports delivered with respect to the applicable Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period; and (v) permit the aggregate cumulative amount of actual cash disbursements of Professional Costs (excluding the fees and expenses of the CCLO) as reported in the Variance Reports delivered with respect to the applicable Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period. Any unfavorable variance from the Approved Budget that is not a Permitted Variance shall constitute an Event of Default hereunder; provided that if the CC Parties can reasonably demonstrate that any such non-compliance is due to a change in timing of anticipated disbursements due to an operational issue for which any favorable variance on account of such non-disbursement has rolled-off the applicable Testing Period and the amount of such payment does not change, then the CC Parties shall have an additional week to return to compliance with the Approved Budget prior to such non-compliance resulting in an Event of Default.

(c)     *Non-Conforming Use of Cash Collateral*. In the event that an expense arises that is not within any of the approved line items in the Approved Budget, or the CC Parties anticipate that any line item will need to be exceeded by more than the Permitted Variance, the CC Parties may request approval from the Prepetition First Lien Agent (acting at the direction of the Majority Prepetition Lenders), with notice to counsel to the Committee (if appointed), and the

Prepetition First Lien Agent (acting at the direction of the Majority Prepetition Lenders) shall have two (2) business days from the date of the CC Parties' request within which to provide consent or object (each approved non-conforming use of Cash Collateral, a "**Non-Conforming Use**"). Absent the affirmative consent of the Prepetition First Lien Agent (acting at the direction of the Majority Prepetition Lenders), the CC Parties shall not be authorized to use Cash Collateral for such expense without further order of the Court. If such written consent is given, the CC Parties shall be authorized pursuant to this Interim Order to use Cash Collateral for any such Non-Conforming Use without further Court approval, and the Prepetition First Lien Secured Parties shall be entitled to all of the protections specified in this Interim Order for any such use of Cash Collateral; provided that each such permitted Non-Conforming Use shall be deemed a modification to the Approved Budget for all testing purposes.

(d)     *Certain Definitions*. As used in this paragraph 4 and elsewhere in this Interim Order, the following terms shall mean:

- "Professional Costs" means any payment or the obligation to make payment on account of fees and expenses incurred by Debtor Professionals or any other party's professional advisors, the fees and expenses of which are obligated to be paid by the CC Parties (including, but not limited to, the fees and expenses of professional advisors to any Committee appointed in the Cases) in connection with the Cases.

- "Permitted Variances" means, with respect to determining compliance with ¶4 relating to the CC Parties' aggregate cumulative cash receipts, cash disbursements and net cash flow, (i) all variances favorable to the CC Parties; (ii) with respect to determining compliance with ¶4(b)(ii), (b)(iii) or (b)(iv) as of the end of any Testing Period, an unfavorable aggregate cumulative variance of (x) for the first four Testing Periods following the Petition Date, less than 15% and (y) for each Testing Period thereafter, less than 10% thereafter (in each case, compared to the relevant amounts forecast for the same period in the Approved Budget); and (iii) with respect of determining compliance with ¶4(b)(v), an unfavorable aggregate cumulative variance of less than 10% (compared to the relevant amounts forecast for the same period in the Approved Budget).

- "Testing Period" means (a) with respect to the first Variance Report delivered after the Petition Date, the two-week period ending on December 22, 2023; (b) with respect to the second Variance Report delivered after the Closing Date, the three-week period ending on December 29, 2023; and (c) with respect to each Variance Report delivered thereafter,

the four-week period ending on the Friday immediately preceding the delivery of the applicable Variance Report. For purposes of each Testing Period, a week shall be measured Saturday to Friday.

5.    <u>Financial and Collateral Reporting.</u>

(a)    Following entry of this Interim Order, the Debtors shall provide the Prepetition First Lien Agent (for distribution to the Prepetition First Lien Lenders), which may be sent via email, with (i) updated Borrowing Base Certificate (as defined in the Prepetition First Lien Credit Agreement) setting forth the calculations described in clause (ii) of the definition of Borrowing Base Certificate by 5:00 pm New York City time on each Wednesday; and (ii) no later than 5:00 pm New York City time on each business day following the entry of this Interim Order and through the earlier of January 12, 2024 and the CC Termination Date, (x) a report regarding the Debtors' actual cash closing position, including cash collections, margin calls or refunds, amounts funded to origin for operating and other disbursements and payments of Professional Costs as of the end of business of the immediately preceding business day, provided that such report shall be broken out by realization of collateral vs. accounts receivable; (y) a statement of the cash balance in the Bank of America concentration account (account number XXX-XXX-7474) as of the end of business of the immediately preceding business day; and (z) a statement of the cash balance in the Segregated Cash Account (as defined herein) as of the end of business of the immediately preceding business day.

(b)    *Inventory and Hedge Reporting*. The CC Parties shall provide to the Prepetition First Lien Agent on each Wednesday, a weekly report (the "Inventory Report") setting forth current inventory (bags by origin/destination location) and hedge positions (if any).

(c)    *Other Notices*. The CC Parties shall provide to the Prepetition First Lien Agent promptly, but in any event within two Business Days, after the giving or receipt thereof,

copies of any default notices given or received by any Debtor or any subsidiary thereof pursuant to the terms of any indenture, loan agreement, credit agreement, or similar agreement.

(d)     Adverse Events. The Debtors shall provide to the Prepetition First Lien Agent prompt written notice, but in any event within two Business Days after the occurrence thereof, of any condition or event (other than the filing of these chapter 11 cases and the plenary proceedings commenced by the Debtors in support of these chapter 11 cases in the District Court Amsterdam, the Netherlands and in the Civil District Court in the Judicial District of Varginha - Minas Gerais State, Brazil) of which any Debtor has actual knowledge, which condition or event has resulted or may reasonably be expected to result in (i) a Material Adverse Change (as defined in the Prepetition First Lien Credit Agreement), or (ii) a breach of or noncompliance with any material term, condition, or covenant of any material contract to which any Debtor or any subsidiary thereof is a party or by which their properties may be bound which breach or noncompliance could reasonably be expected to result in a Material Adverse Change.

6.     Access to Information.

(a)     Starting the week of December 11, 2023, and each week thereafter, the CC Parties, the CC Parties' chief restructuring officer, the CCLO, and the CC Parties' financial advisor will participate in conference calls on Monday and Thursday of such week (or such other two days as mutually agreed) with the Prepetition First Lien Agent and the Prepetition First Lien Lenders and their representatives, consultants, and agents, at such mutually convenient times to be proposed by the Prepetition First Lien Agent upon reasonable notice, and will use commercially reasonable efforts to cause available senior members of management and any investment bankers and other advisors of the CC Parties, as applicable or as requested by the Prepetition First Lien Agent or such Prepetition First Lien Lenders, to participate in such calls for the purpose of

discussing the status of the financial, collateral, the Inventory Report, the Liquidity Reports, progress under the Realization Strategy and the operational condition, businesses, liabilities, assets, and prospects of the CC Parties and any sale, refinance or other strategic transaction efforts.

(b)      In addition to, upon reasonable notice to the Debtors' counsel (email being sufficient), at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the Prepetition First Lien Lenders to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the Prepetition First Lien Agent and Prepetition First Lien Lenders shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law. In addition, subject to execution of a market-standard confidentiality agreement, the Prepetition First Lien Agent's professionals shall have access to all due diligence materials and any data room provided within ninety (90) days prior to the Petition Date or during these Cases by the Debtors to any potential strategic investor, acquiror of one or more of the Debtors' businesses or debt purchaser. The Debtors also shall provide the Prepetition First Lien Agent professionals with updates and information on any developments regarding discussions with potential strategic investors, acquirors or debt purchasers (including the identification of any parties making such inquiries), such updates to be provided on the conference calls conducted in accordance with Section 6(a) of the Interim Order.

7.    <u>Adequate Protection for the Prepetition First Lien Secured Parties</u>. Subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), solely for and equal in amount to the postpetition diminution in value of such interests (each such diminution, a "**Diminution in Value**"), resulting from, among other things, the Carve Out, the CC Parties' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, is hereby granted the following (collectively, the "**First Lien Adequate Protection Obligations**"):

(a)    <u>First Lien Adequate Protection Liens</u>. As security for and solely to the extent of any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the Petition Date (together, the "**First Lien Adequate Protection Liens**"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all Prepetition Collateral. Subject to the terms of this Interim Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out and (B) First Lien Permitted Encumbrances that, in each case, are senior in priority to the First Lien Adequate Protection Liens. The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the Prepetition Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(b)      <u>First Lien Adequate Protection Superpriority Claims</u>. As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any Diminution in Value (the "**First Lien Adequate Protection Superpriority Claims**"), but junior to the Carve Out. Subject to the Carve Out in all respects, the First Lien Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the CC Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.

(c)      <u>Preservation of Collateral</u>. As further adequate protection, the proceeds of Prepetition Collateral will be preserved in the manner set forth in Paragraph 19 of this Interim Order, subject to the limitations set forth therein.

(d)      <u>Appointment of Chief Commodities Liquidation Officer</u>. As further adequate protection, the Debtors shall appoint a chief commodities liquidation officer (the "<u>CCLO</u>"), which the identity and scope of responsibilities of such officer shall be acceptable to the Majority Prepetition Lenders in their sole discretion, provided that part of the responsibilities of such officer shall include, without limitation, to (i) provide updates, on the conference calls conducted in accordance with Section 6(a) of this Interim Order, to the Prepetition First Lien Agent regarding the status of the liquidation process and the conduct of the CCLO's work as set forth in the CCLO's engagement letter and scope of work document and (ii) be an observer of the activities and decision making of the Debtors' hedging risk committee (if any). The Person appointed as

CCLO shall remain in such position on the same terms and scope of responsibilities so long as the CC Parties' use of Cash Collateral is authorized hereunder, unless approved in writing by the Prepetition First Lien Agent and the Majority Prepetition Lenders.

(e)     Other Adequate Protection. As further adequate protection, the CC Parties shall provide the Prepetition First Lien Secured Parties with the reporting and inspection rights described in Paragraphs 5 and 6 of this Interim Order.

8.     Carve Out.

(a)     Priority of Carve Out. Subject to the terms and conditions contained herein, each of the Prepetition Liens, First Lien Adequate Protection Liens, and First Lien Adequate Protection Superpriority Claims shall be subject and subordinate to the Carve Out.

(b)     Definition of Carve Out. As used in this Interim Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $30,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) all unpaid fees and expenses, solely to the extent payable or allowed at any time, whether by interim or final order of this Court, procedural order, or otherwise, but not to exceed the amounts set forth for each Professional Person (as defined below) in the Approved Budget (subject to any Permitted Variance) as of the delivery of the Carve Out Trigger Notice (as defined below) (collectively, the "**Allowed Professional Fees**") incurred by persons or firms (other than the fees and expenses of the CCLO) retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (collectively,

the "**Committee Professionals**," and together with the Debtor Professionals, the **"Professional Persons"**) at any time before the delivery by the Prepetition First Lien Agent (at the direction of the Majority Prepetition Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by this Court prior to or after delivery of such Carve Out Trigger Notice (the amounts set forth in the foregoing clauses (i) through (iii), collectively, the "**Pre-Carve Out Trigger Notice Cap**"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $750,000 incurred on and after the Termination Declaration Date (as defined below), to the extent allowed at any time, whether by interim or final order of this Court, procedural order or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**" and together with the Pre-Carve Out Trigger Notice Cap, the "**Carve Out Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Prepetition First Lien Agent (at the direction of the Majority Prepetition Lenders) to the Debtors' counsel of record, the U.S. Trustee, and counsel to any Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and the CC Parties' use of cash collateral has been terminated, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c)    Carve Out Reserve.  Notwithstanding the occurrence of an Event of Default, and subject to the amounts set forth for each Professional Person in the Approved Budget (subject to any Permitted Variance) as of the delivery of such Carve Out Trigger Notice, on the day on which a Carve Out Trigger Notice is delivered by the Prepetition First Lien Agent as provided for herein (the "**Termination Declaration Date**"), unless otherwise set forth in the Carve Out Trigger Notice, the Carve Out Trigger Notice shall constitute a demand to the CC Parties to utilize all cash on hand as of such date and any available cash thereafter held by any of the CC Parties or available

in the Debtors' Accounts to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The CC Parties shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the CC Parties to utilize all cash on hand as of such date and any available cash thereafter held by any of the CC Parties or available in the Debtors' Accounts, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The CC Parties shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**," and together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in the Pre-Carve Out Trigger Notice Cap (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition First Lien Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition First Lien Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph, then, any excess funds in one of the Carve Out Reserves

following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserves, up to the applicable amount set forth in this Paragraph, prior to making any payments to the Prepetition First Lien Secured Parties.  Notwithstanding anything to the contrary in this Interim Order, following delivery of a Carve Out Trigger Notice, the Prepetition First Lien Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the CC Parties until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Prepetition First Lien Agent for application in accordance with the Prepetition First Lien Loan Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out and (ii) in no way shall an Approved Budget, the Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the CC Parties.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or the Prepetition First Lien Loan Documents, the Carve Out shall be senior to the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superiority Claims, any claims arising under section 507(b) of the Bankruptcy Code, and any and all other forms of adequate protection, liens, or claims securing the Prepetition First Lien Obligations.

(d)    Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees, or on or following the Termination Declaration

Date if on account of Allowed Professional Fees incurred on or prior to the Termination Declaration Date, shall not reduce the Carve Out.

(e) No Direct Obligation To Pay Allowed Professional Fees. The Prepetition First Lien Secured Parties shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition First Lien Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f) Payment of Carve Out On or After the Termination Declaration Date. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the Prepetition First Lien Obligations secured by the Prepetition Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the Bankruptcy Code, and applicable law.

9. Reservation of Rights of the Prepetition First Lien Secured Parties. Subject in all cases to the Carve Out, notwithstanding any other provision in this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition First Lien Secured Parties to seek any other or supplemental relief in respect of the Debtors, including in the case of the Prepetition First Lien Secured Parties the right to seek additional adequate protection at and following the Final Hearing; *provided* that any such further or different adequate protection shall

at all times be subordinate and junior to the Carve Out; (b) any of the rights of the Prepetition First

Lien Secured Parties under the Prepetition First Lien Loan Documents or the Bankruptcy Code or

under non-bankruptcy law (as applicable), including, without limitation, the right of any of the

Prepetition First Lien Secured Parties to (i) request modification of the automatic stay of section

362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases, conversion of any of the

Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded

powers in any of the Cases, (iii) seek to propose, subject to the provisions of section 1121 of the

Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether

legal, equitable, or otherwise) of any of the Prepetition First Lien Secured Parties.  The delay or

failure of the Prepetition First Lien Secured Parties to seek relief or otherwise exercise their rights

and remedies shall not constitute a waiver of any of the rights and remedies of the Prepetition First

Lien Secured Parties.

10.    Reservation of Certain Committee and Third Party Rights and Bar of Challenges
and Claims.  Subject to the Challenge Period, the stipulations, admissions and waivers contained

in this Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their

estates, and any of their respective successors and assigns in all circumstances and for all purposes,

and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined

below) as of the Petition Date.  The stipulations, admissions, and waivers contained in this Interim

Order, including, the Debtors' Stipulations, shall be binding upon all other parties in interest,

including any Committee and any other person acting on behalf of the Debtors' estates (including

any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the

Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other

fiduciary appointed as a legal representative of any of the Debtors or with respect to the property

of the estate of any of the Debtors), unless and to the extent that a party in interest with proper standing granted by order of this Court has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i)(x) by any Committee within 60 calendar days after the entry of a Final Order and (y) if no Committee has been appointed, by any party in interest within 75 calendar days after entry of a Final Order, in each case, subject to further extension by written agreement of the Debtors and the Majority Prepetition Lenders, in the case of the Prepetition First Lien Obligations, or by this Court for good cause shown pursuant to an application filed and served by a party in interest (in each case, a "**Challenge Period**," and the date of expiration of each Challenge Period being a "**Challenge Period Termination Date**"); *provided*, in the event that, prior to the expiration of the Challenge Period, (x) the Cases are converted to cases under chapter 7 of the Bankruptcy Code or (y) a chapter 11 trustee is appointed in the Cases, then in each such case, the Challenge Period shall be extended for a period of fifteen (15) calendar days solely with respect to such trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); (ii) seeking to avoid, object to, or otherwise challenge the findings in this Interim Order and the Debtors' Stipulations regarding: (a) the validity, enforceability, extent, priority, and perfection of the mortgages, security interests, and liens of the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties, as applicable; or (b) the validity, enforceability, allowability, priority, secured status, and amount of the Prepetition First Lien Obligations (any such claim, a "**Challenge**"); and (iii) in which this Court enters a final order in favor of the plaintiff or the movant sustaining any such Challenge in any such timely and properly filed adversary proceeding or contested matter. The timely and proper filing of a motion seeking standing to file a Challenge before the termination of the Challenge Period, which attaches a proposed Challenge, shall toll the Challenge Period Termination Date

only as to the party that timely and properly filed such standing motion, and only with respect to challenges expressly asserted in the proposed Challenge attached to such standing motion, until such motion is resolved or adjudicated by this Court.  Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled):  (a) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any successor case) shall be deemed to be forever barred; (b) the Prepetition First Lien Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any successor cases; (c) the Prepetition First Lien Loan Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the findings and the Debtors' stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, affirmations, and other stipulations as to the priority, extent, and validity of the claims, liens, and interests of the Prepetition First Lien Secured Parties contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, their estates, and all creditors, interest holders, and other parties in interest in these Cases and any successor cases. Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the findings and stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such findings and stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior

31

to the Challenge Period Termination Date. Nothing in this Interim Order vests or confers on any person or entity, including, without limitation, any Committee, standing or authority to pursue any claims or causes of action belonging to the Debtors or their estates, including, without limitation, any Challenges, with respect to the Prepetition First Lien Loan Documents, the Prepetition First Lien Loan Liens and the Prepetition First Lien Obligations.

11.    <u>Events of Default</u>. The occurrence of any of the following events, unless waived by the Majority Prepetition Lenders in accordance with the terms of the Prepetition First Lien Loan Documents, shall constitute an event of default (each, an "**Event of Default**"): (a) the failure of the CC Parties to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, subject to a three (3) business day cure period (if such failure is capable of being cured); provided that the reporting requirements set forth in Paragraphs 4 and 5 shall not be subject to any cure period; (b) the entry by this Court or any other court of an order vacating or modifying this Interim Order or any final Order approving the use of Cash Collateral in these cases; (c) the dismissal of one or more of the Cases of the Debtors or the conversion of one or more of the Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, in each case, unless consented to by the Majority Prepetition Lenders; (d) the appointment of a trustee, receiver or examiner or other representative with expanded powers (*i.e.*, powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) for any of the Debtors, unless otherwise consented to by the Majority Prepetition Lenders; (e) the entry by this Court of an order with respect to any of the Cases shall be entered by the Bankruptcy Court ordering termination of the exclusive period for the CC Parties to file a plan in any of the Cases, or (f) the CC Parties shall seek or request (or support another party in the filing of) the entry of any order to effect any of the events described in this Paragraph 11.

12.    <u>Rights and Remedies Upon Event of Default</u>.

(a)    Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from this Court, but subject to the terms of this Interim Order and the Remedies Notice Period, the Prepetition First Lien Agent (at the direction of the Majority Prepetition Lenders) may declare (any such declaration shall be referred to herein as a "**Termination Declaration**") (i) that the Carve Out shall be triggered, through the delivery of the Carve Out Trigger Notice as provided for herein, and (ii) subject to Paragraph 8 of this Interim Order, an immediate termination, reduction or restriction on the ability of the CC Parties to use Cash Collateral (the date on which a Termination Declaration is delivered, the "**CC Termination Date**").  Any Termination Declaration shall not be effective until written notice has been provided by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), and the U.S. Trustee.

(b)    Without the need for any further notice (other than notice of a Termination Declaration as provided for herein) or order or application or motion to this Court, the automatic stay in the Cases otherwise applicable to the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties is hereby automatically modified so that seven (7) days after the CC Termination Date (the "**Remedies Notice Period**"), unless otherwise ordered by the Court prior to the expiration of the Remedies Notice Period, the Prepetition First Lien Agent and the Majority Prepetition Lenders shall be entitled to exercise any of their rights and remedies set forth in the Prepetition First Lien Loan Documents and this Interim Order and otherwise available at law with respect to the CC Parties' use of Cash Collateral.  Notwithstanding anything in this Interim Order, during the Remedies Notice Period, the CC Parties may only use Cash Collateral with the express

written consent of the Majority Prepetition Lenders. Following entry of a Final Order, in any hearing regarding any exercise of rights or remedies under the Prepetition First Lien Loan Documents, the only issues that may be raised by the CC Parties and any other parties in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the CC Parties and any other parties in interest hereby waive their right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Prepetition First Lien Secured Parties set forth in this Interim Order or the Prepetition First Lien Loan Documents. No rights, protections or remedies of the Prepetition First Lien Secured Parties granted by the provisions of this Interim Order or the Prepetition First Lien Loan Documents shall be limited, modified or impaired in any way by: (a) any actual or purported withdrawal of the consent of any party to the CC Parties' authority to continue to use Cash Collateral; (b) any actual or purported termination of the CC Parties' authority to continue to use Cash Collateral; or (c) except as provided herein or in any Further Interim Order or Final Order, the terms of any other order or stipulation related to the CC Parties' continued use of Cash Collateral or the provision of adequate protection to any party. During the Remedies Notice Period, the Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing with this Court to be held within the Remedies Notice Period, including for the contested use of Cash Collateral. Except as set forth in this Paragraph or otherwise ordered by this Court prior to expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall be deemed to have waived their right to, and shall not be entitled to, seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Prepetition First Lien Secured Parties under this Interim Order.

13. <u>Section 506(c) Waiver</u>. The CC Parties and the Prepetition First Lien Secured Parties shall have the right to seek, in the Further Interim Order or Final Order, a finding that, no costs or expenses of administration (other than as set forth in the Approved Budget), which have been or may be incurred in any of the Cases or any successor cases at any time shall be charged against the Prepetition First Lien Secured Parties, any of their claims, any Prepetition First Lien Obligations, any security interests in and liens on the Prepetition Collateral, or the Prepetition Collateral, pursuant to sections 506(c) or 105(a) of the Bankruptcy Code, or otherwise. Nothing contained in this Interim Order shall be deemed a consent by the Prepetition First Lien Secured Parties to any charge, lien assessment or claim against, or in respect of, the Prepetition Collateral under section 506(c) or 105(a) of the Bankruptcy Code or otherwise.

14. <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

15. <u>Section 507(b) Reservation</u>. Subject to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties is insufficient to compensate for any Diminution in Value. Nothing contained herein shall be deemed a finding by this Court, or an acknowledgment by any of the Prepetition First Lien Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition First Lien Secured Parties against any Diminution in Value.

16. <u>No Waiver for Failure to Seek Relief</u>. The failure or delay of the Prepetition First Lien Secured Parties to exercise rights and remedies under, as applicable, this Interim Order, the

Prepetition First Lien Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

17.    <u>Perfection First Lien Adequate Protection Liens</u>.  The Prepetition First Lien Agent (acting at the written direction of the Majority Prepetition Lenders) is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the Prepetition First Lien Agent (acting at the written direction of the Majority Prepetition Lenders) chooses to file such financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and subject to the Challenge Period, not subject to challenge, dispute, or subordination as of the date of entry of this Interim Order.  If the Prepetition First Lien Agent (acting at the written direction of the Majority Prepetition Lenders) determines to file or execute any financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments, the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the Prepetition First Lien Agent, and the automatic stay shall be modified to allow such filings. A certified copy of this Interim Order may be filed with or recorded in filing or recording offices by the Prepetition First Lien Agent in addition to or in lieu of any such filings, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; *provided*, *however*, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

18.    <u>Credit Bid</u>. The Prepetition First Lien Secured Parties shall have the right to request authority to credit bid under section 363(k) of the Bankruptcy Code all of their claims in connection with a sale of any of the CC Parties' assets under section 363 of the Bankruptcy Code or under a chapter 11 plan.

19.    <u>Segregated Cash Account</u>.  In the event that on or after the entry of this Order any CC Party makes a Disposition (as defined below) of Prepetition Collateral or any CC Party receives a margin refund, the cash proceeds shall be distributed as follows: (a) if the CC Parties' Liquidity is less than $10,000,000 (the "**Minimum Balance**"), cash proceeds shall be deposited into the CC Parties' primary cash concentration account at Bank of America N.A. (the "**Cash Management Bank**") that is subject to an Account Control Agreement (as defined in the Prepetition First Lien Credit Agreement) until the Minimum Balance is met (and such cash proceeds may be used in strict accordance with the Approved Budget); (b) if the CC Parties' Liquidity (as defined below) exceeds the Minimum Balance (including any excess beyond the amount required to be deposited to meet the Minimum Balance pursuant to the foregoing subclause (a)), 25% of such cash proceeds shall be deposited into the CC Parties' primary cash concentration account at the Cash Management Bank and 75% of such cash proceeds shall be deposited into a segregated account at the Cash Management Bank and made subject to an Account Control Agreement (such account, the "**Segregated Cash Account**"); and (c) if the CC Parties' Liquidity exceeds $40,000,000, 100% of such cash proceeds shall be deposited into the Segregated Cash Account; provided that the CC Parties will have 14 days from the entry of this Order (or such longer period as reasonably agreed to by the Prepetition First Lien Agent) to establish that the Segregated Cash Account is subject to an Account Control Agreement (which may be under an existing Account Control Agreement).  Amounts held in the Segregated Cash Account (i) shall constitute Prepetition

Collateral of the Prepetition Secured Parties, (ii) shall be deemed subject to a valid, perfected, and enforceable lien of the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties, and (iii) shall not be disbursed from or otherwise removed or transferred from the Segregated Cash Account by the Debtors or any other party unless (x) pursuant to an order of the Court, (y) if such amounts are to be used to fund a margin call payment, the prior written consent of the Prepetition First Lien Agent (in its sole discretion) has been obtained upon written request by the CC Parties, which such request shall be made at the same time a notice pursuant to Paragraph 3(c) is delivered or (z) if such amounts are to be used other than to fund a margin call payment, the prior written consent of the Majority Prepetition Lenders has been obtained upon written request of no less than two (2) business days advance notice by the CC Parties. Any cash disbursed from the Segregated Cash Account shall be used by the Debtors in strict accordance with the Approved Budget. As used herein: (x) "**Disposition**" means (i) any sale, conveyance, license, lease or other transfer and (ii) any collection on, or other liquidation of, the Prepetition Collateral pursuant to the Realization Strategy; (y) "**Realization Strategy**" means the report delivered by the Debtors to the Prepetition First Lien Agent setting forth the Debtors' strategy for realizing upon the Prepetition Collateral, which shall be in form and substance acceptable to the Majority Lenders; and (z) "**Liquidity**" means, at any time, the unrestricted (other than restricted on account of securing the Prepetition Obligations) cash and Liquid Investments (as defined in the Prepetition First Lien Credit Agreement) on the balance sheet of the Debtors that are held in accounts subject to an Account Control Agreement.

20.    <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)    Notwithstanding any order dismissing any of the Cases entered at any time, (x) the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority

Claims, and any other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until, as applicable, all First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash, and such First Lien Adequate Protection Liens, First Lien Adequate Protection Superpriority Claims, and any other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on the Debtors, their estates and all parties in interest; and (y) to the fullest extent permitted by law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the provisions of this Interim Order.

(b)    Except as expressly provided in this Interim Order or in the Prepetition First Lien Loan Documents, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, and all other rights and remedies of the Prepetition First Lien Secured Parties granted under this Interim Order shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral pursuant to section 363 of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining First Lien Adequate Protection Obligations.  The terms and provisions of this Interim Order shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The First Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, and all other rights and remedies of the Prepetition First Lien Secured Parties under this

Interim Order shall continue in full force and effect until, as applicable, the First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash.

(c)    Other than as set forth in this Interim Order or as otherwise ordered by the Court, the First Lien Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and the First Lien Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551, and except as set forth in this Interim Order the occurrence of any of the foregoing shall be an Event of Default.

21.    <u>Limitation on Use of Prepetition Collateral</u>.    Notwithstanding anything to the contrary set forth in this Interim Order, other than as consented to in writing by the Majority Prepetition Lenders, none of the Prepetition Collateral (including Cash Collateral) or the Carve Out or proceeds thereof may be used:  (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the Prepetition First Lien Secured Parties, and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the Prepetition First Lien Secured Parties under the Prepetition First Lien Loan Documents or this Interim Order, including, without limitation, for the payment

of any services rendered by the professionals retained by the Debtors or any Committee appointed in these Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the Prepetition First Lien Secured Parties to recover on the Prepetition Collateral or seeking affirmative relief against any of the Prepetition First Lien Secured Parties related to the Prepetition First Lien Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Prepetition First Lien Obligations, or liens or security interests of the Prepetition First Lien Secured Parties in the Prepetition Collateral; or (iii) for monetary, injunctive, or other affirmative relief against the Prepetition First Lien Secured Parties, or the respective liens on or security interests in the Prepetition Collateral of the Prepetition First Lien Secured Parties that would impair the ability of any of the Prepetition First Lien Secured Parties to assert or enforce any lien, claim, right, or security interest or to realize or recover on the Prepetition First Lien Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests held by or on behalf of each of the Prepetition First Lien Secured Parties related to the Prepetition First Lien Obligations, as applicable; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the Prepetition First Lien Obligations, or the Prepetition First Lien Loan Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition First Lien Loan Liens or any other rights or interests of any of the Prepetition First Lien Secured Parties related to the Prepetition First Lien

Obligations or the Prepetition First Lien Loan Liens, *provided* that no more than $50,000 of the proceeds of the Prepetition Collateral (including Cash Collateral), in the aggregate, may be used by any Committee appointed in these Cases, if any, solely to investigate, within the Challenge Period, the claims, causes of action, adversary proceedings, or other litigation against the Prepetition First Lien Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests held by or on behalf of each of the Prepetition First Lien Secured Parties related to the Prepetition First Lien Obligations.

22.    <u>Subordination Agreements.</u>  Pursuant to section 510 of the Bankruptcy Code, any intercreditor or subordination provisions contained in any of the Prepetition First Lien Loan Documents (i) shall remain in full force and effect, and (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition First Lien Secured Parties.

23.    <u>Binding Effect; Successors and Assigns</u>.  The provisions of this Interim Order, including (subject to the provision of Paragraph 10 of this Interim Order) all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, any Committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the Prepetition First Lien Secured Parties and other parties as expressly provided for herein; provided, however, the Prepetition First Lien Lenders shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

24.     <u>Limitation of Liability</u>.  Subject to entry of the Further Interim or Final Order, in determining to permit the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the Prepetition First Lien Secured Parties shall not, solely by reason thereof, owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition First Lien Lenders, or the Prepetition First Lien Agent, any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

25.     <u>No Requirement to File Claim for Prepetition First Lien Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of this Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, the Prepetition First Lien Secured Parties shall not be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition First Lien Obligations, all of which shall be due and payable in accordance with the Prepetition First Lien Loan Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request shall not affect the validity, priority, or enforceability of any of the Prepetition First Lien Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the rights, remedies, powers, or privileges of the Prepetition First Lien Secured Parties under any of the Prepetition First Lien Loan Documents, this Interim Order, or applicable law.  The provisions set forth in this Paragraph are intended solely for the purpose of administrative

convenience, and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

26.     Marshaling.  The Debtors and the Prepetition First Lien Secured Parties shall have the right to seek, in the Further Interim Order or Final Order, a finding that, the Prepetition First Lien Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral.

27.     Section 552(b) of the Bankruptcy Code.  The CC Parties and the Prepetition First Lien Secured Parties shall have the right to seek, in the Further Interim Order or Final Order, a finding that, the Prepetition First Lien Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition First Lien Secured Parties with respect to any of the Prepetition Collateral.

28.     Further Interim Hearing.  An further interim hearing to consider the relief requested in the Motion on an interim basis shall be held on January _____, 2024 at _____ (ET).  Any objections or responses to entry of an Additional Interm Order shall be filed on or before 4:00 p.m. (ET) on _____, 2024, and shall be served on:  (a)  counsel to the Debtors Baker & McKenzie; (b) counsel to the Prepetition First Lien Agent, Cadwalader, Wickersham & Taft LLP; (c) the United States Trustee _____  and (d) counsel to any Committee.  In the event no objections to entry of the Further Interim Order are timely received, this Court may enter the Further Interim Order without need for any further notice or the Further Interim Hearing.

29.    <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, and shall take effect and be enforceable immediately upon execution hereof.

30.    <u>Retention of Jurisdiction</u>.  This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

## **SCHEDULE A**

**Foreign Security Agreements**

## List of Foreign Security Agreements

The following documents and agreements, as amended, supplemented, confirmed or otherwise modified from time to time:

1. *With respect to the Netherlands:*

   a. Dutch law Omnibus Deed of Pledge, dated November 30, 2017, by Mercon B.V. and Mercon Coffee Corporation in favor of Prepetition First Lien Agent, covering, *inter alia*, coffee inventory, accounts receivable and applicable pledged bank accounts, as supplemented from time to time.

   b. Dutch law governed Deed of Pledge, dated May 19, 2023, ranking behind the Initial Dutch Deed of Pledge, by Mercon B.V. and Mercon Coffee Corporation, in favor of the Prepetition First Lien Agent, covering, *inter alia*, coffee inventory, accounts receivable and applicable pledged bank accounts, as supplemented from time to time.

2. *With respect to Nicaragua:*

   a. Nicaraguan law *Contrato de Garantía Mobiliaria*, dated June 30, 2023, creating security over the coffee inventory of Comercial Internacional Exportadora, S.A. and Distribuidora de Granos de Nicaragua S.A. in Nicaragua to the Prepetition First Lien Agent, made by Comercial Internacional Exportadora, S.A. and Distribuidora de Granos de Nicaragua S.A, in favor of the Prepetition First Lien Agent.

   b. Nicaraguan law *Contrato de Garantía Mobiliaria*, dated June 30, 2023, creating security over the forward coffee purchase and sale contracts of Comercial Internacional Exportadora, S.A. and Distribuidora de Granos de Nicaragua S.A. in Nicaragua to the Prepetition First Lien Agent, made by Comercial Internacional Exportadora, S.A. and Distribuidora de Granos de Nicaragua S.A., in favor of the Prepetition First Lien Agent.

   c. The New York law Collateral Management Agreement, dated as of November 1, 2016, as amended and assigned to the Prepetition First Lien Agent pursuant to that certain Assignment Agreement and Amendment, dated as of November 30, 2017, by and among Wakefield Inspection Services Nicaragua S.A., as collateral manager, the Prepetition First Lien Agent, as agent, and Comercial Internacional Exportadora, S.A. and Distribuidora de Granos de Nicaragua S.A., as clients.

3. *With respect to Honduras:*

   a. Honduran law Floating Pledge Agreement Over Fungible Inventory (*Contrato de Prenda Flotante Sobre Inventario de Bienes Fungibles*), dated December 5, 2017, made by Comercial Internacional de Granos de Honduras S.A de C.V. in

favor of the Prepetition First Lien Agent with respect to coffee inventory owned by Comercial Internacional de Granos de Honduras S.A de C.V. in Honduras.

b.  Honduran law assignments of Certificates of Deposit made to the Prepetition First Lien Agent from time to time (if any) with respect to coffee inventory owned by Comercial Internacional de Granos de Honduras S.A de C.V. in Honduras.

c.  The New York law Collateral Management Agreement, dated as of February 5, 2019, by and among Wakefield Inspection Services Honduras, Sociedad Anónima, as collateral manager, Prepetition First Lien Agent, as agent and Comercial Internacional de Granos de Honduras S.A de C.V., as client.

4.  *With respect to Guatemala:*

a.  Guatemalan law Possessory Movable Pledge, dated January 19, 2018, pledging the coffee inventory of Mercon Guatemala, S.A. in Guatemala to the Prepetition First Lien Agent.

b.  The New York law Collateral Management Agreement, dated as of January 19, 2018, by and among Wakefield Inspection Services Guatemala, Sociedad Anónima., as collateral manager, Prepetition First Lien Agent, as agent and Mercon Guatemala, S.A., as client.

5.  *With respect to Brazil:*

a.  Brazilian law Mercantile Pledge Agreement and Other Covenants (*penhor mercantile*) over coffee inventory of Mercon Brasil Comercio de Café Ltda. in Brazil, dated April 30, 2019, by and among Mercon Brasil Comercio de Café Ltda. and Rabobank International Brasil S.A., acting as sub-agent for the Prepetition First Lien Agent (in such capacity, the "**Brazilian Collateral Agent**").

b.  Brazilian law Mercantile Pledge Agreement and Other Covenants (*penhor mercantile*) over coffee inventory of Mercon Brasil Comercio de Café Ltda. in Brazil, dated July 29, 2020, by and among Mercon Brasil Comercio de Café Ltda. and the Brazilian Collateral Agent.

c.  Brazilian law Mercantile Pledge Agreement and Other Covenants (*penhor mercantile*) over coffee inventory of Mercon Brasil Comercio de Café Ltda. in Brazil, dated April 30, 2021, by and among Mercon Brasil Comercio de Café Ltda. and the Brazilian Collateral Agent, as amended pursuant the First Amendment thereto.

d.  Brazilian law Amendment and Restatement to the Fiduciary Assignment of CDA/WA and Other Covenants (*Aditamento e Consolidação ao Contrato De Cessão Fiduciária De CDA/WA e Outras Avenças*), dated May 23, 2023, by Mercon Brasil Comercio de Café Ltda. and the Brazilian Collateral Agent.

2

e.  Endorsement of Brazilian Agricultural Certificates of Deposit and the related Agricultural Warrant from Mercon Brasil Comercio de Café Ltda. to the Brazilian Collateral Agent from time to time with respect to coffee inventory owned by Mercon Brasil Comercio de Café Ltda. in Brazil and the related registration thereof .

6.  *With respect to Vietnam:*

a.  Vietnamese law Coffee Mortgage Agreement originally dated 4 December 2014, as amended and restated on 31 May 2016 by and between Mercon B.V. and Mercon Coffee Corporation as the mortgagors, and Société Générale, as the mortgagee, as amended by, without limitation, a Second Amendment thereto, dated November 30, 2017, which replaces Société Générale as mortgagee and collateral agent thereunder, with the Prepetition First Lien Agent.

b.  The New York law Collateral Management Agreement No.708615691.2.11144051 and the related Sight Management Agreement, among Mercon B.V. and Mercon Coffee Corporation, Pacorini Vietnam Ltd. and the Prepetition First Lien Agent (as successor by assignment to Société Générale).

7.  *With respect to the British Virgin Islands:*

a.  BVI law Floating Charge, dated May 30, 2016, by and among, *inter alios*, CISA Export, S.A. and Mercafe Vietnam Ltd., as chargors, and the Prepetition First Lien Agent, as collateral agent.

8.  *With respect to Canada:*

a.  The Hypothec, dated May 31, 2016 under the laws of the Province of Québec and the federal laws of Canada, by Mercon B.V. and Mercon Coffee Corporation in favor of the Prepetition First Lien Agent (as successor to Société Générale), acting as hypothecary representative, in respect of movable property.

b.  The General Security Agreement, dated May 31, 2016, under the laws of the Province of Ontario and the laws of Canada, by Mercon B.V. and Mercon Coffee Corporation and the First Lien Prepetition Agent (as successor to Société Générale), covering, *inter alia*, coffee inventory and accounts receivable.

c.  The Agent Resignation and Appointment Agreement (under New York law), dated as of November 30, 2017, which is effective to assign the rights of Société Générale in respect of the Québec Hypothec and the Canadian GSA to First Lien Prepetition Agent.

9.  *With respect to Belgium:*

3

a. Belgian law Register Pledge Agreement, dated as of April 30, 2019, by and among Mercon B.V. and Mercon Coffee Corporation, as pledgors, and the First Lien Prepetition Agent, as pledgee.

*10. With respect to Germany:*

a. German law Security Transfer Agreement, dated as of November 30, 2017, by and among, Mercon B.V., as transferor, and the Prepetition First Lien Agent as transferee.

b. German law Global Assignment Agreement, dated as of November 30, 2017, by and among Mercon B.V., as assignor, and the Prepetition First Lien Agent as assignee.

c. German law Security Transfer Agreement, dated as of November 30, 2017, by and among Mercon Coffee Corporation, as transferor, and the Prepetition First Lien Agent as transferee.

d. German law Global Assignment Agreement, dated as of November 30, 2017, by and among Mercon Coffee Corporation, as assignor, and the Prepetition First Lien Agent as assignee.

*11. With respect to the United Kingdom:*

a. English law Debenture, dated April 30, 2019, by Mercon B.V., in favor of the Prepetition First Lien Agent.

b. English law Debenture, dated April 30, 2019, by Mercon Coffee Corporation, in favor of the Prepetition First Lien Agent.

## SCHEDULE B

**Pledged Accounts**

## EXHIBIT A

## List of Bank Accounts

| # | Owner | Country | Currency | Bank | Account Number | Key Bank Account or Concentration Account | Link to Concentration Account |
|---|---|---|---|---|---|---|---|
| 1. | Comercial Internacional de Granos de Honduras S.A. de C.V. | USA | US Dollars | Bank of America NA | x-6917 | Key Bank Account | Mercon BV - (x-7474) |
| 2. | Comercial Internacional Exportadora, S.A. | USA | US Dollars | Bank of America NA | x-6931 | Key Bank Account | Mercon BV - (x-7474) |
| 3. | Mercon BV | USA | US Dollars | Brown Brothers Harriman | x-6556 | | |
| 4. | Mercon BV | USA | EUR | Brown Brothers Harriman | x-6580 | | |
| 5. | Mercon BV | USA | US Dollars | Bank of America NA | x-7474 | Concentration Account | |
| 6. | Mercon BV | USA | US Dollars | Bank of America NA | x-1355 | Key Bank Account | Mercon BV - (x-7474) |
| 7. | Mercon BV | Netherlands | EUR | Bank of America NA | x-9011 | Concentration Account | |
| 8. | Mercon BV | Netherlands | EUR | Bank of America NA | x-9029 | Key Bank Account | Mercon BV - (x-9011) |
| 9. | Mercon Coffee Corporation | USA | US Dollars | Bank of America NA | x-7493 | Key Bank Account | Mercon BV - (x-7474) |
| 10. | Mercon Coffee Corporation | Netherlands | EUR | Bank of America NA | x-8017 | Key Bank Account | Mercon BV - (x-9011) |
| 11. | Mercon Coffee Corporation | USA | US Dollars | Brown Brothers Harriman | x-6531 | | |
| 12. | Mercon Coffee Corporation (Specialty) | USA | US Dollars | Bank of America NA | x-5087 | Key Bank Account | Mercon BV - (x-7474) |
| 13. | Mercon Coffee Corporation (Brewed Behavior) | USA | US Dollars | Bank of America NA | x-7758 | | |
| 14. | Mercon Guatemala, S.A. | USA | US Dollars | Bank of America NA | x-4836 | Key Bank Account | Mercon BV - (x-7474) |
| 15. | Agro International Holding B.V. | USA | US Dollars | Bank of America NA | x-6366 | | Mercon BV - (x-7474) |
| 16. | Agro International Holding B.V. | Ethiopia | ETB | Awash Bank | x-0100 | | |
| 17. | Comercial Internacional de Granos de Honduras S.A. de C.V. | Honduras | Lempira | Occidente | x-1427-0 | | |
| 18. | Comercial Internacional de Granos de Honduras S.A. de C.V. | Honduras | US Dollars | Occidente | x-5006-0 | | |
| 19. | Comercial Internacional de Granos de Honduras S.A. de C.V. | Honduras | US Dollars | Banco Lafise Bancentro | x2-548 | | |

| # | Owner | Country | Currency | Bank | Account Number | Key Bank Account or Concentration Account | Link to Concentration Account |
|---|---|---|---|---|---|---|---|
| 20. | Comercial Internacional de Granos de Honduras S.A. de C.V. | Honduras | Lempira | Banco Lafise Bancentro | x-946 | | |
| 21. | Comercial Internacional de Granos de Honduras S.A. de C.V. | Honduras | Lempira | Banco America Central | x-9-501 | | |
| 22. | Comercial Internacional de Granos de Honduras S.A. de C.V. | Honduras | US Dollars | Banco America Central | x-9-503 | | |
| 23. | Comercial Internacional de Granos de Honduras S.A. de C.V. | Honduras | Lempira | Atlantida | x-12362 | | |
| 24. | Comercial Internacional de Granos de Honduras S.A. de C.V. | Honduras | US Dollars | Atlantida | x-04398 | | |
| 25. | Comercial Internacional Exportadora, S.A. | Nicaragua | NIO | Banco America Central | x-0553 | | |
| 26. | Comercial Internacional Exportadora, S.A. | Nicaragua | US Dollars | Banco America Central | x-0554 | | |
| 27. | Comercial Internacional Exportadora, S.A. | Nicaragua | US Dollars | Banco America Central | x-1444 | | |
| 28. | Comercial Internacional Exportadora, S.A. | Nicaragua | NIO | Banco America Central | x-01445 | | |
| 29. | Comercial Internacional Exportadora, S.A. | Nicaragua | US Dollars | Banco Lafise Bancentro | x-0-450 | | |
| 30. | Comercial Internacional Exportadora, S.A. | Nicaragua | NIO | Banco Lafise Bancentro | x-1-569 | | |
| 31. | Comercial Internacional Exportadora, S.A. | Nicaragua | NIO | Banco de Finanzas | x-1209 | | |
| 32. | Comercial Internacional Exportadora, S.A.. | Nicaragua | US Dollars | Banco de Finanzas | x-0855 | | |

| # | Owner | Country | Currency | Bank | Account Number | Key Bank Account or Concentration Account | Link to Concentration Account |
|---|---|---|---|---|---|---|---|
| 33. | Distribuidora de Granos de Nicaragua | Nicaragua | NIO | Banco America Central | x-0741 | | |
| 34. | Distribuidora de Granos de Nicaragua | Nicaragua | US Dollars | Banco America Central | x-0766 | | |
| 35. | Distribuidora de Granos de Nicaragua | Nicaragua | NIO | Banco Lafise Bancentro | x-4525 | | |
| 36. | Distribuidora de Granos de Nicaragua | Nicaragua | US Dollars | Banco Lafise Bancentro | x-4391 | | |
| 37. | Mercafe Vietnam LTD | USA | US Dollars | Bank of America NA | x-7696 | | |
| 38. | Mercapital de Nicaragua, S.A. | USA | US Dollars | Bank of America NA | x-5735 | | |
| 39. | Mercapital de Nicaragua. S.A. | Nicaragua | NIO | Banco America Central | x-1-594 | | |
| 40. | Mercapital de Nicaragua. S.A. | Nicaragua | US Dollars | Banco America Central | x-0-750 | | |
| 41. | Mercapital de Nicaragua. S.A. | Nicaragua | NIO | Banco America Central | x-6-713 | | |
| 42. | Mercapital de Nicaragua. S.A. | Nicaragua | US Dollars | Banco America Central | x-7-109 | | |
| 43. | Mercapital de Nicaragua. S.A. | Nicaragua | US Dollars | Banco Lafise Bancentro | x-1-264 | | |
| 44. | Mercapital de Nicaragua. S.A. | Nicaragua | NIO | Banco Lafise Bancentro | x-2-730 | | |
| 45. | Mercapital de Nicaragua. S.A. | Nicaragua | US Dollars | Banco Lafise Bancentro | x-01-670 | | |
| 46. | Mercapital de Nicaragua. S.A. | Nicaragua | NIO | Banco Lafise Bancentro | x-2-749 | | |
| 47. | Mercapital de Nicaragua. S.A. | Nicaragua | US Dollars | BANCO FICOHSA, S.A | x-097-9 | | |
| 48. | Mercapital de Nicaragua. S.A. | Nicaragua | NIO | BANCO FICOHSA, S.A | x-093-2 | | |
| 49. | Mercapital de Nicaragua. S.A. | Nicaragua | US Dollars | Banco de Finanzas | x-3184 | | |
| 50. | Mercapital de Nicaragua. S.A. | Nicaragua | NIO | Banco de Finanzas | x-3577 | | |
| 51. | Mercapital de Nicaragua. S.A. | Nicaragua | NIO | Avanz | x-2901 | | |
| 52. | Mercapital de Nicaragua. S.A. | Nicaragua | US Dollars | Avanz | x-3702 | | |
| 53. | Mercon Brasil Comercio de Café Ltda | USA | US Dollars | Bank of America NA | x-7498 | | |

| # | Owner | Country | Currency | Bank | Account Number | Key Bank Account or Concentration Account | Link to Concentration Account |
|---|---|---|---|---|---|---|---|
| 54. | Mercon Brasil Comercio de Café Ltda | Brazil | Reais | Bank of America NA | x-7012 | | |
| 55. | Mercon Brasil Comercio de Café Ltda | Brazil | Reais | Bank of America NA | x-7020 | | |
| 56. | Mercon Brasil Comercio de Café Ltda | Brazil | Reais | Banco Itau | x-885-8 | | |
| 57. | Mercon Brasil Comercio de Café Ltda | Brazil | Reais | Banco Bradesco | x-391-8 | | |
| 58. | Mercon Brasil Comercio de Café Ltda | Brazil | Reais | Banco Santander | x-9232 | | |
| 59. | Mercon Brasil Comercio de Café Ltda | Brazil | Reais | Banco HSBC do Brasil | x-027-2 | | |
| 60. | Mercon Brasil Comercio de Café Ltda | Brazil | Reais | Capital Market (broker) | x-792-1 | | |
| 61. | Mercon Brasil Comercio de Café Ltda | Brazil | Reais | Banco Safra | x-877-3 | | |
| 62. | Mercon Brasil Comercio de Café Ltda | Brazil | Reais | ABC BANK | x-2499 | | |
| 63. | Mercon Brasil Comercio de Café Ltda | Brazil | Reais | VOITER | x-0007 | | |
| 64. | Mercon BV | Panama | US Dollars | Banco America Central | x-1377 | | |
| 65. | Mercon BV | Panama | US Dollars | BANCO FICOHSA, S.A | x-3546 | | |
| 66. | Mercon BV | USA | US Dollars | Bank of America NA | x-8761 | | |
| 67. | Mercon BV | USA | US Dollars | Bank of America NA | x-6624 | | |
| 68. | Mercon Coffee Corporation Payroll | USA | US Dollars | Bank of America NA | x-6252 | | |
| 69. | Mercon Guatemala, S.A. | Guatemala | US Dollars | Banco America Central | x-1-330 | | |
| 70. | Mercon Guatemala, S.A. | Guatemala | Quetzales | Banco America Central | x-1-306 | | |
| 71. | Mercon Guatemala, S.A. | Guatemala | US Dollars | Banco Internacional | x-082-2 | | |
| 72. | Mercon Guatemala, S.A. | Guatemala | Quetzales | Banco Internacional | x-307-0 | | |
| 73. | Mercon Guatemala, S.A. | Guatemala | US Dollars | Banco Agromercantil | x-166-3 | | |
| 74. | Mercon Guatemala, S.A. | Guatemala | Quetzales | Banco Agromercantil | x-454-2 | | |
| 75. | Mercon Guatemala, S.A. | Guatemala | Quetzales | BANCO FICOHSA, S.A | x-1161 | | |
| 76. | Mercon Guatemala, S.A. | Guatemala | US Dollars | BANCO FICOHSA, S.A | x-1546 | | |
| 77. | Mercon Coffee Corporation | USA | US Dollars | Terrabank | x-8306 | | |
| 78. | Mercafe Vietnam LTD | VN | US Dollars | Agribank | x-0060 | | |

## **SCHEDULE C**

**Approved Budget**

**Mercon**
Cash Flow Forecast
*in 000s*
*$USD*

| | LIQUIDATION SCENARIO | | | | | |
|---|---|---|---|---|---|---|
| Week # | Fcst 1 | Fcst 2 | Fcst 3 | Fcst 4 | Fcst 5 | Fcst |
| Week Ending: | Dec-15 | Dec-22 | Dec-29 | Jan-5 | Jan-12 | 5 Week $ Total |
| **Receipts** | | | | | | |
| Coffee Sales Receipts | 4,829 | 5,846 | 2,117 | 2,918 | 4,900 | 20,610 |
| Brokers NLV | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - |
| **Total Receipts** | 4,829 | 5,846 | 2,117 | 2,918 | 4,900 | 20,610 |
| **Outflows** | | | | | | |
| Coffee Purchases | (486) | (85) | (1,579) | - | (238) | (2,387) |
| Payroll | (79) | - | - | - | - | (79) |
| Freight & Duty | - | - | - | - | - | (79) |
| Insurance | - | - | (105) | - | - | (105) |
| Operational Expenses | (1,841) | (1,479) | (495) | (516) | (516) | (4,846) |
| Margin Refunds/(Calls) | - | - | - | - | - | - |
| **Operational Disbursements** | (2,406) | (1,563) | (2,179) | (516) | (754) | (7,417) |
| Interest Expenses | - | - | - | - | - | - |
| CapEx | - | - | - | - | - | - |
| Taxes | (896) | - | - | - | - | (896) |
| **Other Non-Operating Disbursements** | (896) | - | - | - | - | (896) |
| LT debt repayment (sales proceeds) | - | - | - | - | - | - |
| Bilateral Debt | - | - | - | - | - | - |
| Financing to growers/producers | - | - | - | - | - | - |
| Syndicated Facility payment | - | - | - | - | - | - |
| **Financing Activity** | | | | | | |
| Security | (50) | (50) | (50) | (50) | (50) | (250) |
| Advisory Fees | - | - | (83) | - | - | (83) |
| Financing Fees | - | - | - | - | - | - |
| **Fees** | (50) | (50) | (133) | (50) | (50) | (333) |
| **Total Outflows** | (3,351) | (1,613) | (2,312) | (566) | (804) | (8,646) |
| **Net Cash Flow** | 1,478 | 4,233 | (195) | 2,352 | 4,096 | 11,964 |
| Beginning Balance - Cash - Bank | 14,323 | 12,179 | 12,027 | 10,244 | 10,408 | 14,323 |
| Net Cash Flow | 1,478 | 4,233 | (195) | 2,352 | 4,096 | 11,964 |
| Segregated Account payment | (3,622) | (4,385) | (1,588) | (2,189) | (3,675) | (15,457) |
| Other | - | - | - | - | - | - |
| DIP draw / (repayment) | - | - | - | - | - | - |
| **Ending Balance - Cash - Bank** | 12,179 | 12,027 | 10,244 | 10,408 | 10,829 | 10,829 |
| Float | - | - | - | - | - | - |
| **Ending Balance - Cash - Book** | 12,179 | 12,027 | 10,244 | 10,408 | 10,829 | 10,829 |
| **Availability** | (79,584) | (85,376) | (88,550) | (90,722) | (94,246) | (94,246) |
| **Total Liquidity** | (77,406) | (83,453) | (86,912) | (89,058) | (92,515) | (92,515) |
| **Segregated Account Balance** | | | | | | |
| Beginning | - | 3,622 | 8,006 | 9,594 | 11,783 | - |
| Additions | 3,622 | 4,385 | 1,588 | 2,189 | 3,675 | 15,457 |
| Payments to Prepetition Line | - | - | - | - | - | - |
| **Ending Balance** | 3,622 | 8,006 | 9,594 | 11,783 | 15,457 | 15,457 |

**Notes:**

1) Margin calls are not reflected in the above forecast.
2) When the opening cash balance is in excess of $10MM, 75% of the receipts are funded into a segregated account . Any balance over $40MM pays down the prepetition line, and the ending balance may ultimately be paid to the syndicate with court approval.
3) Availability includes 100% of the cash in which the syndicate has a security interest. Total Liquidity is the sum of the cash and the availability (excluding the cash with a security interest to avoid duplication).

## Exhibit B

**Redline**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MERCON COFFEE CORPORATION, *et al.*,[1] | Case No. 23-_____  (    ) |
| Debtors. | **Ref. Docket No. _____** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO ~~OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO~~ USE CASH COLLATERAL, (~~III~~II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (~~IV~~III) GRANTING ADEQUATE PROTECTION, (~~V~~IV) MODIFYING AUTOMATIC STAY, (~~VI~~V) SCHEDULING A ~~FINAL~~ FURTHER INTERIM HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Cases**") for entry of an interim order (this "**Interim Order**"), a further interim (the "**Further Interim Order**") and a final order (the "**Final Order**"), pursuant to sections 105, 361, 362, 363, 364, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 2002-1(b), 4001-2, 9006-1, and 9013 of the Local Rules of Bankruptcy Practice and Procedure (the "**Local Rules**") of the United States Bankruptcy Court for the Southern District of New York (the "**Court**"):

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Mercon Coffee Corporation (1844); Mercon B.V. (N/A); Mercon Brasil Comércio de Café Ltda. (N/A); Agro International Holding B.V. (N/A); Mercapital de Nicaragua, S.A. (N/A); Distribuidora de Granos de Nicaragua S.A. (N/A); Cisa Export S.A. (N/A); Comercial Internacional de Granos de Honduras, S.A. de C.V. (N/A); Mercon Guatemala, S.A. (N/A); Mercafe Vietnam LTD. (N/A); Comercial Internacional Exportadora, S.A. (N/A); Mercafe Agri Products, Inc. (N/A); Mercafe Vietnam Co. LTD. (N/A); Transplanta S.A. (N/A). The Debtors' mailing address is: 999 Ponce de Leon Blvd, Suite 910, Coral Gables, FL 33134

[2] Capitalized terms used but not defined herein have the meaning given to such terms in the Motion ~~or the below-referenced DIP Credit Agreement, as applicable~~.

(i)    immediately authorizing ~~each of~~ Mercon Coffee Corporation, a corporation existing under the laws of the State of New York ("**Mercon US**") ~~and~~, Mercon B.V., a corporation existing under the laws of the Netherlands ("**Parent**" ~~and, together with Mercon US, each a "DIP Borrower" and, collectively, the "DIP Borrowers"), to obtain postpetition financing, and for~~), Comercial Internacional Exportadora S.A., a corporation existing under the laws of Nicaragua ("**CISA**"), Comercial Internacional de Granos de Honduras, Sociedad Anonima de Capital Variable, existing under the laws of Honduras ("**CIGRAH**"), Mercon Guatemala S.A., a sociedad anonima, existing under the laws of Guatemala ("**Mercon Guatemala**"), Mercafe Vietnam Ltd., a corporation existing under the laws of the British Virgin Islands ("**Mercafe Vietnam BVI**"), Mercon Brasil Comercio de Café Ltda., a limited liability company existing under the laws of Brazil ("**Mercon Brazil**"), Mercapital de Nicaragua S.A., a corporation existing under the laws of Nicaragua ("**Mercapital Nicaragua**"), CISA Export S.A., a corporation existing under the laws of the British Virgin Islands ("**CISA Export**"),  Agro International Holdings B.V., a corporation existing under the laws of Curacao ("**Agro International**"), and Distribuidora de Granos de Nicaragua S.A. ("**Distribuidora**" and, together with Mercon US, Parent, CISA, CIGRAH, Mercon Guatemala, Mercafe Vietnam BVI, Mercon Brazil, Mercapital Nicaragua, CISA Export, and Agro International, the "~~**DIP Guarantors**" and, together with the DIP Borrowers, the "**DIP Loan**~~**CC Parties**") ~~to guarantee unconditionally the DIP Borrowers' obligations in connection with a superpriority senior secured credit facility (the "**DIP Facility**") consisting of (i) a senior secured revolving credit facility (the "**New Money Loan**") up to an aggregate maximum amount of $20,000,000 (the "**DIP Commitment**"), of which $10,000,000 of DIP Commitments will be available immediately upon entry of this Interim Order and the occurrence of the Closing Date, and the draws on which will be based on~~

2

the Approved Budget in accordance with the terms and conditions set forth in this Interim Order, the DIP Credit Agreement (as defined below), the other DIP Documents (as defined below), and the Final Order and (ii) a dollar-for-dollar roll-up of $20,000,000 in respect of outstanding loans under the Prepetition First Lien Credit Agreement (as defined below) (the "**Roll-Up Loan**" and together with the New Money Loan, the "**DIP Loans**"), which Roll-Up Loans will be deemed made and effective subject to, and upon entry of, the Final Order, in accordance with the terms and conditions set forth therein and in the DIP Credit Agreement, and which Roll-Up Loans shall be deemed to be used to satisfy and discharge the corresponding portion of the outstanding loans held by such DIP Lenders under the Prepetition First Lien Credit Agreement;

(ii)    authorizing the DIP Loan Parties to enter into that certain Superpriority Secured Debtor-In-Possession Credit Agreement (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "**DIP Credit Agreement,**" attached hereto as **Exhibit A**, and together with this Interim Order, the Final Order, and all agreements, documents, and instruments delivered or executed in connection therewith, including any fee letters executed by the DIP Borrowers in connection with the DIP Facility, and other guarantee and security documentation, collectively, the "**DIP Documents**"), among the DIP Borrowers, the DIP Guarantors, the lenders from time to time party thereto (collectively, in such capacity, the "**DIP Lenders**"), and Coöperatieve Rabobank U.A., New York Branch ("**Rabobank**"), as swingline lender, administrative agent and collateral agent (in such capacities as administrative agent and collateral agent, the "**DIP Agent,**" and together with the DIP Lenders and the swingline lender, the "**DIP Secured Parties**"), to perform such other and further acts as may be required in connection with the DIP Documents, and to incur all DIP Obligations (as defined below);

3

(iii)    authorizing the DIP Loan Parties to use the proceeds of the DIP Loans and the Prepetition Collateral (as defined below), including use the Cash Collateral (as defined below), in accordance with the Approved Budget (as defined below) (subject to Permitted Variances (as defined below)) for the purposes set forth in this Interim Order and the DIP Documents;

(ii)    (iv) granting adequate protection to the Prepetition First Lien Secured Parties (as defined below) to the extent of any Diminution in Value (as defined below) of their respective interests in the Prepetition Collateral, including Cash Collateral;

(v)    granting valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in substantially all of the property and assets of the DIP Loan Parties, whether such property is presently owned or after acquired, and each DIP Loan Parties' estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below), subject only to the (x) Carve Out (as defined below), (y) certain liens permitted pursuant to the terms of the DIP Credit Agreement that, under applicable law, are senior to, and have not been subordinated to, the liens of the DIP Agent under the DIP Documents, but only to the extent that such liens are valid, enforceable, perfected and non-avoidable liens as of the Petition Date (or as may be permitted to be perfected after the Petition Date pursuant to Section 546(b) of the Bankruptcy Code) (the liens identified in this clause (y), the "**DIP Permitted Encumbrances**"), and (z) certain liens (including the Bi-lateral Liens (as defined below)) existing as of the Petition Date (but only to the extent that such liens are valid, enforceable, perfected and non-avoidable liens as of the Petition Date (or as may be permitted to be perfected after the Petition Date

4

~~pursuant to Section 546(b) of the Bankruptcy Code)) on assets and property of the DIP Loan Parties for which such assets and property are not subject to the Prepetition First Lien Loan Liens (as defined below), in each case on the terms and conditions set forth herein and in the DIP Documents (such liens, the "**Excepted Liens**");~~

~~(vi)   granting superpriority administrative expense claims against each of the DIP Loan Parties' estates to the DIP Secured Parties with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature, subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Documents;~~

~~(vii)   subject to the Carve Out, entry of the Final Order and to the extent set forth herein, waiving the rights of the Debtors and their estates to surcharge against the DIP Collateral (as defined below) and the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;~~

~~(viii)   subject to the Carve Out, entry of the Final Order and to the extent set forth herein, for the "equities of the case" exception under section 552(b) of the Bankruptcy Code to not apply with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral;~~

(iii)   ~~(ix)~~ pursuant to Bankruptcy Rule 4001, holding an interim hearing (the "**Interim Hearing**") on the Motion before this Court to consider entry of this Interim Order, among other things, (1) authorizing the ~~DIP Loan Parties, on an interim basis, to borrow from the DIP Lenders a principal amount of up to $10,000,000 in New Money Loans, of which $7,500,000 will be available to pay margin calls via a swingline loan, advanced at the DIP Agent's discretion, (2) authorizing the DIP Guarantors to guaranty the DIP Obligations, (3)~~

authorizing the DIP LoanCC Parties' use of Prepetition Collateral (including Cash Collateral), (42) granting the adequate protection described in this Interim Order, and (53) authorizing the DIP LoanCC Parties to execute and deliver the DIP Documents to which they are a party and to perform their respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(x)    authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, upfront fees, arrangement fees, and the reasonable and documented fees and expenses of the DIP Agent's and the DIP Lenders' respective attorneys, advisors, accountants, and other consultants, in each case, as and to the extent provided in, and in accordance with, the applicable DIP Documents and this Interim Order;

(iv)    (xi) modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order and to provide for the immediate effectiveness of this Interim Order; and scheduling a finalanother interim hearing (the "**FinalFurther Interim Hearing**") to consider entry of the Finala Further Interim Order, and approving the form of notice with respect to the FinalFurther Interim Hearing; and

(v)    (xii) granting related relief.

This Court having considered the Motion, including the exhibits thereto, the *Declaration of Harve Light, Chief Restructuring Officer (I) In Support Of The Chapter 11 Petitions and First Day Pleadings and (II) Pursuant To Local Bankruptcy Rule 1107-2* (the "**First Day Declaration**"), the *Declaration of Harve Light in Support of Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, Grant Liens and Provide*

*Superpriority Administrative Expense Status, Grant Adequate Protection, (E) Modify the* *Automatic Stay, and (F) Schedule a Final Hearing and (II) Related Relief* (the "**Light Declaration**," and together with the First Day Declaration, the "**Declarations**Declaration**")**, and the other evidence submitted or adduced and the arguments of counsel made at the Interim Hearing held pursuant to Bankruptcy Rule 4001(b)(2) on December _____, 2023; and this Court having heard and resolved or overruled any objections, reservations of rights, or other statements with respect to the relief requested in the Motion; and it appearing sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors and their estates, and is essential to the Debtors' business and the preservation of the value of the Debtors' assets; and it appearing that the DIP LoanCC Parties' entry intoagreement for the DIP Credit Agreement and the other DIP Documentsuse of Cash Collateral is a sound and prudent exercise of the Debtors' business judgment; and the Debtors having provided notice of the Motion and the relief provided for herein as set forth in the Motion, and except as otherwise provided for herein, it appearing that no other or further notice of the Motion and the relief provided for herein need be given under the circumstances; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.      *Petition Date*.  On December 6, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in this Court, thereby commencing the Cases.

B.      *Debtors in Possession*.  The Debtors continue to be authorized to manage and operate their business and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.      *Jurisdiction and Venue*.  This Court has jurisdiction over the Motion, the Cases, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, dated January 31, 2012.  Venue for the Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Court may enter a final order consistent with Article III of the United States Constitution.

D.      *Committee*.  As of the date hereof, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has not yet appointed an official committee of unsecured creditors in the Cases pursuant to section 1102 of the Bankruptcy Code (any such committee, the "**Committee**").

E.      *Debtors' Stipulations*.  Without prejudice to the rights of parties in interest other than the Debtors, including any Committee as set forth in this Interim Order, and subject to the

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

8

limitations thereon contained in in this Interim Order, the Debtors stipulate and agree that (collectively, Paragraphs E(i) through (vi) below are referred to herein as the "**Debtors' Stipulations**"):

(i)    Prepetition First Lien Loans.

(a)    *Prepetition First Lien Credit Agreement*. Under that certain Third Amended and Restated Credit Agreement, dated as of June 30, 2023 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified, the "**Prepetition First Lien Credit Agreement**," and collectively with all agreements, documents, notes, letters of credit, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, including, without limitation, the Security Agreement (as defined below), the "**Prepetition First Lien Loan Documents**"), by and among Mercon US and Parent (in such capacity, each a "**Borrower**" and collectively, the "**Borrowers**"), the lender parties thereto from time to time (the "**Prepetition First Lien Lenders**"), and Rabobank, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Agent**"), swingline lender and issuing lender, the Prepetition First Lien Lenders provided certain loans, advances, letters of credit and other extensions of credit (collectively, the "**Prepetition First Lien Loans**").  The Prepetition First Lien Agent, the Prepetition First Lien Lenders and Rabobank as swingline lender and issuing lender under the Prepetition First Lien Loan Documents are collectively referred to herein as the "**Prepetition First Lien Secured Parties**" and Prepetition First Lien Lenders in an amount constituting "Majority Lenders" under the Prepetition First Lien Credit Agreement are referred to herein as "**Majority Prepetition Lenders**."

9

(b)    *Prepetition First Lien Obligations*.    All indebtedness, liabilities, and obligations owing from time to time under the Prepetition First Lien Loan Documents, specifically to the extent constituting "Obligations" (as defined in the Prepetition First Lien Credit Agreement), are collectively referred to herein as "**Prepetition First Lien Obligations**". As of the Petition Date, the applicable Debtors were indebted and liable under the Prepetition First Lien Loan Documents, without defense, counterclaim, or offset of any kind to the Prepetition First Lien Lenders in respect of the Prepetition First Lien Obligations for an aggregate amount of not less than $203,532,929.89 in respect of the Prepetition First Lien Loans, including outstanding principal and accrued and unpaid interest, cash collateral obligations, fees, costs, expenses (including any attorneys' and financial advisors' fees), charges, indemnities and all other unpaid Prepetition First Lien Obligations.

(ii)    *First Lien Loan Guarantees and Collateral*.    The Prepetition First Lien Obligations were guaranteed on a joint and several basis pursuant to the terms of that certain Amended and Restated Guarantee, dated as of November 30, 2017, between, the Debtors party thereto, as guarantors, and the Prepetition First Lien Agent. To secure the Prepetition First Lien Obligations, the applicable Debtors entered into (a) that certain Security Agreement, dated as of November 30, 2017 (as amended, supplemented or otherwise modified from time to time, the "**U.S. Security Agreement**") by and between the Borrowers, the Guarantors (as defined in the Prepetition First Lien Credit Agreement), and the Prepetition First Lien Agent and (b) those certain foreign security agreements listed on **Schedule A** hereto (the "**Foreign Security Agreements**," and together with the U.S. Security Agreement, the "**Security Agreements**"). Pursuant to the Security Agreements and the other Prepetition First Lien Loan Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected, and enforceable

first-priority security interests in and liens on (the "**Prepetition First Lien Loan Liens**") the "Collateral" (as defined in the U.S. Security Agreement) and any equivalent term indicating the assets of the Debtors subject to the Prepetition First Lien Loan Liens in any of the Foreign Security Agreements, consisting of substantially all of the applicable Debtors' assets (collectively, the "**Prepetition Collateral**"), subject only to liens senior by operation of law or otherwise expressly permitted by the Prepetition First Lien Loan Documents to rank senior to the Prepetition First Lien Loan Liens (in each case, solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition First Lien Loan Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, collectively, the "**First Lien Permitted Encumbrances**").  For the avoidance of doubt, the Prepetition Collateral does not include "**Excluded Property**" as defined in the Prepetition First Lien Credit Agreement, including any Excluded Property serving as collateral under the Secured Bi-lateral Facilities (as defined below) consisting of certain advances made by the Debtors to coffee growers, certain fixed assets of the Debtors and certain accounts receivable of the Debtors that have been sold to a discounting bank (the "**Bi-lateral Collateral**").  As used herein, (a) the term "**Secured Bi-lateral Facilities**" shall refer to the prepetition bi-lateral secured lending facilities governed by the following documentation: that certain (i) Term Facility Agreement, dated as of May 19, 2022, between, Debtors, CISA, as borrower, and Mercon B.V., Mercon US, Mercapital Nicaragua, Mercon Brasil and Mercon Guatemala, as guarantors, and Nederlandse Financierings- Maatschappij Voor Ontwikkelingslanden N.V. ("**FMO**"), as lender, (ii) Credit Agreement (Escritura Publica Numero Doscientos Veintidos (No. 222). Otorgamiento de Linea de Credito Garantizado con Hipoteca, Prenda y Fianza Solidaria), dated as of

11

November 4, 2016, between, Digranisa, as borrower, CISA, as guarantor, and Banco de Fomento a la Produccion, as lender ("**BFP**"), (iii) Credit Agreement (Escritura Publica Numero Treinta y Siete (No. 37). Contrato de Linea de Credito no Revolvente con Obligacion de Constitucion de Garantia Mobiliaria Sobre Cartera de Credito y Fianza Solidaria), dated as of April 4, 2018, between, Mercapital Nicaragua, as borrower, CISA, as guarantor, and BFP, as lender, (iv) Credit Agreement (Escritura Publica Numero Noventa y Nueve (No. 99). Otorgamiento de Linea de Credito Revolvente Garantizado con Fianza Solidaria y con Obligacion de Constituir Garantia Mobiliaria Sobre Cartera de Credito), dated as of November 27, 2020, between, Mercapital Nicaragua, as borrower, CISA, as guarantor, and BFP, as lender, (v) Term Facility Agreement, dated as of November 1, 2019, between, Mercapital Nicaragua, as borrower, Mercon B.V., Mercon US, and CISA, as guarantors, and FMO, as lender, and (vi)  Third Amendment to Amended and Restated Credit Agreement, dated as of May 12, 2020 (as amended, restated, amended and restated or otherwise modified from time to time, the "Starbucks Credit Agreement"), between, Mercon US, as borrower, Mercon B.V., as guarantor, and Starbucks Coffee Trading Company Sarl, as lender, and (b) the term "**Bi-lateral Liens**" shall refer to the liens granted in the Bi-lateral Collateral in connection with the Secured Bi-lateral Facilities and (iii) the term "**Prepetition Liens**" shall refer to, collectively, the Prepetition First Lien Loan Liens, the Bi-lateral Liens and other and any other liens, if any, on the DIP LoanCC Parties' property in existence as of the Petition Date.

(iii)     *Cash Collateral*.  Any and all of the Debtors' cash, including the DIP LoanCC Parties' cash and other amounts on deposit or maintained in the Pledged Accounts (as defined below) by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and

12

the proceeds of any of the foregoing, including, without limitation, any refunds of margin or other proceeds of swap transactions, securitization transactions and repurchase transactions which are required to be deposited into accounts controlled by the Prepetition First Lien Secured Parties, but excluding, in each case, cash on deposit in Excluded Accounts (as defined in the First Lien Prepetition Credit Agreement) to the extent such cash does not constitute proceeds of Prepetition Collateral, is the Prepetition First Lien Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("**Cash Collateral**"). A schedule of all "**Pledged Accounts**" is attached hereto as **Schedule B**.

(iv) *Consent to Use of Cash Collateral*. ~~Prepetition First Lien Lenders constituting Majority Prepetition Lenders have delivered written direction to~~<u>Pursuant to Section 7(a) of the U.S. Security Agreement,</u> the Prepetition First Lien Agent ~~to consent~~<u>consents</u> to the ~~DIP Loan~~<u>CC</u> Parties' use of ~~the Prepetition Collateral (including~~ Cash Collateral~~)~~ on the terms and conditions set forth in this Interim Order ~~(such consenting Prepetition First Lien Lenders, the "Consenting Prepetition First Lien Lenders")~~. No other or further consents to the use of ~~the Prepetition Collateral (including~~ Cash Collateral~~)~~ need be provided.

(v) *Bank Accounts*. The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has opened or maintains any bank accounts other than the Pledged Accounts and the other accounts listed in the exhibit attached to the Debtors' motion filed with this Court for relief to continue to use the Debtors' existing cash management system (collectively, the "**Debtors' Accounts**").

(vi) *Validity, Perfection, and Priority of Prepetition First Lien Loan Liens and Prepetition First Lien Obligations*. Subject to the Challenge Period (as defined below), each of the Debtors acknowledges and agrees that, in each case as of the Petition Date: (A) the

13

Prepetition First Lien Loan Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (B) the Prepetition First Lien Loan Liens are subject and subordinate only to the First Lien Permitted Encumbrances that, in each case, are senior in priority to the Prepetition First Lien Loan Liens; (C) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (D) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition First Lien Loan Liens and Prepetition First Lien Obligations exist, no portion of the Prepetition First Lien Loan Liens and Prepetition First Lien Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (E) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code) arising out of, based upon, or related to the Prepetition First Lien Loan Liens and Prepetition First Lien Obligations.

F.    *Findings Regarding the ~~DIP Facility and~~ Use of Cash Collateral*.

(i)    The ~~DIP Loan~~CC Parties have an immediate need ~~to obtain the DIP Facility and~~ to use Cash Collateral (to the extent compliant with the Approved Budget, subject to Permitted Variances ~~as set forth in this Interim Order and the DIP Documents~~) to, among other things, (A) preserve the value of the ~~DIP Loan~~CC Parties' assets and their business; (B) pay the costs of administration of their estates (including professional fees and expenses of the ~~DIP Loan~~CC Parties) and satisfy other working capital and general corporate purposes of the ~~DIP Loan~~CC Parties, ~~(C) payment of interest, fees and expenses~~ and (~~D~~C) pay certain adequate protection amounts and pay the Carve Out, in each case, in accordance with the this Interim Order ~~and the DIP Documents~~.  The ~~proceeds~~use of ~~the DIP Facility~~Cash Collateral will provide the ~~DIP Loan~~CC Parties with the ability to fund day-to-day operations, meet administrative obligations during the Cases~~,~~ and preserve the value of their assets~~, and fund the orderly liquidation of the DIP Collateral and the Prepetition~~.  The CC Parties' authority to use Cash Collateral.  ~~The DIP Facility~~ will also reassure the ~~DIP Loan~~CC Parties' constituents that the ~~DIP Loan~~CC Parties will continue to have access to ~~additional~~ liquidity during the Cases.  The ability of the ~~DIP Loan~~CC Parties to ~~obtain~~have sufficient working capital and liquidity through the ~~incurrence~~use of ~~the new indebtedness for borrowed money and other financial accommodations~~Cash Collateral is vital to the preservation and maintenance of the value of the ~~DIP Loan~~CC Parties' assets, including the Prepetition Collateral.  The ~~DIP Loan~~CC Parties will not have sufficient sources of working capital and financing to fund the anticipated administrative expenses associated with the Cases without ~~access to~~ the ~~DIP Facility and~~ authorized use of Cash Collateral.

(ii)    ~~The DIP Facility is the best source of debtor-in-possession financing available to the DIP Loan Parties.  Given their current financial condition, financing~~

15

arrangements and capital structure, the DIP Loan Parties are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The DIP Loan Parties also are unable to obtain (w) secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code, (x) unsecured credit having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (y) credit secured solely by a lien on property of the DIP Loan Parties and their estates that is not otherwise subject to a lien; or (z) credit secured solely by a junior lien on property of the DIP Loan Parties and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting to the DIP Secured Parties, subject to the Carve Out as provided for herein, the DIP Liens (as defined below) and DIP Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and the DIP Documents.

(iii)    The DIP Facility has been negotiated in good faith and at arm's length among the DIP Loan Parties and the DIP Secured Parties, and all of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the DIP Loan Parties pursuant to the DIP Documents and all other obligations under the DIP Documents (collectively, the "**DIP Obligations**") shall be deemed to have been extended by the DIP Secured Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or

US-DOCS\129980735.5

any provision hereof is reversed or modified on appeal, and any liens or claims granted to, or payments made to, the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(iv)    *No Claims or Causes of Action*.  As of the date hereof, there exist no claims or causes of action against any of the DIP Secured Parties with respect to, in connection with, related to, or arising from the DIP Documents that may be asserted by the Debtors or their estates.

(v)    *Priming of the Prepetition Liens*.  The priming of the Prepetition Liens (other than the Excepted Liens) under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as provided herein, will enable the DIP Loan Parties to obtain the DIP Facility and to continue to operate their business during the pendency of the Cases, to the benefit of their estates and creditors, and the DIP Loan Parties would not be able to obtain debtor-in-possession financing in a sufficient amount without granting such priming liens.  The priming of the Prepetition Liens (other than the Excepted Liens) under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as provided herein, is appropriate because the requirements of section 364(d) of the Bankruptcy Code are satisfied, including because the terms of the adequate protection arrangements provided for herein are fair and reasonable and otherwise sufficient under the circumstances to adequately protect the holders of such liens against any Diminution in Value of their collateral.

(ii)    (vi) *Adequate Protection for Prepetition First Lien Secured Parties*.  To the extent provided for herein, each of the Prepetition First Lien Secured Parties are entitled,

pursuant to sections 105, 361, 362, and 363(e), and 364(d) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, for any postpetition diminution in the value thereof. Based on the Motion, the DeclarationsDeclaration, and other evidence filed in support of the Motion, and the record presented to the Court in connection with the Interim Hearing, under the circumstances, the terms of the adequate protection arrangements and the use of Prepetition Collateral (including Cash Collateral) as provided for herein are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and are otherwise sufficient to adequately protect the Prepetition First Lien Secured Parties against any Diminution in Value of the Prepetition Collateral (including Cash Collateral). Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral; provided, however, nothing in this Interim Order shall (a) be construed as the affirmative consent by the Prepetition First Lien Secured Parties for the use of Cash Collateral, other than on the terms set forth in this Interim Order and in the context of the DIP Facility authorized by this Interim Order, (b) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior), or (c) prejudice, limit or otherwise impair the rights of the Prepetition First Lien Secured Parties to seek new, different or additional adequate protection or assert the interests of any of the Prepetition First Lien Secured Parties.

(vii) *Sections 506(c) and 552(b) and Marshaling Waivers.* In light of the Prepetition First Lien Loan Liens being subordinated under this Interim Order to the DIP

~~Obligations and the Carve Out and the DIP Loan Parties' use of the Prepetition Collateral (including Cash Collateral) as set forth herein, the Prepetition First Lien Secured Parties are entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to and upon entry of the Final Order, (i) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code, (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code and (iii) a waiver of the application of the equitable doctrine of marshaling and other similar doctrines.  As a material inducement to the DIP Secured Parties to agree to provide the DIP Facility, the DIP Secured Parties are entitled to, subject to and upon entry of the Final Order, (i) a waiver of the provisions of section 506(c) of the Bankruptcy Code and (ii) a waiver of the application of the equitable doctrine of marshaling and other similar doctrines.~~

G.      *Good Faith*.  The Debtors, ~~DIP Lenders~~ and the ~~Consenting~~ Prepetition First Lien ~~Lenders~~Agent have negotiated at arms' length and acted in good faith regarding (a) the ~~DIP Loan~~CC Parties' ~~incurrence of the DIP Facility and~~ use of the ~~Prepetition Collateral (including Cash Collateral~~), as provided for in this Interim Order, and (b) the other terms of this Interim Order, including, without limitation, the terms of the adequate protection provided for herein.

H.      *Good Cause Shown; Best Interest*.  Good cause has been shown for entry of this Interim Order, and entry of this Interim Order is in the best interests of the Debtors' estates as its implementation will, among other things, allow for the preservation of the value of the ~~DIP Loan~~CC Parties' assets.  Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

I.      *Notice*.  In accordance with Bankruptcy Rules 2002, 4001(b~~) and (c~~), and 9014 and the applicable Local Rules, notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors.  Under the circumstances, the notice given by

19

the Debtors of the Motion, the relief provided for herein, and the Interim Hearing complies with Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and the applicable Local Rules.

Based upon the foregoing findings and conclusions, the Motion, and the record before this Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.  ~~DIP Facility~~Motion Approved.  The Motion is granted on an interim basis as set forth herein.

2.  Objections Overruled.  Any objections, reservations of rights, or other statements with respect to entry of this Interim Order, to the extent not withdrawn or resolved, are overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

3.  Authorization of ~~the DIP Facility and the DIP Documents~~Use of Cash Collateral.

(a)  The ~~DIP Loan Parties are hereby immediately authorized and empowered to enter into, and execute and deliver, and perform under, the DIP Documents, and such additional documents, instruments, certificates and agreements as may be reasonably required or requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents.  The Interim Order, the DIP Credit Agreement, and the other DIP Documents shall govern and control the DIP Facility.  Upon execution and delivery thereof, the DIP Documents shall constitute valid and binding obligations of the DIP Loan Parties enforceable in accordance with their terms.  To the extent there exists any conflict among the terms and conditions of the DIP Documents and this Interim Order, the terms and conditions of this Interim Order shall govern and control.  In all respects, the DIP Documents shall be consistent with this Interim Order and the DIP Credit Agreement.~~CC Parties are hereby authorized to use all Cash Collateral of the Prepetition First Lien Secured Parties, for the

purposes set forth in this Interim Order and in accordance with the Approved Budget (subject to Permitted Variances as set forth in this Interim Order), from the date of this Interim Order through and including the earlier of (i) January 12, 2024 and (ii) the CC Termination Date (as defined below), subject to Paragraph 8 of this Interim Order in the case of the CC Termination Date; provided, however, (i) the Prepetition First Lien Secured Parties are granted the adequate protection set forth in this Interim Order; (ii) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court (to the same extent and not greater than the rights provided pursuant to Section 363(c)(2) of the Bankruptcy Code); and (iii) the CC Parties and the Prepetition First Lien Secured Parties reserve all rights with respect to the use of Cash Collateral for the exclusive benefit of property other than the Prepetition Collateral and allocation of costs in connection with the liquidation or disposition thereof.

(b)    Upon entry of this Interim Order and the occurrence of the Closing Date, the DIP Borrowers are hereby authorized to borrow, and the DIP Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $10,000,000 of New Money Loans, subject to and in accordance with this Interim Order and the DIP Documents, without any further action by the Debtors or any other party.

(c)    Upon entry of this Interim Order and the occurrence of the Closing Date, the fees set forth in 2.7 of the DIP Credit Agreement (i) shall be fully earned and payable pursuant to the terms of the DIP Documents and (ii) shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

(b)    (d) It shall be an Event of Default (as defined below) if Cash Collateral or proceeds of the DIP Loans Prepetition Collateral are used other than for the purposes as permitted

under ~~the DIP Documents and~~ this Interim Order, and in accordance with the Approved Budget, subject to Permitted Variances as set forth in this Interim Order ~~and the DIP Documents~~. Attached as **Schedule C** hereto and incorporated herein by reference is a budget prepared by the ~~DIP Loan~~CC Parties, weeks 1 through 5 of which are in form and substance acceptable to, and approved by, ~~the "Majority Lenders" under and pursuant to the DIP Credit Agreement (the~~ ~~"**Required DIP Lenders**") in accordance with the DIP Credit Agreement~~ the Prepetition First Lien Agent (such initial weeks shall be the "**Initial Approved Budget**") (together with any subsequent budget approved from time to time in accordance with Paragraph 4 of this Interim Order ~~and Section 5.16 of the DIP Credit Agreement~~, the~~an~~ "**Approved Budget**").

~~(e)    In furtherance of the foregoing and without further approval of this Court, each of the DIP Loan Parties is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, to perform all acts and to make, execute, and deliver all instruments and documents and to pay all fees and expenses (including all fees and expenses owed to the DIP Secured Parties under the DIP Documents) that may be reasonably required or necessary for the DIP Loan Parties' performance of their obligations under the DIP Facility, including, without limitation:~~

~~(1)    the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby;~~

~~(2)    the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Documents (in each case in accordance with the terms of the applicable DIP Documents), it being understood that no further approval of this Court shall be required if (a) the amendment, supplement, or other modification~~

(i) is in accordance with the DIP Documents and (ii) does not prejudice the rights of the Debtors or their estates in any material respects, (b) a copy (which may be provided through electronic mail or facsimile) of the amendment, supplement or modification is provided in advance to counsel to the Committee (if appointed), any other statutory committee appointed in the Cases, and the U.S. Trustee; and (c) notice of the amendment, supplement or modification is filed with the Court; provided, that any forbearance from, or waiver of, (x) a breach by the DIP Loan Parties of a covenant, representation or any other agreement in connection with the DIP Documents and this Interim Order or (y) a default or an Event of Default shall not require an order of this Court.

(3)    the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees, expenses and other amounts referred to in the DIP Documents, including (x) all fees, expenses and other amounts owed to the DIP Secured Parties and (y) all reasonable and documented costs and expenses as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses, in accordance with the terms of Paragraph 31 of this Interim Order, of counsel and other professionals retained as provided for in the DIP Documents and this Interim Order (whether incurred before or after the Petition Date, including, for the avoidance of doubt, (a) Cadwalader, Wickersham & Taft, LLP (as primary counsel), (b) Berkeley Research Group, LLC (as financial advisor), and (c) one local counsel firm in each jurisdiction where the DIP Agent on behalf of the DIP Lenders is granted security under the DIP Documents (collectively, the "**DIP Professionals**"); and

(4)    the performance of all other acts required under or in connection with the DIP Documents.

23

(f) Upon entry of this Interim Order, such DIP Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the DIP Loan Parties enforceable against each of the DIP Loan Parties in accordance with their respective terms and the terms of this Interim Order for all purposes during the Cases, any subsequently converted case of any of the DIP Loan Parties to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any case. No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim. All payments or proceeds remitted to or on behalf of the DIP Agent on behalf of any DIP Secured Parties, pursuant to the DIP Documents, the provisions of this Interim Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code.

(g) The DIP Guarantors hereby are authorized and directed to unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrowers

(c) Subject to Paragraph 19, the CC Parties may use Cash Collateral to pay margin calls solely to the extent that by no later than 8:00 p.m. (EST) the day before the margin call, the CC Parties provide written notice (which may be delivered via email) to the Prepetition

24

First Lien Agent that the CC Parties intend to pay a margin call, which such notice shall contain sufficient detail regarding the margin call to be paid, including setting forth the basis for, and the amount of, the margin payment owed and the Loan Parties' current cash on hand.  Subject to Paragraph 19, the CC Parties shall be authorized to make such margin call payment with Cash Collateral if it does not receive a written objection (which may be delivered via email) from the Prepetition First Lien Agent by 10:00 a.m. (EST) the following business day.

    4.    <u>Budget and Variance Reporting</u>.

    (a)    The ~~DIP Loan~~CC Parties shall adhere to the ~~initial~~Initial Approved Budget attached hereto as **Schedule C**. The ~~DIP Borrowers~~CC Parties shall provide an updated proposed Approved Budget in accordance with ~~Section 5.2(r) of the DIP Credit Agreement; *provided* that such updated proposed Approved Budget shall not constitute the new Approved Budget until approved by the DIP Agent acting at the direction of the Required DIP Lenders in accordance with Section 5.16 of the DIP Credit Agreement.~~the following procedures:

    (1)    following entry of this Interim Order, (i) by 5:00 p.m. New York City time on Wednesday December 20, 2023 and by 5:00 p.m. New York City time on each Wednesday thereafter, the CC Parties shall provide the Prepetition First Lien Agent with an updated cash flow forecast for the CC Parties, with line item detail of projected sales, disbursements, collections, net cash flow, and the other items set forth in the Initial Approved Budget for the then-upcoming thirteen (13) week period, in each case, in substance satisfactory to and approved by the Prepetition First Lien Agent (at the direction of the Majority Prepetition Lenders) and substantially consistent with the form of the Initial Approved Budget attached to this Interim Order (the "Weekly Cash Flow Forecast"); and (ii) by 5:00 p.m. New York City time beginning on Wednesday

December 20, 2023, and by 5:00 p.m. New York City time on each Wednesday thereafter, the CC Parties shall provide the Prepetition First Lien Agent with a variance report (the "Variance Report") setting forth, on a consolidated basis, actual cumulative aggregate cash receipts, disbursements (including margin calls, which shall be for informational purposes only) and net cash flows of the CC Parties for the most recent four-week period (and for the first three test periods following the date of the Interim Order, tested on a rolling 2-week, 3-week, and 4-week basis, respectively) covered by such Variance Report and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the Initial Approved Budget or the most recently Approved Budget delivered prior to such Variance Report on a weekly and cumulative basis for the period from the Petition Date, through the end of the week in regard to which such variance report is being delivered, and each such Variance Report shall include explanations for all unfavorable variances in excess of 7.5% for the most recent period in regard to which such variance report is being delivered and shall be certified by the chief restructuring officer of the CC Parties; provided that, for the first four weeks following the Petition Date, variance is to be measured against the initial Approved Budget;

(2) The CC Parties hereby acknowledge and agree that any Weekly Cash Flow Forecast provided to the Prepetition First Lien Agent shall not amend and supplement the applicable Approved Budget until the Prepetition First Lien Agent delivers a notice (which may be delivered by electronic mail) to the CC Parties stating that the Majority Prepetition Lenders have approved of such Weekly Cash Flow Forecast; provided, that if the Prepetition First Lien Agent does not deliver a notice of approval to

26

the CC Parties, then the existing Approved Budget shall continue to constitute the applicable Approved Budget until such time as the subject Weekly Cash Flow Forecast is agreed to among the CC Parties and the Majority Lenders in accordance with this Paragraph 4.  Once such Weekly Cash Flow Forecast is so approved in writing by the Majority Prepetition Lenders, it shall supplement or replace the prior Approved Budget, and shall thereafter constitute the Approved Budget.

(b)    ~~The use of borrowings under the DIP Facility and Cash Collateral shall be in accordance with the Approved Budget, subject to the Permitted Variances set forth in the DIP Documents.  Any unfavorable variance from the Approved Budget that is not a Permitted Variance shall constitute an Event of Default hereunder.~~ The use of Cash Collateral shall be in accordance with the Approved Budget, subject to the Permitted Variances.  Except as otherwise provided herein or approved by the Administrative Agent (at the direction of Majority Prepetition Lenders, in their sole discretion), the CC Parties will not, directly or indirectly, (i) use any Cash Collateral or any other property constituting Prepetition Collateral in a manner or for a purpose other than those permitted under this Interim Order or the Approved Budget, (ii) permit the aggregate cumulative amount of actual cash disbursements (excluding Professional Costs and the payment of margin calls) as reported in the Variance Reports delivered with respect to the applicable Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period, (iii) permit the aggregate cumulative amount of actual cash receipts as reported in the Variance Reports delivered with respect to the applicable Testing Period to be less than, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period, (iv) permit the aggregate cumulative amount

27

of actual net cash flow (which shall exclude Professional Costs and the payment of margin calls) as reported in the Variance Reports delivered with respect to the applicable Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period; and (v) permit the aggregate cumulative amount of actual cash disbursements of Professional Costs (excluding the fees and expenses of the CCLO) as reported in the Variance Reports delivered with respect to the applicable Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period.  Any unfavorable variance from the Approved Budget that is not a Permitted Variance shall constitute an Event of Default hereunder; provided that if the CC Parties can reasonably demonstrate that any such non-compliance is due to a change in timing of anticipated disbursements due to an operational issue for which any favorable variance on account of such non-disbursement has rolled-off the applicable Testing Period and the amount of such payment does not change, then the CC Parties shall have an additional week to return to compliance with the Approved Budget prior to such non-compliance resulting in an Event of Default.

(c)     *Non-Conforming Use of Cash Collateral*.  In the event that an expense arises that is not within any of the approved line items in the Approved Budget, or the ~~DIP Loan~~CC Parties anticipate that any line item will need to be exceeded by more than the Permitted Variance, the ~~DIP  Loan~~CC Parties may request approval from the ~~DIP~~Prepetition First Lien Agent (acting at the direction of the ~~Required DIP Lenders) and~~ Majority Prepetition Lenders), with notice to counsel to the Committee (if appointed), and ~~DIP~~the Prepetition First Lien Agent ~~and~~(acting at the direction of the Majority Prepetition Lenders) shall have two (2) business days from the date of the ~~DIP Loan~~CC Parties' request within which to provide consent or object

28

(each approved non-conforming use of Cash Collateral, a "**Non-Conforming Use**").  Absent the affirmative consent of the ~~DIP~~Prepetition First Lien Agent (acting at the direction of the ~~Required DIP Lenders) and~~ Majority Prepetition Lenders), the ~~DIP Loan~~CC Parties shall not be authorized to use Cash Collateral for such expense without further order of the Court.   If such written consent is given, the ~~DIP Loan~~CC Parties shall be authorized pursuant to this Interim Order to use Cash Collateral for any such Non-Conforming Use without further Court approval, and the Prepetition First Lien Secured Parties shall be entitled to all of the protections specified in this Interim Order for any such use of Cash Collateral; provided that each such permitted Non-Conforming Use shall be deemed a modification to the Approved Budget for all testing purposes.

(d)    *Certain Definitions*.  As used in this paragraph 4 and elsewhere in this Interim Order, the following terms shall mean:

• "Professional Costs" means any payment or the obligation to make payment on account of fees and expenses incurred by Debtor Professionals or any other party's professional advisors, the fees and expenses of which are obligated to be paid by the CC Parties (including, but not limited to, the fees and expenses of professional advisors to any Committee appointed in the Cases) in connection with the Cases.

• "Permitted Variances" means, with respect to determining compliance with ¶4 relating to the CC Parties' aggregate cumulative cash receipts, cash disbursements and net cash flow, (i) all variances favorable to the CC Parties; (ii) with respect to determining compliance with ¶4(b)(ii), (b)(iii) or (b)(iv) as of the end of any Testing Period, an unfavorable aggregate cumulative variance of (x) for the first four Testing Periods following the Petition Date, less than 15% and (y) for each Testing Period thereafter, less than 10% thereafter (in each case, compared to the relevant amounts forecast for the same period in the Approved Budget); and (iii) with respect to determining compliance with ¶4(b)(v), an unfavorable aggregate cumulative variance of less than 10% (compared to the relevant amounts forecast for the same period in the Approved Budget).

• "Testing Period" means (a) with respect to the first Variance Report delivered after the Petition Date, the two-week period ending on December 22, 2023; (b) with respect to the second Variance Report delivered after the Closing Date, the three-week period ending on December 29, 2023; and (c) with respect to each Variance Report delivered thereafter, the four-week period ending on the Friday immediately preceding

29

the delivery of the applicable Variance Report.  For purposes of each Testing Period, a week shall be measured Saturday to Friday.

5.    Financial and Collateral Reporting.

(a)    5. Borrowing Base Reports.  Following entry of this Interim Order, the DIP Loan PartiesDebtors shall provide the DIP Agent (for distribution to the DIP Lenders) and the Prepetition First Lien Agent (for distribution to the Prepetition First Lien Lenders), which may be sent via email, with (i) updated borrowing base reports on a weekly basis.  Borrowing Base Certificate (as defined in the Prepetition First Lien Credit Agreement) setting forth the calculations described in clause (ii) of the definition of Borrowing Base Certificate by 5:00 pm New York City time on each Wednesday; and (ii) no later than 5:00 pm New York City time on each business day following the entry of this Interim Order and through the earlier of  January 12, 2024 and the CC Termination Date, (x) a report regarding the Debtors' actual cash closing position, including cash collections, margin calls or refunds, amounts funded to origin for operating and other disbursements and payments of Professional Costs as of the end of business of the immediately preceding business day, provided that such report shall be broken out by realization of collateral vs. accounts receivable; (y) a statement of the cash balance in the Bank of America concentration account (account number XXX-XXX-7474) as of the end of business of the immediately preceding business day; and (z) a statement of the cash balance in the Segregated Cash Account (as defined herein) as of the end of business of the immediately preceding business day.

(b)    *Inventory and Hedge Reporting*. The CC Parties shall provide to the Prepetition First Lien Agent on each Wednesday, a weekly report (the "Inventory Report") setting forth current inventory (bags by origin/destination location) and hedge positions (if any).

(c)     *Other Notices.*  The CC Parties shall provide to the Prepetition First Lien Agent promptly, but in any event within two Business Days, after the giving or receipt thereof, copies of any default notices given or received by any Debtor or any subsidiary thereof pursuant to the terms of any indenture, loan agreement, credit agreement, or similar agreement.

(d)     *Adverse Events.*  The Debtors shall provide to the Prepetition First Lien Agent prompt written notice, but in any event within two Business Days after the occurrence thereof, of any condition or event (other than the filing of these chapter 11 cases and the plenary proceedings commenced by the Debtors in support of these chapter 11 cases in the District Court Amsterdam, the Netherlands and in the Civil District Court in the Judicial District of Varginha - Minas Gerais State, Brazil) of which any Debtor has actual knowledge, which condition or event has resulted or may reasonably be expected to result in (i) a Material Adverse Change (as defined in the Prepetition First Lien Credit Agreement), or (ii) a breach of or noncompliance with any material term, condition, or covenant of any material contract to which any Debtor or any subsidiary thereof is a party or by which their properties may be bound which breach or noncompliance could reasonably be expected to result in a Material Adverse Change.

6.     Access to Information.

(a)     Starting the week of December 11, 2023, and each week thereafter, the CC Parties, the CC Parties' chief restructuring officer, the CCLO, and the CC Parties' financial advisor will participate in conference calls on Monday and Thursday of such week (or such other two days as mutually agreed) with the Prepetition First Lien Agent and the Prepetition First Lien Lenders and their representatives, consultants, and agents, at such mutually convenient times to be proposed by the Prepetition First Lien Agent upon reasonable notice, and will use commercially reasonable efforts to cause available senior members of management and any

US-DOCS\129980735.5

investment bankers and other advisors of the CC Parties, as applicable or as requested by the Prepetition First Lien Agent or such Prepetition First Lien Lenders, to participate in such calls for the purpose of discussing the status of the financial, collateral, the Inventory Report, the Liquidity Reports, progress under the Realization Strategy and the operational condition, businesses, liabilities, assets, and prospects of the CC Parties and any sale, refinance or other strategic transaction efforts.

(b) 6. Access to Information. The DIP Loan Parties shall provide the DIP Agent (for distribution to the DIP Lenders) and the Prepetition First Lien Agent (for distribution to the Prepetition First Lien Secured Parties) with all reporting and other information required to be provided to the DIP Agent under the DIP Documents. In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP DocumentsIn addition to, upon reasonable notice to the Debtors' counsel (email being sufficient), at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Secured Parties and the Prepetition First Lien Lenders to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Secured PartiesPrepetition First Lien Agent and the Prepetition First Lien Lenders shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law. In addition, subject to execution of a market-standard confidentiality agreement, the DIPPrepetition First Lien Agent's professionals shall have access

to all due diligence materials and any data room provided within ninety (90) days prior to the Petition Date or during these Cases by the Debtors to any potential strategic investor, acquiror of one or more of the Debtors' businesses or debt purchaser, and the. The Debtors also shall provide the DIPPrepetition First Lien Agent professionals with updates and information on any developments regarding discussions with potential strategic investors, acquirors or debt purchasers (including the identification of any parties making such inquiries), such updates to be provided as soon as practicable, but in no event later than 48 hours from the time of the occurrence of such developments/discussionson the conference calls conducted in accordance with Section 6(a) of the Interim Order.

7.    DIP Superpriority Claims.  Pursuant to section 364(c)(1) of the Bankruptcy Code, and without the need to file any proof of claim, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the DIP Loan Parties' estates (the "**DIP Superpriority Claims**") with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and

postpetition property of the DIP Loan Parties and all proceeds thereof, including, without limitation, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "**Avoidance Actions**"), all subject only to, and subordinated in all respects to, the Carve Out.

8.      DIP Liens.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the DIP Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Secured Parties of or over any DIP Collateral, subject to (x) the DIP Permitted Encumbrances and (y) the Carve Out, the following security interests and liens are hereby granted by the DIP Loan Parties to the DIP Agent, for the benefit of the DIP Lenders (collectively, the "**DIP Liens**," and all property on which the DIP Liens are granted, the "**DIP Collateral**"):

(a)      First Priority DIP Lien On Any Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), including, without limitation (in each case, to the extent not subject to valid, perfected, and non-avoidable liens) unencumbered cash of the DIP Loan Parties (whether maintained with the DIP Agent or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents,

34

trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each DIP Loan Parties, other equity or ownership interests in or of any entity (including equity interests in subsidiaries of each DIP Loan Party), money, electronic money, controllable electronic records, investment property, intercompany claims, claims arising on account of transfers of value from any of the DIP Loan Parties to (x) other Debtors or (y) a non-Debtor affiliate incurred on or following the Petition Date, causes of action (other than Avoidance Actions), all products and proceeds of the foregoing, proceeds and property recovered in respect of section 549 of the Bankruptcy Code, and, subject to entry of the Final Order, all proceeds and property recovered in respect of Avoidance Actions.

(b)    DIP Liens Priming the Prepetition Liens.   Pursuant to section 364(d)(1) and section 364(e)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors that was subject to the Prepetition First Lien Loan Liens, including, without limitation, the Prepetition Collateral (including Cash Collateral); provided that such liens shall be immediately junior to any DIP Permitted Encumbrances; provided, further, that, for the avoidance of doubt and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant

35

to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(c)    DIP Liens Junior to Other Prepetition Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all property of the DIP Loan Parties that is subject to an Excepted Lien and/or a DIP Permitted Encumbrance, including, the Bi-lateral Collateral; provided that such junior liens shall be immediately junior to any Excepted Liens; provided, further, that, for the avoidance of doubt and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(d)    Excluded Property.  Notwithstanding the foregoing, the DIP Collateral shall not include (and the DIP Liens shall not extend to) any "Excluded Property" (as defined in the DIP Credit Agreement).

7.    9. Adequate Protection for the Prepetition First Lien Secured Parties.  Subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), solely for and equal in amount to the postpetition diminution in value of such interests (each such diminution, a "**Diminution in Value**"), resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the DIP LoanCC Parties' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition First Lien Agent, for the benefit of itself and the other

Prepetition First Lien Secured Parties, is hereby granted the following (collectively, the "**First Lien Adequate Protection Obligations**"):

      (a)    <u>First Lien Adequate Protection Liens</u>.  As security for and solely to the extent of any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the Petition Date (together, the "**First Lien Adequate Protection Liens**"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all ~~DIP~~<u>Prepetition</u> Collateral ~~and, upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions~~.  Subject to the terms of this Interim Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out~~,~~ ~~(B) the DIP Liens, (C) the DIP Permitted Encumbrances~~ and (~~D~~<u>B</u>) First Lien Permitted Encumbrances that, in each case, are senior in priority to the First Lien Adequate Protection Liens.  The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the ~~DIP~~<u>Prepetition</u> Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

      (b)    <u>First Lien Adequate Protection Superpriority Claims</u>.  As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any Diminution in Value (the "**First Lien Adequate Protection Superpriority Claims**"), but junior to the Carve Out ~~and the DIP Superpriority Claims~~.  Subject to the Carve Out ~~and the DIP Superpriority Claims~~ in all

respects, the First Lien Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the ~~DIP Loan~~CC Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), ~~506(c) (subject to entry of the Final Order),~~ 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.  ~~The Prepetition First Lien Secured Parties shall not receive or retain any payments, property or other amounts in respect of the First Lien Adequate Protection Superpriority Claims under section 507(b) of the Bankruptcy Code granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required DIP Lenders, in each case as provided in the DIP Documents.~~

(c)     ~~First Lien Adequate Protection Payments.  As further adequate protection, the Prepetition First Lien Lenders shall be entitled to payment in kind, in the amount of monthly interest accrued on the Prepetition First Lien Obligations under the Prepetition First Lien Credit Agreement at the nondefault rate, which payment in kind shall be automatically capitalized and added to the amount of the outstanding Prepetition First Lien Obligations (any such payments made pursuant to this Paragraph 9(c) of this Interim Order, a "**Adequate Protection Payment**"); *provided*, however, that if the Roll-Up Loan is approved by the Court pursuant to the Final Order, such interest payments shall cease and no longer be required as adequate protection for the portion of the Prepetition First Lien Obligations to satisfy and discharge by the Roll-Up Loan; *provided*, *further*, that any such Adequate Protection Payments shall not be construed as a waiver by the Prepetition First Lien Lenders of any right to collect, assert, or otherwise account for, default interest for purposes of determining the amount of the Prepetition First Lien~~

38

Obligations, and the Prepetition First Lien Lenders expressly reserve the right to collect, assert, or otherwise account for any such amounts in connection with any such determination; *provided*, *further*, that the foregoing clause (2) shall be without prejudice to the power of the Court, upon its own initiative or upon formal request by a party-in-interest, to make a determination as to whether the Prepetition First Lien Lenders are entitled to receive such postpetition interest based on the collateral securing its claims.Preservation of Collateral.  As further adequate protection, the proceeds of Prepetition Collateral will be preserved in the manner set forth in Paragraph 19 of this Interim Order, subject to the limitations set forth therein.

(d)     Prepetition First Lien Agent's Legal Fees and Expenses.  As further adequate protection, the DIP Loan Parties are authorized and directed to pay, in accordance with the terms of Paragraph 31 of this Interim Order, to and/or on behalf of the Prepetition First Lien Agent, all reasonable and documented costs and expenses  as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the Prepetition First Lien Credit Agreement and this Interim Order (whether incurred before or after the Petition Date, including, for the avoidance of doubt, (a) Cadwalader, Wickersham & Taft, LLP (as primary counsel), (b) Berkeley Research Group, LLC (as financial advisor), and (c) one local counsel firm in each jurisdiction where the Prepetition First Lien Agent on behalf of the Prepetition First Lien Lenders is granted security under the Prepetition First Lien Loan Documents (collectively, the "**Prepetition First Lien Professionals**").

(e)     Adequate Protection Principal Payments.  As further adequate protection, the Prepetition First Lien Secured Parties shall be entitled to receive any proceeds paid to the Prepetition First Lien Agent on account of the Proceeds Waterfall as set forth in Paragraph 26 of

US-DOCS\129980735.5

this Interim Order; provided that the payment of such proceeds will be applied as principal payments under the Prepetition First Lien Credit Agreement.

(d)    (f) Appointment of Chief Commodities Liquidation Officer.  As further adequate protection, the Debtors shall appoint a chief commodities liquidation officer (the "CCLO"), which the identity and scope of responsibilities of such officer shall be acceptable to the Required DIPMajority Prepetition Lenders in their sole discretion, provided that part of the responsibilities of such officer shall include, without limitation, to (i) provide weekly update callsupdates, on the conference calls conducted in accordance with Section 6(a) of this Interim Order, to the DIP Agent and Prepetition First Lien Agent regarding the status of the liquidation process and the conduct of the CCLO's work as set forth in the CCLO's engagement letter and scope of work document and (ii) be an observer of the activities and decision making of the Debtors' hedging risk committee (if any).  The Person appointed as CCLO shall remain in such position on the same terms and scope of responsibilities so long as the CC Parties' use of Cash Collateral is authorized hereunder, unless approved in writing by the Prepetition First Lien Agent and the Majority Prepetition Lenders.

(e)    (g) Other Adequate Protection.  As further adequate protection, (i) the Debtors shall remain in compliance with all of the terms, conditions, covenants, and other requirements set forth in the DIP Documents and (ii) the Debtorsthe CC Parties shall provide the Prepetition First Lien Secured Parties with the reporting and inspection rights described in Paragraphs 5 and 6 of this Interim Order.

8.    10. Carve Out.

(a)    Priority of Carve Out.  Subject to the terms and conditions contained herein, each of the DIP Liens, DIP Superpriority Claims, Prepetition Liens, First Lien Adequate

Protection Liens, and First Lien Adequate Protection Superpriority Claims shall be subject and subordinate to the Carve Out.

(b)    Definition of Carve Out.  As used in this Interim Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $30,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) all unpaid fees and expenses, solely to the extent payable or allowed at any time, whether by interim or final order of this Court, procedural order, or otherwise, but not to exceed the amounts set forth for each Professional Person (as defined below) in the Approved Budget (subject to any Permitted Variance) as of the delivery of the Carve Out Trigger Notice (as defined below) (collectively, the "**Allowed Professional Fees**") incurred by persons or firms (other than the fees and expenses of the CCLO) retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "**Committee Professionals**," and together with the Debtor Professionals, the "**Professional Persons**") at any time before the delivery by the ~~DIP~~Prepetition First Lien Agent (at the direction of the ~~Required DIP~~Majority Prepetition Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by this Court prior to or after delivery of such Carve Out Trigger Notice (the amounts set forth in the foregoing clauses (i) through (iii), collectively, the "**Pre-Carve Out Trigger Notice Cap**"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $750,000 incurred on and after the Termination Declaration Date (as defined below), to the

41

extent allowed at any time, whether by interim or final order of this Court, procedural order or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**" and together with the Pre-Carve Out Trigger Notice Cap, the "**Carve Out Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the ~~DIP~~Prepetition First Lien Agent (at the direction of the ~~Required DIP~~Majority Prepetition Lenders) to the Debtors' counsel of record, the U.S. Trustee, and counsel to any Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default ~~and acceleration of the DIP Obligations under the DIP Facility or if all commitments under the DIP Facility have been terminated~~ and the ~~DIP Loan~~CC Parties' use of cash collateral has been terminated, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

~~(c)    Carve Out Reserve.  Starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the DIP Loan Parties a statement (each such statement, a "**Weekly Statement**") setting forth a good faith estimate of the amount of unpaid fees and expenses incurred during the preceding week by such Professional Person (through Saturday of such week, the "**Calculation Date**") (the "**Estimated Fees and Expenses**"). No later than one business day after the delivery of a Carve Out Trigger Notice, each Professional Person shall deliver one additional statement to the DIP Loan Parties setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has already been delivered and concluding on the date of the Carve Out Trigger Notice, and the DIP Loan Parties shall transfer such amounts to the Professional Fees Escrow Account (as defined below) (such amount, the "**Carve Out Trigger Amount**"); provided that~~

the amounts transferred to the Professional Fees Escrow Account on account of any such statement shall not exceed the amount set forth for such week in the Approved Budget (subject to any Permitted Variance). The DIP Loan Parties shall on a weekly basis, transfer cash proceeds from the DIP Facility or cash on hand in an amount equal to the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the DIP Loan Parties, which shall be reported to the DIP Agent, or if an estimate is not provided, the total budgeted weekly fees of Professional Persons for the prior week set forth in the Approved Budget, into a segregated account not subject to the control of the DIP Agent, any DIP Lender, or any Prepetition First Lien Secured Party (the "**Professional Fees Escrow Account**"); provided that the amounts transferred to the Professional Fees Escrow Account pursuant to this Interim Order shall not exceed the amount set forth for the applicable time period in the Approved Budget (subject to any Permitted Variance). The DIP Loan Parties shall use funds held in the Professional Fees Escrow Account exclusively to pay the Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any interim or final orders of the Court; *provided that* when all Allowed Professional Fees have been paid in full (regardless of when such Allowed Professional Fees are allowed by the Court), any funds remaining in the Professional Fees Escrow Account shall revert to the DIP Loan Parties for use in a manner consistent with the DIP Credit Agreement and this Interim DIP Order; and *provided further that* the DIP Loan Parties' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account. Funds transferred to the Professional Fees Escrow Account shall be held in trust for and exclusively available for the payment of any fees and expenses of the Professional Persons, including with respect to obligations arising out of the

43

Carve Out (with a reversionary interest to the DIP Loan Parties of any amount remaining in the Professional Fees Escrow Account after all Allowed Professional Fees are satisfied in full). Notwithstanding the foregoing, any unused retainers held by Professional Persons on the Petition Date shall be used to pay any Allowed Professional Fees of such Professional Persons before any payment of such Allowed Fees are made from the Professional Fees Escrow Account or otherwise from the DIP Facility or DIP Collateral. Funds transferred to the Professional Fees Escrow Account shall not be subject to any liens or claims granted to the DIP Lenders herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute Cash Collateral or assets of the DIP Loan Parties' estates; *provided that* the DIP Collateral shall include the DIP Loan Parties' reversionary interest in funds held in the Professional Fees Escrow Account, if any, after all allowed Professional Fees are satisfied in full. The DIP Loan Parties will provide, on every other Wednesday commencing on the third Wednesday following the Petition Date, (x) a bi-weekly accounting to the DIP Agent of all deposits to and disbursements from the Professional Fees Escrow Account (together with copies of all current bank statements relating to the Professional Fees Escrow Account); and (y) a bi-weekly summary of all fees (detailed by individual and aggregate hours billed) and expense reimbursements of all Professional Persons actually accrued for the two week period ended (and on a cumulative basis since the Petition Date) the Saturday ten days prior to such date.

(c)    (d) Professional Fees Escrow Account. Notwithstanding the occurrence of an Event of Default or conditions to borrowing or releaseCarve Out Reserve.  Notwithstanding the occurrence of an Event of Default, and subject to the amounts set forth for each Professional Person in the Approved Budget (subject to any Permitted Variance) as of funds from the DIP Facilitydelivery of such Carve Out Trigger Notice, on the day on which a Carve Out Trigger

Notice is delivered by the ~~DIP~~Prepetition First Lien Agent as provided for herein (the "**Termination Declaration Date**") , unless otherwise set forth in the Carve Out Trigger Notice, the Carve Out Trigger Notice shall constitute a demand to the ~~Debtors~~CC Parties to utilize all cash on hand as of such date and any available cash thereafter held by any ~~DIP Loan Party (including any Cash Collateral) to fund the Carve Out Trigger Amount.~~ of the CC Parties or available in the Debtors' Accounts to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The ~~DIP Loan~~CC Parties ~~also~~ shall deposit and hold ~~in trust in the Professional Fees Escrow Account~~such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the CC Parties to utilize all cash on hand as of such date and any available cash thereafter held by any of the CC Parties or available in the Debtors' Accounts, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-~~-~~Carve Out Trigger Notice Cap~~, which~~.  The CC Parties shall ~~exclusively be used~~deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap~~.~~

~~(e)    Application of Carve Out Reserves~~ (the "**Post-Carve Out Trigger Notice Reserve**," and together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in the Pre-Carve Out Trigger Notice Cap (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition First Lien Secured Parties in

accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition First Lien Secured Parties in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserves, up to the applicable amount set forth in this Paragraph, prior to making any payments to the Prepetition First Lien Secured Parties.(1)  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, if the DIPPrepetition First Lien Agent (at the direction of the Required DIP Lenders) sweepsshall not sweep or forecloses foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors, the DIP Agent shall promptly deposit any cash swept or foreclosed upon after delivery of the Carve Out Trigger Notice (including cash received as a result of the sale or other disposition of assets) into the Professional Fees Escrow Account until it isCC Parties until the Carve Out Reserves have been fully funded.

(2)    Notwithstanding, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Prepetition First Lien Agent for application in accordance with the Prepetition First Lien Loan Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the DIP Loan Parties from the Professional Fees Escrow Account shall not constitute Loans (as defined in the

DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Professional Fees Escrow AccountCarve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out and (iiiii) in no way shall an Approved Budget, the Carve Out, Post-Carve Out Trigger Notice Cap, Professional Fees Escrow AccountCarve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the DIP LoanCC Parties. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility or the Prepetition First Lien Loan Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superiority Claims, any claims arising under section 507(b) of the Bankruptcy Code, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations and the Prepetition First Lien Obligations.

(d)     (f) Payment of Allowed Professional Fees Prior to the Termination Declaration Date. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees, or on or following the Termination Declaration Date if on account of Allowed Professional Fees incurred on or prior to the Termination Declaration Date, shall not reduce the Carve Out.

(e)     (g) No Direct Obligation To Pay Allowed Professional Fees. Except for funding the Carve Out as provided herein, none of the DIP Agent, DIP Lenders, or theThe Prepetition First Lien Secured Parties shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition First

47

Lien Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)    (h) Payment of Carve Out On or After the Termination Declaration Date. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIPPrepetition First Lien Obligations secured by the DIPPrepetition Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

9.    11. Reservation of Rights of the DIP Secured Parties and Prepetition First Lien Secured Parties.  Subject in all cases to the Carve Out, notwithstanding any other provision in this Interim Order or the DIP Documents to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition First Lien Secured Parties to seek any other or supplemental relief in respect of the Debtors, including in the case of the Prepetition First Lien Secured Parties the right to seek additional adequate protection at and following the Final Hearing; *provided* that any such further or different adequate protection shall at all times be subordinate and junior to the Carve Out and the claims and liens of the DIP Secured Parties granted under this Interim Order and the DIP Documents; (b) any of the rights of the DIP Secured Parties or the Prepetition First Lien Secured Parties under the DIP Documents, the Prepetition First Lien Loan Documents or the Bankruptcy Code or under non-bankruptcy law (as applicable), including, without limitation, the right of any of the DIP Secured Parties or the

48

Prepetition First Lien Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition First Lien Secured Parties.  The delay or failure of the DIP Secured Parties or the Prepetition First Lien Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the rights and remedies of the DIP Secured Parties or the Prepetition First Lien Secured Parties.

10.    12.  Reservation of Certain Committee and Third Party Rights and Bar of Challenges and Claims.  Subject to the Challenge Period, the stipulations, admissions, and waivers, and releases contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors and assigns in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.  The stipulations, admissions, and waivers contained in this Interim Order, including, the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtors' estates (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), unless and to the extent that a party in interest with proper standing granted by order of this Court has

49

timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i)(x) ~~by~~ any Committee within 60 calendar days after the entry of ~~the~~a Final Order and (y) if no Committee has been appointed, by any party in interest within 75 calendar days after entry of ~~the~~a Final Order, in each case, subject to further extension by written agreement of the Debtors and the Majority Prepetition Lenders, in the case of the Prepetition First Lien Obligations, or by this Court for good cause shown pursuant to an application filed and served by a party in interest (in each case, a "**Challenge Period**," and the date of expiration of each Challenge Period being a "**Challenge Period Termination Date**"); *provided*, in the event that, prior to the expiration of the Challenge Period, (x) the Cases are converted to cases under chapter 7 of the Bankruptcy Code or (y) a chapter 11 trustee is appointed in the Cases, then in each such case, the Challenge Period shall be extended for a period of fifteen (15) calendar days solely with respect to such trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); (ii) seeking to avoid, object to, or otherwise challenge the findings in this Interim Order and the Debtors' Stipulations regarding: (a) the validity, enforceability, extent, priority, and perfection of the mortgages, security interests, and liens of the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties, as applicable; or (b) the validity, enforceability, allowability, priority, secured status, and amount of the Prepetition First Lien Obligations (any such claim, a "**Challenge**"); and (iii) in which this Court enters a final order in favor of the plaintiff or the movant sustaining any such Challenge in any such timely and properly filed adversary proceeding or contested matter. The timely and proper filing of a motion seeking standing to file a Challenge before the termination of the Challenge Period, which attaches a proposed Challenge, shall toll the Challenge Period Termination Date only as to the party that timely and properly filed such standing motion, and

only with respect to challenges expressly asserted in the proposed Challenge attached to such standing motion, until such motion is resolved or adjudicated by this Court.  Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled):  (a) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any successor case) shall be deemed to be forever barred; (b) the Prepetition First Lien Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any successor cases; (c) the Prepetition First Lien Loan Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the findings and the Debtors' stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, ~~releases,~~ affirmations, and other stipulations as to the priority, extent, and validity of the claims, liens, and interests of the Prepetition First Lien Secured Parties contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, their estates, and all creditors, interest holders, and other parties in interest in these Cases and any successor cases.  Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the findings and stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such findings and stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period

51

Termination Date.  Nothing in this Interim Order vests or confers on any person or entity, including, without limitation, any Committee, standing or authority to pursue any claims or causes of action belonging to the Debtors or their estates, including, without limitation, any Challenges, with respect to the Prepetition First Lien Loan Documents, the Prepetition First Lien Loan Liens and the Prepetition First Lien Obligations.

13.    DIP Termination Date.   On the DIP Termination Date (as defined below), consistent with Sections 2.6 and 7.2 of the DIP Credit Agreement, (a) all DIP Obligations shall be immediately due and payable, all Revolving Credit Commitments shall immediately terminate, and the Carve Out shall be funded as provided for in this Interim Order; (b) all authority to use Cash Collateral shall cease unless the Court orders otherwise prior to the expiration of the Remedies Notice Period (as defined below); *provided, however*, that during the Remedies Notice Period, the DIP Loan Parties may use Cash Collateral solely to fund the Carve Out as provided for herein and pay payroll and other expenses critical to the administration of the DIP Loan Parties' estates strictly in accordance with the Approved Budget, subject to Permitted Variances; and (c) upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Documents and the Prepetition First Lien Loan Documents, respectively, in accordance with this Interim Order.

11.    14. Events of Default.  The occurrence of any of the following events, unless waived by the Required DIPMajority Prepetition Lenders in accordance with the terms of the DIPPrepetition First Lien Loan Documents, shall constitute an event of default (each, an "**Event of Default**"):  (a) the failure of the DIP LoanCC Parties to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, subject

to ~~any applicable grace period in the DIP Credit agreement, if any~~ a three (3) business day cure period (if such failure is capable of being cured); ~~(b)~~provided that the ~~failure of the DIP Loan Parties~~reporting requirements set forth in Paragraphs 4 and 5 shall not be subject to ~~comply with~~ any ~~of the Milestones (as defined below)~~cure period; (~~e~~b) the entry by this Court or any other court of an order vacating or modifying this Interim Order or any final Order approving the ~~DIP Facility or~~ use of Cash Collateral in these cases; (~~d~~c) the dismissal of one or more of the Cases of the Debtors or the conversion of one or more of the Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, in each case, unless consented to by the ~~Required DIP~~Majority Prepetition Lenders; (~~e~~d) the appointment of a trustee, receiver or examiner or other representative with expanded powers (*i.e.*, powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) for any of the Debtors, unless otherwise consented to by the ~~Required DIP~~Majority Prepetition Lenders; ~~or (f) the occurrence of any "Event of Default" under the DIP Credit Agreement~~(e) the entry by this Court of an order with respect to any of the Cases shall be entered by the Bankruptcy Court ordering termination of the exclusive period for the CC Parties to file a plan in any of the Cases, or (f) the CC Parties shall seek or request (or support another party in the filing of) the entry of any order to effect any of the events described in this Paragraph 11.

~~15.    Milestones.  Each of the DIP Loan Parties shall satisfy or cause to be satisfied, as applicable, each of the following conditions (each individually, a "**Milestone**" and collectively, the "**Milestones**") unless otherwise consented to in writing by the DIP Lenders:~~

~~(a)    On or prior to December 11, 2023, the Interim Order shall have been entered by the Court;~~

US-DOCS\129980735.5

(b)     On or prior to January 10, 2024, the Final Order shall have been entered by the Court;

(c)     No later than 45 calendar days after the Petition Date, the Court shall have entered an order setting the date (the "**Bar Date**") by which proofs of claim for general unsecured creditors must be filed;

(d)     No later than 80 calendar days following the Petition Date, the Bar Date shall have occurred;

(e)     No later than 80 calendar days following the Petition Date: the DIP Loan Parties shall have provided the DIP Lenders and Prepetition First Lien Lenders a substantially complete draft of a plan of liquidation in form and substance acceptable to the DIP Lenders and the Prepetition First Lien Lenders in their sole discretion (the "**Liquidating Plan**");

(f)     No later than 90 calendar days following the Petition Date:  the DIP Loan Parties shall have filed with the Court the Liquidating Plan and accompanying motion seeking approval of the related disclosure statement and approval of solicitation procedures; and

(g)     No later than 140 calendar days following the Petition Date: the Court shall have entered a final order confirming a Liquidating Plan acceptable to the DIP Lenders and the Prepetition First Lien Lenders in their sole discretion.

12.     16. Rights and Remedies Upon Event of Default.

(a)     Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from this Court, but subject to the terms of this Interim Order and the Remedies Notice Period, the DIPPrepetition First Lien Agent (at the direction of the Required DIPMajority Prepetition Lenders) may declare (any such

54

declaration shall be referred to herein as a "**Termination Declaration**") (i) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) termination, reduction or restriction of any further commitment to extend credit to the DIP Loan Parties to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, (iv) that the Carve Out shall be triggered, through the delivery of the Carve Out Trigger Notice as provided for herein, and (vii) subject to Paragraph 10(b)8 of this Interim Order, an immediate termination, reduction or restriction on the ability of the DIP LoanCC Parties to use Cash Collateral (the date on which a Termination Declaration is delivered, the "DIPCC **Termination Date**").  Any Termination Declaration shall not be effective until written notice has been provided by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Prepetition First Lien Agent, counsel to a Committee (if appointed), and the U.S. Trustee.

(b)    Without the need for any further notice (other than notice of a Termination Declaration as provided for herein) or order or application or motion to this Court, the automatic stay in the Cases otherwise applicable to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties is hereby automatically modified so that seven (7) days after the DIPCC Termination Date (the "**Remedies Notice Period**"), unless otherwise ordered by the Court prior to the expiration of the Remedies Notice Period:  (a) the DIP Agent (at the direction of the Required DIP Lenders) shall be entitled to exercise any of its rights and remedies set forth in the DIP Documents and this Interim Order and otherwise available at law, including to satisfy the DIP Obligations, the DIP Superpriority Claims, and the DIP Liens, subject to the Carve Out; and (b) subject to the foregoing clause (a), the Prepetition

US-DOCS\129980735.5

First Lien Agent and the Majority Prepetition Lenders shall be entitled to exercise any of their rights and remedies set forth in the Prepetition First Lien Loan Documents and this Interim Order and otherwise available at law with respect to the ~~DIP Loan~~CC Parties' use of Cash Collateral. Notwithstanding anything in this Interim Order, during the Remedies Notice Period, the ~~DIP Loan~~CC Parties may only use Cash Collateral with the express written consent of the ~~Required DIP Lenders and the~~ Majority Prepetition Lenders ~~in their respective capacities~~.  Following entry of a Final Order, in any hearing regarding any exercise of rights or remedies under the Prepetition First Lien Loan ~~Documents or the DIP~~ Documents, the only issues that may be raised by the ~~DIP Loan~~CC Parties and any other parties in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the ~~DIP Loan~~CC Parties and any other parties in interest hereby waive their right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of ~~the DIP Secured Parties or~~ the Prepetition First Lien Secured Parties set forth in this Interim Order~~, the DIP Documents,~~ or the Prepetition First Lien Loan Documents.  No rights, protections or remedies of the ~~DIP Secured Parties or the~~ Prepetition First Lien Secured Parties granted by the provisions of this Interim Order~~, the DIP Documents,~~ or the Prepetition First Lien Loan Documents shall be limited, modified or impaired in any way by: (a) any actual or purported withdrawal of the consent of any party to the ~~DIP Loan~~CC Parties' authority to continue to use Cash Collateral; (b) any actual or purported termination of the ~~DIP Loan~~CC Parties'" authority to continue to use Cash Collateral; or (c) except as provided herein or in ~~the~~any Further Interim Order or Final Order, the terms of any other order or stipulation related to the ~~DIP Loan~~CC Parties' continued use of Cash Collateral or the provision of adequate protection to any party.  During the Remedies Notice Period, the

US-DOCS\129980735.5

Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing with this Court to be held within the Remedies Notice Period, including for the contested use of Cash Collateral.  Except as set forth in this Paragraph or otherwise ordered by this Court prior to expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall be deemed to have waived their right to, and shall not be entitled to, seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of ~~the DIP Secured Parties or~~ the Prepetition First Lien Secured Parties under this Interim Order.

13.   ~~17. Limitation on Charging Expenses Against Collateral.  Subject~~Section 506(c) Waiver. The CC Parties and the Prepetition First Lien Secured Parties shall have the right to seek, in the ~~entry of a~~Further Interim Order or Final Order, a finding that, no ~~costs or~~ expenses of administration (other than as set forth in the Approved Budget), which have been or may be incurred in any of the Cases or any ~~future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code,~~successor cases at any time shall be charged against ~~or recovered from (a) the DIP Collateral (except to the extent of the Carve Out) or the DIP Secured Parties or (b) the Prepetition Collateral (except to the extent of the Carve Out) or~~ the Prepetition First Lien Secured Parties, ~~in each case~~any of their claims, any Prepetition First Lien Obligations, any security interests in and liens on the Prepetition Collateral, or the Prepetition Collateral, pursuant to sections 506(c) or 105(a) ~~or 506(c)~~ of the Bankruptcy Code ~~or any similar principle of law or equity, without the prior written consent of the DIP Secured Parties, in the case of the DIP Collateral, and the Majority Prepetition Lenders, in the case of the Prepetition Collateral, and no such consent shall be implied from any other~~

57

~~action, inaction, or acquiescence~~, or otherwise.  Nothing contained in this Interim Order shall be deemed a consent by the ~~DIP Secured Parties or the~~ Prepetition First Lien Secured Parties~~.~~

18.    ~~Use of Cash Collateral.  The DIP Loan Parties are hereby authorized to use all Cash Collateral~~ to any charge, lien assessment or claim against, or in respect of~~,~~ the Prepetition ~~First Lien Secured Parties, for the purposes set forth in this Interim Order and in accordance with the Approved Budget (subject to Permitted Variances as set forth in this Interim Order and the DIP Documents), from the date of this Interim Order through and including the earlier of the Maturity Date (as defined in the DIP Credit Agreement) and the DIP Termination Date, subject to Paragraph 10 of this Interim Order in the case of the DIP Termination Date; provided, however, (a) the Prepetition First Lien Secured Parties are granted the adequate protection set forth in this Interim Order and (b) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.  It shall be an Event of Default if Cash Collateral is used other than for the purposes set forth in this Interim Order and in accordance with the Approved Budget (subject to Permitted Variances as set forth in this Interim Order and the DIP Documents)~~Collateral under section 506(c) or 105(a) of the Bankruptcy Code or otherwise.

14.    ~~19.~~ No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

15.    ~~20.~~ Section 507(b) Reservation.  Subject to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties is insufficient to compensate for any Diminution in Value.  Nothing contained herein shall be deemed a finding

by this Court, or an acknowledgment by any of the Prepetition First Lien Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition First Lien Secured Parties against any Diminution in Value.

16.    ~~21.~~ No Waiver for Failure to Seek Relief.  The failure or delay of ~~the DIP Secured Parties or~~ the Prepetition First Lien Secured Parties to exercise rights and remedies under, as applicable, this Interim Order, ~~the DIP Documents,~~ the Prepetition First Lien Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

17.    ~~22.~~ Perfection ~~of the DIP Liens and~~ First Lien Adequate Protection Liens.  The ~~DIP Agent and the~~ Prepetition First Lien Agent (acting at the written direction of the Majority Prepetition Lenders) ~~are~~is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the ~~DIP Agent or the~~ Prepetition First Lien Agent (acting at the written direction of the Majority Prepetition Lenders) ~~choose~~chooses to file such financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and subject to the Challenge Period, not subject to challenge, dispute, or subordination as of the date of entry of this Interim Order.  If ~~the DIP Agent or~~ the Prepetition First Lien Agent (acting at the written direction of the Majority Prepetition Lenders) determines to file or execute any financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments, the Debtors shall cooperate and assist in any such execution and/or filings as

59

reasonably requested by ~~the DIP Agent and~~ the Prepetition First Lien Agent, and the automatic stay shall be modified to allow such filings.  A certified copy of this Interim Order may be filed with or recorded in filing or recording offices by ~~the DIP Agent or~~ the Prepetition First Lien Agent in addition to or in lieu of any such filings, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; *provided*, *however*, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

~~23.    To the extent that any Prepetition First Lien Secured Party is the secured party under any account control agreements, listed as loss payee or additional insured under any of the DIP Loan Parties' insurance policies or is the secured party under any other agreement, the DIP Agent, on behalf of the DIP Secured Parties, is also deemed to be the secured party under such account control agreements, loss payee or additional insured under the DIP Loan Parties' insurance policies and the secured party under each such agreement (in any such case with the same priority of liens and claims thereunder relative to the priority of (x) the Prepetition Liens and First Lien Adequate Protection Liens and (y) the DIP Liens, as set forth herein), and shall have all rights and powers in each case attendant to that position (including, without limitation, rights of enforcement, but subject in all respects to the terms of this Interim Order), and shall, subject to the terms of this Interim Order, act in that capacity and distribute any proceeds recovered or received in respect of any of the foregoing, first, to the payment in full of the DIP Obligations, and second, to the payment of the Prepetition First Lien Obligations. In accordance with the terms of this Interim Order and the other DIP Documents, the Prepetition First Lien Agent shall serve as agent for the DIP Agent for purposes of perfecting the DIP Agent's security interests in and liens on all DIP Collateral that is of a type such that perfection of a security~~

60

US-DOCS\129980735.5

interest therein may be accomplished only by possession or control by a secured party. Notwithstanding anything to the contrary in any Prepetition First Lien Loan Document or any Account Control Agreement (as defined in the Prepetition First Lien Credit Agreement), (i) the Prepetition First Lien Agent shall act solely at the instruction of the DIP Agent in respect of any such Account Control Agreement (including without limitation delivering any notices thereunder) and (ii) the Prepetition First Lien Agent shall act solely at the instruction of the DIP Agent in respect to any rights it may have under any Collateral Management Agreement (as defined in the Prepetition First Lien Credit Agreement).

24.    Credit Bidding.

(a)    To the fullest extent permissible under section 363(k) of the Bankruptcy Code, the DIP Agent (at the direction of the Required DIP Lenders) shall have the right to credit bid (either directly or through one or more acquisition vehicles) up to the full amount of the DIP Obligations in connection with any sale, lease, transfer, license or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by this Interim Order), whether pursuant to section 363 of the Bankruptcy Code, a chapter 11 plan confirmed in these Cases, or otherwise.

18.    (b) To the fullest extent permissible under section 363(k) of the Bankruptcy Code, and subject to entry of the Final Order, the Credit Bid. The Prepetition First Lien Agent (acting at the written direction of the Majority Prepetition Lenders) Secured Parties shall have the right to request authority to credit bid (either directly or through one or more acquisition vehicles) up to the full amount of the Prepetition First Lien Obligations and any First Lien Adequate Protection Superpriority Claims under section 363(k) of the Bankruptcy Code all of their claims in connection with any a sale, lease, transfer, license or other disposition of property of the Debtors

61

that constitutes Prepetition Collateral outside the ordinary course of business (to the extent permitted by this Interim Order or of any other order of this Court), whether pursuant to the CC Parties' assets under section 363 of the Bankruptcy Code, or under a chapter 11 plan confirmed in these Cases, or otherwise; *provided* that any such credit bid must satisfy the DIP Obligations in full in cash.

25.    Release.   Effective upon entry of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the DIP Secured Parties and, subject to the rights and limitations set forth in Paragraph 12 of this Interim Order, the Prepetition First Lien Lenders and the Prepetition First Lien Agent (all in their respective roles as such), and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Documents, the Prepetition First Lien Obligations, the

Prepetition Liens or the Prepetition First Lien Loan Documents, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties, the Prepetition First Lien Lenders and Rabobank, as administrative agent for the Prepetition First Lien Lenders; provided that nothing in this Paragraph shall in any way limit or release the obligations of any DIP Secured Party under the DIP Documents.

26.    Proceeds of Sale.    Subject to the Carve Out, in the event of any sale, lease, transfer, license or other disposition of property of the Debtors that constitutes DIP Collateral (other than Bi-lateral Collateral) and Prepetition Collateral (to the extent permitted by the Approved Budget and by this Interim Order or any other order of this Court) that triggers a mandatory prepayment under Section 2.5(c)(iii)(B) of the DIP Credit Agreement, the Debtors are authorized to and shall promptly pay, without further notice or order of this Court, such amount (if any) of net cash proceeds resulting therefrom no later than the second business day following receipt of such proceeds, in accordance with Section 2.5(c)(iii)(B) of the DIP Credit Agreement and the Proceeds Waterfall.

19.    Segregated Cash Account.  In the event that on or after the entry of this Order any CC Party makes a Disposition (as defined below) of Prepetition Collateral or any CC Party receives a margin refund, the cash proceeds shall be distributed as follows: (a) if the CC Parties' Liquidity is less than $10,000,000 (the "**Minimum Balance**"), cash proceeds shall be deposited into the CC Parties' primary cash concentration account at Bank of America N.A. (the "**Cash Management Bank**") that is subject to an Account Control Agreement (as defined in the

63

Prepetition First Lien Credit Agreement) until the Minimum Balance is met (and such cash proceeds may be used in strict accordance with the Approved Budget); (b) if the CC Parties' Liquidity (as defined below) exceeds the Minimum Balance (including any excess beyond the amount required to be deposited to meet the Minimum Balance pursuant to the foregoing subclause (a)), 25% of such cash proceeds shall be deposited into the CC Parties' primary cash concentration account at the Cash Management Bank and 75% of such cash proceeds shall be deposited into a segregated account at the Cash Management Bank and made subject to an Account Control Agreement (such account, the "**Segregated Cash Account**"); and (c) if the CC Parties' Liquidity exceeds $40,000,000, 100% of such cash proceeds shall be deposited into the Segregated Cash Account; provided that the CC Parties will have 14 days from the entry of this Order (or such longer period as reasonably agreed to by the Prepetition First Lien Agent) to establish that the Segregated Cash Account is subject to an Account Control Agreement (which may be under an existing Account Control Agreement). Amounts held in the Segregated Cash Account (i) shall constitute Prepetition Collateral of the Prepetition Secured Parties, (ii) shall be deemed subject to a valid, perfected, and enforceable lien of the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties, and (iii) shall not be disbursed from or otherwise removed or transferred from the Segregated Cash Account by the Debtors or any other party unless (x) pursuant to an order of the Court, (y) if such amounts are to be used to fund a margin call payment, the prior written consent of the Prepetition First Lien Agent (in its sole discretion) has been obtained upon written request by the CC Parties, which such request shall be made at the same time a notice pursuant to Paragraph 3(c) is delivered or (z) if such amounts are to be used other than to fund a margin call payment, the prior written consent of the Majority Prepetition Lenders has been obtained upon written request of no less than two (2) business days

64

advance notice by the CC Parties.  Any cash disbursed from the Segregated Cash Account shall be used by the Debtors in strict accordance with the Approved Budget. As used herein: (x) "**Disposition**" means (i) any sale, conveyance, license, lease or other transfer and (ii) any collection on, or other liquidation of, the Prepetition Collateral pursuant to the Realization Strategy; (y) "**Realization Strategy**" means the report delivered by the Debtors to the Prepetition First Lien Agent setting forth the Debtors' strategy for realizing upon the Prepetition Collateral, which shall be in form and substance acceptable to the Majority Lenders; and (z) "**Liquidity**" means, at any time, the unrestricted (other than restricted on account of securing the Prepetition Obligations) cash and Liquid Investments (as defined in the Prepetition First Lien Credit Agreement) on the balance sheet of the Debtors that are held in accounts subject to an Account Control Agreement.

20.    27. Preservation of Rights Granted Under this Interim Order.

(a)    The DIP Obligations and the DIP Liens shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, and any liens or claims granted to the DIP Agents or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(a)    (b) Notwithstanding any order dismissing any of the Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, and the any other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain

65

their priorities as provided in this Interim Order until, as applicable, all ~~DIP Obligations and~~ First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash, and such ~~DIP Liens, DIP Superpriority Claims,~~ First Lien Adequate Protection Liens, First Lien Adequate Protection Superpriority Claims, and the~~any~~ other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on the Debtors, their estates and all parties in interest; and (y) to the fullest extent permitted by law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the provisions of this Interim Order.

(b) ~~(c)~~ Except as expressly provided in this Interim Order or in the ~~DIP~~Prepetition First Lien Loan Documents~~, the DIP Liens, the DIP Superpriority Claims~~, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, and all other rights and remedies of ~~the DIP Secured Parties and~~ the Prepetition First Lien Secured Parties granted under this Interim Order ~~and the DIP Documents~~ shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any ~~DIP Collateral or~~ Prepetition Collateral pursuant to section 363 of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining ~~DIP Obligations or~~ First Lien Adequate Protection Obligations. The terms and provisions of this Interim Order ~~and the DIP Documents~~ shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code. The ~~DIP Liens, the DIP Superpriority Claims, the~~ First Lien Adequate

66

Protection Liens, the First Lien Adequate Protection Superpriority Claims, and all other rights and remedies of ~~the DIP Secured Parties and~~ the Prepetition First Lien Secured Parties under this Interim Order shall continue in full force and effect until, as applicable, the ~~DIP Obligations and~~ First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash.

(c)    ~~(d)~~ Other than as set forth in this Interim Order or as otherwise ordered by the Court, ~~neither the DIP Liens nor~~ the First Lien Adequate Protection Liens shall <u>not</u> be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and ~~neither the DIP Liens nor~~ the First Lien Adequate Protection Liens shall <u>not</u> be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551, and except as set forth in this Interim Order the occurrence of any of the foregoing shall be an Event of Default.

21.    ~~28.~~ <u>Limitation on Use of</u> ~~DIP Facility Proceeds, DIP Collateral, and~~ <u>Prepetition Collateral.</u>  Notwithstanding anything to the contrary set forth in this Interim Order, other than as consented to in writing by ~~the Required DIP Lenders and~~ the Majority Prepetition Lenders, none of ~~the DIP Facility, the DIP Collateral,~~ the Prepetition Collateral (including Cash Collateral) or the Carve Out or proceeds thereof may be used:  (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the ~~DIP Secured Parties or the~~ Prepetition First Lien Secured Parties ~~(each in their capacities as such)~~, and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter

(including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the ~~DIP Secured Parties or the~~ Prepetition First Lien Secured Parties ~~(each in their capacities as such)~~ under the ~~DIP Documents, the~~ Prepetition First Lien Loan Documents~~,~~ or this Interim Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed in these Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the ~~DIP Secured Parties or the~~ Prepetition First Lien Secured Parties to recover on the ~~DIP Collateral or the~~ Prepetition Collateral or seeking affirmative relief against any of ~~the DIP Secured Parties or~~ the Prepetition First Lien Secured Parties related to ~~the DIP Obligations or~~ the Prepetition First Lien Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, ~~the DIP Obligations,~~ the Prepetition First Lien Obligations, or liens or security interests of the ~~DIP Secured Parties or the~~ Prepetition First Lien Secured Parties in the ~~DIP Collateral or~~ Prepetition Collateral~~, as applicable~~; or (iii) for monetary, injunctive, or other affirmative relief against the ~~DIP Secured Parties or the~~ Prepetition First Lien Secured Parties, or the respective liens on or security interests in the ~~DIP Collateral or the~~ Prepetition Collateral of the ~~DIP~~<u>Prepetition First Lien</u> Secured Parties ~~or~~<u>that would impair the ability of any of</u> the Prepetition First Lien Secured Parties ~~that would impair the ability of any of the DIP Secured Parties or the Prepetition First Lien Secured Parties, as applicable,~~ to assert or enforce any lien, claim, right, or security interest or to realize or recover on ~~the DIP Obligations or~~ the Prepetition First Lien

Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests held by or on behalf of each of ~~the DIP Secured Parties or~~ the Prepetition First Lien Secured Parties related to ~~the DIP Obligations and~~ the Prepetition First Lien Obligations, as applicable; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to ~~the DIP Obligations, the DIP Liens,~~ the Prepetition First Lien Obligations, or the Prepetition First Lien Loan Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: ~~(x) any of the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y)~~ any of the Prepetition First Lien Loan Liens or any other rights or interests of any of the Prepetition First Lien Secured Parties related to the Prepetition First Lien Obligations or the Prepetition First Lien Loan Liens, *provided* that no more than $50,000 of the proceeds of ~~the DIP Facility, the DIP Collateral, or~~ the Prepetition Collateral (including Cash Collateral), in the aggregate, may be used by any Committee appointed in these Cases, if any, solely to investigate, within the Challenge Period, the claims, causes of action, adversary proceedings, or other litigation against the Prepetition First Lien Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests held by or on behalf of each of the Prepetition First Lien Secured Parties related to the Prepetition First Lien Obligations.

~~29.    Conditions Precedent.    Except as provided for in the Carve Out, no DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Documents have been satisfied in full or waived in accordance with such DIP Documents.~~

22.   ~~30.~~ Subordination Agreements.  Pursuant to section 510 of the Bankruptcy Code, any intercreditor or subordination provisions contained in any of the Prepetition First Lien Loan Documents (i) shall remain in full force and effect, and (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition First Lien Secured Parties.

~~31.     Expenses and Indemnification.   The DIP Loan Parties shall pay the reasonable and documented professional fees, expenses, and disbursements of the DIP Professionals and Prepetition First Lien Professionals to the extent provided for in this Interim Order promptly following ten (10) business days (the "**Review Period**") after the receipt by counsel for the DIP Loan Parties, any Committee, and the U.S. Trustee of each of the invoices therefor (the "**Invoiced Fees**") and without the necessity of filing formal fee applications or complying with the U.S. Trustee Guidelines.   Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of the Cases, and such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.   The DIP Loan Parties, any Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "**Disputed Invoiced Fees**") if, within the Review Period, a DIP Loan Party, any Committee, or the U.S. Trustee~~

70

notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees within the Review Period (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading). Notwithstanding the foregoing, the DIP Loan Parties are authorized and directed to pay on the Closing Date (as defined in the DIP Documents) all reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel, local counsel and financial advisors to the DIP Agent and the Prepetition First Lien Agent, incurred on or prior to such date without the need for any professional engaged by the DIP Agent or the Prepetition First Lien Agent to first deliver a copy of its invoice as provided for herein.

23. 32. Binding Effect; Successors and Assigns. The DIP Documents and the provisions of this Interim Order, including (subject to the provision of Paragraph 1210 of this Interim Order) all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Secured Parties, the Prepetition First Lien Secured Parties, any Committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties, the Prepetition First Lien Secured Parties and other parties as expressly provided for herein; provided, however, the DIP Lenders and the Prepetition First Lien Lenders shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to

71

extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

24. 33. Limitation of Liability. InSubject to entry of the Further Interim or Final Order, in determining to make any loan under the DIP Documents, permittingpermit the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall not, solely by reason thereof, (i) be deemed in control of the operations of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.  Furthermore, nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Prepetition First Lien Lenders, or the Prepetition First Lien Agent, any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

25. 34. No Requirement to File Claim for DIP Obligations or Prepetition First Lien Obligations.  Notwithstanding anything to the contrary contained in any prior or subsequent order of this Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall not be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations or Prepetition First Lien Obligations, respectively, all of

72

which shall be due and payable in accordance with the ~~DIP Documents or~~ Prepetition First Lien Loan Documents~~, as applicable,~~ without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request shall not affect the validity, priority, or enforceability of any of the ~~DIP Documents or~~ Prepetition First Lien Loan Documents~~, as applicable,~~ or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the rights, remedies, powers, or privileges of the ~~DIP Secured Parties or~~ Prepetition First Lien Secured Parties under any of the ~~DIP Documents or~~ Prepetition First Lien Loan Documents~~, as applicable~~, this Interim Order, or applicable law.  The provisions set forth in this Paragraph are intended solely for the purpose of administrative convenience, and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

26.    ~~35. No~~ Marshaling.  ~~Subject~~ The Debtors and the Prepetition First Lien Secured Parties shall have the right to ~~entry of~~ seek, in the Further Interim Order or Final Order~~: (~~, a~~)~~ finding that, the ~~DIP~~ Prepetition First Lien Secured Parties shall not be subject to the equitable doctrine of ~~"~~ "marshaling~~"~~ " or any other similar doctrine with respect to any of the ~~DIP~~ Prepetition Collateral~~, and the proceeds of the DIP Collateral shall be received and applied pursuant to this Interim Order and the DIP Documents, notwithstanding any other agreement or provision to the contrary; and~~.

27.    Section 552(b) of the Bankruptcy Code.  The CC Parties and the Prepetition First Lien Secured Parties shall ~~not be subject to~~ have the ~~equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral, and the proceeds of the Prepetition Collateral shall be received and applied pursuant to this Interim Order and the~~

Prepetition First Lien Loan Documents, notwithstanding any other agreement or provision to the contrary.

36.   Equities of the Case.  Subject to entry of the right to seek, in the Further Interim Order or Final Order, a finding that, the Prepetition First Lien Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition First Lien Secured Parties with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

28.   37. FinalFurther Interim Hearing.  A finalAn further interim hearing to consider the relief requested in the Motion on a finalan interim basis shall be held on _____January _____, 20232024 at _____ (ET).  Any objections or responses to entry of the Finalan Additional Interm Order shall be filed on or before 4:00 p.m. (ET) on _____, 20232024, and shall be served on:  (a)  counsel to the Debtors Baker & McKenzie; (b)  counsel to the DIPPrepetition First Lien Agent, Cadwalader, Wickersham & Taft LLP; (c) counsel to the Prepetition First Lien Agent, Cadwalader, Wickersham & Taft LLP; (d) the United States Trustee _____ and (ed) counsel to any Committee.  In the event no objections to entry of the FinalFurther Interim Order are timely received, this Court may enter the FinalFurther Interim Order without need for any further notice or the FinalFurther Interim Hearing.

29.   38. Effect of this Interim Order.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, and shall take effect and be enforceable immediately upon execution hereof.

30.    ~~39.~~ Retention of Jurisdiction.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

## SCHEDULE A

**Foreign Security Agreements**

**List of Foreign Security Agreements**

The following documents and agreements, as amended, supplemented, confirmed or otherwise modified from time to time:

1. *With respect to the Netherlands:*

   a. Dutch law Omnibus Deed of Pledge, dated November 30, 2017, by Mercon B.V. and Mercon Coffee Corporation in favor of Prepetition First Lien Agent, covering, *inter alia*, coffee inventory, accounts receivable and applicable pledged bank accounts, as supplemented from time to time.

   b. Dutch law governed Deed of Pledge, dated May 19, 2023, ranking behind the Initial Dutch Deed of Pledge, by Mercon B.V. and Mercon Coffee Corporation, in favor of the Prepetition First Lien Agent, covering, *inter alia*, coffee inventory, accounts receivable and applicable pledged bank accounts, as supplemented from time to time.

2. *With respect to Nicaragua:*

   a. Nicaraguan law *Contrato de Garantía Mobiliaria*, dated June ~~20~~30, 2023, creating security over the coffee inventory of Comercial Internacional Exportadora, S.A. and Distribuidora de Granos de Nicaragua S.A. in Nicaragua to the Prepetition First Lien Agent, made by Comercial Internacional Exportadora, S.A. and Distribuidora de Granos de Nicaragua S.A, in favor of the Prepetition First Lien Agent.

   b. Nicaraguan law *Contrato de Garantía Mobiliaria*, dated June ~~20~~30, 2023, creating security over the forward coffee purchase and sale contracts of Comercial Internacional Exportadora, S.A. and Distribuidora de Granos de Nicaragua S.A. in Nicaragua to the Prepetition First Lien Agent, made by Comercial Internacional Exportadora, S.A. and Distribuidora de Granos de Nicaragua S.A., in favor of the Prepetition First Lien Agent.

   c. The New York law Collateral Management Agreement, dated as of November 1, 2016, as amended and assigned to the Prepetition First Lien Agent pursuant to that certain Assignment Agreement and Amendment, dated as of November 30, 2017, by and among Wakefield Inspection Services Nicaragua S.A., as collateral manager, the Prepetition First Lien Agent, as agent, and Comercial Internacional Exportadora, S.A. and Distribuidora de Granos de Nicaragua S.A., as clients.

3. *With respect to Honduras:*

   a. Honduran law Floating Pledge Agreement Over Fungible Inventory (*Contrato de Prenda Flotante Sobre Inventario de Bienes Fungibles*), dated December 5, 2017, made by Comercial Internacional de Granos de Honduras S.A de C.V. in

favor of the Prepetition First Lien Agent with respect to coffee inventory owned by Comercial Internacional de Granos de Honduras S.A de C.V. in Honduras.

b.  Honduran law assignments of Certificates of Deposit made to the Prepetition First Lien Agent from time to time (if any) with respect to coffee inventory owned by Comercial Internacional de Granos de Honduras S.A de C.V. in Honduras.

c.  The New York law Collateral Management Agreement, dated as of February 5, 2019, by and among Wakefield Inspection Services Honduras, Sociedad Anónima, as collateral manager, Prepetition First Lien Agent, as agent and Comercial Internacional de Granos de Honduras S.A de C.V., as client.

4.  *With respect to Guatemala:*

a.  Guatemalan law Possessory Movable Pledge, dated January 19, 2018, pledging the coffee inventory of Mercon Guatemala, S.A. in Guatemala to the Prepetition First Lien Agent.

b.  The New York law Collateral Management Agreement, dated as of January 19, 2018, by and among Wakefield Inspection Services Guatemala, Sociedad Anónima., as collateral manager, Prepetition First Lien Agent, as agent and Mercon Guatemala, S.A., as client.

5.  *With respect to Brazil:*

a.  Brazilian law Mercantile Pledge Agreement and Other Covenants (*penhor mercantile*) over coffee inventory of Mercon Brasil Comercio de Café Ltda. in Brazil, dated April 30, 2019, by and among Mercon Brasil Comercio de Café Ltda. and Rabobank International Brasil S.A., acting as sub-agent for the Prepetition First Lien Agent (in such capacity, the "**Brazilian Collateral Agent**").

b.  Brazilian law Mercantile Pledge Agreement and Other Covenants (*penhor mercantile*) over coffee inventory of Mercon Brasil Comercio de Café Ltda. in Brazil, dated July 29, 2020, by and among Mercon Brasil Comercio de Café Ltda. and the Brazilian Collateral Agent.

c.  Brazilian law Mercantile Pledge Agreement and Other Covenants (*penhor mercantile*) over coffee inventory of Mercon Brasil Comercio de Café Ltda. in Brazil, dated April 30, 2021, by and among Mercon Brasil Comercio de Café Ltda. and the Brazilian Collateral Agent, as amended pursuant the First Amendment thereto.

d.  Brazilian law Amendment and Restatement to the Fiduciary Assignment of CDA/WA and Other Covenants (*Aditamento e Consolidação ao Contrato De*

2

*Cessão Fiduciária De CDA/WA e Outras Avenças*), dated May 23, 2023, by Mercon Brasil Comercio de Café Ltda. and the Brazilian Collateral Agent.

 e. Endorsement of Brazilian Agricultural Certificates of Deposit and the related Agricultural Warrant from Mercon Brasil Comercio de Café Ltda. to the Brazilian Collateral Agent from time to time with respect to coffee inventory owned by Mercon Brasil Comercio de Café Ltda. in Brazil and the related registration thereof .

6. *With respect to Vietnam:*

 a. Vietnamese law Coffee Mortgage Agreement originally dated 4 December 2014, as amended and restated on 31 May 2016 by and between Mercon B.V. and Mercon Coffee Corporation as the mortgagors, and Société Générale, as the mortgagee, as amended by, without limitation, a Second Amendment thereto, dated November 30, 2017, which replaces Société Générale as mortgagee and collateral agent thereunder, with the Prepetition First Lien Agent.

 b. The New York law Collateral Management Agreement No.708615691.2.11144051 and the related Sight Management Agreement, among Mercon B.V. and Mercon Coffee Corporation, Pacorini Vietnam Ltd. and the Prepetition First Lien Agent (as successor by assignment to Société Générale).

7. *With respect to the British Virgin Islands:*

 a. BVI law Floating Charge, dated May 30, 2016, by and among, *inter alios*, CISA Export, S.A. and Mercafe Vietnam Ltd., as chargors, and the Prepetition First Lien Agent, as collateral agent.

8. *With respect to Canada:*

 a. The Hypothec, dated May 31, 2016 under the laws of the Province of Québec and the federal laws of Canada, by Mercon B.V. and Mercon Coffee Corporation in favor of the Prepetition First Lien Agent (as successor to Société Générale), acting as hypothecary representative, in respect of movable property.

 b. The General Security Agreement, dated May 31, 2016, under the laws of the Province of Ontario and the laws of Canada, by Mercon B.V. and Mercon Coffee Corporation and the First Lien Prepetition Agent (as successor to Société Générale), covering, *inter alia*, coffee inventory and accounts receivable.

 c. The Agent Resignation and Appointment Agreement (under New York law), dated as of November 30, 2017, which is effective to assign the rights of

Société Générale in respect of the Québec Hypothec and the Canadian GSA to First Lien Prepetition Agent.

9.  *With respect to Belgium:*

    a.  Belgian law Register Pledge Agreement, dated as of April 30, 2019, by among Mercon B.V. and Mercon Coffee Corporation, as pledgors, and the First Lien Prepetition Agent, as pledgee.

10. *With respect to Germany:*

    a.  German law Security Transfer Agreement, dated as of November 30, 2017, by and among, Mercon B.V., as transferor, and the Prepetition First Lien Agent as transferee.

    b.  German law Global Assignment Agreement, dated as of November 30, 2017, by and among Mercon B.V., as assignor, and the Prepetition First Lien Agent as assignee.

    c.  German law Security Transfer Agreement, dated as of November 30, 2017, by and among Mercon Coffee Corporation, as transferor, and the Prepetition First Lien Agent as transferee.

    d.  German law Global Assignment Agreement, dated as of November 30, 2017, by and among Mercon Coffee Corporation, as assignor, and the Prepetition First Lien Agent as assignee.

11. *With respect to the United Kingdom:*

    a.  English law Debenture, dated April 30, 2019, by Mercon B.V., in favor of the Prepetition First Lien Agent.

    b.  English law Debenture, dated April 30, 2019, by Mercon Coffee Corporation, in favor of the Prepetition First Lien Agent.

## SCHEDULE B

**Pledged Accounts**

US-DOCS\129980735.5

## **SCHEDULE C**

### **Approved Budget**

US-DOCS\129980735.5

**EXHIBIT A**

**DIP Credit Agreement**

Document comparison by Workshare Compare on Monday, December 11, 2023
2:26:08 PM

| Input: | |
|---|---|
| Document 1 ID | iManage://USDMS10/USActive/60072108/16 |
| Description | #60072108v16<USActive> - Rabo-Mercon - Interim DIP Financing and Cash Collateral Order |
| Document 2 ID | iManage://USDMS10/USActive/60072108/24 |
| Description | #60072108v24<USActive> - Rabo-Mercon - Interim DIP Financing and Cash Collateral Order |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 319 |
| Deletions | 551 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 870 |