**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MERCON COFFEE CORPORATION, *et al.*,[1] | Case No. 23-11945 (MEW) |
| Debtors. | Jointly Administered |

_____/

### ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT BY AND AMONG MERCON COFFEE CORPORATION AND STONEX COMMODITY SOLUTIONS LLC, (II) AUTHORIZING THE PRIVATE SALE OF CERTAIN ASSETS OF MERCON COFFEE CORPORATION FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, <u>AND (IV) GRANTING RELATED RELIEF</u>

Upon the *Debtors' Motion for Entry of an Order (I) Approving the Asset Purchase Agreement By and Among Mercon Coffee Corporation and StoneX Commodity Solutions LLC, (II) Authorizing the Private Sale of Certain Assets of Mercon Coffee Corporation Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and (IV) Granting Related Relief*, dated May 2, 2024 [Docket No. 381] (the "**Motion**")[2]; and the Debtors having agreed on the terms of the Asset Purchase Agreement dated April 12, 2024 attached hereto as **Exhibit 1** (the "**APA**") by and among StoneX Commodity Solutions LLC ("**Purchaser**") and Mercon Coffee Corporation ("**Seller**") for the purchase of certain contracts, inventory, furnishings and equipment, intellectual property and

---

[1] The debtors and debtors in possession in these cases and the last four digits of their respective Employer Identification Numbers are: Mercon Coffee Corporation (1844); Mercon B.V. (N/A); Mercon Brasil Comércio de Café Ltda. (N/A); Agro International Holding B.V. (N/A); Mercapital de Nicaragua, S.A. (N/A); Distribuidora de Granos de Nicaragua S.A. (N/A); Cisa Export S.A. (N/A); Comercial Internacional de Granos de Honduras, S.A. de C.V. (N/A); Mercon Guatemala, S.A. (N/A); Comercial Internacional Exportadora, S.A. (N/A). The Debtors' mailing address is: 999 Ponce de Leon Blvd, Suite 910, Coral Gables, FL 33134 .

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the APA (as defined herein), as applicable.

related assets, and the assignment and assumption of certain executory contracts; and the Bankruptcy Court having conducted a hearing on May 29, 2024 to consider approval of (i) the APA, (ii) the sale and transfer (the "**Sale**") of the Purchased Assets free and clear of all Liens, claims (as defined in section 101(5) of title 11 of the United States Code (the "**Bankruptcy Code**")), Encumbrances (other than Permitted Encumbrances), mortgages, pledges, charges, security interests, obligations, liabilities, contractual commitments or interests of any kind or nature except as otherwise expressly provided in the APA and/or this Order, (iii) the assumption and assignment of the Purchased Contracts; and all parties in interest having been heard, or having had the opportunity to be heard (the "**Sale Hearing**"), regarding the APA, the Sale, the Cure Costs, if any, and the transactions contemplated by the APA (the "**Transactions**"); and upon the record of the Sale Hearing, the *Amended Declaration of Harve Light, Chief Restructuring Officer (I) in Support of the Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2*, dated January 5, 2024 [Doc. No. 92], the *Declaration of Andrew Morley in Support of the Debtors' Motion for Entry of an Order (I) Approving the Asset Purchase Agreement By and Among Mercon Coffee Corporation and StoneX Commodity Solutions LLC, (II) Authorizing the Private Sale of Certain Assets of Mercon Coffee Corporation Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and (IV) Granting Related Relief*, attached as Exhibit B to the Motion (the "**Morley Declaration**"), and the *Declaration of Harve Light, Chief Restructuring Offer of the Debtors, in Support of the Debtors' Motion for Entry of an Order (I) Approving the Asset Purchase Agreement By and Among Mercon Coffee Corporation and StoneX Commodity Solutions LLC, (II) Authorizing the Private Sale of Certain Assets of Mercon Coffee Corporation Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (III)*

2

*Authorizing the Assumption and Assignment of Certain Executory Contracts, and (IV) Granting*
*Related Relief* (the "**Light Declaration**"), attached as Exhibit C to the Motion, and after due
deliberation thereon, and good cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

     A.   **Bankruptcy Petitions**. On December 6, 2023 (the "**Petition Date**"), each of the
Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively,
the "**Chapter 11 Cases**").

     B.   **Jurisdiction and Venue**. The Bankruptcy Court has jurisdiction over the Motion
pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C.
§ 157(b). Venue of the Chapter 11 Cases and the Motion in this District is proper under 28 U.S.C.
§§ 1408 and 1409.

     C.   **Statutory Predicates**. The statutory predicates for the relief requested in the
Motion are sections 105, 362, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004
and 9014, and Local Rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy
Court for Southern District of New York (the "**Local Rules**").

     D.   **Notice**. As evidenced by the certifications of service previously filed with the
Bankruptcy Court, and based on the representations of counsel at the Sale Hearing, proper, timely,
adequate and sufficient notice of the Motion, the APA, the Transactions and this Order, have been
provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Rules 2002,
6004, 6006, 9006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy
Rules**"), and Local Rules 2002-1, 6004-1 and 6006-1. Such notice was good and sufficient and

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of
fact when appropriate. <u>See</u> Fed. R. Bankr. P. 7052.

appropriate under the particular circumstances. No other or further notice of the Motion, including, without limitation, the APA, the Transactions, the Cure Costs, if any, the Sale Hearing or of the entry of this Order is necessary or shall be required. Notice of the Motion, the Sale and the Sale Hearing was also posted electronically on the website maintained by Kroll Restructuring Administration LLC, the Debtors' Claims, Noticing and Balloting Agent, at *http://cases.ra.kroll.com/mercon/*.

E.      **Debtors in Possession**. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

F.      **No Trustee of Examiner**. No trustee or examiner has been appointed in the Chapter 11 Cases.

G.      **Opportunity to Object**. A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities.

H.      **Title in the Purchased Assets**. The Seller has represented that immediately prior to Closing (as defined herein), (a) the Purchased Assets constitute property of the Seller's estate, and title thereto is vested in the Seller's estates within the meaning of section 541(a) of the Bankruptcy Code and (b) the Seller is the sole and lawful owner of the Purchased Assets.

I.      **Business Justification**. The Debtors have demonstrated a sufficient basis and compelling circumstances requiring them to enter into the APA and the Transactions and sell the Purchased Assets. Such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors. Such business reasons include, but are not limited to, the facts that (i) the Sale to Purchaser provides the Debtors with the best opportunity to maximize the sale price and prevent a significant risk to going concern value

associated with delay and (ii) the Sale will relieve the Debtors of ongoing cash outlays and upkeep costs associated with ownership of the Purchased Assets. Entry of this Order and all provisions hereof is a necessary condition precedent to Purchaser consummating the APA.

J.    **Marketing Process**. The Debtors and their professionals marketed the Purchased Assets appropriately and conducted the marketing and sale process as set forth in the Motion in good faith and without collusion. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to make an offer for the Purchased Assets.

K.    **Highest or Otherwise Best Offer**. The total consideration to be provided by Purchaser for the Purchased Assets is the highest or otherwise best offer for the Purchased Assets received by the Debtors.

L.    **Good Faith Purchaser**. The APA and the Transactions have been negotiated by the Debtors and Purchaser (and their respective affiliates and representatives) in good faith, at arm's length and without collusion or fraud. The terms and conditions of the APA and the Transactions, including the total consideration to be realized by the Debtors pursuant to the APA, are fair and reasonable, and the Transactions are in the best interest of the Debtors, their creditors, and their estates.

M.    Purchaser is a "good faith purchaser" entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code and any other applicable bankruptcy or non-bankruptcy law with respect to the sale of the Purchased Assets that it is acquiring pursuant to the APA and the Transactions.

N.    There is no evidence that the APA was controlled by an agreement between potential or actual bidders within the meaning of section 363(n) of the Bankruptcy Code or that

the Debtors and Purchaser have engaged in any conduct that would cause or permit the APA or the Transactions to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

O.      Purchaser is not an "affiliate" or "insider" of the Debtors as defined in section 101 of the Bankruptcy Code, and no common identity of incorporation, director, or stockholder exists between Purchaser, on the one hand, and the Debtors, on the other hand.

P.      Purchaser will be acting in good faith in consummating the Transactions at any time on or after entry of this Order, and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h).

Q.      **Corporate Power and Authority**. Subject to entry of this Order, the Debtors have full corporate power and authority to execute and deliver the APA and the Transactions and to perform all their respective obligations thereunder, and the sale of the Purchased Assets have been duly and validly authorized by all corporate authority necessary to consummate the Transactions. No consents or approvals, other than as expressly provided for in the APA and the entry of this Order, are required by the Debtors to consummate the Transactions.

R.      **Free and Clear**. The sale of the Purchased Assets to Purchaser will be, upon the closing of the Transactions pursuant to the APA (the "**Closing**"), legal, valid and effective transfers of such Purchased Assets, and each such transfer shall vest Purchaser with all right, title, and interest of Seller to the Purchased Assets free and clear of all Liens to the fullest extent permitted by section 363(f) of the Bankruptcy Code, with any such Liens to attach to the consideration to be received by the Debtors in the same priority, validity, force and effect and subject to the same defenses and avoidability, if any, as of Closing.  Purchaser would not enter into the APA to acquire the Purchased Assets if the sale of the Purchased Assets were not free and clear of all Liens, or if

Purchaser would, or in the future could, be liable for any such Liens. A sale of the Purchased Assets other than one free and clear of all Liens would adversely impact the Debtors' estates and would yield substantially less value for the Debtors' estates, with less certainty than the Sale. Therefore, the Sale contemplated by the APA is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

S.      **Satisfaction of 363(f) Standards**. The Debtors may sell the Purchased Assets free and clear of all Liens because, with respect to each creditor asserting a Lien, one or more of the standards set forth in Sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Coöperatieve Rabobank U.A., New York Branch ("**Rabobank**"), as agent under the prepetition first lien credit facility, has properly perfected security interests in, and Liens on, the Purchased Assets and has consented to the Sale, satisfying Section 363(f)(2). The net proceeds of the Sale received by the Debtors will continue to be subject to Rabobank's Liens, and shall be deposited and distributed in accordance with the Final Cash Collateral Order (as defined in the Motion), and Liens will attach to such proceeds in accordance therewith. Additionally, pursuant to section 363(f)(5) of the Bankruptcy Code, any holders of Liens who did object fall within one or more of the other subsections 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, if any, attach to the proceeds of the Transactions ultimately attributable to the Purchased Assets in which such holder alleges a Lien, in the same order of priority, with the same validity, force and effect that such holder had prior to the Transactions, and subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

T.      **No Successor Liability**. Except as otherwise expressly set forth in this Order and/or provided in the APA, and to the fullest extent permitted by section 363(f) of the Bankruptcy Code, the Purchaser is not and shall not be considered to be a successor to the Seller or the bankruptcy

estate by reason of any theory of law or equity, and other than as expressly set forth in this Order and/or provided in the APA with respect to the Purchased Contracts, Purchaser shall not assume or in any way be responsible for any Liability of the Debtors, their Affiliates and/or their bankruptcy estates.

U.      The Transactions contemplated under the APA do not amount to a consolidation, merger or de facto merger of Purchaser with the Debtors and/or the Debtors' estates, there is not substantial continuity between Purchaser and any of the Debtors, there is no common identity between the Debtors and Purchaser, there is no continuity of enterprise between the Debtors and Purchaser, Purchaser is not mere continuations of the Debtors or their estates, and Purchaser does not constitute a successor to the Debtors or their estates.

V.      Other than as expressly set forth in this Order and/or provided in the APA, and to the fullest extent permitted by section 363(f) of the Bankruptcy Code, Purchaser and its respective successors, assigns, members, partners, directors, officers, principals and shareholders (or equivalent) shall have no obligations with respect to any Liabilities of the Debtors of any kind or nature, including, without limitation, any "claims" (as defined in section 101(5) of the Bankruptcy Code), whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the Petition Date and whether imposed by agreement, understanding, law, rule, equity or otherwise arising on or prior to Closing. The Purchaser would not have acquired the Purchased Assets but for the foregoing protections against potential claims, including those based upon "successor liability" theories.

W.      **Releases**. The Releases set forth in Section 8.8 of the APA are incorporated herein and are an integral part of the APA and the Transactions.

X.      **No Fraudulent Transfer**. The Transactions are not for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia or any other jurisdiction. The Debtors and Purchaser are not and will not be entering into the Transactions fraudulently.

Y.      **Fair Consideration**. The consideration constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, section 548 of the Bankruptcy Code, the Uniform Voidable Transactions Act or any similar state or federal law), and fair consideration under the Bankruptcy Code.  The APA represents a fair and reasonable offer to purchase the Purchased Assets and assume or acquire liabilities under the circumstances of the Debtors' cases. Approval of the APA and the consummation of the Transactions are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

Z.      **Assumption and Assignment of the Purchased Contracts**. The assumption and assignment of the Purchased Contracts pursuant to the terms of this Order are integral to the APA, are in the best interest of the Debtors, their estates, their creditors, and all other parties in interests, and represent the reasonable exercise of sound and prudent business judgment by the Debtors.

AA.     The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Purchased Contracts. The Seller and Purchaser, as applicable under the APA, have (i) cured and/or provided adequate assurance of cure of any default existing prior to Closing under all the Purchased Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any counterparty for

actual pecuniary loss to such party resulting from a default prior to Closing under any of the Purchased Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.

BB.    **Compliance with Bankruptcy Code**. The consummation of the Transactions is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including without limitation sections 105(a), 363(b), 363(f), 363(m) and 365 of the Bankruptcy Code and all the applicable requirements of such sections have been or will be complied with in respect of the Transactions as of the Closing.

CC.    **Transactions Not a Sub Rosa Plan**. The sale of the Purchased Assets outside of a plan of reorganization pursuant to the APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors. The Transactions do not constitute a sub rosa chapter 11 plan.

DD.    **Time is of the Essence**. Time is of the essence in consummating the Transactions. In order to maximize the value of the Debtors' assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the APA. Specifically, the Transactions must be consummated promptly in order to preserve the viability of the business subject to the Sale as a going concern, to maximize the value to the Debtors, their estates, their creditors, and all other parties in interest. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rule 6004.

EE.    The Transactions contemplated by the APA are in the best interests of the Debtors and their estates, creditors, interest holders and all other parties in interest herein; and it is therefore,

**ORDERED, ADJUDGED AND DECREED THAT:**

1.    **Relief Granted**. The relief requested in the Motion is hereby granted as set forth herein.

2.      **Objections Overruled**. All objections and responses to the Motion, entry of this Order or the relief granted herein (including all reservation of rights included therein) that have not been overruled, withdrawn, waived, settled, or otherwise resolved, are hereby overruled and denied on the merits with prejudice.

3.      **Notice**. Notice of the Motion, the APA, the Cure Claims, if any, the Transactions, the Sale Hearing and the Sale was fair and equitable under the circumstances, sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006 and 9007 and Local Rules 2002-1, 6004-1 and 6006-1.

4.      **Approval**. The APA (and all ancillary documents related thereto) and the Transactions are hereby approved and authorized in all respects and shall be deemed in full force and effect, and the Debtors are hereby authorized and empowered and directed to enter into, and to perform their obligations under, the APA and to execute and perform such agreements or documents, and take such other actions as are necessary or desirable to effectuate the terms of the APA.

5.      **Good Faith Purchaser**. Purchaser is a good faith purchaser of the Purchased Assets and is hereby granted and is entitled to all the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code. Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified, or vacated by a subsequent order of the Bankruptcy Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of any sale, transfer, or assignment under the APA or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to Closing), and notwithstanding any reversal, modification, or

vacatur, any sale, transfer, or assignment shall be governed in all respects by the original provisions of this Order and the APA, as the case may be.

6. **Section 363(n) of the Bankruptcy Code**. There is no evidence before the Court suggesting that the Sale and the other Transactions approved by this Order are or will be subject to avoidance or any recovery or damages pursuant to section 363(n) or any other section of the Bankruptcy Code.

7. **Authorization of Performance by the Debtors**. The Debtors are authorized to fully perform under, consummate, and implement the terms of the APA, together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the APA, this Order, and the Transactions, including, without limitation, deeds, assignments, stock powers or other instruments of transfer, and to take all further actions as may reasonably be requested by Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to Purchaser any or all of the Purchased Assets, as may be necessary or appropriate to the performance of Seller's obligations as contemplated by the APA, without any further corporate action or orders of the Bankruptcy Court.

8. The Debtors are authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units, any and all certificates, agreements, or amendments necessary or appropriate to effectuate the Transactions contemplated by the APA, any related agreements and this Order, including amended and restated certificates or articles of incorporation, by-laws, or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of

the Debtors may determine are necessary or appropriate. The execution of any such document or
the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority
of such person to so act.

9.      The Debtors and Purchaser shall have no obligation to consummate the
Transactions until all conditions precedent to their obligations to proceed have been met, satisfied
or validly waived in accordance with the terms of the APA.

10.      **Valid Transfer**. Effective upon Closing, the sale of the Purchased Assets
by the Debtors to Purchaser shall constitute a legal, valid and effective transfer of the Purchased
Assets and vests Purchaser with all right, title, and interest of the Debtors in and to the Purchased
Assets, free and clear of all Liens, claims, rights, interests and encumbrances to the fullest extent
permitted by section 363(f) of the Bankruptcy Code.

11.      **Free and Clear**. Except to the extent specifically provided in the APA,
upon Closing, the Debtors shall be, and hereby are, authorized, empowered, and directed, pursuant
to sections 105, 363(b) and 363(f) of the Bankruptcy Code, to sell the Purchased Assets to
Purchaser. Except to the extent specifically provided in the APA, and to the fullest extent permitted
by section 363(f) of the Bankruptcy Code, the sale of the Purchased Assets pursuant to the APA
vests Purchaser with all right, title and interest of the Debtors to such Purchased Assets free and
clear of any and all Liens, claims, rights, interests encumbrances and other liabilities of any kind
or nature whatsoever, whether contingent, unliquidated, unmatured, imposed by agreement,
understanding, law, equity, or otherwise, with all such Liens to attach only to the proceeds of the
sale and assignment of such Purchased Assets with the same priority, validity, force, and effect as
they now have in or against such Purchased Assets. The Motion provided sufficient notice as to

the sale of the Purchased Assets free and clear of all Liens, claims, rights, interests and encumbrances in accordance with Local Rules 2002-1, 6004-1 and 6006-1.

12.    Upon Closing, if any person or entity that has filed financing statements or *lis pendens*, or filed any other documents or agreements evidencing interests or claims against or in the Purchased Assets shall not have delivered to the Debtors prior to Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all interests of claims that the person or entity has with respect to the Purchased Assets, or otherwise, then Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, will constitute conclusive evidence of the release of all interests of claims in the Purchased Assets of any kind or nature.

13.    The provisions of this Order authorizing the sale of the Purchased Assets free and clear of Liens, shall be self-executing, and the Debtors and Purchaser shall not be required to execute or file releases, termination statements, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.

14.    As of and after Closing: (a) each of the Debtors' creditors is hereby authorized to execute such documents and take all other actions as may be necessary to release its Interests or Claims in the Purchased Assets (if any) as such Interests or Claims may have been recorded or may otherwise exist; and (b) any Purchased Asset that may be subject to a statutory lien will be turned over and such liens will attach to the net cash proceeds of the Sale in the same priority they currently enjoy with respect to the Purchased Assets.

15.    **<u>Direction to Surrender Possession or Control</u>**. All persons or entities, presently or on or after the Closing Date, in possession or control of some or all of the Purchased

14

Assets, are directed to surrender possession or control of the Purchased Assets to Purchaser on the Closing Date or at such time thereafter as Purchaser may request.

16.    **Transfer of Title and Interests**. All of the Debtors' interests in the Purchased Assets to be acquired by Purchaser under the APA shall be, upon Closing, transferred to and vested in Purchaser pursuant to the terms of the APA. Upon Closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Purchased Assets to Purchaser pursuant to the APA.

17.    **Fair Consideration**. The consideration provided by Purchaser to the Debtors pursuant to the APA for the purchase of the Purchased Assets constitutes reasonably equivalent value and fair consideration under, and the Transactions shall not constitute a fraudulent transfer or fraudulent conveyance under, the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Voidable Transfer Act, or the Uniform Fraudulent Conveyance Act.

18.    **No Successor Liability**. To the fullest extent permitted by section 363(f) of the Bankruptcy Code, Purchaser and its respective affiliates, predecessors, successors, assigns, members, partners, officers, directors, principals, and shareholders (or equivalent) are not and shall not be (a) deemed a "successor" in any respect to the Debtors or their estates as a result of the consummation of the Transactions contemplated by the APA or any other event occurring in the Chapter 11 Cases under any theory of law or equity, (b) deemed to have, de facto or otherwise, merged, or consolidated with or into the Debtors or their estates, (c) deemed to have a common identity with the Debtors, (d) deemed to have a continuity of enterprise with the Debtors, or (e) deemed to be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.  To the fullest extent permitted by section 363(f) of the Bankruptcy Code, Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation

of any of the Debtors and/or their estates including successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability except as otherwise expressly provided in the APA, and the Motion contains sufficient notice of such limitation in accordance with Local Rule 6004-1. To the fullest extent permitted by section 363(f) of the Bankruptcy Code, and except as otherwise expressly provided in this Order and/or the APA, the transfer of the Purchased Assets to Purchaser under the APA shall not result in Purchaser or its respective affiliates, predecessors, successors, assigns, members, partners, officers, directors, principals, and shareholders (or equivalent): (i) having any liability or responsibility for any claim against the Debtors or against an insider of the Debtors (including, without limitation, Excluded Liabilities), (ii) having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, recoupment or otherwise, directly or indirectly, any Liens, or (iii) having any liability or responsibility to the Debtors except as is expressly set forth in the APA.

19. **Assumption and Assignment of Purchased Contracts and the Assumed Lease**. The Debtors are authorized and directed at Closing to assume and assign each of the Purchased Contracts to Purchaser pursuant to sections 105(a) and 365 of the Bankruptcy Code and to execute and deliver to Purchaser such documents or other instruments as may be necessary to assign and transfer the Purchased Contracts to Purchaser. The payment of the applicable Cure Costs (if any) shall: (a) effect a cure of all defaults existing thereunder as of Closing; (b) compensate for any actual pecuniary loss to such non-Debtor counterparty resulting from such default; and (c) together with the assumption of the Purchased Contracts by the Debtors and the assignment of the Purchased Contracts to Purchaser, constitute adequate assurance of future performance thereof.

20.     Pursuant to section 365(f) of the Bankruptcy Code, subject to the payment of the applicable Cure Costs, if any, the Purchased Contracts shall be assigned and transferred to and remain in full force and effect for the benefit of, Purchaser notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer. Except as otherwise provided in section 365(c) of the Bankruptcy Code, any provisions in any Purchased Contract that prohibit or condition the assignment of such Purchased Contract to Purchaser or allow the counterparty to such Purchased Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Purchased Contract to Purchaser, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Purchaser of the Purchased Contracts have been satisfied. Upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Purchased Contracts, and such Purchased Contracts shall remain in full force and effect for the benefit of Purchaser. Each non-Debtor counterparty to the Purchased Contracts shall be forever barred, estopped and permanently enjoined from (a) asserting against the Debtors or Purchaser or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of Closing or arising by reason of Closing, including any breach related to or arising out of change-in-control provisions in such Purchased Contract, or any purported written or oral modification to the Purchased Contract and (b) asserting against Purchaser (or its property, including the Purchased Assets) any claim, counterclaim, defense, breach, condition, setoff asserted, or assertable against the Debtors existing as of Closing or arising by reason of the Closing.

21.    Upon Closing and the payment of the relevant Cure Costs, if any, Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Purchased Contracts, and the Debtors shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Purchased Contracts. There shall be no rent accelerations, assignment fees, increases or any other fees charged to Purchaser or the Debtors as a result of the assumption and assignment of the Purchased Contracts. The failure of the Debtors or Purchaser to enforce at any time one or more terms or conditions of any Purchased Contract shall not be a waiver of such terms or conditions or of the right of the Debtors or Purchaser, as the case may be, to enforce every term and condition of such Purchased Contract. The validity of the assumption and assignment of any Purchased Contract shall not be affected by an existing dispute between the Debtors and any counterparty to such Purchased Contract.

22.    All defaults or other obligations of the Debtors under the Purchased Contracts arising or accruing after the deadline for objecting to the Motion and prior to Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured on Closing, or as soon thereafter as reasonably practicable.

23.    The language in this paragraph 23 resolves the *Limited Objection of the Marine Policy Underwriters to the Motion* [Docket No. 510]. For the avoidance of doubt, (i) in connection with the Sale, the Debtors are not assuming and assigning that certain Marine Open Commodity Policy MERC23-R30C (as renewed and continued) issued by the Continental Insurance Company and applicable affiliates as the lead insurer, to the debtor-insured, Mercon B.V., for the policy term of November 1, 2023, until November 1, 2024, including all attachments (the "**Policy**"), (ii) the Policy is an Excluded Asset under the Asset Purchase Agreement and the

Sale Order, (iii) no right, title, or interest in the Policy or its proceeds is being transferred to the Purchaser in connection with the Sale or otherwise, and (iv) the Purchaser shall have no right to assert claims or exercise any other rights as an insured under the Policy.

24.     **Releases**. The Releases are approved and authorized in all respects and shall be deemed in full force and effect.

25.     **Fees and Expenses**. Any amounts payable or otherwise reimbursable by the Debtors under the APA or any of the documents delivered by the Debtors in connection with the APA, including without limitation, any allowed claims for breach thereof, expense reimbursement for documented outside counsel and/or advisor fees, amounts relating to the indemnity provided by the Debtors under the APA, if any, and the purchase price adjustment amount, if any, shall be paid in the manner provided in the APA without further order of the Bankruptcy Court, shall be an allowed administrative claim in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, and shall not be discharged, modified, or otherwise affected by any reorganization plan for the Debtors, except by written agreement with Purchaser or its successors or assigns (such agreement to be provided in Purchaser's or its successors' or assigns' respective sole discretion.

26.     **Amendments**. Subject to the terms of this Order, the APA and any related agreements may be waived, modified, amended, or supplemented in immaterial manner by agreement of Seller and Purchaser, without further action or order of the Bankruptcy Court; provided, however, that any material alteration, waiver, modification, amendment or supplement shall require the Bankruptcy Court's approval.

27.     **Failure to Specify Provisions**. The failure specifically to include any particular provisions of the APA or any related agreements in this Order shall not diminish or

impair the effectiveness of such provision, it being the intent of the Bankruptcy Court, the Debtors

and Purchaser that the APA and any related agreements are authorized and approved in their

entirety with such amendments thereto as may be made by the parties in accordance with this

Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

28.    **Binding Order**. This Order and the APA shall be binding upon and govern

the acts of all persons and entities, including, without limitation, the Debtors, Seller, Purchaser,

and their respective successors and permitted assigns, including, without limitation, any chapter

11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7

case if this case is converted from chapter 11, all creditors of any Debtor (whether known or

unknown), filing agents, filing officers, title agents, recording agencies, governmental

departments, secretaries of state, federal, state, and local officials, and all other persons and entities

who may be required by operation of law, the duties of their office or contract, to accept, file,

register, or otherwise record or release any documents or instruments or who may be required to

report or insure any title in or to the Purchased Assets. The terms and provisions of the APA and

this Order will inure to the benefit of the Debtors, their bankruptcy estates, their creditors,

Purchaser and all agents, representatives, affiliates, and permitted successors and assigns of

Purchaser, and any other affected third parties, including all persons asserting any Interests or

Claims in the Purchased Assets to be sold to Purchaser pursuant to the APA, notwithstanding any

subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any

chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms

and provisions likewise will be binding.

29.    **No Stay of Order**. The provisions of Bankruptcy Rules 6004 and 6006

staying the effectiveness of this Order for fourteen (14) days are hereby waived, and this Order

shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. Time is of the essence in closing the Transactions referenced herein, and the Debtors and Purchaser intend to close the Transactions as soon as practicable.

30.     **Lift of Automatic Stay**. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Bankruptcy Court, to allow Purchaser to deliver any notice provided for in the APA and allow Purchaser to take any and all actions permitted under the APA, including, without limitation, terminating the APA in accordance with the terms and conditions thereof.

31.     **Retention of Jurisdiction**. The Bankruptcy Court shall retain exclusive jurisdiction to (a) interpret, implement and enforce the terms and provisions of this Order and the APA, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, in all respects, (b) decide any disputes concerning this Order and the APA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the APA and this Order including, but not limited to, the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature and extent of the Purchased Assets and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Liens and (c) enforce any injunctions set forth herein.

32.     **Subsequent Plan Provisions**. Nothing contained in any chapter 11 plan confirmed in the Debtors' cases or any order confirming any such plan or any other order in the Debtors' cases (including any order entered after any conversion of these cases into cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of

the APA or this Order and, to the extent of any such conflict, the terms of this Order and the APA shall control.

33.     **Further Assurances**. From time to time, as and when requested by the other, the Debtors and Purchaser, as the case may be, shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Transactions, including, such actions as may be necessary to vest, perfect or confirm, or record or otherwise, in Purchaser its right, title and interest in and to the Purchased Assets.

34.     **Governing Terms**. To the extent this Order is inconsistent with any prior order or pleading in these Chapter 11 Cases, or the terms of the APA (including all ancillary documents executed in connection with such agreements), this Order shall govern.

35.     **Not a Bulk Sale**. The APA and the Sale contemplated hereunder shall not be subject to any bulk sales laws or any similar law of any state or jurisdiction.

Dated:  New York, New York
        May 30, 2024

                              /s/ **Michael E. Wiles**
                              HONORABLE MICHAEL E. WILES
                              UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

Asset Purchase Agreement

*EXECUTION VERSION*

# ASSET PURCHASE AGREEMENT

by and among

StoneX Commodity Solutions LLC,

as Purchaser,

and

Mercon Coffee Corporation

as Seller,

dated as of April 12, 2024

## TABLE OF CONTENTS

**Page**

I.    DEFINITIONS...................................................................................................1

  1.1    Certain Definitions............................................................................1

  1.2    Other Definitional and Interpretive Matters.....................................8

II.   PURCHASE AND SALE ................................................................................9

  2.1    Purchase and Sale of Assets..............................................................9

  2.2    Excluded Assets...............................................................................11

  2.3    Assumption of Liabilities.................................................................12

  2.4    Excluded Liabilities.........................................................................13

  2.5    Purchased Contracts; Cure Amounts................................................14

  2.6    Non-Assignment of Assets...............................................................15

  2.7    Further Conveyances and Assumptions............................................16

  2.8    Wrong Pockets.................................................................................16

III.  CONSIDERATION ......................................................................................17

  3.1    Consideration...................................................................................17

  3.2    Purchase Price Deposit; Purchaser Parent Guaranty ......................19

  3.3    Payment of Purchase Price...............................................................20

IV.   CLOSING AND TERMINATION ...............................................................20

  4.1    Closing Date.....................................................................................20

  4.2    Deliveries by Seller .........................................................................21

  4.3    Deliveries by Purchaser....................................................................21

  4.4    Termination of Agreement ...............................................................22

  4.5    Procedure Upon Termination ...........................................................23

  4.6    Effect of Termination .......................................................................23

  4.7    Withholding......................................................................................24

V.    REPRESENTATIONS AND WARRANTIES OF SELLER ........................24

  5.1    Organization and Good Standing......................................................24

  5.2    Authorization of Agreement ............................................................25

  5.3    No Conflicts; Required Consents .....................................................25

  5.4    Title to Purchased Assets.................................................................26

  5.5    Material Contracts ...........................................................................26

  5.6    Litigation ........................................................................................26

94065242.11

## TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| | 5.7 | Compliance with Laws | 27 |
| | 5.8 | Company Plans | 27 |
| | 5.9 | Labor Matters | 27 |
| | 5.10 | Broker Fee | 27 |
| | 5.11 | Taxes | 28 |
| | 5.12 | Assumed Lease | 28 |
| | 5.13 | Compliance | 28 |
| | 5.14 | Financial Statements | 28 |
| | 5.15 | No Other Representations or Warranties | 29 |
| **VI.** | **REPRESENTATIONS AND WARRANTIES OF PURCHASER** | | **29** |
| | 6.1 | Organization and Good Standing | 29 |
| | 6.2 | Authorization of Agreement | 29 |
| | 6.3 | Consents and Approvals; No Violations | 30 |
| | 6.4 | Financial Capability; Solvency | 30 |
| | 6.5 | Broker Fee | 30 |
| | 6.6 | Condition of the Purchased Assets | 30 |
| | 6.7 | Exclusivity of Representations and Warranties | 31 |
| **VII.** | **BANKRUPTCY COURT MATTERS** | | **31** |
| | 7.1 | Submission for Bankruptcy Court Approval | 31 |
| | 7.2 | Bankruptcy Process | 31 |
| **VIII.** | **COVENANTS** | | **32** |
| | 8.1 | Access to Information | 32 |
| | 8.2 | Actions Pending the Closing | 33 |
| | 8.3 | Consents | 34 |
| | 8.4 | Commercially Reasonable Efforts; Consents to Assignment | 35 |
| | 8.5 | Publicity | 36 |
| | 8.6 | Confidentiality | 37 |
| | 8.7 | Employee Matters | 37 |
| | 8.8 | Releases | 38 |
| | 8.9 | Bulk Transfer Laws | 39 |
| | 8.10 | Notification of Certain Matters | 39 |

94065242.11

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 8.11 | Sale Free and Clear | 39 |
| 8.12 | Use of Seller Intellectual Property | 39 |
| 8.13 | Access; Enforcement; Record Retention | 40 |
| 8.14 | Insurance Matters | 40 |
| **IX.** | **CONDITIONS TO CLOSING** | **41** |
| 9.1 | Conditions Precedent to Obligations of Purchaser | 41 |
| 9.2 | Conditions Precedent to Obligations of Seller | 42 |
| 9.3 | Conditions Precedent to Obligations of Purchaser and Seller | 42 |
| 9.4 | Frustration of Closing Conditions | 43 |
| **X.** | **TAXES** | **43** |
| 10.1 | Transfer Taxes | 43 |
| 10.2 | Purchase Price Allocation | 43 |
| 10.3 | Post-Closing Tax Covenants | 44 |
| 10.4 | Property Tax Apportionment | 44 |
| **XI.** | **GENERAL GOVERNING PROVISIONS** | **44** |
| 11.1 | No Survival of Representations and Warranties | 44 |
| 11.2 | Expenses | 44 |
| 11.3 | Injunctive Relief | 44 |
| 11.4 | Governing Law | 45 |
| 11.5 | Submission to Jurisdiction; Consent to Service of Process | 45 |
| 11.6 | Waiver of Right to Trial by Jury | 45 |
| 11.7 | Entire Agreement; Amendments and Waivers | 46 |
| 11.8 | Notices | 46 |
| 11.9 | Severability | 47 |
| 11.10 | Assignment | 47 |
| 11.11 | Non-Recourse | 47 |
| 11.12 | Mutual Drafting | 48 |
| 11.13 | Counterparts; Facsimile and Electronic Signatures | 48 |
| 11.14 | Seller Disclosure Schedules | 48 |
| 11.15 | Nonassertion of Attorney-Client Privilege | 48 |
| 11.16 | Limitations Under Applicable Law | 49 |

iii

## TABLE OF CONTENTS
(continued)

**Page**

**Exhibits**
Exhibit A                        Escrow Agreement

**Schedules**
Schedule 1.1(a)(ii)              Seller's Knowledge Parties
Schedule 2.1(b)(i)               Purchased Contracts
Schedule 2.1(b)(ii)              Acquired Inventory
Schedule 2.1(b)(iii)             Furnishings and Equipment
Schedule 2.1(b)(iv)              Leased Real Property
Schedule 2.1(b)(v)               Acquired Intellectual Property
Schedule 2.3(b)                  Cure Costs
Schedule 2.5(a)                  Available Contracts
Schedule 5.3(b)                  Antitrust Regulations
Schedule 5.9(b)(i)               Transferring Business Employees
Schedule 5.9(b)(ii)              Consultants and Independent Contractors
Schedule 8.2                     Actions Pending Closing

94065242.11

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of April 12, 2024 (the "Effective Date"), is by and among StoneX Commodity Solutions LLC, a Delaware limited liability company ("Purchaser"), and Mercon Coffee Corporation, a New York corporation ("Seller"). Certain capitalized terms used in this Agreement that are not otherwise defined are defined in Article I.

A.     WHEREAS, Seller is a debtor and debtor-in-possession under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") that filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") Case No. 23-11945-mew (the "Bankruptcy Case").

B.     WHEREAS, Seller is engaged in, and holds assets and liabilities relating to, the Business.

C.     WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller, the Purchased Assets and the Assumed Liabilities in a sale authorized by the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and subject to the terms and conditions set forth in this Agreement and the Sale Order, all as more specifically provided herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree:

## I.     DEFINITIONS

1.1     Certain Definitions. For purposes of this Agreement, each of the following terms, when used herein with initial capital letters, has the meaning specified in this Section 1.1:

"Accounting Principles" means the principles, policies, procedures, categorizations, definitions, methods, practices, judgments, classifications, estimation methodologies and techniques that were consistently employed by Seller, on or prior to the Effective Date, to prepare its consolidated financial statements, which are maintained in accordance with IFRS, as consistently applied by Seller.

"Accrued PTO" means obligations and Liabilities with respect to accrued but unused paid time off, including any vacation and holiday pay hours and sick leave.

"Affiliate" means, with respect to any specified Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; provided, however, that for the purposes of this Agreement Seller shall not be deemed an Affiliate of Purchaser (and vice versa).

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, of a material portion of the Purchased Assets or all or substantially all of the equity interests of Seller or any Subsidiary or parent company owning any Purchased Assets, in one going-concern transaction or a series of going-concern transactions with one or more Persons other than Purchaser or its Affiliates; provided, that an Alternative Transaction shall exclude the sale, transfer or other disposition, directly or indirectly, of any entity (or part thereof) which directly or indirectly owns any securities issued by Seller, whether through an asset sale, share sale, merger, amalgamation, or other transaction, so long as such entity does not own any Purchased Assets.

"Ancillary Agreements" means, collectively, the agreements, instruments or certificates to be executed in connection with the Transactions, including the Escrow Agreement, the Bills of Sale and the Assignment and Assumption Agreements.

"Anti-Bribery Laws" means the U.S. Foreign Corrupt Practices Act of 1977.

"Antitrust Regulations" mean the consents, authorizations and approvals required to be obtained in connection with the consummation of the Closing from any Governmental Body identified on Schedule 5.3(b).

"Business" means the United States specialty coffee business operated by Seller.

"Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

"Business Employee" means each employee of Seller in the operation of the Business.

"Cash and Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Code" means the Internal Revenue Code of 1986.

"Company Plan" means each employee benefit plan and each other material equity incentive, severance, termination indemnity, redundancy pay, employment, company stock plan, change-in-control, retention, fringe benefit, bonus, thirteenth month, incentive, savings, retirement, deferred compensation, disability or holiday pay plan, agreement, arrangement, program, policy or Contract; provided, that any governmental plan or program, including plans or programs requiring the mandatory payment of social insurance taxes or similar contributions to a governmental fund with respect to the wages of an employee, will not be considered a "Company Plan".

"Contract" means any written or oral contract, agreement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, lease, instrument, license, lease, guaranty, mortgage or other legally binding agreement).

2

"Cure Costs" means monetary amounts that must be paid and obligations that otherwise must be satisfied under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption or assignment of any Purchased Contract, as agreed upon by the Parties. Schedule 2.3(b) sets forth the estimated Cure Costs as of the Effective Date.

"Escrow Agent" means CitiBank N.A.

"Escrow Agreement" means that certain escrow agreement dated as of the Effective Date, by and among Seller, Purchaser and the Escrow Agent, attached as Exhibit A.

"Exchange Rates" means the exchange rates published in the Market Data Center for the Exchange Rates: New York Closing Snapshot of the Wall Street Journal website (http://online.wsj.com/mdc/public/page/2_3021-forex.html) on the third Business Day prior to the Closing Date, or if not available, the successor website of the Wall Street Journal.

"Final Cash Amount" means an amount equal to $5,428,886.78.

"Final Order" means an order of the Bankruptcy Court that has not been reversed, modified, or stayed, and as to which the time for appeal has expired, and the deadline for filing any motion or petition for review, rehearing or certiorari has expired, and as to which no appeal, motion or petition for review, rehearing or certiorari is pending.

"Fraud" means, with respect to any Party, an actual and intentional fraud with respect to the making of the representations and warranties expressly set forth in Article V, or Article VI of this Agreement; provided, that such actual and intentional fraud of such Party shall only be deemed to exist if (a) such Party had actual knowledge that the representation and warranty made by such Party was actually breached when made, (b) that such representation and warranty was made with the express intent to induce another Party to rely thereon and take action or refrain from taking action to such other Party's detriment, (c) such reliance and subsequent action or inaction by such other Party was justifiable, and (d) such action or inaction resulted in losses to such other Party. For the avoidance of doubt, "Fraud" does not include constructive fraud, equitable fraud, promissory fraud or negligent misrepresentation or omission, or any form of fraud based on recklessness or negligence.

"Government Official" includes: (a) officers, employees or representatives of any national, regional, local or other Governmental Body; (b) any private person acting in an official capacity for or on behalf of any Governmental Body (such as a consultant retained by a Governmental Body); (c) candidates for political office at any level; (d) political parties and their officials; and (e) officers, employees or representatives of public international organizations (such as the United Nations, World Bank and International Monetary Fund).

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction, including the Bankruptcy Court.

3

"IFRS" means the accounting principles issued by the International Financial Reporting Standards for Small and Medium-Sized Entities.

"Intellectual Property" means all intellectual property, including (a) patents and patent applications, continuations, divisions, provisionals, renewals, extensions, continuations and continuations-in-part, reissues and reexaminations, (b) trademarks, service marks, trade dress, logos, corporate names, domain names, social media accounts, and trade names, together with the goodwill associated with any of the foregoing, and all applications and registrations therefor, (c) copyrights, copyrightable works, rights in databases, data collections, copyright registrations and copyright applications and corresponding rights in works of authorship, (d) inventions (whether patentable or unpatentable and whether or not reduced to practice), know how, technology, technical data, trade secrets, confidential business information, manufacturing and production processes and techniques, research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, distributor, reseller and supplier lists and information, correspondence, records, and other documentation, and other proprietary information of every kind, (e) Software in any form, including internet websites, web content and links, source code, object code, firmware, algorithms, files, records, technical drawings and related documentation, data and manuals, and mobile applications, and (f) rights of publicity and personality.

"Inventory Adjustment" means an amount in U.S. dollars equal to the product of (a) the number of pounds of Missing Inventory and (b) 1.50.

"KC Lease Agreement" means that certain Commercial and Industrial Lease Agreement, dated as of February 25, 2022, by and among K-Bell LLC and Seller, relating to the following premises: 3125 Bell Street, Kansas City, Missouri.

"Knowledge of Seller" or "Seller's Knowledge" means the actual knowledge, after reasonable inquiry, as of the applicable date, of (i) those Persons identified on Schedule 1.1(a)(ii).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation, Order, stipulation or award of any Governmental Body or common law requirement.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private), investigations or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, loss, liability, claim (including "claim" as defined in the Bankruptcy Code), commitment, undertaking, damage, expense, fine, penalty, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, fixed, absolute, contingent, accrued or unaccrued, and whether due or to become due, and whether in contract, tort or otherwise, and including all costs and expenses relating thereto (including all reasonable fees, disbursements and expenses of legal counsel, experts, engineers and consultants and costs of investigation).

"<u>Lien</u>" means any lien (including any inchoate liens, judgment liens, liens imposed by operation of law or contractual liens), encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, sublease, charge, option, right of first offer or first refusal, right of use or possession, restriction, easement, servitude, restrictive covenant, encroachment or encumbrance or any other similar encumbrance or restriction, whether imposed by Law, Contract or otherwise, whether or not any of the above arose, accrued, or relate to any time periods before or after the filing of the Bankruptcy Cases and including any "Lien" as defined in the Bankruptcy Code.

"<u>Order</u>" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of, or entered, issued, made or rendered by, a Governmental Body.

"<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day-to-day operations of the Business consistent with past practice (taking into account the commencement of the Bankruptcy Cases and any Orders of the Bankruptcy Court).

"<u>Organizational Documents</u>" means (a) with respect to a corporation, the certificate or articles of incorporation and bylaws; (b) with respect to any other entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of such entity, and the limited liability company agreement, agreement of limited partnership, trust agreement or similar agreement; and (c) any stockholders, shareholders, equity holders, registration rights, voting or other similar agreement.

"<u>Party</u>" or "<u>Parties</u>" means Purchaser and Seller, as the case may be.

"<u>Permits</u>" means all licenses, permits, franchises, certificates, rights, registrations, approvals, authorizations, consents, waivers, exemptions, releases, variances, certificates of authority, accreditations, or Orders issued by any Governmental Body.

"<u>Permitted Exception</u>" means (i) Liens for utilities and current Taxes not yet due and payable or being contested in good faith, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Purchased Assets, (iii) zoning regulations and other Laws affecting the Leased Real Property which are imposed by any Governmental Body having jurisdiction over such Leased Real Property (but excluding violations thereof), (iv) mechanic's, materialman's and similar statutory liens for sums incurred in the Ordinary Course of Business not yet due and payable, (v) with respect to the Leased Real Property, (A) the terms, conditions, and provisions of the Assumed Lease, (B) any Lien or other matter affecting title to the fee estate underlying such Leased Real Property that does not materially affect the permitted use of the Leased Real Property, (C) Liens in favor of lessors under the Assumed Lease, or encumbering the interests of such lessors (or other holders of superior interests), and (D) any right, title or interest of a lessor, sublessor or licensor under the Assumed Lease, (vi) such other Liens or title exceptions which do not, individually or in the aggregate, have a material effect on the operation of the Purchased Assets, and (vii) any Liens that will be removed or released by operation of the Sale Order.

"<u>Person</u>" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"<u>Purchaser Material Adverse Effect</u>" means any event, change, effect, development, condition, state of facts or occurrence (collectively, a "<u>Change</u>") which has had or would reasonably be expected to have, individually or when considered together with any other Change, a material adverse effect on the ability of Purchaser to consummate the Transactions prior to the Termination Date, or materially delay the ability of Purchaser to perform its obligations under this Agreement.

"<u>Purchaser Parent</u>" means StoneX Group Inc., a Delaware corporation.

"<u>Purchaser Parent Guaranty</u>" means that certain guaranty delivered by Purchaser Parent (as guarantor) to Seller (as beneficiary) dated as of the Effective Date.

"<u>Representative</u>" means, with respect to any Person, any and all of its directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents.

"<u>Sale Hearing</u>" means the hearing conducted by the Bankruptcy Court to approve the Transactions.

"<u>Sale Order</u>" means an order entered by the Bankruptcy Court, pursuant to Sections 363 and 365 of the Bankruptcy Code, authorizing and approving, among other things, (a) the sale of the Purchased Assets, (b) the assumption of the Assumed Liabilities by Purchaser, and (c) the assumption and assignment of the Purchased Contracts, in accordance with the terms and conditions of this Agreement, in form and substance reasonably agreeable to the Parties.

"<u>Seattle Lease Agreement</u>" means that certain Lease Agreement, dated as of March 22, 2019, by and among Mead St. Building, LLC and Seller, as amended by the First Amendment to Lease, dated as of August 16, 2023, relating to the following premises: Mead Street Building Suite #204/208, Seattle, WA 98108.

"<u>Seller Material Adverse Effect</u>" means any Change that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, financial condition or results of operations of the Business, including the Purchased Assets and Assumed Liabilities, taken as a whole, or would adversely affect the ability of Seller to execute or deliver this Agreement, to perform any of their obligations under this Agreement or to consummate any of the Transactions prior to the Termination Date; <u>provided</u>, that, none of the following, alone or in combination, will be deemed to constitute, nor will any of the following (including the effect of any of the following) be taken into account in determining whether there has been or will be, a "Seller Material Adverse Effect": (a) the general conditions and trends in the industries or businesses in which the Business is operated or in which any of the Purchased Assets operate, including competition in geographic or product areas, (b) general political, economic, financial or capital markets conditions (including interest rates, exchange rates, commodity prices, costs of goods, tariffs, trade wars and credit markets), (c) any act of civil unrest, war, sabotage, cyberattacks, terrorism or military actions, or the escalation thereof, including an outbreak or

6

escalation of hostilities involving the United States or any other Governmental Body or the declaration by the United States or any other Governmental Body of a national emergency or war, (d) any conditions resulting from natural or manmade disasters, weather conditions, epidemics, pandemics or disease outbreaks (including COVID-19) or public health emergencies (as declared by the World Health Organization, the Health and Human Services Secretary of the United States, Public Health England or the European Centre for Disease Prevention and Control), or other acts of God, or any response of any Governmental Body to any of the foregoing or any worsening of any of the foregoing, (e) compliance by Seller with applicable Law or with their covenants and agreements contained in this Agreement (including the impact thereof on the relationships, contractual or otherwise, of the Business or Purchased Assets with any third parties), (f) the failure of the financial or operating performance of the Purchased Assets to meet internal or published, Seller's or analyst projections, forecasts, estimates, predictions or budgets for any period (<u>provided</u>, that the underlying causes thereof, to the extent not otherwise excluded by this definition, may be deemed to contribute to a Seller Material Adverse Effect; <u>provided</u>, <u>further</u>, that this clause (f) shall not be construed as implying that Seller is making any representation or warranty hereunder with respect to any internal, Seller's or analyst projections, forecasts or budgets), (g) any action taken or omitted to be taken by or at the written request or with the written consent of Purchaser or that is required or permitted by this Agreement, (h) any actions taken by Purchaser or any of its Affiliates (other than those expressly permitted to be taken hereunder), (i) the execution, announcement or pendency of this Agreement and the Ancillary Agreements or the terms hereof or thereof (including the identity of Purchaser), compliance with or performance under the terms hereof or thereof or the announcement, pendency or consummation of the Transactions, including the impact thereof on the relationships, contractual or otherwise, of the Business with employees, labor unions, works councils, financing sources, customers, suppliers, partners or other business relationships, (j) changes in any Laws (including COVID-19 Measures) or Accounting Principles or standards or any authoritative interpretations thereof, (k) any Change resulting from the public reporting of the Bankruptcy Cases, or (l) any effect resulting from (i) the commencement or filing of the Bankruptcy Cases, (ii) any filing by a Subsidiary of Seller that is not a party to this Agreement under a similar foreign insolvency regime, or (iii) Seller's inability to pay certain prepetition obligations as a result of the commencement of the Bankruptcy Cases; <u>provided</u>, <u>however</u>, that any Change resulting from clauses (a), (b), (d) or (j) immediately above shall be taken into account in determining whether a Seller Material Adverse Effect has occurred or would reasonably be expected to occur to the extent (and only to the extent) that such Change has a disproportionate effect on the Business and the Purchased Assets, taken as a whole, compared to other participants in the industries and jurisdictions in which the Business and the Purchased Assets operate.

"<u>Software</u>" means all computer software and code, including assemblers, applets, compilers, source code, object code, development tools, design tools, user interfaces, databases and data, in any form or format, however fixed, including any related documentation.

"<u>Subsidiary</u>" means each corporation or other Person in which a Person owns or controls, directly or indirectly, capital stock or other equity interests representing more than 50% of the outstanding voting stock or other equity interests.

"<u>Tax Authority</u>" means any government, agency, or instrumentality thereof, charged with the administration of any Law or regulation relating to Taxes.

"<u>Tax Returns</u>" means any return, declaration, report, claim for refund or information return or statement relating to Taxes required to be filed with any Governmental Body, including any schedule or attachment thereto and any amendment thereof.

"<u>Taxes</u>" means any tax of any kind, including any federal, state, local or foreign income, profits, license, severance, occupation, windfall profits, capital gains, capital stock, transfer, registration, social security (or similar), production, franchise, gross receipts, payroll, sales, employment, use, property, excise, value-added, estimated, stamp, alternative or add-on minimum, environmental or withholding tax, and any other duty, assessment or governmental charge, together with all interest and penalties imposed with respect to such amounts.

"<u>Transactions</u>" means the transactions contemplated by this Agreement.

"<u>Trust Account</u>" means the escrow account maintained by CitiBank N.A, pursuant to that Escrow Agreement, dated as of the date hereof, by and among Seller, Purchaser and CitiBank N.A.

"<u>WARN Act</u>" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and all similar state or local Laws.

    1.2    <u>Other Definitional and Interpretive Matters</u>.

Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

    (a)    <u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded, and the words "<u>to</u>" and "<u>until</u>" shall be deemed to exclude the date referred to. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

    (b)    <u>Contracts</u>.  Reference to any Contract means such Contract as amended or modified and in effect from time to time in accordance with its terms.

    (c)    <u>Currency</u>. Any reference in this Agreement to US Dollars or USD$ will mean U.S. dollars.

    (d)    <u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

    (e)    <u>IFRS</u>.  Terms used herein which are defined in IFRS are, unless specifically defined herein, used herein as defined in IFRS.

(f)    <u>Gender and Number</u>.  Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

(g)    <u>Headings</u>.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any Article, Section, Recital, Exhibit or Schedule are to the corresponding Article, Section, Recital, Exhibit or Schedule of or to this Agreement unless otherwise specified.

(h)    <u>Herein</u>.   The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>" and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(i)    <u>Including</u>.  The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(j)    <u>Extent</u>. The word "<u>extent</u>" and the phrase "<u>to the extent</u>" mean the degree to which a subject or other thing extends, and do not simply mean "if".

(k)    <u>Or</u>.  The term "<u>or</u>" is disjunctive and not exclusive.

(l)    <u>Made Available</u>.  The term "<u>made available</u>" and words of similar import refer to documents posted to the electronic datasite hosted by Intralinks at least three (3) Business Days prior to the Effective Date or Closing Date, as applicable.

(m)    <u>Law</u>.   Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect from time to time, including any successor legislation thereto and any rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, replacement or re-enactment of such section or other provision.

(n)    <u>Covenants</u>. Where <u>Article VIII</u> provides that a Party shall perform or comply with an obligation or agreement contained therein, such provision shall not be construed as such Party providing a guarantee or warranty with respect to such performance or compliance but shall be construed as requiring such Party to perform or comply to the extent within its control.

## II.    PURCHASE AND SALE

2.1    <u>Purchase and Sale of Assets</u>.

(a)    On the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Seller will sell, convey, assign, transfer and deliver to Purchaser, and Purchaser or its designee shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens (other than Liens created by Purchaser and Permitted Exceptions).

(b)    The term "Purchased Assets" means, to the extent exclusively relating to the Business, all right, title and interest of Seller in, to or under (but not including any Excluded Asset):

(i)    the Contracts that (A) are set forth on Schedule 2.1(b)(i) (as modified pursuant to Section 2.5), (B) are unexpired as of the Closing Date (including those Contracts that have been previously unrenewed) and (C) have not been rejected (or are not the subject of a notice of rejection or a pending rejection motion) by Seller (the "Purchased Contracts");

(ii)    the inventory as more particularly described on Schedule 2.1(b)(ii) (the "Acquired Inventory");

(iii)    the plant, property and equipment set forth on Schedule 2.1(b)(iii) under the heading "Furnishings and Equipment";

(iv)    all of the leasehold interests of Seller in all real property that is leased to Seller as lessee or tenant identified on Schedule 2.1(b)(iv) (collectively, the "Leased Real Property") pursuant to any lease, sublease, occupancy agreement or other contractual obligation (the "Assumed Lease");

(v)    the Intellectual Property set forth on Schedule 2.1(b)(v) under the heading "Acquired Intellectual Property";

(vi)    all express or implied warranties, guarantees and similar rights related to the Business or the other Purchased Assets, in each case to the extent transferrable in accordance with applicable Law or Contract;

(vii)    all goodwill related to the Purchased Assets;

(viii)    all books, records, files, invoices, and inventory records exclusively relating to the Purchased Assets, in each case to the extent permitted by applicable Laws and in Seller's possession, but excluding (A) such files, books and records or other data or materials as may be required under applicable Law regarding privacy or are prohibited under Law or by Contract from being delivered to Purchaser, and (B) any books and records primarily related to or that are required to realize the benefits of any Excluded Assets; provided, however, that Seller shall have continued access to such books and records as are reasonably required to administer the Bankruptcy Case and Seller may retain copies of any documents;

(ix)    solely to the extent transferrable pursuant to applicable Law and available to Seller as of the date hereof, all personnel records relating to Transferring Business Employees (including, without limitation, peer review materials);

(x)    all insurance proceeds relating to the physical condition of the Purchased Assets, to the extent not expended on the repair or restoration

10

of the Purchased Assets prior to the Closing; provided that such proceeds shall be included as Purchased Assets solely to the extent necessary to make Purchaser whole with respect to any such Purchased Asset and such proceeds shall not be included as Purchased Assets to the extent Purchaser would receive amounts in excess of the value to be paid by Purchaser with respect to any such Purchased Asset at Closing;

(xi)    solely to the extent transferable pursuant to applicable Law, all Permits held by Seller relating to the ownership, development or operation of the Purchased Assets; and

(xii)    all rights, claims, causes of action and credits to the extent exclusively relating to any other Purchased Asset or Assumed Liability, including any such item arising under any guarantee, warranty, indemnity, right of recovery, right of setoff or similar right in favor of Seller exclusively in respect of any Purchased Asset or Assumed Liability.

For the avoidance of doubt (x) any Cash and Cash Equivalents solely to the extent received in connection with a delivery made by Seller on or after February 21, 2024 and prior to Closing pursuant to a Purchased Contract exclusively relating to an identifiable portion of the Acquired Inventory (the "Interim Cash Amount") and (y) all accounts receivable solely to the extent arising in connection with a delivery made by Seller on or after February 21, 2024 and prior to Closing pursuant to a Purchased Contract exclusively relating to an identifiable portion of the Acquired Inventory (the "Accounts Receivable Adjustment") will be treated as dollar-for-dollar deductions to the Purchase Price pursuant to and in accordance with Section 3.1(a)(iii)-(iv).

2.2    Excluded Assets.

(a)    Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey any of the Excluded Assets to Purchaser, and Seller will retain all right, title and interest to, in and under the Excluded Assets.

(b)    The term "Excluded Assets" means:

(i)    all assets excluded from the definition of Purchased Asset pursuant to Section 2.1(b);

(ii)    all Cash and Cash Equivalents of Seller, including the Interim Cash Amount;

(iii)    all Contracts that are not Purchased Contracts;

(iv)    all accounts receivable under Contracts and Purchased Contracts for services rendered prior to the Closing Date, including the Accounts Receivable Adjustment;

(v)    all corporate minute books and related documentation of Seller and all books and records (i) related to Excluded Assets or Excluded

94065242.11

Liabilities, (ii) that cannot be transferred to Purchaser in accordance with applicable Law, (iii) that are required by Seller in connection with the Bankruptcy Case, (iv) related to proposals to acquire the Business or the Purchased Assets or any part thereof by any Person other than Purchaser, including any such books and records that are privileged, or (v) prepared in connection with this Agreement or the Transactions, including any such books and records that are privileged;

(vi)    all insurance policies and binders and all refunds and credits from insurance policies or binders due or to become due with respect to such policies and binders;

(vii)    all rights and obligations under or arising out of all insurance policies relating to Excluded Liabilities;

(viii)    all rights, claims, causes of action and credits relating to any Excluded Liability;

(ix)    all claims, rights and causes of action of Seller arising under this Agreement or any Ancillary Agreement;

(x)    all assets in respect of Taxes, including Tax attributes and refunds or credits of or against Taxes;

(xi)    Tax Returns and other Records relating to Taxes, other than Tax Returns and other Records exclusively related to *ad valorem* property Taxes imposed with respect to the Purchased Assets; and

(xii)    all right, title and interest in and to all equity interests owned by Seller.

2.3    <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will assume or will cause one or more of its designees to assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, only the following Liabilities existing as of the Closing Date and no other Liabilities of Seller or any of their Affiliates (collectively, the "<u>Assumed Liabilities</u>"):

(a)    all Liabilities from the ownership or operation of the Purchased Assets or the Business by Purchaser to the extent such Liabilities arise after the Closing;

(b)    any Assumed Cure Costs that Purchaser is required to pay pursuant to <u>Section 2.5</u>; and

(c)    all Liabilities of Seller under the Purchased Contracts solely to the extent arising from and after the Closing Date, in each case excluding any Liabilities caused solely by the conduct of Seller prior to the Closing which constitute a tort, breach of contract or violation of any Law.

94065242.11

2.4     <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary set forth herein, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Legal Proceeding against, Seller or relating to any Purchased Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising (including on the basis of any Law imposing successor liability), whether existing on the date of initial filing of the Bankruptcy Cases or arising thereafter as a result of any act, omission, or circumstances taking place prior to the initial filing of the Bankruptcy Cases, in each case other than the Assumed Liabilities (all such Liabilities that Purchaser is not assuming being referred to collectively as the "<u>Excluded Liabilities</u>"), including the following:

(a)     any and all Liabilities of Seller under any Contract of Seller that is not a Purchased Contract, whether accruing prior to, at, or after the Closing;

(b)     the sponsorship of and any current or contingent liabilities or obligations at any time arising under, pursuant to, or in connection with any Company Plan or any other benefit or compensation plan, program, policy, Contract, agreement, or arrangement at any time maintained, sponsored or contributed to or required to be contributed to by Seller or any of its Affiliates, or with respect to which Seller or its Affiliates have any current or contingent liability or obligation;

(c)     all Liabilities pursuant to the WARN Act relating to any action or inaction of Seller prior to or upon the Closing;

(d)     all Liabilities arising from events occurring or conditions existing or occurring prior to the Closing Date relating to Business Employees including, without limitation, accrued salaries, wages, Accrued PTO, payroll Taxes, retirement plan payables, and any obligations relating to any Company Plan, liability for any Equal Employment Opportunity Commission claim, wage and hour claim, unemployment compensation claim or workers' compensation claim or personnel policy, or claim for on-the-job injuries;

(e)     all Liabilities with respect to employment, termination of employment, compensation, severance, and employee benefits of any nature owed to any Business Employee or any other current or former officer, manager, director, member, employee, or independent contractor (or any of their respective dependents or beneficiaries) of a Seller or any of its Affiliates relating to or arising out of such individual's employment or service (or the termination of employment or service) with a Seller or any of its Affiliates or any of its predecessors, whether or not such individual becomes a Transferring Business Employee, including, without limitation, any obligation to pay or provide any Business Employee or other current or former officer, manager, director, member, employee, or independent contractor (or any of his or her respective dependents or beneficiaries) of a Seller or any of its Affiliates, any severance or change in control payments, transaction bonuses, retiree benefits, salary, wages, or commissions;

(f)     (i) all Tax Liabilities of Seller, and (ii) all Liabilities for Taxes relating to the Purchased Assets for any taxable period (or portion thereof), ending on or prior to the Closing; and

(g)    all Liabilities or obligations to the extent relating to the ownership, possession, or use of the Excluded Assets, including executory Contracts and real property leases that are not Purchased Contracts, or the ownership, possession, or use of the Purchased Assets to the extent arising prior to the Closing, except to the extent specifically contemplated by Section 2.3.

2.5    Purchased Contracts; Cure Amounts.

(a)    Schedule 2.5(a) sets forth a list of all executory Contracts and real property leases relating to the Leased Real Property or the Purchased Assets to which Seller is a party (the "Available Contracts"), which Schedule 2.5(a) may be updated from time to time prior to the Sale Hearing to add or remove any Contracts inadvertently included or excluded from such schedule. Up to three (3) Business Days prior to the Closing Date, Purchaser, in its sole discretion by written notice to Seller, shall designate in writing which Available Contracts Purchaser wishes to assume as a Purchased Contract, and for Seller to assign to Purchaser, by adding same to Schedule 2.1(b)(i), and any Available Contract previously excluded from Schedule 2.1(b)(i) that Purchaser wishes to assume as a Purchased Contract shall be automatically deemed added to Schedule 2.1(b)(i) and deemed a Purchased Contract, with a corresponding adjustment to the Final Cash Amount to be mutually agreed between the Parties. No later than three (3) Business Days prior to the Closing Date, Purchaser shall notify Seller in writing of any Available Contracts (including those listed on Schedule 2.1(b)(i)) which Purchaser does not desire to be assumed by Seller and assigned to Purchaser, in which case any such Contracts shall not be assigned to Purchaser and shall be included as Excluded Assets and may be rejected by Seller. All Available Contracts of Seller that are listed on Schedule 2.5(a) and which Purchaser does not designate in writing for assumption on Schedule 2.1(b)(i) shall not be considered Purchased Contracts or Purchased Assets and shall automatically be deemed Excluded Assets. At the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller will assume the Purchased Contracts (to the extent not previously assumed) and, subject to the terms herein, assign the Purchased Contracts to Purchaser, and Purchaser, subject to the terms herein, will assume the Purchased Contracts.

(b)    The Parties hereby acknowledge that Seller has filed with the Bankruptcy Court and served upon all counterparties to the Purchased Contracts a cure notice, setting forth the Cure Costs for all such Purchased Contracts and providing such counterparties with an opportunity to object to such Cure Costs or to Purchaser's assumption and assignment of such Purchased Contracts.

(c)    In the event of a dispute as of the Closing Date regarding assumption and assignment of, or the proposed Cure Costs to be paid in respect of, any Contract proposed to be a Purchased Contract as set forth in Schedule 2.1(b)(i), Purchaser shall have right to designate any Purchased Contract as an Excluded Asset at any time prior to or following the Closing Date in the event any such dispute is not resolved to Purchaser's satisfaction by entry of a Final Order of the Bankruptcy Court (or upon the consensual resolution of such dispute as may be agreed by Purchaser and such counterparty). Upon an election by Purchaser to designate such previously Purchased Contract as an Excluded Asset in accordance herewith, Purchaser shall have no Liability or other obligation whatsoever to Seller or the counterparty to such contract, whether such Liability or other obligation arises prior to or after the Closing Date.

14

(d)      Seller shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts to which Seller is a party that are Purchased Contracts. To the maximum extent permitted by the Bankruptcy Code, Seller shall use its best efforts to assume and transfer and assign all Purchased Assets to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code as of the Closing Date, including taking all actions required by the Bankruptcy Court to obtain a Final Order containing a finding that the proposed assumption and assignment of the Purchased Contracts to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

(e)      At Closing, (i) Seller shall, pursuant to the Sale Order and the Assignment and Assumption Agreements and other transfer and assignment documents reasonably requested by Purchaser, assume and assign, or cause to be assigned, to Purchaser (the consideration for which is included in the Purchase Price) each of the Purchased Contracts that is capable of being assumed and assigned, (ii) subject to Section 2.5(b), Purchaser shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as set forth in this Agreement, any filing with the Bankruptcy Court, as agreed to by Buyer and the contract counterparty, or as determined by the Bankruptcy Court) (the "Assumed Cure Costs"), and (iii) Purchaser shall assume and perform and discharge the Assumed Liabilities (if any) under the Purchased Contracts, pursuant to the Sale Order and the Assignment and Assumption Agreements. For the avoidance of doubt, Seller will have no Liability for any Assumed Cure Costs.

2.6      Non-Assignment of Assets.

(a)      Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not affect the assignment or transfer of any Purchased Asset (including any Purchased Contract) if (i) (A) it is prohibited by applicable Law, (B) an attempted assignment or transfer thereof would be reasonably likely to subject Purchaser, its Affiliates or any of its or their respective Representatives to civil or criminal Liability or (C) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto, would constitute a breach, default or violation thereof or of any Law (each such action, a "Necessary Consent"), or (ii) the Bankruptcy Court has not entered an Order (including, for the avoidance of doubt, the Sale Order) approving such assignment or transfer. In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Seller and Purchaser will use their respective commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset (including any Purchased Contract) or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided, however, that neither Seller nor Purchaser will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Legal Proceedings to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would give rise to any of the circumstances described in clauses (i) or (ii) of the first sentence of this Section 2.6(a), (x) Seller and Purchaser will, and will cause their respective Affiliates to, (1) use commercially reasonable efforts (including cooperating with one another to obtain such Necessary Consents, to the extent feasible) as may be necessary so that Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, (2) complete any such assignments or transfers as soon as reasonably practicable, and (3) upon receipt of any applicable Necessary

15

Consents, to transfer or assign the applicable Purchased Asset to Purchaser and (y) Seller will, and will cause their respective Affiliates to, cooperate with Purchaser in good faith without further consideration in any arrangement reasonably acceptable to Purchaser and Seller intended to provide Purchaser with the benefit of any such Purchased Assets.

(b)       Subject to <u>Section 2.6(a)</u>, if after the Closing (i) Purchaser or its designee holds any Excluded Assets or Excluded Liabilities or (ii) Seller holds any Purchased Assets or Assumed Liabilities, Purchaser or Seller will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

(c)       Notwithstanding anything to the contrary set forth in this Agreement, Purchaser may, in Purchaser's sole discretion and within five (5) Business Days prior to Closing, designate any asset, right, or property of Seller an Excluded Asset, notwithstanding the inclusion of such asset, right or property as a Purchased Asset pursuant to this Agreement; <u>provided that</u> Purchaser's designation of any such asset, right or property of Seller as an Excluded Asset shall not reduce the Final Cash Amount or the Purchase Price. In such case, Purchaser shall deliver written notice to Seller of its election to designate such asset, right or property as an Excluded Asset (as applicable) in accordance with the provisions of <u>Section 11.8</u>.

2.7       <u>Further Conveyances and Assumptions</u>.  From time to time following the Closing, Seller and Purchaser will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Seller and its Affiliates and their respective successors and assigns, the assumption of the Liabilities intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Transactions; <u>provided</u>, that nothing in this <u>Section 2.7</u> will require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

2.8       <u>Wrong Pockets</u>.

(a)       If, following the Closing, any Excluded Asset is found to have been transferred to Purchaser or its Affiliates, Purchaser shall (i) transfer, or cause its applicable Affiliate to transfer such right, property or asset to Seller or its designee as soon as practicable for no consideration, and (ii) obtain all consents from Persons necessary or appropriate for the purposes of transferring, assigning, and conveying such Excluded Asset (or part thereof) or the relevant interests in them to Seller or its applicable designee; <u>provided</u>, that, until such consent is obtained, the Parties shall cooperate so that Seller or its applicable designee obtains the rights and benefits and assumes the risks and obligations of the relevant Excluded Asset.

(b)       If, following the Closing, any Purchased Asset is found to have been transferred to or retained by Seller or its Affiliate, Seller shall (i) transfer, or cause its applicable Affiliate to transfer, such Purchased Asset to Purchaser or its designee as soon as practicable for

94065242.11

no consideration, and (ii) obtain all consents from Persons necessary or appropriate for the purposes of transferring, assigning, and conveying such Purchased Asset (or part thereof) or the relevant interests in them to Purchaser or its applicable designee; provided, that, until such consent is obtained, the Parties shall cooperate so that Purchaser or its applicable designee obtains the rights and benefits and assumes the risks and obligations of the relevant Purchased Asset.

(c)  Except as otherwise provided in this Agreement or any Ancillary Agreement, following the Closing, (i) if any payments due with respect to the Purchased Assets, or any rights, properties or assets transferred to Purchaser or its Affiliates following the Closing pursuant to Section 2.8(a), are paid to Seller or any of its Affiliates, Seller shall, or shall cause its applicable Affiliate to, promptly remit by wire or draft such payment to an account designated in writing by Purchaser and (ii) if any payments due with respect to the Excluded Assets are paid to Purchaser or their Affiliates, Purchaser shall, or shall cause the applicable Affiliate to, promptly remit by wire or draft such payment to an account designated in writing by Seller.

## III.   CONSIDERATION

3.1   Consideration.

(a)  Purchase Price. Subject to the terms and conditions set forth in this Agreement, the aggregate consideration for the Purchased Assets will be the assumption of the Assumed Liabilities *plus* an amount equal to (i) the Final Cash Amount, (ii) *minus* the Inventory Adjustment, if any (iii) *minus* the Accounts Receivable Adjustment, if any, (iv) *minus* the Interim Cash Amount, as adjusted and determined pursuant to the final Closing Statement (collectively, the "Purchase Price").

(b)  Acquired Inventory Review.

(i)  On the Effective Date, Seller shall deliver to Purchaser Schedule 2.1(b)(ii) which shall contain a written listing of the Acquired Inventory. During the Interim Period and pursuant to Section 8.1, Seller shall provide Purchaser and its Representatives access to the Acquired Inventory and any other information reasonably requested by Purchaser to facilitate Purchaser's review of the Acquired Inventory ("Inventory Review"). In performing the Inventory Review, Purchaser will take into account any and all sales, purchases, deliveries, and turnovers of inventory that may take place in the ordinary course of business during the Interim Period. Five (5) days prior to the Closing, Purchaser will deliver to Seller a statement identifying any items listed in the Acquired Inventory that could not be located or accounted for during the Inventory Review (the "Missing Inventory"); provided that the Missing Inventory shall be prepared by Purchaser in good faith and without duplication of any inventory accounted for pursuant to the Accounts Receivable Adjustment or the Interim Cash Amount. The undisputed Missing Inventory shall be utilized by Seller in good faith in Seller's preparation of the Inventory Adjustment on the Estimated Closing Statement.

(c)  Adjustment to Final Cash Amount.

17

(i)      At least three (3) days prior to Closing, Seller shall prepare and shall deliver to Purchaser a statement (the "Estimated Closing Statement") setting forth Seller's calculation, based on good faith estimates of (A) the Accounts Receivable Adjustment, if any, (B) the Interim Cash Amount (C) the Missing Inventory and corresponding Inventory Adjustment, if any, and (D) the Purchase Price resulting from the calculation in the preceding clauses (A) through (C) (the "Estimated Closing Cash Purchase Price"). Within twenty (20) Business Days after the Closing Date, Purchaser shall prepare and deliver to Seller a statement (the "Closing Statement") setting forth Purchaser's actual calculations of (A) the Accounts Receivable Adjustment, if any, (B) the Interim Cash Amount (C) the Missing Inventory and corresponding Inventory Adjustment, if any, and (D) the Purchase Price resulting from the calculations in the preceding clauses (A) through (C) (the "Closing Cash Purchase Price"). The Closing Statement shall be prepared in accordance with the applicable definitions set forth in this Agreement. During the twenty (20) Business Day period immediately following Closing and the twenty (20) Business Days immediately following Seller's receipt of the Closing Statement, each Party shall (x) assist the other Party in the review of the Estimated Closing Statement or Closing Statement, as applicable, and provide the other Party and its advisors with full access during normal business hours and upon reasonable notice to the books, records (including work papers, schedules, memoranda and other documents), supporting data, facilities and employees of the Business for purposes of their review of the Estimated Closing Statement or Closing Statement, as applicable, and (y) cooperate fully with the other Party and its advisors in connection with such review, including providing on a timely basis all other information necessary or useful in connection with the review of the Estimated Closing Statement or Closing Statement, as applicable, as is reasonably requested by the other Party or its representatives. The Closing Statement and the resulting calculation of each of the Missing Inventory and corresponding Inventory Adjustment, Accounts Receivable Adjustment, the Interim Cash Amount and the Closing Cash Purchase Price set forth in the Closing Statement shall become final and binding upon the Parties twenty (20) Business Days following Seller's receipt thereof unless Seller gives written notice of its disagreement (a "Notice of Disagreement") to Purchaser prior to such date; provided, however, that the Closing Statement and the resulting calculation of the Missing Inventory and corresponding Inventory Adjustment, the Accounts Receivable Adjustment, the Interim Cash Amount and the Closing Cash Purchase Price shall become final and binding upon the Parties upon Seller's delivery, prior to the expiration of the thirty (30) day period, of written notice to Purchaser of Seller's acceptance of the Closing Statement. Any Notice of Disagreement shall specify in reasonable detail the nature and amount of any disagreement so asserted.

(ii)      If a timely Notice of Disagreement is received by Purchaser, then the Closing Statement and the resulting calculations of each of the Missing Inventory and corresponding Inventory Adjustment, the Accounts Receivable Adjustment, the Interim Cash Amount and the Closing Cash

18

Purchase Price shall become final and binding upon the Parties hereto on the earlier of (A) the date any and all matters specified in the Notice of Disagreement are finally resolved in writing by Seller and Purchaser, or (B) the date any and all unresolved matters specified in the Notice of Disagreement are finally resolved in writing by the Bankruptcy Court. During the thirty (30) days immediately following the delivery of a Notice of Disagreement, Seller and Purchaser shall seek in good faith to resolve in writing any differences which they may have with respect to any matter specified in the Notice of Disagreement. At the end of such thirty (30) day period, Seller and Purchaser shall submit all unresolved disputes to the Bankruptcy Court for review and resolution (the "Remaining Matters"). Purchaser and Seller shall instruct the Bankruptcy Court to, and the Bankruptcy Court shall, make a final determination of the items included in the Closing Statement (to the extent such amounts are in dispute) in accordance with the guidelines and procedures set forth in this Agreement. Purchaser and Seller shall instruct the Bankruptcy Court not to, and the Bankruptcy Court shall not, assign a value to any item in dispute greater than the greatest value for such item assigned by Purchaser, on the one hand, or Seller, on the other hand, or less than the smallest value for such item assigned by Purchaser, on the one hand, or Seller, on the other hand. Purchaser and Seller shall also instruct the Bankruptcy Court to, and the Bankruptcy Court shall, make its determination solely as to the Remaining Matters. Seller and Purchaser shall each be responsible for their own Bankruptcy Court fees and expenses. Any payment due under the Bankruptcy Court's final determination shall be made to the appropriate Party within five (5) Business Days of such determination.

(iii)    Within five (5) Business Days after the date of the final determination of the Missing Inventory and corresponding Inventory Adjustment, the Accounts Receivable Adjustment, the Interim Cash Amount and the Closing Cash Purchase Price:

(A)    If the Estimated Closing Cash Purchase Price is greater than the Closing Cash Purchase Price as finally determined, Seller shall pay to Purchaser the amount of such excess by wire transfer in immediately available funds.

(B)    If the Estimated Closing Cash Purchase Price as finally determined is less than the Closing Cash Purchase Price, Purchaser shall pay to Seller the amount of such shortfall by wire transfer in immediately available funds.

3.2    Purchase Price Deposit; Purchaser Parent Guaranty. Upon the execution of this Agreement, (i) Purchaser shall immediately deposit a sum equal to $542,889 (the "Deposit Amount") into the Trust Account by wire transfer of immediately available funds, to be released by the Escrow Agent and delivered to either Purchaser or Seller, in accordance with the provisions of this Agreement and the Escrow Agreement, and (ii) Purchaser shall deliver to Seller the Purchaser Parent Guaranty, duly executed by Purchaser Parent. The Deposit Amount (together with all accrued investment income thereon, if any) shall be distributed as follows:

94065242.11

(a)    if the Closing occurs, the Deposit Amount will be applied towards the Final Cash Amount payable by Purchaser pursuant to <u>Section 3.3</u> and such Deposit Amount, together with all accrued investment income thereon, if any, shall be delivered to Seller, in accordance with this Agreement and the Escrow Agreement;

(b)    if this Agreement is validly terminated by Seller pursuant to <u>Section 4.4(d)</u>, then the Deposit Amount, together with all accrued investment income thereon, will promptly be released to Seller (and such Deposit Amount will be deemed fully earned by Seller as compensation and consideration for entering into this Agreement and shall not be a penalty), <u>provided</u>, <u>however</u>, that if Purchaser has provided valid written notice of the termination of this Agreement in accordance with and pursuant to <u>Section 4.4(a)</u>, <u>4.4(c)</u>, <u>4.4(e)</u>, <u>4.4(g)</u>, or <u>4.4(h)</u>, and but for the termination by Seller of this Agreement under <u>Section 4.4(d)</u>, this Agreement would reasonably be expected to have been validly terminated as of the date of such written notice in accordance with <u>Section 4.4(a)</u>, <u>4.4(c)</u>, <u>4.4(e)</u>, <u>4.4(g)</u>, or <u>4.4(h)</u>, then the Deposit Amount shall be promptly released to Purchaser; or

(c)    if this Agreement is validly terminated for any reason other than by Seller pursuant to <u>Section 4.4(d)</u>, then the Deposit Amount, together with all accrued investment income thereon, will promptly be released to Purchaser, <u>provided</u>, <u>however</u>, that if Seller has provided to Purchaser valid written notice of the termination of this Agreement in accordance with and pursuant to <u>Section 4.4(d)</u>, and but for the termination by Purchaser of this Agreement under another provision of <u>Article IV</u>, this Agreement would reasonably be expected to have been validly terminated as of the date of such written notice in accordance with <u>Section 4.4(d)</u>, then the Deposit Amount shall be promptly released to Seller.

3.3    <u>Payment of Purchase Price</u>.  At the Closing on the terms and subject to the conditions set forth in this Agreement, (a) Purchaser will pay to Seller, in immediately available funds to the account or accounts designated in writing by Seller (for itself, or on behalf of an Affiliate) not less than three (3) Business Days prior to the Closing, an aggregate amount (the "<u>Initial Payment</u>") equal to (A) the Estimated Closing Cash Purchase Price determined pursuant to the Estimated Closing Statement, *minus* (B) the Deposit Amount and (b) the Deposit Amount will be released to Seller.

## IV.    CLOSING AND TERMINATION

4.1    <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in <u>Sections 9.1</u>, <u>9.2</u> and <u>9.3</u> (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> (the "<u>Closing</u>") will take place remotely by exchange of electronic documentation and signatures at 10:00 a.m. (Eastern time) on the date that is three (3) Business Days following the satisfaction or waiver of the conditions set forth in <u>Sections 9.1</u>, <u>9.2</u> and <u>9.3</u> (other than conditions that by their nature are to be first satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the Parties may designate in writing (including by e-mail).  For purposes of this Agreement and the Transactions, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Purchased Assets and the Assumed Liabilities shall be deemed for accounting purposes to pass to Purchaser,

20

at 12:01 am, New York City time, on the Closing Date (subject to the occurrence of the Closing). The date on which the Closing is held is referred to in this Agreement as the "Closing Date."

4.2    Deliveries by Seller.  At the Closing and unless otherwise waived in writing by Purchaser, Seller will deliver to Purchaser:

(a)    the Purchased Assets, by making the Purchased Assets available to Purchaser at their present location;

(b)    one or more duly executed bills of sale (the "Bills of Sale");

(c)    one or more duly executed assignment and assumption agreements (the "Assignment and Assumption Agreements");

(d)    copies of resolutions duly adopted by the board of directors (or similar governing body) of Seller authorizing and approving Seller's execution and delivery of this Agreement and the consummation of the Transactions;

(e)    the officer's certificate required to be delivered pursuant to Sections 9.1(a) and 9.1(b); and

(f)    copies of the termination notices provided to all Transferring Business Employees.

4.3    Deliveries by Purchaser.  At the Closing and unless otherwise waived in writing by Seller, Purchaser will deliver to Seller:

(a)    the payment by wire transfer of immediately available funds to accounts designated in writing by Seller not less than three (3) Business Days prior to the Closing of the amount in cash as determined pursuant to Section 3.3;

(b)    the Bill of Sale, executed by Purchaser;

(c)    the Assignment and Assumption Agreement, executed by Purchaser;

(d)    the officer's certificate required to be delivered pursuant to Sections 9.2(a) and 9.2(c);

(e)    all documents, instruments and certificates, reasonably requested by Seller, to evidence the employment of the Transferring Business Employee to the extent so employed by the Purchaser or an Affiliate in accordance with Section 8.7; and

(f)    all such other documents, instruments and certificates, reasonably requested by Seller, to evidence the assumption by Purchaser of the Assumed Liabilities.

4.4     Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser or Seller, if the Closing has not occurred by 5:00 p.m. Eastern time on the date that is six (6) months following the date hereof (the "Termination Date"), which date may be extended pursuant to Sections 4.4(c) and 4.4(d)(i); provided, however, that if the Closing has not occurred on or before the Termination Date and (i) Purchaser is able to terminate this Agreement pursuant to Section 4.4(c), then Seller may not terminate this Agreement pursuant to this Section 4.4(a) or (ii) Seller is able to terminate this Agreement pursuant to Section 4.4(d), then Purchaser may not terminate this Agreement pursuant to this Section 4.4(a); provided, further, however, that the Termination Date may be extended by mutual written consent of Seller and Purchaser;

(b)     by mutual written consent of Seller and Purchaser;

(c)     by Purchaser, if Seller materially breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in Sections 9.1 or 9.3 or breach of Section 4.1 and such breach has not been cured within 20 Business Days after the giving of written notice by Purchaser to Seller of such breach; provided, that Purchaser is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Section 9.2 or Section 9.3; provided, further, that in the event that Purchaser provides such written notice to Seller within twenty (20) Business Days of the Termination Date, then the Termination Date will be extended until the end of the twenty (20) Business Day cure period set forth in this Section 4.4(c);

(d)     by Seller, provided that Seller is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Sections 9.1 or 9.3,

(i)     if Purchaser breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in Sections 9.2 or 9.3 and such breach has not been cured within twenty (20) Business Days after the giving of written notice by Seller to Purchaser of such breach; provided, that in the event that Seller provides such written notice to Purchaser within twenty (20) Business Days of the Termination Date, then the Termination Date will be extended until the end of the twenty (20) Business Day cure period set forth in this Section 4.4(d)(i), or

(ii)     if all of the conditions set forth in Section 9.1 and Section 9.3 have been satisfied (in each case, other than those conditions that by their nature are first satisfied at the Closing), Seller has given written notice to Purchaser confirming that all of the conditions set forth in Section 9.2 have been satisfied (other than those conditions that by their nature are first satisfied at the Closing) or waived and that Seller stands ready, willing and able to consummate the Closing and Purchaser fails to consummate the Closing within three (3)

94065242.11

Business Days after the date that the Closing should have occurred pursuant to Section 4.1;

(e)    by Purchaser or Seller, if there is in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; provided, that no Party may terminate this Agreement pursuant to this Section 4.4(e) unless it has complied with Section 8.4;

(f)    automatically upon the consummation of an Alternative Transaction;

(g)    by Purchaser if (i) Seller enters into any definitive agreement in respect of one or more Alternative Transactions with one or more Persons or (ii) the Bankruptcy Court approves an Alternative Transaction; and

(h)    by Purchaser if the Bankruptcy Court enters an order (i) dismissing, or abstaining from, any one of the Bankruptcy Cases in which a Purchased Asset is included in the property of Seller's estate, (ii) converting any one of the Bankruptcy Cases in which a Purchased Asset is included in the property of Seller's estate to a case under Chapter 7 of the Bankruptcy Code, or (iii) appointing a trustee or examiner pursuant to Section 1104 or any other section of the Bankruptcy Code in any of the Bankruptcy Cases in which a Purchased Asset is included in the property of Seller's estate.

4.5    Procedure Upon Termination.  In the event of termination pursuant to Section 4.4 (other than Section 4.4(f), under which termination will take place automatically), the terminating Party will give written notice thereof to the other Party or Parties, and this Agreement will terminate as described in Section 4.6, and the purchase of the Purchased Assets and assumption of the Assumed Liabilities hereunder will be abandoned, without further action by Purchaser or Seller.

4.6    Effect of Termination.

(a)    In the event that this Agreement is terminated as provided herein, then each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and there will be no Liability or obligation on Purchaser, Seller or any of their respective Representatives, except as specifically set forth in this Section 4.6; provided, however, that the provisions of Section 3.2, this Section 4.6, and Article XI (other than Section 11.3) and, to the extent necessary to effectuate the foregoing enumerated provisions, Article I, will survive any such termination and will be enforceable hereunder; provided, further, that, subject to Section 4.6(b), nothing in this Section 4.6(a) will be deemed to release any Party from Liability for Fraud or any willful breach of this Agreement prior to termination, with "willful" meaning an intentional action or omission known and intended to be a breach hereof; provided further that nothing in this Section 4.6(a) will be deemed to interfere with Seller's rights to retain the Deposit Amount to the extent provided in Section 3.2.

(b)    The parties hereby agree that is impossible to determine accurately the amount of damages that Seller would suffer if the Transactions were not consummated as a result of a breach of this Agreement by Purchaser. As a result, notwithstanding anything in this Agreement to the contrary, Seller and Purchaser hereby agree that, in the event of a failure by

23

Purchaser to consummate the Transactions and consequent termination of this Agreement by Seller in accordance with Section 4.4(d), (i) Seller's right to retain the Deposit Amount pursuant to Section 3.2(b) shall serve as liquidated damages against Purchaser (and not as a penalty) and (ii) such liquidated damages shall be the sole and exclusive remedy of Seller against Purchaser for any monetary damages suffered by Seller, or any Liability or obligation of any kind of Purchaser, in each case, caused by, arising out of, relating to, or in connection with (A) any breach or threatened or attempted breach of this Agreement or any Ancillary Agreement, (B) any failure or threatened or attempted failure of Purchaser to comply with its obligations under this Agreement or any other agreement, certificate or other document entered into between the parties pursuant to the terms of this Agreement, (C) any failure to consummate any of the Transactions contemplated by this Agreement, or (D) this Agreement, any other agreement, certificate, or other document entered into between the Parties pursuant to the terms of this Agreement, the Transactions contemplated hereby or the failure of any of the Transactions to be consummated or the termination of this Agreement, in each case, including in litigation under any legal theory, whether sounding in Law (whether for breach of contract, in tort, or otherwise) or in equity (the items referred to in the foregoing clauses (A) through (D), the "Potential Claims"), except with respect to Fraud.  Seller shall not be entitled to bring, and shall in no event support, facilitate, encourage, or take any action other than opposing, the bringing of, any litigation against Purchaser or any of its Affiliates with respect to, arising out of, relating to, or in connection with any Potential Claim or otherwise with respect to the Transactions, and Seller shall dismiss with prejudice any then pending litigation by Seller against Purchaser or any of its Affiliates as promptly as practicable after such termination (and in no event later than three (3) Business Days following such termination). Notwithstanding any of the foregoing, for the avoidance of doubt, unless Seller has terminated this Agreement in accordance with Section 4.4(d), the foregoing shall not be construed to limit Seller's rights to specific performance in accordance with the terms of Section 11.3.

4.7    Withholding. Each Party shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amount as it is required to deduct and withhold with respect to the making of such payment under the Code or other applicable Tax Law; provided, however, that Purchaser shall reasonably cooperate with Seller and allow Seller to supply such forms or other documentation as may reduce or eliminate any such requirement to deduct and withhold.  To the extent that amounts are deducted or withheld in accordance with the provisions of this Section 4.7 and timely paid to the appropriate Tax Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction or withholding was made.

## V.    REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the letter from Seller, dated the Effective Date, addressed to Purchaser (the "Seller Disclosure Schedule"), Seller hereby represents and warrant to Purchaser as of the Effective Date and the Closing Date that:

5.1    Organization and Good Standing.  Seller (a) is an entity duly organized, validly existing and in good standing (to the extent such concept of good standing applies in the relevant jurisdiction) under the Laws of the jurisdiction of its organization, (b) subject (with respect to Seller) to any limitations imposed on Seller as a result of filing a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties

and to carry on its business as now conducted, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which the Purchased Assets and Assumed Liabilities requires it to qualify, except where the failure to be so organized, existing and in good standing or to have such power and authority or be so qualified would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

5.2     Authorization of Agreement. Subject to entry of the Sale Order, Seller has the requisite power and authority to execute and deliver this Agreement and each Ancillary Agreement to which it is a party and to perform its respective obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance by Seller of this Agreement and each Ancillary Agreement to which it is a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate or similar action on the part of Seller. This Agreement and each Ancillary Agreement to which it is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by Seller and (assuming the due authorization, execution and delivery by the other parties and the entry of the Sale Order) this Agreement and each Ancillary Agreement to which it is a party constitutes legal, valid and binding obligations of Seller enforceable against Seller in accordance with its respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law) (the "Enforceability Exceptions").

5.3     No Conflicts; Required Consents.

(a)     Except as set forth in Section 5.3(a) of Seller Disclosure Schedule and assuming that (A) requisite Bankruptcy Court approvals are obtained; including the Sale Order, (B) the notices, authorizations, approvals, Orders, permits or consents set forth in Section 5.3(b) of Seller Disclosure Schedule are made, given or obtained (as applicable), and (C) the requirements of the Antitrust Regulations are complied with, the execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the Transactions, do not: (i) violate the Organizational Documents of Seller, other than such violations that do not prevent Seller's ability to consummate the Transactions prior to the Termination Date; (ii) violate any Law applicable to Seller or by which any Purchased Asset is bound; or (iii) result in any breach of, constitute a default (or an event that, with or without notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Lien (other than a Permitted Exception) on any Purchased Asset; except, in each case, for any such violations, breaches, defaults or other occurrences which would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(b)     Except as set forth in Section 5.3(b) of Seller Disclosure Schedule, no Seller is required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) requisite Bankruptcy Court approvals; including the Sale Order, or (ii) any filings required to be made under the Antitrust Regulations.

94065242.11

5.4    Title to Purchased Assets.

(a)    Except as set forth in Section 5.4 of Seller Disclosure Schedule and in each case subject to the Enforceability Exceptions, Seller has good and valid title, or in the case of leased properties and assets, valid leasehold interests, in the Purchased Assets free and clear of all Liens (other than Permitted Exceptions and Liens on or against the Purchased Assets that will be fully released at the Closing in accordance with Section 363 of the Bankruptcy Code) and, at the Closing, Purchaser will be vested with good and valid title or valid leasehold interests, as applicable, in such Purchased Assets, free and clear of all Liens (other than Permitted Exceptions) and Excluded Liabilities, to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code.

(b)    Except as would not materially impair the present ownership, use, or operations of the Purchased Assets, the Purchased Assets are in good operating condition and repair (ordinary wear and tear excepted) and are fit for use in the Ordinary Course of Business.

5.5    Material Contracts.

(a)    Seller has made available to Purchaser an accurate and complete copy of all Available Contracts, including any amendments thereto; an accurate and complete list of which is set forth in Schedule 2.5(a) of Seller Disclosure Schedule.

(b)    Subject to requisite Bankruptcy Court approvals; including the Sale Order, and assumption by Purchaser of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs by Purchaser in accordance with the terms of this Agreement) and except as a result of the commencement of the Bankruptcy Case or would not be, individually or in the aggregate, material to the Business, as a whole, each of the Purchased Contracts is in full force and effect and is a valid, binding and enforceable obligation of Seller and, to the Knowledge of Seller, each of the other parties thereto, except as may be limited by the Enforceability Exceptions.  Except as set forth in Section 5.5(b) of Seller Disclosure Schedule, as a result of the commencement of the Bankruptcy Case or would not be, individually or in the aggregate, material to the Business, as a whole, Seller is not in material default, nor is alleged in writing by the counterparty thereto to have materially breached or to be in material default, under any Purchased Contracts, and, to the Knowledge of Seller, the other party to each Purchased Contract is not in material default thereunder. Seller has not nor, to the Knowledge of Seller, has any other party to such Purchased Contract exercised any termination rights or, in the case of the other party, indicated to Seller in writing, such party's intent to terminate such Purchased Contract, in each case other than termination at the end of such Purchased Contract's term in accordance with its terms.

5.6    Litigation.  Except as set forth in Section 5.6 of Seller Disclosure Schedule, there is no Legal Proceeding or Order pending or, to the Knowledge of Seller, threatened in writing, before any Governmental Body brought by or against Seller or that affects any of the Purchased Assets that, if adversely determined, would be, individually or in the aggregate, material to the Business, taken as a whole.

94065242.11

5.7    Compliance with Laws. The Business is, and at all times since January 1, 2021, has been, conducted in material compliance with, and Seller has in all material respects complied with, all applicable Laws relating to the operation of the Business and the Purchased Assets.

5.8    Company Plans.

(a)    Section 5.8(a) of Seller Disclosure Schedule sets forth a list of each material Company Plan.

(b)    Except as would not have, individually or in the aggregate, a Seller Material Adverse Effect, each Company Plan is in material compliance with all applicable Laws. Except as would not result in material Liability to Purchaser or its Affiliates after the Closing, Seller has performed in all material respects their obligations under each Company Plan in compliance with the terms of such Company Plan and in material compliance with all applicable Laws.

(c)    Except as disclosed on Section 5.8(c) of Seller Disclosure Schedule, the consummation of the Transactions shall not directly or indirectly cause any facility of Seller to transfer or set aside any material assets to fund any benefits under any Company Plan.

5.9    Labor Matters.  Except as would not have, individually or in the aggregate, a Seller Material Adverse Effect:

(a)    Except as set forth in Section 5.9(a) of Seller Disclosure Schedule, Seller is not party to, or bound by, any labor agreement, collective bargaining agreement, or any other Contract with any labor union, works council, employee committee or employee representative of any employee group (each a "Collective Bargaining Agreement").

(b)    Section 5.9(b)(i) of Seller Disclosure Schedule sets forth an accurate and complete list of all Transferring Business Employees (including each employee on leave of absence or layoff status) along with the position, date of hire, wage rate or salary, accrued but unused sick and vacation leave or paid time off; provided, however, data will only be provided in a manner compliant with applicable Law and to the extent available to Seller as of the date hereof. Section 5.9(b)(ii) of Seller Disclosure Schedule sets forth an accurate and complete list of all consultants and independent contractors currently performing services exclusively in connection with the Business for Seller, including compensation rate, location and a reasonable description of services performed; provided, however, such data will only be provided in a manner compliant with applicable Law and to the extent available to Seller as of the date hereof.

(c)    Seller has since January 1, 2021, complied in all material respects with all applicable Laws relating to labor and employment matters.

5.10    Broker Fee.  Seller has not incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or Transactions for which Purchaser is or will become liable. All such fees or payments for which Seller is responsible are described in Section 5.10 of Seller Disclosure Schedule.

94065242.11

5.11    Taxes.

(a)    Seller has timely filed all material Tax Returns with respect to the Purchased Assets, the Assumed Liabilities, or the Business that it was required to file in accordance with applicable Laws.  Seller has timely paid all material Taxes shown as due on such Tax Returns.

(b)    No audits in respect of material Taxes related to the Purchased Assets, the Assumed Liabilities, or the Business are pending or being conducted.  No Tax Authority has asserted in writing any deficiency with respect to material Taxes related to the Purchased Assets, the Assumed Liabilities, or the Business against Seller with respect to any Tax period for which the period of assessment remains open, other than any deficiency which has been satisfied, settled, or withdrawn.

(c)    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall be construed as providing a representation or warranty with respect to the existence, amount, expiration, or availability of (or any limitations on) any Tax asset or Tax attribute of Seller.

5.12    Assumed Lease.

(a)    Seller has made available to Purchaser accurate and complete copies of the Assumed Lease, including all applicable amendments.

(b)    Seller has not leased, subleased, licensed, contracted to sell, lease, or transfer, or otherwise granted to any Person the right to use, occupy or acquire any portion of any parcel of the Assumed Lease.

(c)    Seller has not exercised or given any written notice of exercise of, nor has any lessor or landlord exercised or given any written notice of exercise by such party of, any option, right of first offer or right of first refusal contained in the Assumed Lease.

5.13    Compliance. Seller has not nor, to the Knowledge of Seller, has any director acting on behalf of Seller, since January 1, 2021, directly or indirectly corruptly offered, authorized, or made, any payment, or any other thing of value, to any Government Official in order to secure any improper advantage, official action, or to assist Seller to obtain or retain business in connection to the Business or Purchased Assets in breach of Anti-Bribery Laws.

5.14    Financial Statements .  To the Knowledge of Seller, all financial statements made available by Seller to Purchaser in connection with this Agreement, including without limitation, profit and loss statement for the annual periods ending September 30, 2022, and September 30, 2023 and periodic interim statements ("Financial Statements") have been prepared, in all material respects, in accordance with the Accounting Principles, and accurately reflect, in all material respects, the financial condition, results of operations, cash flows and changes in equity of Seller and as of the respective dates thereof and for the respective periods indicated. Except as set forth on the Financial Statements, the Financial Statements present fairly, in all material respects, the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.

94065242.11

5.15    No Other Representations or Warranties.    Except for the representations and warranties contained in this Article V (as modified by Seller Disclosure Schedule), neither Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, the Purchased Assets, the Assumed Liabilities or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller, or any of Seller or its Affiliates' respective Representatives. Except for the representations and warranties contained in this Article V (as modified by Seller Disclosure Schedule), Seller (a) expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or express warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Seller or any of its Affiliates). Seller make no representations or warranties to Purchaser regarding the probable success or profitability of the Business, the Purchased Assets or the use thereof. The disclosure of any matter or item in Seller Disclosure Schedule will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Seller Material Adverse Effect.

## VI.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as of the Effective Date and the Closing Date that:

6.1    Organization and Good Standing.    Purchaser is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.2    Authorization of Agreement.    Purchaser has the requisite power and authority to execute and deliver this Agreement and each Ancillary Agreement to which it is a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement and each Ancillary Agreement to which it is a party, and the consummation by it of the Transactions, have been duly and validly authorized by all requisite corporate or similar action on the part of the Purchaser, and no other corporate action on the part of Purchaser is necessary to authorize the execution, delivery and performance by Purchaser of this Agreement, each Ancillary Agreement to which it is a party and the consummation of the Transactions. This Agreement and each Ancillary Agreement to which it is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by Purchaser and this Agreement and each Ancillary Agreement to which it is a party constitutes legal, valid and binding obligations of Purchaser in accordance with its respective terms, subject to Enforceability Exceptions.

29

6.3    <u>Consents and Approvals; No Violations</u>.

(a)    The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the Transactions do not and will not (i) conflict with or violate the Organizational Documents of Purchaser, (ii)  conflict with or violate any Law applicable to Purchaser or by which Purchaser or any of its respective properties are bound, or (iii) result in any breach or violation of or constitute a default (or an event which with or without notice or lapse of time or both would become a default) or result in the loss of a benefit under, or give rise to any right of termination, cancellation, amendment or acceleration of, any Contracts to which Purchaser is a party or by which Purchaser or any of its respective properties are bound, except, in the case of <u>clauses (ii)</u> and <u>(iii)</u>, for any such conflict, violation, breach, default, acceleration, loss, right or other occurrence which would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b)    The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the Transactions do not and will not require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Body, except for any such consent, approval, authorization, permit, action, filing or notification the failure of which to make or obtain would not materially affect the ability of Purchaser to consummate the Transactions.

6.4    <u>Financial Capability; Solvency</u>.

(a)    Purchaser has, and upon the Closing will have, immediately available funds sufficient for the satisfaction of all of Purchaser's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the Transactions. Purchaser has not incurred, and is not contemplating or aware of, any obligation, commitment, restriction or other Liability of any kind, in each case, that would impair or adversely affect such resources, funds or capabilities.

(b)    Immediately after giving effect to the transactions contemplated hereby, Purchaser shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Seller. In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

6.5    <u>Broker Fee</u>.  Purchaser has not incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or Transactions for which Seller is or will become liable.

6.6    <u>Condition of the Purchased Assets</u>.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in <u>Article V</u> (as modified by Seller Disclosure Schedule), and Purchaser acknowledges and

agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and "as is" basis in all respects.

6.7    <u>Exclusivity of Representations and Warranties</u>.    Purchaser acknowledges that except for the representations and warranties made by Seller in <u>Article V</u>, neither Seller, any of its respective Affiliates, nor any Representatives of any of the foregoing, make (and neither Purchaser or any other Person has relied upon) any representations or warranties on behalf of Seller. Purchaser further agrees that neither Seller nor any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser in certain "data rooms" or management presentations in expectation of the Transactions.    Purchaser acknowledges and agrees that it has conducted its own independent investigation of Seller, their respective businesses and the Transactions, and has not relied on any representation, warranty or other statement by any Person on behalf of Seller, other than the representations and warranties of Seller expressly contained in <u>Article V</u>, and that all other representations and warranties are specifically disclaimed. In connection with any investigation by Purchaser of Seller, Purchaser has received or may receive from Seller or its other Representatives on behalf of Seller certain projections, forward-looking statements and other forecasts and certain business plan information in written or verbal communications.    Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to Purchaser (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).    Accordingly, Purchaser acknowledges that neither Seller nor any other Person on behalf of Seller makes (and neither Purchaser or any other Person has relied upon) any representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans). Notwithstanding anything herein to the contrary, nothing herein shall limit the liability of Seller, their Affiliates or any Representatives thereof or restrict any remedies available to Purchaser in the event of Fraud by Seller, their Affiliates or any Representatives thereof.

## VII.    BANKRUPTCY COURT MATTERS

7.1    <u>Submission for Bankruptcy Court Approval</u>.  As promptly as practicable after the execution of this Agreement, Seller will file with the Bankruptcy Court a motion seeking entry of the Sale Order.

7.2    <u>Bankruptcy Process</u>.

(a)    Seller and Purchaser acknowledge and agree that this Agreement and the Transactions are subject to Bankruptcy Court approval, including entry of the Sale Order.

(b)    Seller shall obtain entry of the Sale Order no later than 28 days after the filing of a motion approving the Sale Order, <u>provided</u> that if compliance with the forgoing is not possible due to lack of availability of the Bankruptcy Court, such deadline shall be automatically

extended to the date that is three (3) Business Days after the first date of the Bankruptcy Court is available.

(c)     Purchaser and Seller agree to use commercially reasonable efforts to cause the Bankruptcy Court to enter the Sale Order in a form and substance reasonably agreeable to the Parties.

(d)     Seller covenants and agrees that if the Sale Order is entered, the terms of any plan of reorganization or liquidation, or any structured dismissal, of any of the Bankruptcy Cases, submitted by Seller to the Bankruptcy Court for confirmation will not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Purchaser hereunder, or in any way prevent or interfere with the consummation or performance of the Transactions including any transaction that is contemplated by or approved pursuant to the Sale Order.

(e)     Purchaser agrees to be bound by and accept the terms and conditions of the Sale Order as entered by the Bankruptcy Court to the extent such order is substantially in a form and substance reasonably agreeable to the Parties. If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement are appealed or petition for certiorari or motion for rehearing or reargument is filed with respect thereto, Seller agrees to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion and Purchaser agrees to cooperate in such efforts and each Party agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal.

(f)     For the avoidance of doubt, nothing in this Agreement will restrict Seller or its Affiliates from settling, delegating or otherwise transferring any Excluded Liabilities, or from entering into discussions or agreements with respect to the foregoing.

## VIII.  COVENANTS

8.1    <u>Access to Information</u>.  From the Effective Date through the Closing Date (the "<u>Interim Period</u>"), Purchaser will be entitled, through its Representatives, to make such investigation of the properties, offices, plants and other facilities, books and records (excluding Tax Returns) of Seller as it reasonably requests in furtherance of the consummation of the Transactions. Any such investigation and examination will be conducted upon reasonable advance notice and under reasonable circumstances, will occur only during normal business hours and will be subject to restrictions under applicable Law. Seller will provide reasonable access to their respective Representatives and shall direct such Representatives to furnish Purchaser with such financial, operating and other data and information as Purchaser may reasonably request in furtherance of the consummation of the Transactions.  Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would require Seller to disclose information that would violate applicable Law, including the Antitrust Regulations and data protection Laws or would violate any attorney-client privilege or confidentiality obligations of Seller. No investigation by Purchaser will affect or be deemed to modify any of the representations, warranties, covenants or agreements of Seller contained in this Agreement. Notwithstanding anything to the contrary herein, Purchaser shall not have any right to access, inspect, or otherwise review any Tax Returns of Seller or any of its Affiliates, other than

94065242.11

any such Tax Return which is a Purchased Asset. Anything herein notwithstanding, the Parties acknowledge that, following the date hereof, Seller and its Affiliates shall continue conducting customary liquidation actions for the shut-down of operations of Seller's global business which may impede Seller's ability to comply with such obligations of Seller set forth in this Section 8.1.

8.2    <u>Actions Pending the Closing</u>.  Except (i) as required by applicable Law (including actions, rules, regulations or requirements of a Governmental Body in response or related to the COVID-19 pandemic) or by order of the Bankruptcy Court, (ii) as otherwise expressly contemplated by this Agreement, (iii) as required by any Contract to which Seller is bound, (iv) as set forth on <u>Schedule 8.2</u> or (v) with the prior written consent of Purchaser (which shall not be unreasonably withheld, conditioned or delayed and, in any event, Purchaser shall provide its prior written consent or a reason for not consenting within 48 hours), during the Interim Period:

(a)    Seller will (taking into account the commencement of the Bankruptcy Cases and customary and reasonable liquidation and shut-down of operations of Seller other than in respect of the Purchased Assets or the Business, other similar changes, facts and circumstances that customarily and reasonably result from the events leading up to and following the commencement of the Bankruptcy Cases):

(i)    comply with applicable Law in all material respects and use commercially reasonable efforts to maintain the Purchased Assets in their current condition, ordinary wear and tear excepted (and excluding sales of inventory in the Ordinary Course of Business); <u>provided</u> <u>that</u> Purchaser expressly consents to Seller's continuing to make such deliveries currently scheduled in March and April of 2024 (a full list of which is set forth on <u>Schedule 8.2(a)</u>), on existing terms only, as Seller reasonably determines are appropriate (other than to the buyers "Harvest" and Black Rifle");

(ii)    use commercially reasonable efforts to reject that certain Seattle Lease Agreement;

(iii)    use commercially reasonable efforts to reject that certain KC Lease Agreement; and

(iv)    keep in full force and effect current insurance policies, self-funded plans or trusts or other comparable insurance relating to or affecting the Leased Real Property and the Purchased Assets.

(b)    Seller will not take any of the following actions to the extent exclusively relating to the Purchased Assets:

(i)    except as specifically permitted pursuant to <u>Section 8.2(a)</u>, sell, transfer, encumber or otherwise dispose of any material inventory, other than in the Ordinary Course of Business; <u>provided</u> <u>that</u> Seller shall consult with Purchaser in good faith prior to any such action with respect to material inventory; <u>provided further that</u> Seller will not deliver to any customer under any Purchased Contract who has a material, past due accounts receivable amount owed to Seller, including the buyers "Harvest and "Black Rifle";

(ii)    amend the Organizational Documents of Seller in a manner that would reasonably be expected to materially delay or impede Seller's ability to consummate the Transactions;

(iii)    (A) enter into any new Contracts for the delivery of inventory or (B) enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons related to or affecting the Purchased Assets;

(iv)    amend or modify, including any related accounts receivable terms, in any material respects (other than by automatic extension or renewal or in the ordinary course of business) any Purchased Contract;

(v)    take any action (other than any actions required by the Bankruptcy Court or applicable Law) in breach of the Bidding Procedures Order or the Sale Order;

(vi)    with respect to any Purchased Asset (A) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases without the prior written consent of Purchaser; or (B) fail to use commercially reasonable efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases;

(vii)    (A) reject or terminate (other than by expiration in accordance with its terms) any Purchased Contract or seek Bankruptcy Court approval to do so, or (B) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Purchased Contract;

(viii)    voluntarily pursue or seek, or fail to use commercially reasonable efforts to oppose any third party in pursuing or seeking, a dismissal of or abstention of the Bankruptcy Court from any of the Bankruptcy Cases, conversion of any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee under chapter 11 or chapter 7 of the Bankruptcy Code and/or the appointment of an examiner with expanded powers in any of the Bankruptcy Cases;

(ix)    subject any of the Purchased Assets to any material Lien not in the Ordinary Course of Business other than Liens which will be discharged at or in connection with the Closing and except for Permitted Exceptions; or

(x)    agree or commit to any of the foregoing.

8.3    <u>Consents</u>.

(a)    Except with respect to the consents described in <u>Section 8.4</u> which shall be governed by the provisions of <u>Section 8.4</u>, Seller and Purchaser will use their commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals contemplated

by this Agreement, including the consents and approvals referred to in <u>Section 5.3</u> and the Necessary Consents; <u>provided</u>, <u>however</u>, that none of Seller or Purchaser (other than with respect to Assumed Cure Costs) will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Legal Proceedings to obtain any such consent or approval.  For the avoidance of doubt, the Parties acknowledge and agree that obtaining any such authorizations, consents and approvals, giving such notices and making such filings with respect to the items described in this <u>Section 8.3</u> will not be a condition to Closing.

8.4   <u>Commercially Reasonable Efforts; Consents to Assignment</u>.

(a)   Upon the terms and subject to the conditions of this Agreement, and without limiting the generality of <u>Section 8.4(d)</u>, each of the Parties will use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions as promptly as practicable, including the prompt preparation and filing of all forms, registrations and notices required to be filed to consummate the Transactions and the taking of such commercially reasonable actions as are necessary to obtain any requisite approvals, consents, orders, exemptions or waivers by any Governmental Body or any other Person.  Each Party will promptly consult with the others with respect to, provide any necessary information with respect to, and provide the other Parties (or their legal counsel) copies of, all filings made by such party with any Governmental Body or any other Person or any other information supplied by such Party to a Governmental Body or any other Person in connection with this Agreement and the Transactions.  Purchaser and Seller will make all filings required under any Antitrust Regulations within ten (10) Business Days after the Effective Date (unless the Parties jointly agree to alternate timing). Purchaser will be responsible for all filing fees under the Antitrust Regulations applicable to Purchaser.

(b)   The Parties may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other parties under this <u>Section 8.4</u> as "outside counsel" or "outside counsel and corporate in-house counsel with responsibility for antitrust and regulatory matters only. Such materials and the information contained therein will be given only to the designated counsel of the recipient and will not be disclosed by such outside counsel and / or corporate in-house counsel with responsibility for antitrust or regulatory matters to the directors, officers or employees (other than corporate in-house counsel with responsibility for antitrust and regulatory matters if permitted) of the recipient unless express permission is obtained in advance from the source of the materials or its legal counsel; <u>provided</u>, that materials provided pursuant to this <u>Section 8.4</u> may be redacted by the producing party to remove references concerning the valuation of Seller, as necessary to comply with contractual arrangements and as necessary to address reasonable privilege considerations.

(c)   Each Party will promptly inform the others of any communication from any Governmental Body (other than the Bankruptcy Court or the Office of the United States Trustee) regarding any of the Transactions and promptly provide the others with copies of all related correspondence or filings. If any Party or Affiliate thereof receives a request for additional information or documentary material from any such Governmental Body (other than the Bankruptcy Court or the Office of the United States Trustee) with respect to the Transactions, then such Party will endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with

such request. Each Party will provide any necessary information and reasonable assistance as the others may request in connection with its preparation of any additional necessary filings or submissions to any Governmental Body.

(d)     Neither Seller nor Purchaser will independently participate in any meeting with any Governmental Body (other than the Bankruptcy Court or the Office of the United States Trustee) in respect of any findings or inquiry in connection with the Transactions without giving, in the case of Seller, Purchaser, and in the case of Purchaser, Seller, prior notice of the meeting and, to the extent reasonably practicable and not prohibited by the applicable Governmental Body, the opportunity to attend and / or participate in such meeting.

(e)     Seller and Purchaser shall jointly control all communications with any Governmental Body relating to Antitrust Regulations, and jointly determine and direct the strategy and process by which the Parties will obtain all required consents, clearances, expirations or terminations of waiting periods, authorizations, Orders or approvals of, or any exemptions by, any Governmental Body relating to Antitrust Regulations.

(f)     The Parties shall not voluntarily extend any waiting period or other applicable time period under the applicable Antitrust Regulation or enter into any agreement with any Governmental Body to delay, or otherwise not to consummate as soon as practicable the Transactions, except with the prior written consent of the other Parties, which consent may be withheld in the sole discretion of the non-requesting Party. Purchaser and Seller agree, at Purchaser's sole cost, to take any and all actions that are necessary or reasonably advisable to avoid or eliminate each and every impediment under the Antitrust Regulations that may be asserted or required by any Governmental Body to consummate the transactions contemplated by this Agreement as expeditiously as possible, and in any event prior to the Termination Date, including (i) proposing, negotiating, committing to, effecting and agreeing to, by consent decree, hold separate order, or otherwise, the sale, divestiture, license, hold separate, and other disposition of, any entities, operations, assets, divisions, businesses, product lines, customers or facilities of the Business or Purchaser, or their respective Affiliates, (ii) creating, terminating, amending or assigning existing relationships, ventures, contractual rights, or obligations of the Business or Purchaser, (iii) amending, assigning, or terminating existing licenses or other agreements (and entering into such new licenses or other agreements), (iv) otherwise taking or committing to any and all actions that would limit Purchaser's freedom of action with respect to, or its ability to retain or hold, directly or indirectly, any businesses, assets, products, or equity interests of the Business or Purchaser, or their respective Affiliates, and (v) entering into any governmental order, consent decree or other agreement to effectuate any of the foregoing.

8.5     Publicity. With the exception of press releases issued by Seller and Purchaser on the Effective Date and the Closing Date in forms mutually agreeable to Seller and Purchaser, Purchaser and Seller will not issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Parties, which approval may not be unreasonably withheld, conditioned or delayed, except that such consent will not be required if disclosure is otherwise required by applicable Law or by the Bankruptcy Court; provided, however, that Purchaser or Seller, as applicable, will use its or their commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court

requirement to consult with the other Parties with respect to the text of any such required disclosure.

8.6    <u>Confidentiality</u>. Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under <u>Section 8.1</u>, and is subject to the terms of the confidentiality agreement dated December 15, 2023 between Seller and Purchaser (the "<u>Confidentiality Agreement</u>"), the terms of which are incorporated herein by reference. Purchaser acknowledges and understands that this Agreement and related documents may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders or contract counterparties and that, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.

8.7    <u>Employee Matters</u>.

(a)    Effective as of the day prior to the Closing Date, Seller or its Affiliates shall terminate the employment of the Business Employees currently employed by Seller or their Affiliates and identified on <u>Schedule 5.9(b)(i)</u> (the "<u>Transferring Business Employees</u>"), and Purchaser, subject to all applicable Purchaser policies, including the completion of a satisfactory background screening, will make offers of employment, to all Transferring Business Employees who are on active status and currently in good standing, for employment effective as of the day following the Closing Date. Employee offers will be made according to the compensation terms set by Purchaser and all applicable Laws. Each employee will be reviewed for appropriate classification within Purchaser's employment policies and procedures, and will be classified accordingly. All employees who accept employment with Purchaser shall be eligible for benefits offered by Purchaser to employees of that employee's classification. With respect to each Transferring Business Employee, Purchaser shall not assume Seller's or its Affiliates' Liability to such Transferring Business Employee for any Accrued PTO as of the Closing Date (the "<u>PTO Liability</u>"). Seller shall pay to each Transferring Business Employee the cash value of such Transferring Business Employee's PTO Liability prior to or on the Closing Date.

(b)    On the Closing, Seller shall, to the extent permitted by applicable Law, use its commercially reasonable efforts to effectuate the transfer of the employment of each Transferring Business Employee who is employed by Seller or its Affiliates to Purchaser. If Seller reasonably expects that, despite using commercially reasonable efforts to effect an employee transfer as set forth in the preceding sentence, Seller will be unable to transfer, or cause the transfer, of any Transferring Business Employee to Purchaser prior to the Closing Date, Seller shall promptly notify Purchaser of this and such Business Employees shall be covered by clause (c) of this <u>Section 8.7</u> below; <u>provided</u>, <u>however</u>, that the delivery of such notice pursuant to this <u>Section 8.7(a)</u> shall not affect or be deemed to modify any representation or warranty made by Seller, nor permit Purchaser to terminate this Agreement prior to the Closing in accordance with <u>Section 4.4(c)</u>.

(c)    Where required by applicable Law in order to effectuate the transfer of employment of a Transferring Business Employee who is employed by Seller to Purchaser or its Affiliates as of the Closing Date, Seller and Purchaser shall cooperate and use commercially

94065242.11

reasonable efforts to timely enter into necessary and appropriate employment transfer documents with the affected employees, including tripartite transfer of employment agreements, on terms and conditions consistent with this Article VIII, and in compliance with applicable Law.

(d)    [Intentionally Omitted]

(e)    Purchaser shall use its commercially reasonable efforts to ensure that any Transferring Business Employee who requires a visa or work permit in order to work for Purchaser or its Affiliates in their current position may continue to work in such position as a Transferring Business Employee following the Closing Date, which efforts may include, but are not limited to, amending current visa or work permit petitions to properly reflect any new employing entity or position prior to the Closing.

(f)    For the avoidance of doubt, nothing in this Section 8.7, express or implied, shall confer upon any Person other than the Parties any rights or remedies, including any third-party beneficiary rights, or shall be construed to (i) establish, amend, terminate or modify any compensation or benefit plan, program, policy, Contract, agreement or arrangement; (ii) limit the ability of Purchaser or any of its Affiliates to amend, modify or terminate any compensation or benefit plan, program, policy, Contract, agreement or arrangement; (iii) create any right in any Transferring Business Employee or any other Person to any employment or service with Purchaser or any of its Affiliates or to any particular term or condition of employment or service with Purchaser or any of its Affiliates; or (iv) limit the ability of Purchaser or any of its Affiliates to terminate the employment or service of any Person at any time and for any or no reason.

8.8    Releases.  Notwithstanding anything to the contrary contained herein, effective upon the Closing, (a) Purchaser (individually and on behalf of its Affiliates) hereby releases and waives any and all actual or potential claims, causes of action, Legal Proceedings and/or Liabilities, of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which Purchaser or any of its Affiliates had, have, or may have in the future against Seller and its Affiliates and their respective successors and assigns and all of their respective Representatives relating in any way to the Purchased Assets or the Assumed Liabilities, and (b) Seller (individually and on behalf of its Affiliates) hereby releases and waives any and all actual or potential claims, causes of action, Legal Proceedings and/or Liabilities of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which Seller or an Affiliate thereof had, have, or may have in the future against Purchaser and its Affiliates and their respective successors and assigns and all of their respective Representatives relating in any way to the Purchased Assets or the Assumed Liabilities; provided, that (i) nothing in this Agreement will constitute a release of any Person arising from conduct of such Person that is determined by a final order of a court of competent jurisdiction to have constituted Fraud, willful breach, knowing and intentional misrepresentation or a criminal act by such Person and (ii) nothing in this Agreement will be construed to release any Person from any of its contractual obligations under this Agreement and the other agreements contemplated by the Transactions, including its obligations in respect of the Purchased Assets, Assumed Liabilities, Excluded Assets and Excluded Liabilities, as the case may be, each of which will remain fully effective and enforceable from and after the Closing Date.

8.9    <u>Bulk Transfer Laws</u>.  Purchaser acknowledges that Seller will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the Transactions, and hereby waives all claims related to the non-compliance therewith.

8.10    <u>Notification of Certain Matters</u>.  Each Party shall promptly notify the other Parties in writing of any Change or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in (a) any matter of which Seller or Purchaser, as applicable, becomes aware which would cause a breach or inaccuracy of the representations and warranties set forth herein, (b) any of the conditions set forth in <u>Section 9.1(a)</u>, <u>9.1(b)</u>, <u>9.1(c)</u>, <u>9.2(a)</u>, <u>9.2(b)</u> or <u>9.2(c)</u> becoming incapable of being satisfied or (c) a Seller Material Adverse Effect (in the case of Seller as notifying Party) or a Purchaser Material Adverse Effect (in the case of Purchaser as the notifying Party); <u>provided</u>, that failure to deliver any such notice by any Party shall not constitute a failure of the conditions to Closing set forth in <u>Section 9.2</u> or <u>Section 9.3</u> to be satisfied. No notification pursuant to this <u>Section 8.10</u> shall (i) be deemed to have cured any breach of any representation or warranty or covenant made in this Agreement, or (ii) limit or otherwise affect the remedies available hereunder to Purchaser or Seller, as applicable.

8.11    <u>Sale Free and Clear</u>.  Seller acknowledges and agrees, and the Sale Order shall be drafted to provide, without limitation, that, (a) on the Closing Date and concurrently with the Closing, all then-existing Liens against or created by Seller, any of its Affiliates, or the bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets and (b) Purchaser is not a successor to Seller or the bankruptcy estate by reason of any theory of law or equity, and Purchaser shall not assume or in any way be responsible for any Liability of Seller, any of its Affiliates (other than, for the avoidance of doubt, indirectly by means of the acquisition of the Purchased Assets and the assumption of the Assumed Liabilities) and/or the bankruptcy estate, except as expressly provided in this Agreement.  Notwithstanding the foregoing, on the Closing Date, the Purchased Assets shall be transferred to Purchaser free and clear of all Liens (other than Permitted Exceptions) to the fullest extent permitted by Section 363 of the Bankruptcy Code.

8.12    <u>Use of Seller Intellectual Property</u>.

(a)    Other than the Acquired Intellectual Property, neither Purchaser nor any of its Affiliates shall use, or have or acquire the right to use or any other rights in, any Intellectual Property of Seller or any of its Affiliates, including the trade name "Mercon" and "Mercafe" or any variations or derivatives thereof or any names, trademarks, service marks or logos of Seller or any of its Affiliates, or any name or Intellectual Property that, in the reasonable judgment of Seller, is similar to any of the foregoing (the "<u>Mercon Names</u>").

(b)    Purchaser and its Affiliates shall, and shall cause their Affiliates to, (i) immediately after the Closing, cease to hold themselves out as having any affiliation with Seller and any of its Affiliates and (ii) use reasonable best efforts to minimize and eliminate use of the Mercon Names by Purchaser and its Affiliates. As soon as practicable after the Closing Date (and in any event within six (6) months thereafter) Purchaser shall and shall cause its Affiliates to cease and discontinue use of all Mercon Marks.

8.13    Access; Enforcement; Record Retention.  Seller and its respective Affiliates shall have the right to retain copies of all books and records of the Business relating to periods ending on or before the Closing Date. Further, for a period of three (3) years following the Closing (or until the earlier liquidation or dissolution of Seller), Seller and its respective Affiliates shall retain all records and reports prepared by or for Seller and its Affiliates in connection with the sale of the Business and the Transactions contemplated by this Agreement, including all analyses related to the Business or Purchaser or its Affiliates so prepared or received, and copies of all bids and expressions of interest received from third parties with respect thereto. For a period of twelve (12) months following the Closing (or until the earlier liquidation or dissolution of Seller), upon request by Seller, and at Seller's sole expense, Purchaser will permit Seller and its Representatives to have reasonable access during normal business hours to all premises, properties, personnel, books and records, and Contracts of or related to the Purchased Assets or the Assumed Liabilities for the purposes of (a) preparing Tax Returns for any taxable period ending on or before the Closing Date, (b) reasonably monitoring or enforcing rights or obligations of Seller under this Agreement or any of the Ancillary Agreements, or (c) complying with the requirements of any Governmental Body; provided, however, that, for avoidance of doubt, the foregoing shall not require Purchaser to take any such action if such action could, upon written advice from legal counsel, reasonably be expected to result in violation of applicable Law. Purchaser agrees to maintain the files or records which are contemplated by the first sentence of this Section 8.13 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for twelve (12) months following the Closing. This Section 8.13 shall not apply to any dispute or threatened dispute among the Parties.

8.14    Insurance Matters.  Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Seller, the Business, the Purchased Assets that is maintained by Seller or its Affiliates, if any (whether such policies are maintained with third party insurers or with Seller or its Affiliates), shall cease to provide any coverage to Purchaser, the Business, or the Purchased Assets and no further coverage shall be available to Purchaser, the Business, or the Purchased Assets under any such policies; provided, however, that Purchaser shall have the right to make claims and the right to any proceeds with respect to any matter related to the Purchased Assets or the Assumed Liabilities under any insurance policies for occurrence-based claims pertaining to, arising out of and inuring to the benefit of Seller for all periods prior to the Closing, and each Seller shall use commercially reasonable efforts to seek the maximum recovery or allow Purchaser to seek recovery (including by executing or delivering any document, agreement, instrument or other information as Purchaser may reasonably request to seek such recovery and as permitted under the applicable insurance policy) under such insurance policies, in each case, at Purchaser's sole cost and expense (including, if and to the extent unpaid and otherwise payable as a result of such recovery, any deductibles, self-insured retentions or other out-of-pocket expenses required to be paid by Purchaser or to the insurer in connection therewith), and Seller shall use its commercially reasonable efforts to cooperate with Purchaser's reasonable requests if it seeks recovery, with respect to such matters and shall remit (or, at Purchaser's request, direct any such insurer to pay directly to Purchaser) any insurance proceeds actually obtained therefrom (net of Seller's reasonable and documented out-of-pocket costs and expenses of seeking such recovery, to the extent not otherwise paid or reimbursed by Purchaser) to Purchaser or its designee to the extent such proceeds constitute an Purchased Asset. In the event Seller receives insurance proceeds in respect of any such claims made under this Section 8.14, it shall remit such proceeds to Purchaser as soon as reasonably practicable. In the event of any such claim, Purchaser shall (i)

40

to the extent assignable and permitted under the applicable insurance policy, assign or cause to be assigned to Seller or the applicable insurer or (ii) to the extent not so assignable and permitted, pursue claims and other rights of recovery against third parties with respect to the matter for which a claim is made, and shall cooperate with Seller with respect to the pursuit of such rights. Notwithstanding anything in this Agreement to the contrary, Purchaser acknowledges that Seller retains exclusive control over all such insurance policies, including the right to exhaust, lapse, renew, alter, amend, settle, release, waive, commute, buy back or otherwise modify any of such insurance policies, notwithstanding any actual or potential impact such actions have or could have on the coverage and rights provided under this <u>Section 8.14</u>. This Agreement shall not be considered as an attempted assignment of any such policy, and nothing in this Agreement is intended to waive or abrogate in any way Seller's own rights to insurance coverage for any Liability, whether relating to Seller or any of its respective Affiliates, any Purchased Asset or otherwise.

## IX.    CONDITIONS TO CLOSING

9.1    <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser in whole or in part in its sole discretion to the extent permitted by applicable Law):

(a)    each of the representations and warranties of Seller contained in <u>Section 5.1</u> (*Organization and Good Standing*), <u>Section 5.2</u> (*Authorization of Agreement*) and <u>Section 5.10</u> (*Broker Fee*) (collectively, the "<u>Seller Fundamental Representations</u>") shall be true and correct in all material respects as of the date when made and as of the Closing Date (other than in the case of the Seller Fundamental Representations that are made as of a specified date, which representations and warranties shall be true and correct in all material respects as of such specified date), and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect;

(b)    each of the representations and warranties of Seller contained in <u>Article V</u>, other than the Seller Fundamental Representations, shall be true and correct in all respects (without giving effect to any limitation or qualification by a materiality standard, including "in all material respects," "material" or "Seller Material Adverse Effect") as of the date when made and as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a Seller Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect;

(c)    Since the date of this Agreement, there shall have been no Seller Material Adverse Effect;

(d)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them

41

prior to or on the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer Seller, dated the Closing Date, to the foregoing effect; and

(e)      Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 4.2</u>.

9.2      <u>Conditions Precedent to Obligations of Seller</u>.   The obligations of Seller to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller in whole or in part in its sole discretion to the extent permitted by applicable Law):

(a)      each of the representations and warranties of Purchaser contained in <u>Section 6.1</u> (*Organization and Good Standing*), <u>Section 6.2</u> (*Authorization of Agreement*), <u>Section 6.4</u> (*Financial Capability*) and <u>Section 6.5</u> (*Broker Fee*) (collectively, the "<u>Purchaser Fundamental Representations</u>") shall be true and correct in all material respects as of the date when made and as of the Closing Date (other than in the case of Purchaser Fundamental Representations that are made as of a specified date, which representations and warranties shall be true and correct in all material respects as of such specified date), and Seller shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect;

(b)      each of the representations and warranties of Purchaser contained in Article <u>VI</u>, other than the Purchaser Fundamental Representations, shall be true and correct (without giving effect to any limitation or qualification by a materiality standard, including "in all material respects," "material" or "Purchaser Material Adverse Effect") as of the date when made and as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a Purchaser Material Adverse Effect, and Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect;

(c)      Purchaser shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Purchaser prior to or on the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect; and

(d)      Purchaser shall have delivered to Seller all of the items set forth in <u>Section 4.3</u>.

9.3      <u>Conditions Precedent to Obligations of Purchaser and Seller</u>.   The respective obligations of Purchaser and Seller to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller and Purchaser, jointly, in whole or in part to the extent permitted by applicable Law):

(a)    any waiting period (and any extension thereof) under any Antitrust Regulation applicable to the Transactions shall have expired or shall have been terminated or the necessary clearance thereunder shall have been received and shall remain in full force and effect and any contractual timing commitments with any Governmental Body through timing agreements or otherwise must have expired or been satisfied;

(b)    no Governmental Body shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the Transactions; and

(c)    the Bankruptcy Court shall have entered the Sale Order, which shall (i) be in full force and effect, (ii) not be subject to any stay or appeal, (iii) not have been materially modified without the written consent of Purchaser and Seller (not to be unreasonably withheld, conditioned, or delayed), (iv) not have been reversed or vacated, and (v) unless waived by Purchaser, shall be a Final Order.

9.4    <u>Frustration of Closing Conditions</u>.  No Party may rely on the failure of any condition set forth in <u>Sections 9.1</u>, <u>9.2</u> or <u>9.3</u>, as the case may be, if such failure was caused by such Party's breach of any provision of this Agreement.

## X.    TAXES

10.1    <u>Transfer Taxes</u>. All documentary, sales, stamp, transfer, motor vehicle registration, value-added, excise and other similar direct or indirect non-income or transfer Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the Transactions, (collectively, "<u>Transfer Taxes</u>"), will be borne and paid by Purchaser. Each Party agrees to cooperate with such other Party in the timely completion, execution and filing of any documentation required or exemptions allowed by any local, state or other Governmental Body in connection with the Transfer Taxes. Purchaser and Seller shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under applicable Law.

10.2    <u>Purchase Price Allocation</u>. Seller and Purchaser each agree that the Purchase Price (including for the Assumed Liabilities and any other items required to be taken into account for income Tax purposes) shall be allocated among the Purchased Assets purchased pursuant to this Agreement in accordance with Section 1060 of the Code.  Within sixty (60) days after Closing, Purchaser shall provide to Seller a schedule (the "<u>Proposed Allocation Schedule</u>") allocating the Purchase Price in accordance with the foregoing. Purchaser and Seller shall work in good faith to resolve any disputes related to the Proposed Allocation Schedule and if they cannot do so within a reasonable period of time such dispute shall be resolved by a nationally recognized accounting firm (the "<u>Allocation Accounting Firm</u>") mutually selected by Purchaser and Seller.  The Allocation Schedule shall be construed as final in such form as is agreed by Purchaser and Seller or in such form as is necessary to reflect any resolution of a disputed matter by the Allocation Accounting Firm (the "<u>Final Allocation Schedule</u>"). The costs of such accounting firm associated with resolving such dispute shall be borne equally by Purchaser and Seller.  Purchaser and Seller each agree to file IRS Form(s) 8594 and all federal, state and local income Tax Returns in

43

accordance with the Final Allocation Schedule, as finally determined, and none of them shall thereafter take an income Tax Return position inconsistent with such allocation unless such inconsistent position shall arise out of or through an audit or other inquiry or examination by the IRS or other Tax Authority.

10.3    <u>Post-Closing Tax Covenants</u>.  Following the Closing, the Purchaser will not (and will not allow its Affiliates to) take any action after the Closing other than in the Ordinary Course of Business that could give rise to any Tax liability or reduce any Tax attribute of Seller or its Affiliates.

10.4    <u>Property Tax Apportionment</u>. For the avoidance of doubt, ad valorem property Taxes (but not including income Taxes) attributable to the Purchased Assets for a Tax period that begins on or before the Closing Date and ends thereafter (a "<u>Straddle Period</u>") shall be apportioned between Seller, on one hand, and Purchaser, on the other hand, based on the number of days in the Straddle Period on or prior to the Closing Date and the number of days in the Straddle Period after the Closing Date.

## XI.    GENERAL GOVERNING PROVISIONS

11.1    <u>No Survival of Representations and Warranties</u>.  The Parties agree that each of the representations and warranties of the Parties and Seller pre-Closing covenants contained in this Agreement will terminate at, and will not survive, the Closing hereunder, and none of the Parties, their shareholders, officers and directors, will have any Liability to each other after the Closing for any breach thereof except for claims against the Parties for Fraud with respect thereto. The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing in accordance with their respective terms and each Party will be liable to the other after the Closing for any breach thereof.

11.2    <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, whether or not the Transactions are consummated, each of Seller, on the one hand, and Purchaser, on the other hand, will bear its own expenses incurred in connection with the negotiation and execution of this Agreement, the Ancillary Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transactions and all Legal Proceedings incident thereto; provided that if the Sale Order is not obtained, Purchaser shall be entitled to expense reimbursement up to $50,000 of its documented outside counsel and/or advisor fees.

11.3    <u>Injunctive Relief</u>.

(a)    The Parties agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement, including specific performance of such covenants, promises or agreements or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this

44

Agreement.  The rights set forth in this <u>Section 11.3</u> will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)     The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Purchaser or Seller, as applicable, under this Agreement all in accordance with the terms of this <u>Section 11.3</u>.

11.4    <u>Governing Law</u>.   This Agreement and any claim or controversy hereunder, including matters of validity, construction, effect, enforceability, performance and remedies, and with respect to statute of limitations or any other applicable limitations period shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflict of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

11.5    <u>Submission to Jurisdiction; Consent to Service of Process</u>. Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Legal Proceedings arising out of or relating to this Agreement or any Ancillary Agreement or the Transactions and agrees that all claims in respect of such Legal Proceedings may be heard and determined in any such court. Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Ancillary Agreement or the Transactions or thereby in any other court. Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Legal Proceedings so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in <u>Section 11.8</u>; <u>provided, however</u>, that nothing in this <u>Section 11.5</u> shall affect the right of any Party to serve legal process in any other manner permitted by Law or in equity. Each Party agrees that a final judgment in any Legal Proceedings so brought shall be conclusive and may be enforced by Legal Proceedings or in any other manner provided by Law or in equity. The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Legal Proceedings arising out of or relating to this Agreement or any Ancillary Agreement or the Transactions.

11.6    <u>Waiver of Right to Trial by Jury</u>. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL PROCEEDING ARISING OUT OF THIS AGREEMENT OR ANY ANCILLARY AGREEMENT OR ANY OF THE TRANSACTIONS. EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT, IN THE EVENT OF ANY LEGAL PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY,

94065242.11

AMONG OTHER THINGS, THE MUTUAL WAIVER AND CERTIFICATIONS IN THIS <u>SECTION 11.6</u>.

11.7    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement, the Exhibits and Seller Disclosure Schedule represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

11.8    <u>Notices</u>.  All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) when sent by email (with written confirmation of transmission), or (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Seller, to:

Riveron
401 S. Old Woodward Ave.
Suite 340
Birmingham, MI 48009
Attn: Harve Light
Email: Harve.Light@riveron.com

With copies (which will not constitute notice) to:

Baker & McKenzie LLP
452 5th Ave, New York, NY 10018
Attention: Federico Cuadra Del Carmen / Paul Keenan
Email:      Federico.Cuadra@bakermckenzie.com
            Paul.Keenan@bakermckenzie.com

If to Purchaser, to:

StoneX Group Inc.

230 Park Ave, 10th Floor
New York, NY 10169
Attention: Ryan McNearney and SXCS Legal Department
Email: Ryan.McNearney@StoneX.com; DG-RKContracts@stonex.com

With copies (which will not constitute notice) to:

Polsinelli PC
1000 2nd Ave, Suite 3500
Seattle, WA 98104
Attention: Jane Pearson
Email: Jane.Pearson@polsinelli.com

11.9    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

11.10    Assignment.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of Law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void; provided, however, that (a) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more Affiliates, to its lenders as collateral security or, after the Closing Date, to an acquirer of Purchaser or substantially all of its assets, and (b) Seller may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court, and in the case of each clause (a) and (b) without any other Party's consent. No assignment of any obligations hereunder will relieve the Parties of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Seller or Purchaser will also apply to any such assignee unless the context otherwise requires.

11.11    Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, partner, equity holder, manager, agent, attorney, Representative or Affiliate of the Parties or any of their Affiliates (each, a "Non-Recourse Party") will have any Liability for any obligations or Liabilities of Seller or Purchaser, as applicable, under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the Transactions. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby or thereby may only be brought against Persons that are expressly named as Parties thereto, and then only with respect to the specific obligations set forth herein or therein.  Other than the Parties, no other Person will have

any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any Party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any Legal Proceeding based on, in respect of, or by reason of, Transactions (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party or another Person or otherwise.  This Section 11.11 is intended to benefit and may be enforced by each Non-Recourse Party (and each such Person will be a third party beneficiary of this Section 11.11) and will be binding on all the respective successors and permitted assigns of the Parties.

11.12  Mutual Drafting. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

11.13  Counterparts; Facsimile and Electronic Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

11.14  Seller Disclosure Schedules.  All capitalized terms not defined in Seller Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Seller in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in Seller Disclosure Schedule. The disclosure of any matter in any section of Seller Disclosure Schedule shall be deemed to be a disclosure for all purposes of this Agreement and all other sections of Seller Disclosure Schedule in which it is reasonably apparent on the face of such disclosure that the information applicable to such other section of Seller Disclosure Schedule. The listing of any matter shall expressly not be deemed to constitute an admission by Seller, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in Seller Disclosure Schedule relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the listing of any matter in Seller Disclosure Schedule be deemed or interpreted to expand the scope of Seller's representations, warranties, or covenants set forth in this Agreement. All attachments to Seller Disclosure Schedule are incorporated by reference into the applicable section of Seller Disclosure Schedule in which they are directly or indirectly referenced. The information contained in Seller Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

11.15  Nonassertion of Attorney-Client Privilege. Purchaser waives and will not assert, and agrees to cause its Affiliates to waive and not to assert, any attorney-client or other applicable legal privilege or protection with respect to any communication between any legal counsel and Seller, any of its Affiliates or any shareholder, officer, employee or director of Seller or any of its Affiliates occurring during any matter involving this Agreement, the Ancillary Agreements or any

other agreements or transactions contemplated hereby or thereby, including in connection with a dispute with Purchaser or its Subsidiaries it being the intention of the Parties that all such rights to such attorney-client and other applicable legal privilege or protection and to control such attorney-client and other applicable legal privilege or protection shall be retained by Seller and that Seller, and not Purchaser or its Subsidiaries shall have the sole right to decide whether or not to waive any attorney-client or other applicable legal privilege or protection.  Accordingly, from and after the Closing, none of Purchaser or its Subsidiaries shall have any access to any such communications or to the files of any matter involving this Agreement, the Ancillary Agreements or any other agreements or transactions contemplated hereby or thereby, all of which shall be and remain the property of Seller and not of Purchaser or its Subsidiaries, or to internal counsel relating to such engagement, and none of Purchaser or its Subsidiaries or any Person acting or purporting to act on their behalf shall seek to obtain the same by any process on the grounds that the privilege and protection attaching to such communications and files belongs to Seller.

11.16  <u>Limitations Under Applicable Law</u>. Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations hereunder shall be subject to limitations under applicable Law, including Sections 1113 and 1114 of the Bankruptcy Code.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

PURCHASER:

STONEX COMMODITY SOLUTIONS LLC

By: _____

Name:  Brent Grecian
Title: President and CEO

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

SELLER:

MERCON COFFEE CORPORATION

By:

Name: Harve Light

Title: Chief Restructuring Officer

*[Signature page to Asset Purchase Agreement]*

## **Exhibit A**

Escrow Agreement

See attached.

Execution Version

<u>ESCROW AGREEMENT</u>

THIS ESCROW AGREEMENT (this "<u>Agreement</u>") is made and entered into as of April 12, 2024 by and among StoneX Commodity Solutions LLC, a Delaware limited liability company, (the "<u>Purchaser</u>"), Mercon Coffee Corporation, a New York corporation, (the "<u>Seller</u>" and, together with the "Purchaser", sometimes referred to individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>"), and Citibank, N.A., as escrow agent (the "<u>Escrow Agent</u>").

<u>RECITALS</u>

WHEREAS, in connection with the transactions contemplated by that certain Asset Purchase Agreement (the "<u>Purchase Agreement</u>"), dated as of the date hereof, by and between Purchaser and Seller, the parties thereto have agreed to establish an escrow arrangement for the limited purposes set forth therein and herein; and

WHEREAS, the Purchase Agreement provides that a portion of the purchase price shall be deposited by Purchaser into escrow in an amount equal to $542,889 (the "<u>Escrow Amount</u>") to be held and distributed by the Escrow Agent in accordance with the terms and subject to the conditions of the Purchase Agreement and this Agreement.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties hereto agree as follows:

1.    <u>Appointment</u>.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.    <u>Escrow Funds</u>.

(a)    Simultaneous with the execution and delivery of this Agreement, the Purchaser is depositing with the Escrow Agent the Escrow Amount in immediately available funds.

(b)    The Escrow Agent hereby acknowledges receipt of the Escrow Amount, together with all products and proceeds thereof, including all interest, dividends, gains and other income (collectively, the "<u>Escrow Earnings</u>") earned with respect thereto (collectively, the "<u>Escrow Funds</u>") in separate and distinct account (the "<u>Escrow Account</u>"), subject to the terms and conditions of this Agreement.

(c)    For greater certainty, all Escrow Earnings shall be retained by the Escrow Agent and reinvested in the Escrow Funds and shall become part of the Escrow Funds; and shall be disbursed as part of the Escrow Funds in accordance with the terms and conditions of this Agreement.

(d)    The Escrow Funds shall (i) not be subject to set off by the Escrow Agent or any of its affiliates, except as set forth in <u>Section 8</u>, (ii) subject to <u>Section 14</u> below, not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of

any party hereto, and (iii) be held and disbursed solely for the purposes and in accordance with the terms of this Agreement and the Purchase Agreement. The Escrow Agent shall promptly acknowledge receipt of the Escrow Funds in writing to each of the Parties on the date of receipt.

3.    <u>Investment of Escrow Funds</u>.

(a)    Unless otherwise jointly instructed in writing and executed by an Authorized Representative (as defined in <u>Section 4(a)(iv)</u> below) of both Parties, the Escrow Agent shall invest the Escrow Funds in an interest-bearing deposit obligation of Citibank, N.A., with an initial interest rate of 200 basis points (2.00%), insured by the Federal Deposit Insurance Corporation ("<u>FDIC</u>") to the applicable limits. The Parties acknowledge that the initial interest rate is subject to change from time to time and shall be reflected in the monthly statement provided to the Parties. The Escrow Funds shall at all times remain available for distribution in accordance with <u>Section 4</u> below.

(b)    The Escrow Agent shall send an account statement to each of the Parties on a monthly basis reflecting activity in the Escrow Account for the preceding month.

(c)    Except as a direct result of its own gross negligence, willful misconduct or fraud, as adjudicated by a court of competent jurisdiction, in the execution of its express contractual duties under this Agreement, the Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the escrowed property, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the escrowed property in accordance with the terms, and subject to the conditions, of this Agreement. The Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

4.    <u>Disposition and Termination of the Escrow Funds</u>.

(a)    <u>Escrow Funds</u>.  The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds as provided in, this <u>Section 4(a)</u> as follows:

(i)    Upon receipt of a Joint Release Instruction (as defined below) with respect to the Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of a Joint Release Instruction with respect to the Escrow Funds, disburse all or part of the Escrow Funds in accordance with such Joint Release Instruction.

(ii)    If at any time either of the Parties receives a Final Determination (as defined below), the prevailing Party will deliver a copy of such Final Determination to the Escrow Agent and the other Party. Upon receipt of a copy of such Final Determination, the Escrow Agent shall promptly, but in any event within five (5) Business Days following receipt by the Escrow Agent from the applicable Party of the Final Determination, disburse, part or all, as the case may be, of the Escrow Funds (but only to the extent funds are available in the Escrow Funds) to Purchaser or Seller in accordance with such Final Determination.  Subject to the terms of this <u>Section 4</u>, the Escrow Agent will act on such Final Determination without further inquiry.

2

(iii)    All payments and disbursements of any part of the Escrow Funds shall be made by wire transfer of immediately available funds to the account or accounts, or by check, as set forth in the Joint Release Instruction or Final Determination, as applicable.

(iv)    Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in the Escrow Account under the terms of this Agreement must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and Exhibit A-2 (the "Authorized Representatives") and delivered to the Escrow Agent as an attachment to an e-mail received on a Business Day sent to the e-mail address set forth in Section 11 below. In the event a Joint Release Instruction or Final Determination is delivered to the Escrow Agent, whether in writing, by e-mail or otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated in Exhibit A-1 and/or A-2 attached hereto (the "Call Back Authorized Individuals"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual.  To ensure accuracy of the instructions it receives, the Escrow Agent may record such call backs.  If the Escrow Agent is unable to verify the instructions, or is not reasonably satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved.  The persons and telephone numbers for call backs may be changed only in writing, executed by an Authorized Representative of the applicable Party and actually received and acknowledged by the Escrow Agent.

(v)    If the Escrow Agent releases any funds, including but not limited to the Escrow Amount or any portion of it, to a Party and subsequently determines, in its sole discretion, that the payment or any portion of it was made in error, the Party shall, upon notice, promptly refund the erroneous payment.  Any such erroneous payment by the Escrow Agent, and the Party's return thereof to the Escrow Agent, shall not affect any obligation or right of either the Escrow Agent or the Parties.  Each of the Parties agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to the Escrow Agent's recovery of any erroneous payment.

(vi)    Each Party hereby agrees that it will cooperate with the other Party and the Escrow Agent in good faith to ensure distribution of the Escrow Funds to the relevant Party entitled thereto under the terms of the Purchase Agreement.

(b)    Certain Definitions.

(i)    "Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are not required or authorized by law to be closed in New York, New York.

(ii)    "Final Determination" means a final, non-appealable decision, judgment, award, decree or order of any court of competent jurisdiction which may be issued, together with (A) a certificate executed by an Authorized Representative of the prevailing Party, to the effect that such decision, judgment, award, decree or order is final and non-appealable and from a court of competent jurisdiction having proper authority and (B) the written payment

3

instructions executed by an Authorized Representative of the prevailing Party, to effectuate such decision, judgment, award, decree or order.

(iii)    "Joint Release Instruction" means a joint written instruction executed by an Authorized Representative of each of Purchaser and Seller, directing the Escrow Agent to disburse all or a portion of the Escrow Funds, as applicable.

(iv)    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5.    Escrow Agent. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duties, shall be implied. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, including without limitation the Purchase Agreement, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of Escrow Agent. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction or Final Determination furnished to it hereunder and reasonably believed by it to be genuine and to have been signed by an Authorized Representative of the proper Party or Parties. Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent the Authorized Representatives' forms in the form of Exhibit A-1 and Exhibit A-2 attached hereto. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its reasonable opinion, conflict with any of the provisions of this Agreement, the Escrow Agent shall promptly notify the Parties of such uncertainty or apparent conflict and, following delivery of such notice and until such time as the Escrow Agent receives revised instructions, claims, demands, Joint Release Instructions from the Parties or a Final Determination, the Escrow Agent shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction or Final Determination. The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment. The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct loss to

4

either Party.  To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same (other than with respect to a dispute involving the Escrow Agent).  Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action, except in the case of the Escrow Agent's willful misconduct or fraud, as adjudicated by a court of competent jurisdiction.

6.      Resignation and Removal of Escrow Agent.  The Escrow Agent (a) may resign and be discharged from its duties and obligations hereunder by giving thirty (30) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by Purchaser and Seller acting jointly at any time by providing written notice executed by an Authorized Representative of each Party, to the Escrow Agent.  Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act; provided, however, that the Escrow Agent shall notify the Parties as soon as reasonably practicable of such of such merger, conversion or consolidation as soon as reasonably practicable. The Escrow Agent's sole responsibility after such thirty (30) day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation executed by an Authorized Representative of each of the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate.  In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7.      Fees and Expenses.  All fees and expenses of the Escrow Agent are described in Schedule 1 attached hereto and shall be paid equally by the Parties. The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent's services as contemplated by this Agreement.

8.      Indemnity.  Each of the Parties shall jointly and severally indemnify, defend, and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable and documented fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (other than taxes on income earned by an Indemnitee in connection herewith) (collectively "Escrow Agent Losses") incurred or suffered by an Indemnitee, arising out of or in connection with (a) the Escrow Agent's execution and

performance of this Agreement, tax reporting or withholding, the Escrow Agent's enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except to the extent that such Escrow Agent Losses, as adjudicated by a court of competent jurisdiction, have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee, or (b) the Escrow Agent following any instructions or other directions from Purchaser or Seller. The Parties hereby grant the Escrow Agent a right of set-off against their respective interests in the Escrow Funds solely for the payment of any undisputed Escrow Agent Losses due from the applicable responsible Party under this <u>Section 8</u> that have been previously invoiced and remain unpaid by such Party. Notwithstanding anything to the contrary herein, Purchaser and Seller agree, solely as between themselves, that any obligation for indemnification under this <u>Section 8</u> (or for reasonable fees and expenses of the Escrow Agent described in <u>Section 7</u>) shall be borne by the Party or Parties determined by a court of competent jurisdiction pursuant to a final, non-appealable order to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by Purchaser and one-half by Seller. The Parties acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement.

9.    <u>Tax Matters.</u>

(a)    Purchaser shall be responsible for and the taxpayer on all taxes due on the interest or income earned, if any, on the Escrow Funds for the calendar year in which such interest or income is earned. The Escrow Agent shall report any interest or income earned on the Escrow Funds, if any, to the Internal Revenue Service (the "<u>IRS</u>") or other taxing authority on IRS Form 1099. Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may request.

(b)    The Escrow Agent shall be responsible only for income reporting to the IRS with respect to income earned on the Escrow Funds. The Escrow Agent shall timely withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall timely remit such taxes to the appropriate authorities.

(c)    The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates. This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.    <u>Covenant of Escrow Agent.</u>  The Escrow Agent hereby agrees and covenants with Purchaser and Seller that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

94230726.4

11.    <u>Notices</u>.    Except as otherwise expressly required in <u>Section 4(a)(iv)</u>, all communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered to the individuals listed in this Section 11 or the Authorized Representatives (i) personally, (ii) on the day of transmission if sent by electronic mail ("<u>e-mail</u>") with a PDF attachment executed by an Authorized Representative of the Party/ Parties to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iii) by overnight delivery with a reputable national overnight delivery service, or (iv) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given five (5) Business Days after the date such notice is deposited with the United States Postal Service.  If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

<u>if to Purchaser, then to</u>:

StoneX Group Inc.
230 Park Ave, 10th Floor
New York, NY 10169
Attention: Ryan McNearney and SXCS Legal Department
Email: Ryan.McNearney@StoneX.com; DG-RKContracts@stonex.com

<u>with a copy (which shall not constitute notice) to</u>:

Polsinelli PC
1000 2nd Avenue, Suite 3500
Seattle, WA 98104
Attn: Jane Pearson/Amanda Terr
E-mail: Jane.Pearson@polsinelli.com; Aterr@polsinelli.com

<u>or, if to Seller then to</u>:

Riveron
401 S. Old Woodward Ave.
Suite 340
Birmingham, MI 48009
Attn: Harve Light
Email: Harve.Light@riveron.com

94230726.4

with a copy (which shall not constitute notice) to:

Baker & McKenzie LLP
452 5th Avenue
New York, NY 10018
Attn: Federico Cuadra Del Carmen / Paul Keenan
Email:Federico.Cuadra@bakermckenzie.com; Paul.Keenan@bakermckenzie.com

or, if to the Escrow Agent, then to:

Citibank, N.A.
Citi Private Bank
388 Greenwich Street, 17th Floor
New York, NY   10013
Attn: Eddy Rosero; Debra DeMarco
Telephone No.: 212-783-7073; 212-783-7092
Facsimile No.:  212-783-7131
E-mail: eddy.rosero@citi.com
debra.demarco@citi.com

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iv) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent.  In the event that the Escrow Agent, in its reasonable discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12.    Termination.    This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Funds in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by an Authorized Representative of each of Purchaser and Seller after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

13.    Miscellaneous.    The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto; provided, that Seller shall be permitted to assign its rights, obligations and interests in this Agreement to an entity with authority by the Bankruptcy Court (as defined in the Purchase Agreement) to act on behalf of the Seller on written notice to the Purchaser and Escrow Agent. Subject to Section 16, neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party without the prior consent of the other parties.  This Agreement shall be governed by and construed under the laws of the State of Delaware without giving effect to the rules of conflict of laws that would result in the application of laws of any other jurisdiction. Each party irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of Delaware. The parties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement.  This

Agreement and any Joint Release Instruction may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Agreement may be transmitted by electronic transmission in portable document format (.pdf), and such .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written. Except as expressly provided in Section 8, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

14.    Compliance with Court Orders.   In the event that any property deposited in escrow under this Agreement shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15.    Further Assurances.   Following the date hereof, each party shall deliver to the other parties such further information and documents and shall execute and deliver to the other parties such further instruments and agreements as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party the benefits hereof.

16.    Assignment.   No assignment of the interest of any of the Parties shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be delivered to, and consented to by, the Escrow Agent (such consent not to be unreasonably withheld, conditioned or delayed); provided, that Seller shall be permitted to assign its rights, obligations and interests in this Agreement to an entity with authority by the Bankruptcy Court (as defined in the Purchase Agreement) to act on behalf of the Seller on written notice to the Purchaser and Escrow Agent. To comply with federal law including USA Patriot Act requirements, assignees shall provide to the Escrow Agent the appropriate IRS form W-9 or W-8 as applicable and such other forms and documentation that the Escrow Agent may reasonably request to verify identification and authorization to act. In no event shall the Escrow Agent be obligated hereunder to (x) make any payments from the Escrow Funds directly to any assignee of either Party of any

9

94230726.4

rights under this Agreement, or (y) obey any written instructions delivered pursuant hereto from any assignee of any rights under this Agreement, unless, in the case of clauses (x) and (y), such assignee has become a party to this Agreement. Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

17.    <u>Force Majeure.</u>  The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.    <u>Compliance with Federal Law</u>. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds at Citibank pursuant to the terms and conditions of this Agreement. For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity. The Escrow Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.    <u>Use of Citibank Name.</u>  No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any other Parties hereto, or on such Party's behalf, without the prior written consent of the Escrow Agent.

20.    <u>Use of Electronic Records and Signatures.</u> As used in this Agreement, the terms "writing" and "written" include electronic records, and the terms "execute," "signed" and "signature" include the use of electronic signatures. Notwithstanding any other provision of this Agreement or the attached Exhibits and Schedules, any electronic signature that is presented as the signature of the purported signer, regardless of the appearance or form of such electronic signature, may be deemed genuine by Escrow Agent in Escrow Agent's sole discretion, and such electronic signature shall be of the same legal effect, validity and enforceability as a manually executed, original, wet-ink signature; provided, however, that any such electronic signature must be an actual and not a typed signature. In accordance with Section 8 of this Agreement, Escrow Agent shall be indemnified and held harmless from any Escrow Agent Losses it incurs as a result of its acceptance of and reliance on electronic signatures that it deems to be genuine. Any electronically signed agreement, instruction or other document shall be an "electronic record" established in the ordinary course of business and any copy shall constitute an original for all purposes. The terms "electronic signature" and "electronic record" shall have the meaning

ascribed to them in 15 USC § 7006. This Agreement and any instruction or other document furnished hereunder may be transmitted as a PDF file attached to an email.

21.    <u>Sanctions</u>. None of the Parties or any of their parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of any Party, the affiliates of the Parties or any of their subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute, or otherwise make available such Escrow Funds in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

<div align="center">*    *    *    *    *</div>

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

PURCHASER:

**STONEX COMMODITY SOLUTIONS LLC**

By: _____

Name: Brent Grecian

Its:    President and CEO

SELLER:

**MERCON COFFEE CORPORATION**

By: _____

Name: _____

Its: _____

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____

Name: Debra DeMarco

Its:    Senior Vice President

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

PURCHASER:

**STONEX COMMODITY SOLUTIONS LLC**

By: _____

Name:

Its:

SELLER:

**MERCON COFFEE CORPORATION**

By: _____

Name:    Harve Light

Its:    Chief Restructuring Officer

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____

Name:

Its:

*Signature Page to Escrow Agreement*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

PURCHASER:

**STONEX COMMODITY SOLUTIONS LLC**

By:    _____
Name:
Its:


SELLER:

**MERCON COFFEE CORPORATION**

By:    _____
Name:  _____
Its:    _____


ESCROW AGENT:

**CITIBANK, N.A.**

By:    _____
Name:  Debra DeMarco
Its:    Senior Vice President

*Signature Page to Escrow Agreement*

## Schedule 1

### ESCROW AGENT FEE SCHEDULE
### Citibank, N.A., Escrow Agent

**Acceptance Fee**

To cover the acceptance of the escrow agency appointment, the study of the Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

**Fee:  waived**

**Administration Fee**

The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the escrow account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement. Fee is based on the Escrow Amount being deposited in an interest-bearing deposit obligation of Citibank N.A., FDIC insured to the applicable limits.

**Fee: waived**

**Tax Preparation Fee**

To cover preparation and mailing of Forms 1099-INT, if applicable, or other applicable forms, for the escrow parties for each calendar year:

**Fee:  waived**

**Transaction Fees**

To oversee all required disbursements or release of property from the escrow account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

**Fee:  waived**

**Other Fees**

Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

---

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform.  Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change.  Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder.  The Acceptance Fee, if any, is payable upon execution of the Agreement.  Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

94230726.4

EXHIBIT A-1

Certificate as to Purchaser's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Purchaser and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of Purchaser. The below listed persons (must list at least two individuals) have also been designated an Authorized Individual and may be contacted by Citibank, N.A. prior to the release of Escrow Funds from the escrow account(s).

| Name / Title / Telephone | Specimen Signature |
|---|---|
| Ryan McNearney | |
| Name | Signature |
| Vice President Legal + Business Affairs | |
| Title | |
| 816.728.9455 | 816.728.9455 |
| Phone | Mobile Phone |
| Brent Gorecian | |
| Name | Signature |
| CEO | |
| Title | |
| 816.410.7123 | 816.206.6934 |
| Phone | Mobile Phone |
| | |
| Name | Signature |
| | |
| Title | |
| | |
| Telephone | Mobile Phone |

EXHIBIT A-2

Certificate as to the Seller's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Seller and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of the Seller. The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and may be contacted by Citibank N.A. prior to the release of Escrow Funds from the escrow account(s).

Name / Title / Telephone                    Specimen Signature

Harve Light
Name                                        Signature

Chief Restructuring Officer
Title

248 670 0877                                248 670 0877
Phone                                       Mobile Phone


Name                                        Signature


Title


Phone                                       Mobile Phone


Name                                        Signature


Title


Telephone                                   Mobile Phone

*[Exhibit to Escrow Agreement]*

*EXECUTION VERSION*

**Schedules to the**

**ASSET PURCHASE AGREEMENT**

by and among

StoneX Commodity Solutions LLC,

as Purchaser,

and

Mercon Coffee Corporation

as Seller,

dated as of April 12, 2024

i

*EXECUTION VERSION*

### Schedule 1.1(a)(ii)
**Seller's Knowledge**

1.  Craig Russell

2.  Juan Pablo Ibarra

3.  Felipe Cam

4.  Marina Alvarez

5.  Jolene Zehnder

2

*EXECUTION VERSION*

### Schedule 2.1(b)(i)
**Purchased Contracts**

See attached.

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sell | SPECIALTY SEATTLE | INVENTORY | 24697992505330 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2468938 | 1/05/2024 | 23/24 | Current Crop | TRADING 3P | 2505330-1 | 10/6/2023 | Emily Smith | Rimini Coffee | United States of America | | 5/1/2024 | FOT/DLY | SW | Net 30 Fm D/O | 2324 | Houston | Oakland | May 2024 | AN-OK (MSP) BRA-SPC IPE AMARELO 16+ 59kbg | BRA-SPC IPE AMARELO 16+ | BRA-SPC IPE AMARELO 16+ | 1 | USD | PF-100.00% | 10 | 59kbg | 1,301 | 0 | -9.833333333 | ICE C | KCK24+78.00 USC/Lb | 0 | 148 | 78 | 226 | 2939.61364 | ICE C | KCK24 | 188.1 | 15 | 203.1 | 48 | 251.1 | 2641.750134 | $ 624 | $ 3,266 | -$ 522 | $ 195 | -$ 326 | -$ 522 | $ 195 | -$ 326 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24697992505329 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2468938 | 1/04/2024 | 23/24 | Current Crop | TRADING 3P | 2505329-1 | 10/6/2023 | Emily Smith | Rimini Coffee | United States of America | | 4/1/2024 | FOT/DLY | SW | Net 30 Fm D/O | 2324 | Houston | Oakland | Apr 2024 | AN-OK (MSP) BRA-SPC IPE AMARELO 16+ 59kbg | BRA-SPC IPE AMARELO 16+ | BRA-SPC IPE AMARELO 16+ | 1 | USD | PF-100.00% | 10 | 59kbg | 1,301 | 0 | -9.833333333 | ICE C | KCK24+78.00 USC/Lb | 0 | 148 | 78 | 226 | 2939.61364 | ICE C | KCK24 | 188.1 | 15 | 203.1 | 48 | 251.1 | 2641.750134 | $ 624 | $ 3,266 | -$ 522 | $ 195 | -$ 326 | -$ 522 | $ 195 | -$ 326 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24697992505328 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2468938 | 1/03/2024 | 23/24 | Current Crop | TRADING 3P | 2505328-1 | 10/6/2023 | Emily Smith | Rimini Coffee | United States of America | | 3/1/2024 | FOT/DLY | SW | Net 30 Fm D/O | 2324 | Houston | Oakland | Mar 2024 | AN-OK (MSP) BRA-SPC IPE AMARELO 16+ 59kbg | BRA-SPC IPE AMARELO 16+ | BRA-SPC IPE AMARELO 16+ | 1 | USD | PF-100.00% | 10 | 59kbg | 1,301 | 0 | -9.833333333 | ICE C | KCH24+78.80 USC/Lb | 0 | 147.2 | 78.8 | 226 | 2939.61364 | ICE C | KCK24 | 188.1 | 15 | 203.1 | 48 | 251.1 | 2641.750134 | $ 624 | $ 3,266 | -$ 532 | $ 206 | -$ 326 | -$ 532 | $ 206 | -$ 326 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24607782520782 | SPECIALTY SEATTLE | Vietnam | Beta 1 | Milds | Asian Milds | 1883293 | 1/12/2023 | 23/24 | Current Crop | TRADING 3P | 2520782-1 | 11/3/2023 | Serena Beze | Rolling Hills Coffee | United States of America | | 12/1/2023 | FOT/DLY | LW | Net 30 Fm D/O | 2122 | Portland | Jacksonville | Dec 2023 | DP-JA (MSP) VIE-SPC ANAEROBIC PROCESS 60kbg | VIE-SPC ANAEROBIC PROCESS | VIE-SPC ANAEROBIC PROCESS | 1 | USD | PF-100.00% | 14 | 60kbg | 1,852 | 0 | -14 | ICE C | KCZ23+95.50 USC/Lb | 0 | 166.5 | 95.5 | 262 | 4851.88368 | ICE C | KCK24 | 188.1 | 80 | 268.1 | 47 | 315.1 | 4964.847384 | $ 870 | $ 5,835 | $ - | -$ 983 | -$ 983 | $ - | -$ 983 | -$ 983 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24601912520804 | SPECIALTY SEATTLE | Honduras | Beta 1 | Milds | Fully Washed | 2122241 | 1/12/2023 | 23/24 | Current Crop | TRADING 3P | 2520804-1 | 11/3/2023 | Serena Beze | Rolling Hills Coffee | United States of America | | 12/1/2023 | FOT/DLY | LW | Net 30 Fm D/O | 2122 | Houston | Jacksonville | Dec 2023 | DP-JA (MSP) HON-SPC FEMALE LA CUESTA 69kbg | HON-SPC FEMALE LA CUESTA | HON-SPC FEMALE LA CUESTA | 1 | USD | PF-100.00% | 18 | 69kbg | 2,738 | 0 | -20.7 | ICE C | KCZ23+88.50 USC/Lb | 0 | 166.5 | 88.5 | 255 | 6982.18866 | ICE C | KCK24 | 188.1 | 111 | 299.1 | 31 | 330.1 | 8189.696581 | $ 849 | $ 9,039 | $ - | -$ 2,056 | -$ 2,056 | $ - | -$ 2,056 | -$ 2,056 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 25085582559612 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2512556 | 1/04/2024 | 23/24 | Current Crop | TRADING 3P | 2559612-1 | 2/17/2024 | Craig Russell | Russell 360 | United States of America | | 4/1/2024 | FOT/DLY | SW½ | Net 30 Fm D/O | 2223 | Oakland | Portland | Apr 2024 | AN-OK (MSP) BRA-SPC IPE AMARELO 16+ 59kbg | BRA-SPC IPE AMARELO 16+ | BRA-SPC IPE AMARELO 16+ | 1 | USD | PF-100.00% | 5 | 59kbg | 650 | 0 | -4.916666667 | ICE C | KCK24-20.00 USC/Lb | 0 | 187 | -20 | 167 | 1086.09619 | ICE C | KCK24 | 188.1 | 15 | 203.1 | 20 | 223.1 | 1320.875067 | $ 130 | $ 1,451 | -$ 7 | -$ 358 | -$ 365 | -$ 7 | -$ 358 | -$ 365 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24970042559612 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2496384 | 1/04/2024 | 23/24 | Current Crop | TRADING 3P | 2559612-1 | 2/17/2024 | Craig Russell | Russell 360 | United States of America | | 4/1/2024 | FOT/DLY | SW½ | Net 30 Fm D/O | 2223 | Fife | Portland | Apr 2024 | AN-OK (MSP) BRA-SPC IPE AMARELO 16+ 59kbg | BRA-SPC IPE AMARELO 16+ | BRA-SPC IPE AMARELO 16+ | 1 | USD | PF-100.00% | 12 | 59kbg | 1,561 | 0 | -11.8 | ICE C | KCK24-20.00 USC/Lb | 0 | 187 | -20 | 167 | 2606.630856 | ICE C | KCK24 | 188.1 | 15 | 203.1 | 20 | 223.1 | 3170.100161 | $ 312 | $ 3,482 | -$ 17 | -$ 858 | -$ 876 | -$ 17 | -$ 858 | -$ 876 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24967742559611 | SPECIALTY SEATTLE | Colombia | Beta 1 | Milds | Fully Washed | 2496771 | 1/03/2024 | 23/24 | Current Crop | TRADING 3P | 2559611-1 | 2/17/2024 | Craig Russell | Russell 360 | United States of America | | 3/1/2024 | FOT/DLY | SW½ | Net 30 Fm D/O | 2324 | Fife | Fife | Mar 2024 | CO-FI (MSP) COL-SPC CATTLEYA EXCELSO EP 70kbg | COL-SPC CATTLEYA EXCELSO EP | COL-SPC CATTLEYA EXCELSO EP | 1 | USD | PF-100.00% | 20 | 70kbg | 3,086 | 0 | -23.33333333 | ICE C | KCH24-10.00 USC/Lb | 0 | 186 | -10 | 176 | 5432.1344 | ICE C | KCK24 | 188.1 | 43 | 231.1 | 30 | 261.1 | 7132.76284 | $ 926 | $ 8,059 | -$ 65 | -$ 2,562 | -$ 2,627 | -$ 65 | -$ 2,562 | -$ 2,627 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24602292559612 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2214132 | 1/04/2024 | 23/24 | Current Crop | TRADING 3P | 2559612-1 | 2/17/2024 | Craig Russell | Russell 360 | United States of America | | 4/1/2024 | FOT/DLY | SW½ | Net 30 Fm D/O | 2223 | Oakland | Portland | Apr 2024 | CS-PO (MSP) BRA-SPC 2/3 DAMA DA NOITE 59kbg | BRA-SPC 2/3 DAMA DA NOITE | BRA-SPC 2/3 DAMA DA NOITE | 1 | USD | PF-100.00% | 3 | 59kbg | 390 | 0 | -2.95 | ICE C | KCK24-20.00 USC/Lb | 0 | 187 | -20 | 167 | 651.657714 | ICE C | KCK24 | 188.1 | 26 | 214.1 | 20 | 234.1 | 835.4486022 | $ 78 | $ 913 | $ - | -$ 262 | -$ 262 | $ - | -$ 262 | -$ 262 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24607272554171 | SPECIALTY SEATTLE | Nicaragua | Beta 1 | Milds | Washed | 2171195 | 1/01/2024 | 23/24 | Current Crop | TRADING 3P | 2554171-1 | 12/13/2023 | Serena Beze | Santa Lucia Estate C | United States of America | | 1/1/2024 | FOT/DLY | LW | Net 10 Fm D/O | 2223 | Fife | New Jersey | Jan 2024 | RP-NY (MSP) NIC-SPC SHG CABO AZUL 69kbg | NIC-SPC SHG CABO AZUL | NIC-SPC SHG CABO AZUL | 1 | USD | PF-100.00% | 20 | 69kbg | 3,042 | 0 | -23 | ICE C | KCH24+77.00 USC/Lb | 0 | 188 | 77 | 265 | 8062.2222 | ICE C | KCK24 | 188.1 | 40 | 228.1 | 31 | 259.1 | 6939.595788 | $ 943 | $ 7,883 | -$ 3 | $ 183 | $ 179 | -$ 3 | $ 183 | $ 179 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24603672554170 | SPECIALTY SEATTLE | Nicaragua | Beta 1 | Milds | Washed | 2069533 | 1/01/2024 | 23/24 | Current Crop | TRADING 3P | 2554170-1 | 12/13/2023 | Serena Beze | Santa Lucia Estate C | United States of America | | 1/1/2024 | FOT/DLY | LW | Net 10 Fm D/O | 2122 | Houston | New Jersey | Jan 2024 | RP-NY (MSP) NIC-SPC SHG CABO AZUL 69kbg | NIC-SPC SHG CABO AZUL | NIC-SPC SHG CABO AZUL | 1 | USD | PF-100.00% | 7 | 69kbg | 1,065 | 0 | -8.05 | ICE C | KCH24+40.00 USC/Lb | 0 | 188 | 40 | 228 | 2427.793704 | ICE C | KCK24 | 188.1 | 40 | 228.1 | 31 | 259.1 | 2428.858526 | $ 330 | $ 2,759 | -$ 1 | -$ 330 | -$ 331 | -$ 1 | -$ 330 | -$ 331 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 25580492558601 | SPECIALTY SEATTLE | India | Beta 1 | Milds | Washed | | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2558601-1 | 1/18/2024 | Serena Beze | Single Speed Coffee | United States of America | | 2/1/2024 | DAP/DLY | LW | Net 30 Fm D/O | 2223 | New Jersey | Houston | Feb 2024 | DP-HO (MSP) INDI-SPC MON MALABAR 50kbg | INDI-SPC MON MALABAR | INDI-SPC MON MALABAR | 1 | USD | PF-100.00% | 7 | 50kbg | 772 | 0 | -5.833333333 | ICE C | KCH24+182.00 USC/Lb | 0 | 178 | 182 | 360 | 2777.796 | ICE C | KCK24 | 188.1 | 146 | 334.1 | 0 | 334.1 | 2577.94901 | $ - | $ 2,578 | $ - | $ 200 | $ 200 | $ - | $ 200 | $ 200 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | OVERDUE DLVY | | SPECIALTY SEATTLE | Indonesia | Beta 1 | Milds | Washed | | 1/06/2023 | 22/23 | Current Crop | DTBF/PAPER | 2469827-1 | 5/31/2023 | Serena Beze | Single Speed Coffee | United States of America | | 6/1/2023 | FOT/DLY | LW | DTBF | 2122 | | Oakland | | | INDI-SPC MON MALABAR | INDI-SPC MON MALABAR | 1 | USD | PF-100.00% | 1 | 60kbg | 132 | 0 | -0.666666667 | ICE C | KCN23+183.00 USC/Lb | 0 | 177 | 183 | 360 | 317.4624 | ICE C | KCK24 | 188.1 | 146 | 334.1 | 0 | 334.1 | 294.622744 | $ - | $ 295 | $ - | $ 23 | $ 23 | $ - | $ - | $ - | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | OVERDUE DLVY | | SPECIALTY SEATTLE | Ethiopia | Beta 1 | Milds | Washed | | 1/07/2023 | 22/23 | Current Crop | DTBF/PAPER | 2484429-1 | 7/21/2023 | Jolene Zehnder | Sowers Coffee | United States of America | | 7/1/2023 | FOT/DLY | LW | DTBF | 2223 | | Portland | | | ETHI-SPC YIRG GEDEB WASH | ETHI-SPC YIRG GEDEB WASH | 1 | USD | PF-100.00% | 0 | 69kbg | 0 | 0 | -0.15 | ICE C | KCU23+244.85 USC/Lb | 0 | 159.15 | 244.85 | 404 | 80.159256 | ICE C | KCK24 | 188.1 | 78 | 266.1 | 48 | 314.1 | 52.7979654 | $ 10 | $ 62 | $ - | $ 18 | $ 18 | $ - | $ - | $ - | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24603122557881 | SPECIALTY SEATTLE | Vietnam | Beta 1 | Milds | Specialty Milds | 2413613 | 1/01/2024 | 23/24 | Current Crop | TRADING 3P | 2557881-1 | 1/12/2024 | Michelle Dunaway | Spindletap Coffee | United States of America | | 1/1/2024 | FOT/DLY | SW1 | Cash Prior Release | 2223 | Fife | Houston | Jan 2024 | DP-HO (MSP) VIE-SPC ARA ANAEROBIC LIFT 60kbg | VIE-SPC ARA ANAEROBIC LIFT | VIE-SPC ARA ANAEROBIC LIFT | 1 | USD | PF-100.00% | 1 | 60kbg | 132 | 0 | -1 | ICE C | KCH24+148.00 USC/Lb | 0 | 182 | 148 | 330 | 436.5108 | ICE C | KCK24 | 188.1 | 50 | 238.1 | 47 | 285.1 | 314.949156 | $ 62 | $ 377 | -$ 8 | $ 67 | $ 59 | -$ 8 | $ 67 | $ 59 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24605942515179 | SPECIALTY SEATTLE | Peru | Beta 1 | Milds | Washed | 2300796 | 1/01/2024 | 23/24 | Current Crop | TRADING 3P | 2515179-1 | 10/27/2023 | Emily Smith | Stone Tower Coffee | United States of America | | 1/1/2024 | FOT/DLY | SW | Net 10 Fm D/O | 2122 | New Jersey | New Jersey | Jan 2024 | RP-NY (MSP) PER-SPC CAT GR1 WASHED 69kbg | PER-SPC CAT GR1 WASHED | PER-SPC CAT GR1 WASHED | 1 | USD | PF-100.00% | 20 | 69kbg | 3,042 | 0 | -23 | ICE C | KCH24+406.00 USC/Lb | 0 | 162 | 406 | 568 | 17280.53664 | ICE C | KCK24 | 188.1 | 168 | 356.1 | 3 | 359.1 | 10833.80123 | $ 91 | $ 10,925 | $ - | $ 6,355 | $ 6,355 | $ - | $ 6,355 | $ 6,355 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24697952495117 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2468934 | 1/01/2024 | 23/24 | Current Crop | TRADING 3P | 2495117-1 | 8/28/2023 | Emily Smith | Sunday Coffee Pr | United States of America | | 1/1/2024 | FOT/DLY | SW | Net 10 Fm D/O | 2324 | Houston | Fife | Jan 2024 | CS-PO (MSP) BRA-SPC IPE AMARELO 16+ 59kbg | BRA-SPC IPE AMARELO 16+ | BRA-SPC IPE AMARELO 16+ | 1 | USD | PF-100.00% | 4 | 59kbg | 520 | 0 | -3.933333333 | ICE C | KCH24+102.00 USC/Lb | 0 | 152 | 102 | 254 | 1321.525424 | ICE C | KCK24 | 188.1 | 15 | 203.1 | 51 | 254.1 | 1056.700054 | $ 265 | $ 1,322 | -$ 188 | $ 187 | -$ 1 | -$ 188 | $ 187 | -$ 1 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24970042559372 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2496384 | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2559372-1 | 2/14/2024 | Michelle Dunaway | Swiss Water Decaffei | Canada | | 2/1/2024 | EXW/DLY | SW1 | Net 30 Fm D/O | 2324 | Fife | Fife | Feb 2024 | CO-FI (SPC) BRA-SPC IPE AMARELO 16+ 59kbg | BRA-SPC IPE AMARELO 16+ | BRA-SPC IPE AMARELO 16+ | 1 | USD | PF-100.00% | 252 | 59kbg | 32,778 | 0 | -247.8 | ICE C | KCH24+3.30 USC/Lb | 0 | 193 | 3.3 | 196.3 | 64343.19987 | ICE C | KCK24 | 188.1 | 15 | 203.1 | 10 | 213.1 | 66572.10338 | $ 3,278 | $ 69,850 | $ 1,606 | -$ 7,113 | -$ 5,507 | $ 1,606 | -$ 7,113 | -$ 5,507 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | FORWARD DLVY | | SPECIALTY SEATTLE | Ethiopia | Beta 1 | Naturals | African Naturals | | 1/02/2024 | 23/24 | Current Crop | DTBF/PAPER | 2559816-1 | 2/21/2024 | Serena Beze | Tall Fir Coffee | United States of America | | 2/1/2024 | FOT/DLY | LW | DTBF | 2122 | | Portland | | | ETHI-SPC CAT ORG NAT YIRG GR1 | ETHI-SPC CAT ORG NAT YIRG GR1 | 1 | USD | PF-100.00% | 1 | 60kbg | 132 | 0 | -1 | ICE C | KCH24+162.00 USC/Lb | 0 | 188 | 162 | 350 | 462.966 | ICE C | KCK24 | 188.1 | 212 | 400.1 | 48 | 448.1 | 529.236276 | $ 63 | $ 593 | $ - | -$ 130 | -$ 130 | $ - | $ - | $ - | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | FORWARD DLVY | | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | | 1/02/2024 | 23/24 | Current Crop | DTBF/PAPER | 2559815-1 | 2/21/2024 | Serena Beze | Tall Fir Coffee | United States of America | | 2/1/2024 | FOT/DLY | LW | DTBF | 2223 | | Portland | | | BRA-SPC BELA VISTA ANA LIFT | BRA-SPC BELA VISTA ANA LIFT | 1 | USD | PF-100.00% | 1 | 60kbg | 132 | 0 | -1 | ICE C | KCH24+85.00 USC/Lb | 0 | 188 | 85 | 273 | 361.11348 | ICE C | KCK24 | 188.1 | 56.35 | 244.45 | 38 | 282.45 | 323.348682 | $ 50 | $ 374 | $ - | -$ 13 | -$ 13 | $ - | $ - | $ - | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | FORWARD DLVY | | SPECIALTY SEATTLE | Colombia | Beta 1 | Milds | Washed | | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2559814-1 | 2/21/2024 | Serena Beze | Tall Fir Coffee | United States of America | | 2/1/2024 | FOT/DLY | LW | Net 10 Fm D/O | 2324 | | Portland | | | DEC-SPC COL EXCELSO EA | DEC-SPC COL EXCELSO EA | 1 | USD | PF-100.00% | 1 | 70kbg | 154 | 0 | -1.166666667 | ICE C | KCK24+188.00 USC/Lb | 0 | 162 | 188 | 350 | 540.127 | ICE C | KCK24 | 188.1 | 96 | 284.1 | 31 | 315.1 | 438.428802 | $ 48 | $ 486 | -$ 40 | $ 94 | $ 54 | -$ 40 | $ 94 | $ 54 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | FORWARD DLVY | | SPECIALTY SEATTLE | Indonesia | Beta 1 | Milds | Specialty Milds | | 1/02/2024 | 23/24 | Current Crop | DTBF/PAPER | 2559813-1 | 2/21/2024 | Serena Beze | Tall Fir Coffee | United States of America | | 2/1/2024 | FOT/DLY | LW | DTBF | 2324 | | Portland | | | IND-SPC SUM ORG ACEH GR1 TP | IND-SPC SUM ORG ACEH GR1 TP | 1 | USD | PF-100.00% | 1 | 60kbg | 132 | 0 | -1 | ICE C | KCK24+237.00 USC/Lb | 0 | 188 | 237 | 425 | 562.173 | ICE C | KCK24 | 188.1 | 86 | 274.1 | 47 | 321.1 | 362.568516 | $ 62 | $ 425 | $ - | $ 137 | $ 137 | $ - | $ - | $ - | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | FORWARD DLVY | | SPECIALTY SEATTLE | Guatemala | Beta 1 | Milds | Fully Washed | | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2559812-1 | 2/21/2024 | Serena Beze | Tall Fir Coffee | United States of America | | 2/1/2024 | FOT/DLY | LW | Net 10 Fm D/O | 2223 | | Portland | | | GUA-SPC HUEHUETENANG FANCY SHB | GUA-SPC HUEHUETENANG FANCY SHB | 1 | USD | PTBF-0.00% | 2 | 69kbg | 304 | -2 | -2.3 | ICE C | KCK24+105.00 USC/Lb | 0 | 188.1 | 105 | 293.1 | 891.7121988 | ICE C | KCK24 | 188.1 | 54 | 242.1 | 31 | 273.1 | 736.5524508 | $ 94 | $ 831 | $ - | $ 61 | $ 61 | $ - | $ 61 | $ 61 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24606892489032 | SPECIALTY SEATTLE | Honduras | Beta 1 | Milds | Specialty Milds | 1885610 | 1/01/2024 | 23/24 | Current Crop | TRADING 3P | 2489032-1 | 8/8/2023 | Mark Inman | Thanksgiving Coffee | United States of America | | 1/1/2024 | FOT/DLY | SW½ | Net 30 Fm D/O | 2122 | Fife | Oakland | Jan 2024 | AN-OK (MSP) DEC-SPC SWP HON FTO SHG 60kbg | DEC-SPC SWP HON FTO SHG | DEC-SPC SWP HON FTO SHG | 1 | USD | PF-100.00% | 10 | 60kbg | 1,323 | 0 | -10 | ICE C | KCH24+163.00 USC/Lb | 0 | 137 | 163 | 300 | 3968.28 | ICE C | KCK24 | 188.1 | 190 | 378.1 | 40 | 418.1 | 5001.35556 | $ 529 | $ 5,530 | -$ 676 | -$ 886 | -$ 1,562 | -$ 676 | -$ 886 | -$ 1,562 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24606892489031 | SPECIALTY SEATTLE | Honduras | Beta 1 | Milds | Specialty Milds | 1885610 | 1/12/2023 | 23/24 | Current Crop | TRADING 3P | 2489031-1 | 8/8/2023 | Mark Inman | Thanksgiving Coffee | United States of America | | 12/1/2023 | FOT/DLY | SW½ | Net 30 Fm D/O | 2122 | Fife | Oakland | Dec 2023 | AN-OK (MSP) DEC-SPC SWP HON FTO SHG 60kbg | DEC-SPC SWP HON FTO SHG | DEC-SPC SWP HON FTO SHG | 1 | USD | PF-100.00% | 10 | 60kbg | 1,323 | 0 | -10 | ICE C | KCZ23+162.00 USC/Lb | 0 | 138 | 162 | 300 | 3968.28 | ICE C | KCK24 | 188.1 | 190 | 378.1 | 40 | 418.1 | 5001.35556 | $ 529 | $ 5,530 | -$ 663 | -$ 899 | -$ 1,562 | -$ 663 | -$ 899 | -$ 1,562 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24606892489030 | SPECIALTY SEATTLE | Honduras | Beta 1 | Milds | Specialty Milds | 1885610 | 1/11/2023 | 23/24 | Current Crop | TRADING 3P | 2489030-1 | 8/8/2023 | Mark Inman | Thanksgiving Coffee | United States of America | | 11/1/2023 | FOT/DLY | SW½ | Net 30 Fm D/O | 2122 | Fife | Oakland | Nov 2023 | AN-OK (MSP) DEC-SPC SWP HON FTO SHG 60kbg | DEC-SPC SWP HON FTO SHG | DEC-SPC SWP HON FTO SHG | 1 | USD | PF-100.00% | 10 | 60kbg | 1,323 | 0 | -10 | ICE C | KCZ23+162.00 USC/Lb | 0 | 138 | 162 | 300 | 3968.28 | ICE C | KCK24 | 188.1 | 190 | 378.1 | 40 | 418.1 | 5001.35556 | $ 529 | $ 5,530 | -$ 663 | -$ 899 | -$ 1,562 | -$ 663 | -$ 899 | -$ 1,562 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24606892489029 | SPECIALTY SEATTLE | Honduras | Beta 1 | Milds | Specialty Milds | 1885610 | 1/10/2023 | 23/24 | Current Crop | TRADING 3P | 2489029-1 | 8/8/2023 | Mark Inman | Thanksgiving Coffee | United States of America | | 10/1/2023 | FOT/DLY | SW½ | Net 30 Fm D/O | 2122 | Fife | Oakland | Oct 2023 | AN-OK (MSP) DEC-SPC SWP HON FTO SHG 60kbg | DEC-SPC SWP HON FTO SHG | DEC-SPC SWP HON FTO SHG | 1 | USD | PF-100.00% | 10 | 60kbg | 1,323 | 0 | -10 | ICE C | KCZ23+162.00 USC/Lb | 0 | 138 | 162 | 300 | 3968.28 | ICE C | KCK24 | 188.1 | 190 | 378.1 | 40 | 418.1 | 5001.35556 | $ 529 | $ 5,530 | -$ 663 | -$ 899 | -$ 1,562 | -$ 663 | -$ 899 | -$ 1,562 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24606892489028 | SPECIALTY SEATTLE | Honduras | Beta 1 | Milds | Specialty Milds | 1885610 | 1/09/2023 | 22/23 | Current Crop | TRADING 3P | 2489028-1 | 8/8/2023 | Mark Inman | Thanksgiving Coffee | United States of America | | 9/1/2023 | FOT/DLY | SW½ | Net 30 Fm D/O | 2122 | Fife | Oakland | Sep 2023 | AN-OK (MSP) DEC-SPC SWP HON FTO SHG 60kbg | DEC-SPC SWP HON FTO SHG | DEC-SPC SWP HON FTO SHG | 1 | USD | PF-100.00% | 6 | 60kbg | 794 | 0 | -6 | ICE C | KCU23+163.00 USC/Lb | 0 | 137 | 163 | 300 | 2380.968 | ICE C | KCK24 | 188.1 | 190 | 378.1 | 40 | 418.1 | 3000.813336 | $ 317 | $ 3,318 | -$ 406 | -$ 532 | -$ 937 | -$ 406 | -$ 532 | -$ 937 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24605502489026 | SPECIALTY SEATTLE | Honduras | Beta 1 | Milds | Washed | | 1/11/2023 | 23/24 | Current Crop | TRADING 3P | 2489026-1 | 8/8/2023 | Mark Inman | Thanksgiving Coffee | United States of America | | 11/1/2023 | FOT/DLY | SW½ | Net 30 Fm D/O | 2122 | Houston | Oakland | Nov 2023 | AN-OK (MSP) HON-SPC SHG FTO 69kbg | HON-SPC SHG FTO | HON-SPC SHG FTO | 1 | USD | PF-100.00% | 35 | 69kbg | 5,324 | 0 | -40.25 | ICE C | KCZ23+67.00 USC/Lb | 0 | 163 | 67 | 230 | 12245.4507 | ICE C | KCK24 | 188.1 | 75 | 263.1 | 40 | 303.1 | 14007.73078 | $ 2,130 | $ 16,137 | $ - | -$ 3,892 | -$ 3,892 | $ - | -$ 3,892 | -$ 3,892 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24605502489025 | SPECIALTY SEATTLE | Honduras | Beta 1 | Milds | Washed | | 1/10/2023 | 23/24 | Current Crop | TRADING 3P | 2489025-1 | 8/8/2023 | Mark Inman | Thanksgiving Coffee | United States of America | | 10/1/2023 | FOT/DLY | SW½ | Net 30 Fm D/O | 2122 | Houston | Oakland | Oct 2023 | AN-OK (MSP) HON-SPC SHG FTO 69kbg | HON-SPC SHG FTO | HON-SPC SHG FTO | 1 | USD | PF-100.00% | 35 | 69kbg | 5,324 | 0 | -40.25 | ICE C | KCZ23+67.00 USC/Lb | 0 | 163 | 67 | 230 | 12245.4507 | ICE C | KCK24 | 188.1 | 75 | 263.1 | 40 | 303.1 | 14007.73078 | $ 2,130 | $ 16,137 | $ - | -$ 3,892 | -$ 3,892 | $ - | -$ 3,892 | -$ 3,892 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24605502489024 | SPECIALTY SEATTLE | Honduras | Beta 1 | Milds | Washed | | 1/09/2023 | 22/23 | Current Crop | TRADING 3P | 2489024-1 | 8/8/2023 | Mark Inman | Thanksgiving Coffee | United States of America | | 9/1/2023 | FOT/DLY | SW½ | Net 30 Fm D/O | 2122 | Houston | Oakland | Sep 2023 | AN-OK (MSP) HON-SPC SHG FTO 69kbg | HON-SPC SHG FTO | HON-SPC SHG FTO | 1 | USD | PF-100.00% | 35 | 69kbg | 5,324 | 0 | -40.25 | ICE C | KCU23+67.00 USC/Lb | 0 | 163 | 67 | 230 | 12245.4507 | ICE C | KCK24 | 188.1 | 75 | 263.1 | 40 | 303.1 | 14007.73078 | $ 2,130 | $ 16,137 | $ - | -$ 3,892 | -$ 3,892 | $ - | -$ 3,892 | -$ 3,892 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24605502489023 | SPECIALTY SEATTLE | Honduras | Beta 1 | Milds | Washed | | 1/08/2023 | 22/23 | Current Crop | TRADING 3P | 2489023-1 | 8/8/2023 | Mark Inman | Thanksgiving Coffee | United States of America | | 8/1/2023 | FOT/DLY | SW½ | Net 30 Fm D/O | 2122 | Houston | Oakland | Aug 2023 | AN-OK (MSP) HON-SPC SHG FTO 69kbg | HON-SPC SHG FTO | HON-SPC SHG FTO | 1 | USD | PF-100.00% | 5 | 69kbg | 761 | 0 | -5.75 | ICE C | KCU23+67.00 USC/Lb | 0 | 163 | 67 | 230 | 1749.3501 | ICE C | KCK24 | 188.1 | 75 | 263.1 | 40 | 303.1 | 2001.104397 | $ 304 | $ 2,305 | $ - | -$ 556 | -$ 556 | $ - | -$ 556 | -$ 556 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 25085582559029 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2512556 | 1/03/2024 | 23/24 | Current Crop | TRADING 3P | 2559029-1 | 1/31/2024 | Camila Topke | Theory Coffee | United States of America | | 3/1/2024 | FOT/DLY | LW | Net 30 Fm D/O | 2324 | Oakland | Oakland | Mar 2024 | AN-OK (MSP) BRA-SPC IPE AMARELO 16+ 59kbg | BRA-SPC IPE AMARELO 16+ | BRA-SPC IPE AMARELO 16+ | 1 | USD | PF-100.00% | 11 | 59kbg | 1,431 | 0 | -10.81666667 | ICE C | KCH24+81.00 USC/Lb | 0 | 195 | 81 | 276 | 3948.967704 | ICE C | KCK24 | 188.1 | 15 | 203.1 | 38 | 241.1 | 2905.925147 | $ 544 | $ 3,450 | $ 99 | $ 401 | $ 499 | $ 99 | $ 401 | $ 499 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24603192556952 | SPECIALTY SEATTLE | Ethiopia | Beta 1 | Milds | Washed | 2099846 | 1/03/2024 | 23/24 | Current Crop | TRADING 3P | 2556952-1 | 1/8/2024 | Jolene Zehnder | Top Pot Doughnuts | United States of America | | 3/1/2024 | FOT/DLY | LW | Net 15 Fm D/O | 2122 | Fife | Fife | Mar 2024 | CO-FI (MSP) ETHI-SPC YIRG GEDEB WASH 60kbg | ETHI-SPC YIRG GEDEB WASH | ETHI-SPC YIRG GEDEB WASH | 1 | USD | PF-100.00% | 4 | 60kbg | 529 | 0 | -4 | ICE C | KCK24+133.45 USC/Lb | 0 | 181.55 | 133.45 | 315 | 1666.6776 | ICE C | KCK24 | 188.1 | 78 | 266.1 | 48 | 314.1 | 1407.945744 | $ 254 | $ 1,662 | $ - | $ 5 | $ 5 | $ - | $ 5 | $ 5 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24603192556225 | SPECIALTY SEATTLE | Ethiopia | Beta 1 | Milds | Washed | 2099846 | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2556225-1 | 12/20/2023 | Jolene Zehnder | Top Pot Doughnuts | United States of America | | 2/1/2024 | FOT/DLY | LW | Net 15 Fm D/O | 2122 | Fife | Fife | Feb 2024 | CO-FI (MSP) ETHI-SPC YIRG GEDEB WASH 60kbg | ETHI-SPC YIRG GEDEB WASH | ETHI-SPC YIRG GEDEB WASH | 1 | USD | PF-100.00% | 4 | 60kbg | 529 | 0 | -4 | ICE C | KCH24+124.15 USC/Lb | 0 | 190.85 | 124.15 | 315 | 1666.6776 | ICE C | KCK24 | 188.1 | 78 | 266.1 | 48 | 314.1 | 1407.945744 | $ 254 | $ 1,662 | $ - | $ 5 | $ 5 | $ - | $ 5 | $ 5 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24605052503417 | SPECIALTY SEATTLE | Peru | Beta 1 | Milds | Fully Washed | | 1/12/2023 | 23/24 | Current Crop | TRADING 3P | 2503417-1 | 10/3/2023 | Serena Beze | Tubbs Coffee | United States of America | | 12/1/2023 | FOT/DLY | LW | Net 30 Fm D/O | 2223 | Fife | Fife | Dec 2023 | CO-FI (MSP) PER-SPC GR 1 FTO 69kbg | PER-SPC GR 1 FTO | PER-SPC GR 1 FTO | 1 | USD | PF-100.00% | 8 | 69kbg | 1,217 | 0 | -9.2 | ICE C | KCZ23+166.25 USC/Lb | 0 | 148.75 | 166.25 | 315 | 3833.35848 | ICE C | KCK24 | 188.1 | 78 | 266.1 | 32 | 298.1 | 3238.275211 | $ 389 | $ 3,628 | $ - | $ 206 | $ 206 | $ - | $ 206 | $ 206 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24603642556794 | SPECIALTY SEATTLE | Honduras | Beta 1 | Milds | Specialty Milds | 1813243 | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2556794-1 | 1/5/2024 | Serena Beze | Tubbs Coffee | United States of America | | 2/1/2024 | FOT/DLY | LW | Net 30 Fm D/O | 2021 | Fife | Portland | Feb 2024 | CO-FI (MSP) HON-SPC SHG ANAEROBIC PROCESS 69kbg | HON-SPC SHG ANAEROBIC PROCESS | HON-SPC SHG ANAEROBIC PROCESS | 1 | USD | PF-100.00% | 3 | 69kbg | 456 | 0 | -3.45 | ICE C | KCH24+16.65 USC/Lb | 0 | 183.35 | 16.65 | 200 | 912.7044 | ICE C | KCK24 | 188.1 | 208 | 396.1 | 31 | 427.1 | 1807.611064 | $ 141 | $ 1,949 | $ - | -$ 1,036 | -$ 1,036 | $ - | -$ 1,036 | -$ 1,036 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24831912556949 | SPECIALTY SEATTLE | Colombia | Beta 1 | Milds | Washed | 2483180 | 1/01/2024 | 23/24 | Current Crop | TRADING 3P | 2556949-1 | 1/8/2024 | Emily Smith | Upper Left Roasters | United States of America | | 1/1/2024 | FOT/DLY | SW | Net 30 Fm D/O | 2324 | Fife | Portland | Jan 2024 | CS-PO (MSP) DEC-SPC COL EXCELSO EA 70kbg | DEC-SPC COL EXCELSO EA | DEC-SPC COL EXCELSO EA | 1 | USD | PF-100.00% | 3 | 70kbg | 463 | 0 | -3.5 | ICE C | KCH24+177.00 USC/Lb | 0 | 182 | 177 | 359 | 1662.04794 | ICE C | KCK24 | 188.1 | 96 | 284.1 | 31 | 315.1 | 1315.286406 | $ 144 | $ 1,459 | -$ 28 | $ 231 | $ 203 | -$ 28 | $ 231 | $ 203 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | OVERDUE DLVY | | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | | 1/09/2023 | 22/23 | Current Crop | TRADING 3P | 2500082-1 | 9/20/2023 | Emily Smith | Vinaccio Coffee | United States of America | | 9/1/2023 | FOT/DLY | SW | Net 30 Fm D/O | 2223 | | Seattle | | | BRA-SPC IPE AMARELO 15/16 SSFC | BRA-SPC IPE AMARELO 15/16 SSFC | 1 | USD | PF-100.00% | 0 | 59kbg | 0 | 0 | -6.987E-15 | ICE C | KCZ23+79.45 USC/Lb | 0 | 158.55 | 79.45 | 238 | 2.19963E-12 | ICE C | KCK24 | 188.1 | 15 | 203.1 | 38 | 241.1 | 1.87708E-12 | $ 0 | $ 0 | -$ 0 | $ 0 | -$ 0 | -$ 0 | $ 0 | -$ 0 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | OVERDUE DLVY | | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | | 1/04/2023 | 22/23 | Current Crop | TRADING 3P | 2221003-1 | 10/25/2022 | Emily Smith | Vinaccio Coffee | United States of America | | 4/1/2023 | FOT/DLY | SW | Net 30 Fm D/O | 2122 | | Seattle | | | BRA-SPC IPE AMARELO 15/16 SSFC | BRA-SPC IPE AMARELO 15/16 SSFC | 1 | USD | PF-100.00% | 0 | 59kbg | 0 | 0 | -3.4935E-15 | ICE C | KCK23+59.45 USC/Lb | 0 | 179.55 | 59.45 | 239 | 1.10443E-12 | ICE C | KCK24 | 188.1 | 15 | 203.1 | 38 | 241.1 | 9.38538E-13 | $ 0 | $ 0 | -$ 0 | $ 0 | -$ 0 | -$ 0 | $ 0 | -$ 0 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 25085602508689 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2512558 | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2508689-1 | 10/16/2023 | Mark Inman | Water Ave. | United States of America | | 2/1/2024 | FOT/DLY | SW½ | Net 30 Fm D/O | 2324 | Oakland | Oakland | Feb 2024 | AN-OK (MSP) BRA-SPC BARINAS NAT FERM 16+ 60kbg | BRA-SPC BARINAS NAT FERM 16+ | BRA-SPC BARINAS NAT FERM 16+ | 1 | USD | PF-100.00% | 50 | 60kbg | 6,614 | 0 | -50 | ICE C | KCH24+95.00 USC/Lb | 0 | 154 | 95 | 249 | 16468.362 | ICE C | KCK24 | 188.1 | 48 | 236.1 | 38 | 274.1 | 15615.1818 | $ 2,513 | $ 18,128 | -$ 2,255 | $ 595 | -$ 1,660 | -$ 2,255 | $ 595 | -$ 1,660 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 25085602508688 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2512558 | 1/01/2024 | 23/24 | Current Crop | TRADING 3P | 2508688-1 | 10/16/2023 | Mark Inman | Water Ave. | United States of America | | 1/1/2024 | FOT/DLY | SW½ | Net 30 Fm D/O | 2324 | Oakland | Oakland | Jan 2024 | AN-OK (MSP) BRA-SPC BARINAS NAT FERM 16+ 60kbg | BRA-SPC BARINAS NAT FERM 16+ | BRA-SPC BARINAS NAT FERM 16+ | 1 | USD | PF-100.00% | 50 | 60kbg | 6,614 | 0 | -50 | ICE C | KCH24+95.00 USC/Lb | 0 | 154 | 95 | 249 | 16468.362 | ICE C | KCK24 | 188.1 | 48 | 236.1 | 38 | 274.1 | 15615.1818 | $ 2,513 | $ 18,128 | -$ 2,255 | $ 595 | -$ 1,660 | -$ 2,255 | $ 595 | -$ 1,660 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 25085602508687 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2512558 | 1/12/2023 | 23/24 | Current Crop | TRADING 3P | 2508687-1 | 10/16/2023 | Mark Inman | Water Ave. | United States of America | | 12/1/2023 | FOT/DLY | SW½ | Net 30 Fm D/O | 2324 | Oakland | Oakland | Dec 2023 | AN-OK (MSP) BRA-SPC BARINAS NAT FERM 16+ 60kbg | BRA-SPC BARINAS NAT FERM 16+ | BRA-SPC BARINAS NAT FERM 16+ | 1 | USD | PF-100.00% | 50 | 60kbg | 6,614 | 0 | -50 | ICE C | KCZ23+95.00 USC/Lb | 0 | 154 | 95 | 249 | 16468.362 | ICE C | KCK24 | 188.1 | 48 | 236.1 | 38 | 274.1 | 15615.1818 | $ 2,513 | $ 18,128 | -$ 2,255 | $ 595 | -$ 1,660 | -$ 2,255 | $ 595 | -$ 1,660 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | OVERDUE DLVY | | SPECIALTY SEATTLE | Colombia | Beta 1 | Milds | Fully Washed | | 1/12/2023 | 23/24 | Current Crop | TRADING 3P | 2552570-1 | 12/5/2023 | Mark Inman | Water Ave. | United States of America | | 12/1/2023 | FOT/DLY | SW½ | Net 30 Fm D/O | 2223 | | Tacoma | | | COL-SPC CATTLEYA EXCELSO EP | COL-SPC CATTLEYA EXCELSO EP | 1 | USD | PF-100.00% | 1 | 70kbg | 154 | 0 | -1.166666667 | ICE C | KCZ23+122.00 USC/Lb | 0 | 177 | 122 | 299 | 461.42278 | ICE C | KCK24 | 188.1 | 43 | 231.1 | 40 | 271.1 | 356.638142 | $ 62 | $ 418 | -$ 17 | $ 60 | $ 43 | -$ 17 | $ 60 | $ 43 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24921912491728 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2491902 | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2491728-1 | 8/18/2023 | Michelle Dunaway | What's Brewing | United States of America | | 2/1/2024 | FOT/DLY | SW1 | Net 30 Fm D/O | 2223 | Houston | Houston | Feb 2024 | DP-HO (MSP) BRA-SPC NY 2/3 MTGB FC 60kbg | BRA-SPC NY 2/3 MTGB FC | BRA-SPC NY 2/3 MTGB FC | 1 | USD | PF-100.00% | 50 | 60kbg | 6,614 | 0 | -50 | ICE C | KCH24+33.00 USC/Lb | 0 | 147.35 | 33 | 180.35 | 11927.9883 | ICE C | KCK24 | 188.1 | 0 | 188.1 | 18 | 206.1 | 12440.5578 | $ 1,190 | $ 13,631 | -$ 2,695 | $ 992 | -$ 1,703 | -$ 2,695 | $ 992 | -$ 1,703 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24921882491724 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2491904 | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2491724-1 | 8/18/2023 | Michelle Dunaway | What's Brewing | United States of America | | 2/1/2024 | FOT/DLY | SW1 | Net 30 Fm D/O | 2223 | Houston | Houston | Feb 2024 | DP-HO (MSP) BRA-SPC IPE AMARELO 16+ 60kbg | BRA-SPC IPE AMARELO 16+ | BRA-SPC IPE AMARELO 16+ | 1 | USD | PF-100.00% | 28 | 60kbg | 3,704 | 0 | - 28 | ICE C | KCH24+48.00 USC/Lb | 0 | 147.35 | 48 | 195.35 | 7235.232648 | ICE C | KCK24 | 188.1 | 15 | 203.1 | 18 | 221.1 | 7522.271568 | $ 667 | $ 8,189 | -$ 1,509 | $ 556 | -$ 954 | -$ 1,509 | $ 556 | -$ 954 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24698012559298 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2468940 | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2559298-1 | 8/18/2023 | Michelle Dunaway | What's Brewing | United States of America | 2491724 | 2/1/2024 | FOT/DLY | SW1 | Net 30 Fm D/O | 2223 | Houston | Houston | Feb 2024 | DP-HO (MSP) BRA-SPC IPE AMARELO 16+ 59kbg | BRA-SPC IPE AMARELO 16+ | BRA-SPC IPE AMARELO 16+ | 1 | USD | PF-100.00% | 2 | 59kbg | 260 | 0 | -1.966666667 | ICE C | KCH24+48.00 USC/Lb | 0 | 147.35 | 48 | 195.35 | 508.1889598 | ICE C | KCK24 | 188.1 | 15 | 203.1 | 18 | 221.1 | 528.3500268 | $ 47 | $ 575 | -$ 106 | $ 39 | -$ 67 | -$ 106 | $ 39 | -$ 67 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24880112526639 | SPECIALTY SEATTLE | Colombia | Beta 1 | Milds | Decaf SWP | | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2526639-1 | 11/9/2023 | Camila Topke | Whats the Buzz | United States of America | | 2/1/2024 | FOT/DLY | LW | Net 30 Fm D/O | 2324 | Fife | Houston | Feb 2024 | DP-HO (MSP) DEC-SPC COLOMBIA SWP 60kbg | DEC-SPC COLOMBIA SWP | DEC-SPC COLOMBIA SWP | 1 | USD | PF-100.00% | 3 | 60kbg | 397 | 0 | -3 | ICE C | KCH24+225.00 USC/Lb | 0 | 174 | 225 | 399 | 1583.34372 | ICE C | KCK24 | 188.1 | 150 | 338.1 | 31 | 369.1 | 1341.675468 | $ 123 | $ 1,465 | -$ 56 | $ 175 | $ 119 | -$ 56 | $ 175 | $ 119 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24840172484052 | SPECIALTY SEATTLE | Colombia | Beta 1 | Milds | Washed | | 1/12/2023 | 23/24 | Current Crop | TRADING 3P | 2484052-1 | 7/21/2023 | Jolene Zehnder | Whats the Buzz | United States of America | | 12/1/2023 | FOT/DLY | LW | Net 30 Fm D/O | 2324 | Houston | Houston | Dec 2023 | DP-HO (MSP) COL-SPC HUILA SUPREMO 70kbg | COL-SPC HUILA SUPREMO | COL-SPC HUILA SUPREMO | 1 | USD | PF-100.00% | 10 | 70kbg | 1,543 | 0 | -11.66666667 | ICE C | KCH24+114.90 USC/Lb | 0 | 160.1 | 114.9 | 275 | 4243.855 | ICE C | KCK24 | 188.1 | 58 | 246.1 | 12 | 258.1 | 3797.86442 | $ 185 | $ 3,983 | $ - | $ 261 | $ 261 | $ - | $ 261 | $ 261 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24608822500460 | SPECIALTY SEATTLE | Indonesia | Beta 1 | Milds | Wet-Hulled | 1981461 | 1/12/2023 | 23/24 | Current Crop | TRADING 3P | 2500460-1 | 9/22/2023 | Camila Topke | Whats the Buzz | United States of America | | 12/1/2023 | FOT/DLY | SW1 | Net 30 Fm D/O | 2223 | Fife | Houston | Dec 2023 | DP-HO (MSP) IND-SPC SUM GR 1 DP 60kbg | IND-SPC SUM GR 1 DP | IND-SPC SUM GR 1 DP | 1 | USD | PF-100.00% | 8 | 60kbg | 1,058 | 0 | -8 | ICE C | KCZ23+197.00 USC/Lb | 0 | 153 | 197 | 350 | 3703.728 | ICE C | KCK24 | 188.1 | 150 | 338.1 | 47 | 385.1 | 3577.801248 | $ 497 | $ 4,075 | -$ 371 | $ - | -$ 371 | -$ 371 | $ - | -$ 371 | YES | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24604192500444 | SPECIALTY SEATTLE | Ethiopia | Beta 1 | Naturals | African Naturals | 2140188 | 1/04/2024 | 23/24 | Current Crop | TRADING 3P | 2500444-1 | 9/22/2023 | Camila Topke | Whats the Buzz | United States of America | | 4/1/2024 | FOT/DLY | SW1 | Net 30 Fm D/O | 2223 | New Jersey | Houston | Apr 2024 | DP-HO (MSP) ETHI-SPC GUJI NATURAL GR3 60kbg | ETHI-SPC GUJI NATURAL GR3 | ETHI-SPC GUJI NATURAL GR3 | 1 | USD | PF-100.00% | 10 | 60kbg | 1,323 | 0 | -10 | ICE C | KCK24+165.00 USC/Lb | 0 | 155 | 165 | 320 | 4232.832 | ICE C | KCK24 | 188.1 | 81 | 269.1 | 48 | 317.1 | 3559.54716 | $ 635 | $ 4,194 | $ - | $ 38 | $ 38 | $ - | $ 38 | $ 38 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24604192500443 | SPECIALTY SEATTLE | Ethiopia | Beta 1 | Naturals | African Naturals | 2140188 | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2500443-1 | 9/22/2023 | Camila Topke | Whats the Buzz | United States of America | | 2/1/2024 | FOT/DLY | SW1 | Net 30 Fm D/O | 2223 | New Jersey | Houston | Feb 2024 | DP-HO (MSP) ETHI-SPC GUJI NATURAL GR3 60kbg | ETHI-SPC GUJI NATURAL GR3 | ETHI-SPC GUJI NATURAL GR3 | 1 | USD | PF-100.00% | 5 | 60kbg | 661 | 0 | -5 | ICE C | KCH24+165.00 USC/Lb | 0 | 155 | 165 | 320 | 2116.416 | ICE C | KCK24 | 188.1 | 81 | 269.1 | 48 | 317.1 | 1779.77358 | $ 317 | $ 2,097 | $ - | $ 19 | $ 19 | $ - | $ 19 | $ 19 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24602972526640 | SPECIALTY SEATTLE | Nicaragua | Beta 1 | Milds | Fully Washed | 2132550 | 1/02/2024 | 23/24 | Current Crop | TRADING 3P | 2526640-1 | 11/9/2023 | Camila Topke | Whats the Buzz | United States of America | | 2/1/2024 | FOT/DLY | LW | Net 30 Fm D/O | 2223 | Portland | Houston | Feb 2024 | DP-HO (MSP) NIC-SPC LA VIRGEN WOMAN OWN 69kbg | NIC-SPC LA VIRGEN WOMAN OWN | NIC-SPC LA VIRGEN WOMAN OWN | 1 | USD | PF-100.00% | 10 | 69kbg | 1,521 | 0 | -11.5 | ICE C | KCH24+28.00 USC/Lb | 0 | 172 | 28 | 200 | 3042.348 | ICE C | KCK24 | 188.1 | 66 | 254.1 | 31 | 285.1 | 3865.303134 | $ 472 | $ 4,337 | $ - | -$ 1,295 | -$ 1,295 | $ - | -$ 1,295 | -$ 1,295 | NO | KCK24 | 191.15 | 2/12/2024 |
| Sell | SPECIALTY SEATTLE | INVENTORY | 24602602484051 | SPECIALTY SEATTLE | Brazil | Beta 1 | Naturals | Natural | 2124602 | 1/12/2023 | 23/24 | Current Crop | TRADING 3P | 2484051-1 | 7/21/2023 | Jolene Zehnder | Whats the Buzz | United States of America | | 12/1/2023 | FOT/DLY | LW | Net 30 Fm D/O | 2324 | Houston | Houston | Dec 2023 | DP-HO (MSP) BRA-SPC VELOSO 2/3 CERRADO 16+ 60kbg | BRA-SPC VELOSO 2/3 CERRADO 16+ | BRA-SPC VELOSO 2/3 CERRADO 16+ | 1 | USD | PF-100.00% | 11 | 60kbg | 1,455 | 0 | -11 | ICE C | KCH24+79.90 USC/Lb | 0 | 160.1 | 79.9 | 240 | 3492.0864 | ICE C | KCK24 | 188.1 | 12 | 200.1 | 38 | 238.1 | 2911.527036 | $ 553 | $ 3,464 | -$ 407 | $ 435 | $ 28 | -$ 407 | $ 435 | $ 28 | YES | KCK24 | 191.15 | 2/12/2024 |

*EXECUTION VERSION*

**<u>Schedule 2.1(b)(ii)</u>**
**Acquired Inventory**

See attached.

4

| | | | | | | | | 3,503,394 | $5,363,887 |
|---|---|---|---|---|---|---|---|---|---|
| BUY / SELL | BOOK | ORIGIN | GROUP 1 | GROUP 2 | CROP | COMMODITY | COMMODITY FINAL | Volume (lbs) | |
| Buy | INVENTORY | Guatemala | Milds | Washed | 2223 | GUA-SPC ORIENTE SHB EP | GUA-SPC ORIENTE SHB EP | 430,781 | |
| Buy | INVENTORY | Costa Rica | Milds | Washed | 2223 | COS-SPC SHB SCOOTERS BLEND | COS-SPC SHB SCOOTERS BLEND | 83,665 | |
| Buy | INVENTORY | Nicaragua | Milds | Washed | 2223 | NIC-SPC PLUMERIA SHG RFA | NIC-SPC PLUMERIA SHG RFA | 125,498 | |
| Buy | INVENTORY | Nicaragua | Milds | Washed | 2223 | NIC-SPC PLUMERIA LIFT SHG | NIC-SPC PLUMERIA LIFT SHG | 132 | |
| Buy | INVENTORY | Costa Rica | Milds | Specialty Milds | 2223 | COS-SPC TESOROS VOLCANICOS | COS-SPC TESOROS VOLCANICOS | 144,519 | |
| Buy | INVENTORY | Nicaragua | Milds | Washed | 2223 | NIC-SPC SHG CABO AZUL | NIC-SPC SHG CABO AZUL | 100,318 | |
| Buy | INVENTORY | Guatemala | Milds | Washed | 2223 | GUA-SPC SHB ST PALENCIA WASHED | GUA-SPC SHB ST PALENCIA WASHED | 148,468 | |
| Buy | INVENTORY | Nicaragua | Milds | Washed | 2223 | NIC-SPC SHG LA ESMERALDA RCP | NIC-SPC SHG LA ESMERALDA RCP | 0 | |
| Buy | INVENTORY | Ethiopia | Milds | Washed | 2122 | ETHI-SPC SID HAMAM WASH | ETHI-SPC SID HAMAM WASH | 51,985 | |
| Buy | INVENTORY | Rwanda | Milds | Specialty Milds | 2223 | RWA-SPC ISHEMA NEXT GEN | RWA-SPC ISHEMA NEXT GEN | 40,609 | |
| Buy | INVENTORY | Ethiopia | Naturals | African Naturals | 2223 | ETHI-SPC NAT SIDAMO GR 3 | ETHI-SPC NAT SIDAMO GR 3 | 84,658 | |
| Buy | INVENTORY | Rwanda | Milds | Washed | 2223 | RWA-SPC ABAKUNDAKAWA COOP FT | RWA-SPC ABAKUNDAKAWA COOP FT | 41,800 | |
| Buy | INVENTORY | Colombia | Milds | Specialty Milds | 2223 | COL-SPC CATTLEYA RFA EP | COL-SPC CATTLEYA RFA EP | 79,940 | |
| Buy | INVENTORY | Peru | Milds | Fully Washed | 2324 | PER-SPC GR 1 ORGANIC | PER-SPC GR 1 ORGANIC | 102,680 | |
| Buy | INVENTORY | Honduras | Milds | Fully Washed | 2223 | HON-SPC HG ORG | HON-SPC HG ORG | 0 | |
| Buy | INVENTORY | Nicaragua | Milds | Washed | 2122 | NIC-SPC SHG EP | NIC-SPC SHG EP | 83,665 | |
| Buy | INVENTORY | Rwanda | Milds | Washed | 2223 | RWA-SPC HINGAKAWA FTO | RWA-SPC HINGAKAWA FTO | 37,038 | |
| Buy | INVENTORY | Colombia | Milds | Washed | 2324 | DEC-SPC COL EXCELSO EA | DEC-SPC COL EXCELSO EA | 66,513 | |
| Buy | INVENTORY | Colombia | Milds | Fully Washed | 2324 | COL-SPC EXCELSO EP | COL-SPC EXCELSO EP | 33,025 | |
| Buy | INVENTORY | El Salvador | Milds | Specialty Milds | 2122 | SAL-SPC-SHG WASHED | SAL-SPC-SHG WASHED | 0 | |
| Buy | INVENTORY | Peru | Milds | Washed | 2223 | PER-SPC CAT GR1 WASHED | PER-SPC CAT GR1 WASHED | 40,768 | |
| Buy | INVENTORY | Peru | Milds | Washed | 2324 | PER-SPC GR 1 ORGANIC SCORE 84 | PER-SPC GR 1 ORGANIC SCORE 84 | 34,227 | |
| Buy | INVENTORY | Ethiopia | Milds | Specialty Milds | 2122 | ETHI-SPC SID2 WSH RFA ORG | ETHI-SPC SID2 WSH RFA ORG | 1,058 | |
| Buy | INVENTORY | Guatemala | Milds | Washed | 2223 | GUA-SPC STOCKLOT | GUA-SPC STOCKLOT | 0 | |
| Buy | INVENTORY | Nicaragua | Milds | Fully Washed | 2223 | NIC-SPC LA VIRGEN WOMAN OWN | NIC-SPC LA VIRGEN WOMAN OWN | 4,259 | |
| Buy | INVENTORY | Vietnam | Milds | Asian Milds | 2223 | VIE-SPC EPW | VIE-SPC EPW | 124,870 | |
| Buy | INVENTORY | Guatemala | Milds | Washed | 1920 | GUA-SPC CODA BLEND | GUA-SPC CODA BLEND | 41,833 | |
| Buy | INVENTORY | Guatemala | Milds | Specialty Milds | 2122 | GUA-SPC SHB EP | GUA-SPC SHB EP | 28,598 | |
| Buy | INVENTORY | Mexico | Milds | Washed | 2223 | DEC-SPC MC BLEND | DEC-SPC MC BLEND | 41,833 | |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC IPE AMARELO 16+ | BRA-SPC IPE AMARELO 16+ | 36,941 | |
| Buy | INVENTORY | Ethiopia | Milds | Specialty Milds | 2122 | ETHI-SPC CAT WSH SID G1 | ETHI-SPC CAT WSH SID G1 | 39,947 | |
| Buy | INVENTORY | Honduras | Milds | Specialty Milds | 2223 | HON-SPC SHG ANAEROBIC PROCESS | HON-SPC SHG ANAEROBIC PROCESS | 19,319 | |
| Buy | INVENTORY | Nicaragua | Milds | Specialty Milds | 2223 | NIC-SPC BUENA VISTA LIFT RCP | NIC-SPC BUENA VISTA LIFT RCP | 25,100 | |
| Buy | INVENTORY | Ethiopia | Naturals | African Naturals | 2122 | ETHI-SPC NAT LIMU GR1 | ETHI-SPC NAT LIMU GR1 | 27,778 | |
| Buy | INVENTORY | Mexico | Milds | Washed | 2324 | MEX-SPC WASHED SHG | MEX-SPC WASHED SHG | 22,057 | |
| Buy | INVENTORY | Colombia | Milds | Washed | 2223 | COL-SPC MEDELLIN EXCELSO EP | COL-SPC MEDELLIN EXCELSO EP | 31,945 | |
| Buy | INVENTORY | Colombia | Milds | Fully Washed | 2223 | COL-SPC CATTLEYA EXCELSO EP | COL-SPC CATTLEYA EXCELSO EP | 41,567 | |
| Buy | INVENTORY | Ethiopia | Milds | African Milds | 2122 | ETHI-SPC SIDAMO WSH GR 2 | ETHI-SPC SIDAMO WSH GR 2 | 26,191 | |
| Buy | INVENTORY | Mexico | Milds | Washed | 2223 | MEX-SPC SHG ORGANIC | MEX-SPC SHG ORGANIC | 36,052 | |
| Buy | INVENTORY | Guatemala | Milds | Washed | 2122 | GUA-SPC ORIENTE SHB EP | GUA-SPC ORIENTE SHB EP | 10,953 | |
| Buy | INVENTORY | Colombia | Milds | Fully Washed | 2324 | COL-SPC CATTLEYA EXCELSO EP | COL-SPC CATTLEYA EXCELSO EP | 60,803 | |
| Buy | INVENTORY | Peru | Milds | Washed | 2223 | PER-SPC CAT ORG GR1 WASHED | PER-SPC CAT ORG GR1 WASHED | 52,785 | |
| Buy | INVENTORY | Colombia | Milds | Fully Washed | 2223 | COL-SPC EXCELSO EP | COL-SPC EXCELSO EP | 27,007 | |
| Buy | INVENTORY | Guatemala | Milds | Specialty Milds | 2223 | GUA-SPC AVE DEL PARAISO LIFT | GUA-SPC AVE DEL PARAISO LIFT | 22,057 | |
| Buy | INVENTORY | Mexico | Milds | Washed | 2122 | DEC-SPC MC BLEND | DEC-SPC MC BLEND | 13,995 | |
| Buy | INVENTORY | Nicaragua | Milds | Washed | 2122 | NIC-SPC SHG LA ESMERALDA RCP | NIC-SPC SHG LA ESMERALDA RCP | 19,775 | |
| Buy | INVENTORY | Vietnam | Milds | Asian Milds | 2223 | VIE-SPC SHG LOTUS LIFT | VIE-SPC SHG LOTUS LIFT | 55,465 | |
| Buy | INVENTORY | Guatemala | Milds | Specialty Milds | 2122 | GUA-SPC RAINFOREST SHB EP | GUA-SPC RAINFOREST SHB EP | 22,514 | |
| Buy | INVENTORY | Guatemala | Milds | Washed | 2223 | GUA-SPC SAN MARCOS FTO | GUA-SPC SAN MARCOS FTO | 13,691 | |
| Buy | INVENTORY | Honduras | Milds | Washed | 2223 | HON-SPC ORGANIC SL | HON-SPC ORGANIC SL | 0 | |
| Buy | INVENTORY | Honduras | Milds | Specialty Milds | 2223 | HON-SPC MARCALA RED HONEY | HON-SPC MARCALA RED HONEY | 15,648 | |
| Buy | INVENTORY | Ethiopia | Milds | Washed | 2122 | ETHI-SPC YIRG GEDEB WASH | ETHI-SPC YIRG GEDEB WASH | 26,572 | |
| Buy | INVENTORY | Guatemala | Milds | Washed | 2223 | GUA-SPC HHT WOMEN PRODUCED | GUA-SPC HHT WOMEN PRODUCED | 40,920 | |
| Buy | INVENTORY | Ethiopia | Milds | African Milds | 2223 | ETHI-SPC WSH SIDAMO GR 1 | ETHI-SPC WSH SIDAMO GR 1 | 12,566 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Buy | INVENTORY | Guatemala | Milds | Washed | 2122 | GUA-SPC CODA BLEND | GUA-SPC CODA BLEND | 19,015 |
| Buy | INVENTORY | Ethiopia | Milds | Specialty Milds | 2122 | ETHI-SPC CATA WSH YIRG GR1 | ETHI-SPC CATA WSH YIRG GR1 | 10,979 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2324 | BRA-SPC IPE AMARELO 16+ | BRA-SPC IPE AMARELO 16+ | 65,294 |
| Buy | INVENTORY | Indonesia | Milds | Specialty Milds | 2324 | IND-SPC SUM ORG ACEH GR1 TP | IND-SPC SUM ORG ACEH GR1 TP | 19,974 |
| Buy | INVENTORY | Vietnam | Milds | Asian Milds | 2223 | VIE-SPC ANAEROBIC PROCESS | VIE-SPC ANAEROBIC PROCESS | 16,667 |
| Buy | INVENTORY | Ethiopia | Milds | Specialty Milds | 2122 | ETHI-SPC CAT NAT YIRG G1 | ETHI-SPC CAT NAT YIRG G1 | 4,630 |
| Buy | INVENTORY | Colombia | Milds | Decaf SWP | 2324 | DEC-SPC COLOMBIA SWP | DEC-SPC COLOMBIA SWP | 11,244 |
| Buy | INVENTORY | Vietnam | Milds | Asian Milds | 2122 | VIE-SPC ANAEROBIC PROCESS | VIE-SPC ANAEROBIC PROCESS | 12,170 |
| Buy | INVENTORY | Colombia | Milds | Washed | 2223 | COL-SPC EQ GAITANIA EXCELSO EP | COL-SPC EQ GAITANIA EXCELSO EP | 10,185 |
| Buy | INVENTORY | Nicaragua | Milds | Fully Washed | 2122 | NIC-SPC LA VIRGEN WOMAN OWN | NIC-SPC LA VIRGEN WOMAN OWN | 18,102 |
| Buy | INVENTORY | Honduras | Naturals | Specialty Natural | 2223 | HON-SPC LA CUESTA NATURAL ML | HON-SPC LA CUESTA NATURAL ML | 10,953 |
| Buy | INVENTORY | Nicaragua | Milds | Natural Process | 2223 | NIC-SPC PROYECTO UVA NATURAL | NIC-SPC PROYECTO UVA NATURAL | 14,908 |
| Buy | INVENTORY | Honduras | Milds | Honey | 2223 | HON-SPC SHG DORAZNO HONEY ML | HON-SPC SHG DORAZNO HONEY ML | 6,997 |
| Buy | INVENTORY | Vietnam | Milds | Specialty Milds | 2223 | VIE-SPC ARA HONEY PROCESS LIFT | VIE-SPC ARA HONEY PROCESS LIFT | 13,889 |
| Buy | INVENTORY | Rwanda | Milds | Specialty Milds | 2122 | RWA-SPC AKAGERA PROJECT MUKAMA | RWA-SPC AKAGERA PROJECT MUKAMA | 10,318 |
| Buy | INVENTORY | Honduras | Naturals | Natural | 2223 | HON-SPC ZOPILOTE NATURAL | HON-SPC ZOPILOTE NATURAL | 6,997 |
| Buy | INVENTORY | Colombia | Milds | Decaf SWP | 2324 | DEC-SPC COL SWP RFA | DEC-SPC COL SWP RFA | 9,259 |
| Buy | INVENTORY | Peru | Milds | Washed | 2122 | PER-SPC CAT GR1 WASHED | PER-SPC CAT GR1 WASHED | 45,636 |
| Buy | INVENTORY | Guatemala | Milds | Washed | 2223 | GUA-SPC ANT ENTRE VOLCANES | GUA-SPC ANT ENTRE VOLCANES | 10,800 |
| Buy | INVENTORY | Guatemala | Milds | Fully Washed | 2223 | GUA-SPC LOS CONEJOS HOT ML | GUA-SPC LOS CONEJOS HOT ML | 5,754 |
| Buy | INVENTORY | Nicaragua | Milds | Washed | 2122 | NIC-SPC PLUMERIA LIFT SHG | NIC-SPC PLUMERIA LIFT SHG | 7,302 |
| Buy | INVENTORY | Peru | Milds | Washed | 2122 | PER-SPC CAT ORG GR1 WASHED | PER-SPC CAT ORG GR1 WASHED | 23,274 |
| Buy | INVENTORY | Indonesia | Milds | Specialty Milds | 2122 | IND-SPC SUM ORG ACEH GR1 TP | IND-SPC SUM ORG ACEH GR1 TP | 10,185 |
| Buy | INVENTORY | Vietnam | Milds | Specialty Milds | 2223 | VIE-SPC ARA ANAEROBIC LIFT | VIE-SPC ARA ANAEROBIC LIFT | 10,847 |
| Buy | INVENTORY | Honduras | Naturals | Natural | 2223 | HON-SPC EL CACHIMBON NATURAL | HON-SPC EL CACHIMBON NATURAL | 8,823 |
| Buy | INVENTORY | Nicaragua | Milds | Fully Washed | 2122 | NIC-SPC SHG RFA CERTIFIED | NIC-SPC SHG RFA CERTIFIED | 7,606 |
| Buy | INVENTORY | Honduras | Naturals | Specialty Natural | 2223 | HON-SPC GRANADILLAS NATURAL ML | HON-SPC GRANADILLAS NATURAL ML | 6,237 |
| Buy | INVENTORY | Honduras | Milds | Washed | 2223 | HON-SPC ORGANIC SHG | HON-SPC ORGANIC SHG | 16,125 |
| Buy | INVENTORY | Nicaragua | Milds | Washed | 2223 | NIC-SPC LA VIRGEN GUARDA ML | NIC-SPC LA VIRGEN GUARDA ML | 0 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2324 | BRA-SPC BARINAS NAT FERM 16+ | BRA-SPC BARINAS NAT FERM 16+ | 19,842 |
| Buy | INVENTORY | Guatemala | Milds | Specialty Milds | 2122 | GUA-SPC AVE DEL PARAISO LIFT | GUA-SPC AVE DEL PARAISO LIFT | 10,953 |
| Buy | INVENTORY | Nicaragua | Milds | Specialty Milds | 2122 | NIC-SPC SHG FTO | NIC-SPC SHG FTO | 15,212 |
| Buy | INVENTORY | Nicaragua | Milds | Washed | 2223 | NIC-SPC NUEVA SEGOVIA SHG | NIC-SPC NUEVA SEGOVIA SHG | 4,564 |
| Buy | INVENTORY | Nicaragua | Milds | Honey | 2223 | NIC-SPC AIDA LILA PROLONGED | NIC-SPC AIDA LILA PROLONGED | 4,411 |
| Buy | INVENTORY | Ethiopia | Naturals | Natural | 2122 | ETHI-SPC CAT NAT ORG GUJI2 | ETHI-SPC CAT NAT ORG GUJI2 | 1,587 |
| Buy | INVENTORY | Honduras | Milds | Washed | 2122 | HON-SPC SHG FTO | HON-SPC SHG FTO | 16,733 |
| Buy | INVENTORY | Colombia | Milds | Washed | 2122 | COL-SPC NARINO EXCELSO EP | COL-SPC NARINO EXCELSO EP | 43,982 |
| Buy | INVENTORY | Guatemala | Milds | Fully Washed | 2122 | GUA-SPC HUEHUETENANG FANCY SHB | GUA-SPC HUEHUETENANG FANCY SHB | 12,930 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC 2/3 DAMA DA NOITE | BRA-SPC 2/3 DAMA DA NOITE | 6,113 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2324 | BRA-SPC NY 2/3 MTGB FC | BRA-SPC NY 2/3 MTGB FC | 10,714 |
| Buy | INVENTORY | Papua New Guinea | Milds | Washed | 2122 | PNG-SPC B-15 | PNG-SPC B-15 | 6,746 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC FREITAS 4266 16+ LIFT | BRA-SPC FREITAS 4266 16+ LIFT | 5,688 |
| Buy | INVENTORY | Honduras | Milds | Honey | 2223 | HON-SPC GUIN. RED HNY ML LIFT | HON-SPC GUIN. RED HNY ML LIFT | 8,975 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC BELA VISTA BOURBON | BRA-SPC BELA VISTA BOURBON | 6,349 |
| Buy | INVENTORY | Mexico | Milds | Washed | 2223 | MEX-SPC SHG CHIAPAS | MEX-SPC SHG CHIAPAS | 20,688 |
| Buy | INVENTORY | Nicaragua | Milds | Washed | 2122 | NIC-SPC SANTA ANA WOMENS LIFT | NIC-SPC SANTA ANA WOMENS LIFT | 5,628 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC LUIZ PAIXAO 16+ | BRA-SPC LUIZ PAIXAO 16+ | 4,365 |
| Buy | INVENTORY | Guatemala | Milds | Washed | 2122 | GUA-SPC SHB ST PALENCIA WASHED | GUA-SPC SHB ST PALENCIA WASHED | 7,910 |
| Buy | INVENTORY | Ethiopia | Naturals | African Naturals | 2122 | ETHI-SPC GUJI ALAKA NAT | ETHI-SPC GUJI ALAKA NAT | 2,381 |
| Buy | INVENTORY | Guatemala | Milds | Fully Washed | 2223 | GUA-SPC EL MOLINO DBL FERM | GUA-SPC EL MOLINO DBL FERM | 3,042 |
| Buy | INVENTORY | Honduras | Milds | Specialty Milds | 2122 | DEC-SPC SWP HON FTO SHG | DEC-SPC SWP HON FTO SHG | 7,804 |
| Buy | INVENTORY | Honduras | Milds | Washed | 2223 | HON-SPC RAINFOREST SHG EP | HON-SPC RAINFOREST SHG EP | 6,693 |
| Buy | INVENTORY | Honduras | Milds | Washed | 2223 | HON-SPC SHG EL ROBLE ML | HON-SPC SHG EL ROBLE ML | 3,499 |
| Buy | INVENTORY | Ethiopia | Milds | Specialty Milds | 2122 | ETHI-SPC CAT WSH GUJI1 | ETHI-SPC CAT WSH GUJI1 | 6,349 |
| Buy | INVENTORY | Honduras | Milds | Honey | 2223 | HON-SPC R. CORTEZ HNY ML LIFT | HON-SPC R. CORTEZ HNY ML LIFT | 5,781 |
| Buy | INVENTORY | Guatemala | Milds | Fully Washed | 2223 | GUA-SPC RIO COLORADO WSH SHB | GUA-SPC RIO COLORADO WSH SHB | 3,042 |
| Buy | INVENTORY | Nicaragua | Milds | Washed | 2122 | NIC-SPC SHG CABO AZUL | NIC-SPC SHG CABO AZUL | 7,758 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2324 | BRA-SPC NY 2 17/18 FC CERRADO | BRA-SPC NY 2 17/18 FC CERRADO | 8,201 |

| Buy | INVENTORY | Nicaragua | Milds | Washed | 2223 | NIC-SPC RCP YLW CATUAI ML LIFT | NIC-SPC RCP YLW CATUAI ML LIFT | 3,022 |
|-----|-----------|-----------|-------|--------|------|--------------------------------|--------------------------------|-------|
| Buy | INVENTORY | Honduras | Milds | Fully Washed | 2122 | HON-SPC FEMALE LA CUESTA | HON-SPC FEMALE LA CUESTA | 2,738 |
| Buy | INVENTORY | Vietnam | Milds | Asian Milds | 2223 | VIE-SPC OPAL BOLD | VIE-SPC OPAL BOLD | 11,905 |
| Buy | INVENTORY | Honduras | Naturals | Natural | 2223 | HON-SPC MARCALA NAT ML LIFT | HON-SPC MARCALA NAT ML LIFT | 8,062 |
| Buy | INVENTORY | Mexico | Milds | Fully Washed | 2122 | MEX-SPC SHG FTO | MEX-SPC SHG FTO | 2,282 |
| Buy | INVENTORY | Guatemala | Milds | Washed | 2223 | GUA-SPC CUBULCO SHB | GUA-SPC CUBULCO SHB | 2,130 |
| Buy | INVENTORY | Brazil | Milds | Specialty Milds | 2122 | BRA-SPC MTGB VALUE | BRA-SPC MTGB VALUE | 4,365 |
| Buy | INVENTORY | Nicaragua | Naturals | Natural | 2122 | NIC-SPC JINOTEGA NAT LIFT | NIC-SPC JINOTEGA NAT LIFT | 2,586 |
| Buy | INVENTORY | Guatemala | Milds | Specialty Milds | 2122 | GUA-SPC LOS CONEJOS | GUA-SPC LOS CONEJOS | 2,282 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2122 | BRA-SPC VELOSO 2/3 CERRADO 16+ | BRA-SPC VELOSO 2/3 CERRADO 16+ | 5,946 |
| Buy | INVENTORY | Vietnam | Robustas | Washed Robusta | 2223 | VIE-SPC ROB HONEY PROCESS | VIE-SPC ROB HONEY PROCESS | 4,894 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC FREITAS 4267 16+ LIFT | BRA-SPC FREITAS 4267 16+ LIFT | 3,175 |
| Buy | INVENTORY | Ethiopia | Milds | Specialty Milds | 2122 | ETHI-SPC CAT WSH ORG GUJI2 | ETHI-SPC CAT WSH ORG GUJI2 | 6,614 |
| Buy | INVENTORY | Vietnam | Milds | Specialty Milds | 2223 | VIE-SPC WOMENS ARABICA | VIE-SPC WOMENS ARABICA | 4,101 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC RAFAEL SILVA 15+ LIFT | BRA-SPC RAFAEL SILVA 15+ LIFT | 2,646 |
| Buy | INVENTORY | Guatemala | Milds | Fully Washed | 2223 | GUA-SPC HUEHUETENANG FANCY SHB | GUA-SPC HUEHUETENANG FANCY SHB | 3,955 |
| Buy | INVENTORY | Costa Rica | Milds | Washed | 2223 | COS-SPC SUMAVA SARCHI | COS-SPC SUMAVA SARCHI | 1,217 |
| Buy | INVENTORY | Ethiopia | Naturals | African Naturals | 2122 | ETHI-SPC GUJI NATURAL GR 3 | ETHI-SPC GUJI NATURAL GR 3 | 4,252 |
| Buy | INVENTORY | Ethiopia | Naturals | African Naturals | 2122 | ETHI-SPC CAT ORG NAT YIRG GR1 | ETHI-SPC CAT ORG NAT YIRG GR1 | 7,143 |
| Buy | INVENTORY | Ethiopia | Naturals | African Naturals | 2122 | ETHI-SPC YIRG KONGA NAT | ETHI-SPC YIRG KONGA NAT | 1,323 |
| Buy | INVENTORY | Ethiopia | Milds | Specialty Milds | 2122 | ETHI-SPC CAT NAT SID G1 | ETHI-SPC CAT NAT SID G1 | 1,058 |
| Buy | INVENTORY | Honduras | Naturals | Specialty Natural | 2223 | HON-SPC EL ROBLE NATURAL ML | HON-SPC EL ROBLE NATURAL ML | 913 |
| Buy | INVENTORY | Costa Rica | Milds | Washed | 2223 | COS-SPC MONTES DE ORO | COS-SPC MONTES DE ORO | 913 |
| Buy | INVENTORY | Brazil | Milds | Specialty Milds | 2223 | BRA-SPC FAZ BELA VISTA | BRA-SPC FAZ BELA VISTA | 4,101 |
| Buy | INVENTORY | Colombia | Milds | Washed | 2223 | DEC-SPC COL EXCELSO EA | DEC-SPC COL EXCELSO EA | 2,290 |
| Buy | INVENTORY | Guatemala | Milds | Washed | 2223 | GUA-SPC FANCY SHB F SN ISI CHA | GUA-SPC FANCY SHB F SN ISI CHA | 2,434 |
| Buy | INVENTORY | Colombia | Milds | Washed | 2223 | COL-SPC HUILA SUPREMO | COL-SPC HUILA SUPREMO | 4,475 |
| Buy | INVENTORY | Colombia | Milds | Decaf SWP | 2223 | DEC-SPC COL SWP RFA | DEC-SPC COL SWP RFA | 1,455 |
| Buy | INVENTORY | Guatemala | Milds | Washed | 2021 | GUA-SPC SHB ST PALENCIA WASHED | GUA-SPC SHB ST PALENCIA WASHED | 1,521 |
| Buy | INVENTORY | Indonesia | Milds | Wet-Hulled | 2122 | IND-SPC SUM GR 1 DP | IND-SPC SUM GR 1 DP | 1,058 |
| Buy | INVENTORY | Honduras | Naturals | Natural | 2021 | HON-SPC EL CACHIMBON NATURAL | HON-SPC EL CACHIMBON NATURAL | 1,673 |
| Buy | INVENTORY | Vietnam | Milds | Asian Milds | 2122 | VIE-SPC SHG LOTUS | VIE-SPC SHG LOTUS | 4,497 |
| Buy | INVENTORY | Peru | Milds | Fully Washed | 2223 | PER-SPC GR 1 FTO | PER-SPC GR 1 FTO | 2,282 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC JOSE SILVEIRA PEA LIFT | BRA-SPC JOSE SILVEIRA PEA LIFT | 1,587 |
| Buy | INVENTORY | Costa Rica | Milds | Washed | 2223 | COS-SPC RUSTICOS SUMAVA | COS-SPC RUSTICOS SUMAVA | 456 |
| Buy | INVENTORY | Mexico | Milds | Fully Washed | 2223 | MEX-SPC SHG FTO | MEX-SPC SHG FTO | 913 |
| Buy | INVENTORY | Vietnam | Robustas | Washed Robusta | 2223 | VIE-SPC ROB WASHED SC 15 | VIE-SPC ROB WASHED SC 15 | 7,275 |
| Buy | INVENTORY | Indonesia | Milds | Wet-Hulled | 2223 | IND-SPC SUMATRA LINTONG TP | IND-SPC SUMATRA LINTONG TP | 1,455 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC VELOSO 2/3 CERRADO 16+ | BRA-SPC VELOSO 2/3 CERRADO 16+ | 1,892 |
| Buy | INVENTORY | Honduras | Milds | Washed | 2223 | HON-SPC R PORTILLO WSH ML LIFT | HON-SPC R PORTILLO WSH ML LIFT | 0 |
| Buy | INVENTORY | Kenya | Milds | Specialty Milds | 2122 | KEN-SPC KAGANDA AA | KEN-SPC KAGANDA AA | 50 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2122 | BRA-SPC IPE AMARELO 15/16 SSFC | BRA-SPC IPE AMARELO 15/16 SSFC | 2,601 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC IPE AMARELO 15/16 SSFC | BRA-SPC IPE AMARELO 15/16 SSFC | 3,622 |
| Buy | INVENTORY | India | Milds | Washed | 2223 | INDI-SPC MON MALABAR | INDI-SPC MON MALABAR | 772 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC 2/3 FAZENDA LOBO | BRA-SPC 2/3 FAZENDA LOBO | 1,171 |
| Buy | INVENTORY | Ethiopia | Milds | Specialty Milds | 2122 | ETHI-SPC CAT NAT GUJI2 | ETHI-SPC CAT NAT GUJI2 | 1,587 |
| Buy | INVENTORY | Brazil | Milds | Decaf SWP | 2122 | DEC-SPC BRAZIL BELA VISTA SW | DEC-SPC BRAZIL BELA VISTA SW | 1,058 |
| Buy | INVENTORY | Nicaragua | Milds | Washed | 2223 | NIC-SPC LA VIRGEN JAVA ML | NIC-SPC LA VIRGEN JAVA ML | 761 |
| Buy | INVENTORY | Honduras | Naturals | Natural | 2223 | HON-SPC GUINOPE NAT ML LIFT | HON-SPC GUINOPE NAT ML LIFT | 2,130 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC DE SOUZA PEA LIFT | BRA-SPC DE SOUZA PEA LIFT | 794 |
| Buy | INVENTORY | Nicaragua | Milds | Natural Process | 2122 | NIC-SPC PROYECTO UVA NATURAL | NIC-SPC PROYECTO UVA NATURAL | 608 |
| Buy | INVENTORY | Guatemala | Milds | Washed | 2122 | GUA-SPC JALAPA FANCY SHB | GUA-SPC JALAPA FANCY SHB | 913 |
| Buy | INVENTORY | Vietnam | Milds | Asian Milds | 2122 | VIE-SPC OPAL BOLD | VIE-SPC OPAL BOLD | 661 |
| Buy | INVENTORY | Honduras | Milds | Specialty Milds | 2021 | HON-SPC SHG ANAEROBIC PROCESS | HON-SPC SHG ANAEROBIC PROCESS | 456 |
| Buy | INVENTORY | Ethiopia | Naturals | African Naturals | 2223 | ETHI-SPC NAT LIMU GR1 | ETHI-SPC NAT LIMU GR1 | 728 |
| Buy | INVENTORY | Honduras | Milds | Washed | 2122 | HON-SPC SHG FANCY | HON-SPC SHG FANCY | 0 |
| Buy | INVENTORY | Costa Rica | Milds | Yellow Honey Process | 2223 | COS-SPC LA LIA SARCHI YH | COS-SPC LA LIA SARCHI YH | 304 |
| Buy | INVENTORY | United States of America | Milds | Decaf SWP | 2223 | DEC-SPC NOVUS BLEND SWP | DEC-SPC NOVUS BLEND SWP | 397 |

| Buy | INVENTORY | Colombia | Milds | Fully Washed | 2223 | COL-SPC ORGANIC EXCELSO EP | COL-SPC ORGANIC EXCELSO EP | 0 |
| Buy | INVENTORY | Mexico | Milds | Washed | 2122 | MEX-SPC SHG ORGANIC | MEX-SPC SHG ORGANIC | 304 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC 2/3 FAVO DE MEL | BRA-SPC 2/3 FAVO DE MEL | 0 |
| Buy | INVENTORY | Peru | Milds | Washed | 2223 | DEC-SPC PERU SWP FAIRTRADE ORG | DEC-SPC PERU SWP FAIRTRADE ORG | 0 |
| Buy | INVENTORY | Colombia | Milds | Decaf SWP | 2021 | DEC-SPC COLOMBIA SWP | DEC-SPC COLOMBIA SWP | 157 |
| Buy | INVENTORY | Indonesia | Milds | Wet-Hulled | 2021 | IND-SPC SUM GR 1 DP | IND-SPC SUM GR 1 DP | 211 |
| Buy | INVENTORY | Rwanda | Milds | Washed | 2021 | RWA-SPC HINGAKAWA WOMEN COFFEE | RWA-SPC HINGAKAWA WOMEN COFFEE | 132 |
| Buy | INVENTORY | Colombia | Milds | Washed | 2223 | COL-SPC EQ HUILA EXCELSO EP | COL-SPC EQ HUILA EXCELSO EP | 0 |
| Buy | INVENTORY | Honduras | Milds | Washed | 2122 | HON-SPC ORGANIC SHG | HON-SPC ORGANIC SHG | 0 |
| Buy | INVENTORY | Vietnam | Milds | Specialty Milds | 2223 | VIE-SPC ARA CAR MACERATED | VIE-SPC ARA CAR MACERATED | 132 |
| Buy | INVENTORY | Papua New Guinea | Milds | Specialty Milds | 2122 | PNG-SPC VIRGIN MTN A/X | PNG-SPC VIRGIN MTN A/X | 0 |
| Buy | INVENTORY | Honduras | Milds | Washed | 2021 | NIC-SPC PLUMERIA LIFT SHG | NIC-SPC PLUMERIA LIFT SHG | 152 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC MINASUL NAT 3 | BRA-SPC MINASUL NAT 3 | 0 |
| Buy | INVENTORY | Brazil | Naturals | Natural | 2223 | BRA-SPC MINASUL AMAM 4 | BRA-SPC MINASUL AMAM 4 | 0 |
| Buy | INVENTORY | Vietnam | Milds | Specialty Milds | 2122 | VIE-SPC ARA HONEY PROCESS | VIE-SPC ARA HONEY PROCESS | 132 |
| Buy | INVENTORY | Nicaragua | Robustas | Washed Robusta | 2122 | NIC-SPC ROBUSTA ANAEROBIC | NIC-SPC ROBUSTA ANAEROBIC | 0 |
| Buy | INVENTORY | Guatemala | Milds | Specialty Milds | 2223 | GUA-SPC LOS CONEJOS | GUA-SPC LOS CONEJOS | 0 |
| Buy | INVENTORY | Vietnam | Robustas | Premium Robusta | 2122 | VIE-SPC ROB GR1 16 POLISHED | VIE-SPC ROB GR1 16 POLISHED | 132 |
| Buy | INVENTORY | Costa Rica | Milds | Washed | 2122 | COS-SPC SHB | COS-SPC SHB | 40 |

*EXECUTION VERSION*

### Schedule 2.1(b)(iii)
### Furnishings and Equipment

See attached.

**FIXED ASSETS**

**Mercon Coffee Corporation**

| Accounting account | Account no. | Location | Description | Purchase date | Amount | DEPREC Acum | BALANCE TO DEPREC |
|---|---|---|---|---|---|---|---|
| Machinery and equipments | 1203010200 | Kansas | WEIGH RIGHT 16175 BB 50%/9558-Weigh Right 16230 BB 50% (12,995 x 2) | 12/20/2021 | $ 25,990.00 | $ 4,981.41 | $ 21,008.59 |
| Machinery and equipments | 1203010200 | Kansas | Advanced Auxiliary 58932657 BB | 1/5/2022 | $ 3,941.90 | $ 722.68 | $ 3,219.22 |
| Machinery and equipments | 1203010200 | Kansas | 104660-1-31/MARZ/2022-TRACY ALLE / Primo 2BBL Sample Roaster | 4/5/2022 | $ 10,000.00 | $ 3,333.34 | $ 6,666.66 |
| Machinery and equipments | 1203010200 | Kansas | 104660-1-31/MARZ/2022-TRACY ALLE / K30 Espresso Grinder | 4/5/2022 | $ 1,080.50 | $ 360.17 | $ 720.33 |
| Machinery and equipments | 1203010200 | Kansas | 11935-DBA-EXHAUST PIPE | 7/20/2022 | $ 4,342.89 | $ 1,230.48 | $ 3,112.41 |
| Machinery and equipments | 1203010200 | Kansas | 13803-ROASTER PROBATINO BB | 9/21/2022 | $ 16,088.08 | $ 1,876.94 | $ 14,211.14 |
| Machinery and equipments | 1203010200 | Kansas | RECLASIFICACION V01-7030 BB | 6/30/2022 | $ 27,584.53 | $ 4,137.67 | $ 23,446.86 |
| Machinery and equipments | 1203010200 | Kansas | A COFFEE ROASTER MS DBA BB | 6/30/2022 | $ 11,178.00 | $ 1,676.70 | $ 9,501.30 |
| Machinery and equipments | 1203010200 | Kansas | did not received specification from the user about what specific machine was this) | 12/1/2022 | $ 1,005.94 | $ 100.59 | $ 905.35 |
| Machinery and equipments | 1203010200 | Kansas | Lab. Equipment/ to detect caffei (G02-676) | 12/29/2022 | $ 4,930.00 | $ 986.00 | $ 3,944.00 |
| Machinery and equipments | 1203010200 | Kansas | HWB-2105, 1PH, 2+G, 4.0KW/240VAC, 208-240VAC,UL. | 11/25/2022 | $ 962.99 | $ 882.74 | $ 80.25 |
| Machinery and equipments | 1203010200 | Kansas | 15261 PROBAT TOSTADOR 223075 BB | 12/6/2022 | $ 8,101.90 | $ 1,485.35 | $ 6,616.55 |
| Machinery and equipments | 1203010200 | Kansas | USED FB80 3EE | 9/1/2022 | $ 7,602.00 | $ 4,434.50 | $ 3,167.50 |
| Machinery and equipments | 1203010200 | Miami | V01-8454 Coffee Espresso Machine | 10/12/2023 | $ 2,995.95 | $ 99.87 | $ 2,896.09 |
| Machinery and equipments | 1203010200 | Seattle | Afterburner 1017-Selkirk | 11/18/2019 | $ 18,000.00 | $ 14,400.00 | $ 3,600.00 |
| Machinery and equipments | 1203010200 | Seattle | Mechanical/64992/ROASTER INSTALL | 1/31/2020 | $ 29,416.52 | $ 22,552.67 | $ 6,863.85 |
| Machinery and equipments | 1203010200 | Seattle | AGTRON 27475 BASIC COFFEE ANALYZ | 3/6/2020 | $ 9,400.00 | $ 6,893.33 | $ 2,506.67 |
| Machinery and equipments | 1203010200 | Seattle | 13702-METER Group EST-010009 | 10/6/2022 | $ 11,725.10 | $ 2,735.86 | $ 8,989.24 |
| Machinery and equipments | 1203010200 | Seattle | 19662-Weigh Right-17217 | 8/18/2023 | $ 16,002.79 | $ 1,066.85 | $ 14,935.94 |
| Machinery and equipments | 1203010200 | Seattle | 19776-Plexpack Corp-46247-1 - V01-175 | 8/22/2023 | $ 6,957.50 | $ 347.88 | $ 6,609.63 |
| Machinery and equipments | 1203010200 | Seattle | 19776-Plexpack Corp-46247-2 - V01-176 | 8/22/2023 | $ 5,566.00 | $ 278.30 | $ 5,287.70 |
| Machinery and equipments | 1203010200 | Seattle | 19984-Advanced 58933275 - V01-185 | 8/29/2023 | $ 3,659.40 | $ 182.97 | $ 3,476.43 |
| Machinery and equipments | 1203010200 | Seattle | 20439Weigh 17282 SHIPPIN CHARGE - V01-193 | 9/27/2023 | $ 991.94 | $ 49.60 | $ 942.34 |
| Machinery and equipments | 1203010200 | Seattle | 20558-Selkirk 1023 capital expen - V01-212 Coffee Roaster | 10/2/2023 | $ 14,000.00 | $ 466.66 | $ 13,533.34 |
| Machinery and equipments | 1203010200 | Seattle | 21102-San Fransiscan 3793 CAPITA -V01-216 Coffee Roaster | 10/25/2023 | $ 2,675.00 | $ 89.16 | $ 2,585.84 |
| Machinery and equipments | 1203010200 | Seattle | 20556-CAPITAK EXPENSE-ROASTING E - V01-202 Coffee Roaster | 9/29/2023 | $ 43,345.00 | $ 1,444.84 | $ 41,900.16 |
| Machinery and equipments | 1203010200 | Seattle | Pro V3 USA/CANADA 120V (UL).(Seattle Office)-IKAWA Invoice:3692 | 2/19/2019 | $ 4,790.00 | $ 4,550.50 | $ 239.50 |
| Machinery and equipments | 1203010200 | Seattle | Grinder KR804 New W/SHKR S/N 2029180033 Invoice 46867 Ditting | 3/5/2019 | $ 3,044.15 | $ 2,841.21 | $ 202.94 |
| Machinery and equipments | 1203010200 | Seattle | BRZ4 Sample Roaster - NG Invoice 193018 Probat | 3/19/2019 | $ 24,593.26 | $ 22,953.71 | $ 1,639.55 |
| Machinery and equipments | 1203010200 | Seattle | Aurelia Wave T3 V 2gr Raised Black 220v/ VA358 T3 2gr Chrome | 6/21/2019 | $ 14,555.22 | $ 12,857.11 | $ 1,698.11 |
| Machinery and equipments | 1203010200 | Seattle | Weigh Model Model iQ-1ES Net Weigh Filling Machine.Invoice 14309 | 7/30/2019 | $ 25,155.00 | $ 21,801.00 | $ 3,354.00 |
| Machinery and equipments | 1203010200 | Seattle | BRZ4One P12/2 Roaster - NG - 31495-PROBAT- | 8/12/2019 | $ 41,939.83 | $ 35,034.12 | $ 6,905.71 |
| **Total Machinery and equipments** | | | | | **$ 401,621.39** | **$ 176,854.21** | **$ 224,767.18** |
| Intangible Others | | Kansas | Adquistion Brewed behavior v01-6179 | 8/2/2021 | $ 150,000.00 | $ 23,333.33 | $ 126,666.67 |
| Intangible Others | | Kansas | 13810-ACQUISITION BREWED BEHAV | 10/13/2022 | $ 150,000.00 | $ 13,461.54 | $ 136,538.46 |
| Intangible Others | | Miami | ETHOS Panamá, C.A.-Implementacion  Modulo planificacion Adaptive 1900-005-001 (2019) | | $ 11,000.00 | $ 1,463.22 | $ 9,536.78 |
| Intangible Others | | Miami | ETHOS Panamá, C.A.-Implementacion  Modulo planificacion Adaptive 1900-008-002 | | $ 11,000.00 | $ 6,678.57 | $ 4,321.43 |
| **Total Intangible Others** | | | | | **$ 322,000.00** | **$ 44,936.66** | **$ 277,063.34** |
| Computer Equipment | 1201070100 | Kansas | 2 LAPTOP TRACY AND THATCHE BB | 10/8/2021 | $ 3,858.18 | $ 1,671.84 | $ 2,186.34 |
| Computer Equipment | 1201070100 | Miami | Lenovo ThinkPad X1 Carbon 8th Gen 20U9002NUS 14"Ultrabook - WQHD - 2560 x | 10/7/2020 | $ 2,333.54 | $ 1,400.12 | $ 933.42 |
| Computer Equipment | 1201070100 | Miami | MNJ 3774481 LAPTOP/MONITOR ASUS | 3/24/2021 | $ 2,290.24 | $ 1,221.44 | $ 1,068.80 |
| Computer Equipment | 1201070100 | Miami | MNJ 3788650 LENOVO THINK PAD | 6/22/2021 | $ 1,751.64 | $ 846.63 | $ 905.01 |
| Computer Equipment | 1201070100 | Miami | MNJ 3799533 # 7641 Lenovo Thinkpad | 8/25/2021 | $ 2,243.86 | $ 1,009.74 | $ 1,234.12 |
| Computer Equipment | 1201070100 | Miami | MNJ 3807279 Lenovo ThinkPad 3 | 10/11/2021 | $ 6,419.87 | $ 2,781.99 | $ 3,637.88 |
| Computer Equipment | 1201070100 | Miami | 11622-MNJ 3832648 Dell OptiPlex | 3/15/2022 | $ 1,036.83 | $ 777.62 | $ 259.21 |
| Computer Equipment | 1201070100 | Miami | 11622-MNJ 3835546 FIREPOWER | 3/30/2022 | $ 2,208.69 | $ 1,656.52 | $ 552.17 |
| Computer Equipment | 1201070100 | Miami | 12766-Microsoft Surface Laptop 4 | 8/17/2022 | $ 1,924.93 | $ 513.29 | $ 1,411.64 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Computer Equipment | 1201070100 | Miami | 13771-MNJ3866159 LENOVO THINKPAD | 10/7/2022 | $ | 1,695.27 | $ 395.56 | $ 1,299.71 |
| Computer Equipment | 1201070100 | Miami | MNJ 3868688 LENOVO | 10/25/2022 | $ | 2,357.86 | $ 550.17 | $ 1,807.69 |
| Computer Equipment | 1201070100 | Miami | 19041-MNJ-LENOVO | 7/24/2023 | $ | 1,748.71 | $ 145.73 | $ 1,602.98 |
| Computer Equipment | 1201070100 | Miami | MNJ/3680633/LAPTOP. Lenovo ThinkPad X1 Carbon 6th Gen 20KH002JUS 14" Car | 12/22/2019 | $ | 1,690.44 | $ 1,352.35 | $ 338.09 |
| Computer Equipment | 1201070100 | Miami | CC Dec 2019// Laptop FV | 2/1/2020 | $ | 1,707.75 | $ 1,309.28 | $ 398.48 |
| Computer Equipment | 1201070100 | Miami | Lenovo ThinkPad T480 20LS0010US 14" Touchscreen LCD Notebook - Intel Core i7 | 5/1/2019 | $ | 2,086.50 | $ 1,947.40 | $ 139.10 |
| Computer Equipment | 1201070100 | Miami | Lenovo ThinkPad P52s 20LB0026US 15.6" Mobile Workstation Ultrabook - 1920 x 1 | 4/2/2019 | $ | 1,578.25 | $ 1,499.34 | $ 78.91 |
| Computer Equipment | 1201070100 | Miami | Lenovo ThinkPad X1 Carbon 14" LCD Ultrabook -Serial Numbers:20HRS0FH00 (Juar | 10/14/2022 | $ | 2,501.34 | $ 583.65 | $ 1,917.69 |
| Computer Equipment | 1201070100 | Miami | Lenovo ThinkPad P51s 20HB001VUS 15.6" LC-Serial Number: 1S20HB001VUSR90P/ | 10/15/2021 | $ | 1,751.19 | $ 408.61 | $ 1,342.58 |
| Computer Equipment | 1201070100 | Miami | RECAST V01-6048 cysco catalyst | 6/28/2021 | $ | 4,839.16 | $ 2,338.93 | $ 2,500.23 |
| Computer Equipment | 1201070100 | Miami | MNJ 3789152 CISCO CATALYST | 6/24/2021 | $ | 1,227.86 | $ 593.47 | $ 634.39 |
| Computer Equipment | 1201070100 | Miami | MNJ 3789153 CISCO CATALYST | 6/24/2021 | $ | 5,874.70 | $ 2,839.44 | $ 3,035.26 |
| Computer Equipment | 1201070100 | Miami | Polycom, Inc - RealPresence Group 500-720p: Group 500 HD codec,EagleEyeIV-12x | 2/19/2020 | $ | 8,628.59 | $ 6,574.68 | $ 2,053.92 |
| Computer Equipment | 1201070100 | Seattle | CC 06/14/2021 TO 06/20/2021 CDW DIR F704296, Lenovo thinkpad T14 Gen | 6/29/2021 | $ | 1,595.46 | $ 771.14 | $ 824.32 |
| Computer Equipment | 1201070100 | Seattle | MNJ 3787893 Lenovo Erick chastai | 6/16/2021 | $ | 1,881.70 | $ 909.49 | $ 972.21 |
| Computer Equipment | 1201070100 | Seattle | 9123-MNJ 3818743 LENOVO MS | 12/20/2021 | $ | 1,792.95 | $ 717.18 | $ 1,075.77 |
| Computer Equipment | 1201070100 | Seattle | CISCO Catalyst 9200 C9200L-48P-4G | 5/22/2019 | $ | 3,833.77 | $ 3,322.64 | $ 511.13 |
| Computer Equipment | 1201070100 | Seattle | WatchGuard Firebox T55-W | 5/14/2019 | $ | 1,758.91 | $ 1,524.44 | $ 234.47 |
| Computer Equipment | 1201070100 | Seattle | UPS 2200VA LCD RM 2U 120V | 5/16/2019 | $ | 1,302.11 | $ 1,128.47 | $ 173.64 |
| Computer Equipment | 1201070100 | Seattle | Xerox Versalink B 605/S LED Multifunction Printer | 5/2/2019 | $ | 2,048.96 | $ 1,775.77 | $ 273.19 |
| Computer Equipment | 1201070100 | Seattle | 15157-MNJ 3875771 (Lenovo ThinkPad T14 Notebook) V01-7684 | 12/14/2022 | $ | 1,575.48 | $ 315.10 | $ 1,260.38 |
| Computer Equipment | 1201070100 | Seattle | 15491-MNJ 3877629 (Lenovo ThinkPad T14 Gen 2 20W00154US 14" Notebook -) | 1/3/2023 | $ | 1,608.55 | $ 294.90 | $ 1,313.65 |
| **Total  Computer Equipment** | | | | | **$** | **79,153.29** | **$ 43,176.90** | **$ 35,976.39** |
| Leasehold Improvements | 1202040000 | Kansas | 11215-QUALITY-WOOD FLOORS IN BB | 5/19/2022 | $ | 5,850.00 | $ 1,852.50 | $ 3,997.50 |
| Leasehold Improvements | 1202040000 | Kansas | 14006-EXPANSION TRAINING BB | 9/4/2022 | $ | 15,217.41 | $ 1,775.36 | $ 13,442.05 |
| Leasehold Improvements | 1202040000 | Kansas | 14006-EXPANSION TRAINING BB | 9/26/2022 | $ | 15,366.46 | $ 1,792.75 | $ 13,573.71 |
| Leasehold Improvements | 1202040000 | Kansas | 14006-EXPANSION TRAINING BB | 10/16/2022 | $ | 555.66 | $ 64.83 | $ 490.83 |
| Leasehold Improvements | 1202040000 | Kansas | First 20%, expansion training BB | 5/12/2022 | $ | 18,306.88 | $ 2,135.80 | $ 16,171.08 |
| Leasehold Improvements | 1202040000 | Kansas | 11576-776 expansion training BB | 6/20/2022 | $ | 12,127.35 | $ 1,414.86 | $ 10,712.49 |
| Leasehold Improvements | 1202040000 | Kansas | Bodhi 793 expansion training BB | 6/20/2022 | $ | 1,870.82 | $ 218.26 | $ 1,652.56 |
| Leasehold Improvements | 1202040000 | Kansas | 12060-796 EXPANSION TRAINING BB | 7/25/2022 | $ | 11,396.63 | $ 1,329.61 | $ 10,067.02 |
| Leasehold Improvements | 1202040000 | Kansas | 12255-811 EXPANSION TRAINING BB | 7/24/2022 | $ | 11,657.58 | $ 1,360.05 | $ 10,297.53 |
| Leasehold Improvements | 1202040000 | Kansas | 12607-827 EXPANSION TRAINING BB | 8/14/2022 | $ | 15,186.04 | $ 1,771.70 | $ 13,414.34 |
| Leasehold Improvements | 1202040000 | Kansas | 12650- EXPANSION TRAINING BB | 6/16/2022 | $ | 1,276.76 | $ 148.96 | $ 1,127.80 |
| Leasehold Improvements | 1202040000 | Kansas | 12793-EXPANDEE TRAINING SEATTLE | 8/6/2022 | $ | 10,936.40 | $ 1,275.91 | $ 9,660.49 |
| Leasehold Improvements | 1202040000 | Kansas | 12880-EXPANSION TRAINING BB | 9/2/2022 | $ | 11,107.17 | $ 1,295.84 | $ 9,811.33 |
| Leasehold Improvements | 1202040000 | Kansas | 13425-EXPANSION TRAINING BB | 9/12/2022 | $ | 11,342.61 | $ 1,323.30 | $ 10,019.31 |
| Leasehold Improvements | 1202040000 | Kansas | 13425-EXPANSION TRAINING BB | 8/22/2022 | $ | 6,207.06 | $ 724.16 | $ 5,482.90 |
| Leasehold Improvements | 1202040000 | Kansas | 13423-EXPANSION TRAINING BB | 9/19/2022 | $ | 18,667.83 | $ 2,177.91 | $ 16,489.92 |
| Leasehold Improvements | 1202040000 | Kansas | 15622-EXPANSION TRAINING BB | 1/24/2023 | $ | 1,784.03 | $ 163.54 | $ 1,620.49 |
| Leasehold Improvements | 1202040000 | Kansas | 16254-Western Specialty-32085 | 11/20/2023 | $ | 1,786.82 | $ 670.06 | $ 1,116.77 |
| Leasehold Improvements | 1202040000 | Kansas | 20460-Depost-Design Services | 9/27/2023 | $ | 1,500.00 | $ - | $ 1,500.00 |
| Leasehold Improvements | 1202040000 | Miami | Leasehold Improvements V01-8292 | 8/2/2023 | $ | 9,901.00 | $ 3,300.33 | $ 6,600.67 |
| Leasehold Improvements | 1202040000 | Seattle | MER-9009R-0 | 2/20/2020 | $ | 2,168.66 | $ 1,626.50 | $ 542.17 |
| Leasehold Improvements | 1202040000 | Seattle | 20790-Bodhi Builders-1133 - V01-206 | 10/3/2023 | $ | 2,634.38 | $ 43.90 | $ 2,590.48 |
| Leasehold Improvements | 1202040000 | Seattle | 20790-CAPITOL EXPENSE - V01-207 | 10/9/2023 | $ | 10,372.56 | $ 172.88 | $ 10,199.68 |
| Leasehold Improvements | 1202040000 | Seattle | 21421-BODHI 1158 -V01-228 | 11/6/2023 | $ | 4,420.32 | $ 36.84 | $ 4,383.48 |
| Leasehold Improvements | 1202040000 | Seattle | 21123-BODHI 1147-V01-229 | 10/23/2023 | $ | 224.91 | $ 1.87 | $ 223.04 |
| Leasehold Improvements | 1202040000 | Seattle | 21420-Bodhi 1154 CAPITAL EXPENSE -V01-235 | 10/30/2023 | $ | 7,465.64 | $ 62.21 | $ 7,403.43 |
| Leasehold Improvements | 1202040000 | Seattle | 21770-Bodhi 1139 CAPITAL | 10/17/2023 | $ | 2,735.20 | $ 22.79 | $ 2,712.41 |
| Leasehold Improvements | 1202040000 | Seattle | 21772-Bodhi 1170 CAPITAL | 11/20/2023 | $ | 750.00 | $ 6.25 | $ 743.75 |
| Leasehold Improvements | 1202040000 | Seattle | 21772-Bodhi 1164 CAPITAL | 11/13/2023 | $ | 1,855.51 | $ 15.46 | $ 1,840.05 |
| Leasehold Improvements | 1202040000 | Seattle | 21776-Bodhi 1171 CAPITAL | 11/20/2023 | $ | 10,611.04 | $ 88.43 | $ 10,522.61 |
| Leasehold Improvements | 1202040000 | Seattle | 21937-Bodhi 1178 CAPITAL | 11/27/2023 | $ | 4,354.85 | $ 36.29 | $ 4,318.56 |
| Leasehold Improvements | 1202040000 | Seattle | 21937-Bodhi 1177 CAPITAL | 11/27/2023 | $ | 4,277.42 | $ 35.65 | $ 4,241.77 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Leasehold Improvements | 1202040000 | Seattle | 21937-Bodhi 1176 CAPITAL | 11/27/2023 | $ | 400.00 | $ | 3.33 | $ | 396.67 |
| Leasehold Improvements | 1202040000 | Seattle | 21777-Bodhi 1167 CAPITAL | 11/13/2023 | $ | 30,000.00 | $ | 250.00 | $ | 29,750.00 |
| Leasehold Improvements | 1202040000 | Seattle | 21777-Bodhi 1167 CAPITAL | 11/13/2023 | $ | 30,000.00 | $ | 250.00 | $ | 29,750.00 |
| Leasehold Improvements | 1202040000 | Seattle | 21779-Bodhi 1163 CAPITAL | 11/13/2023 | $ | 150.00 | $ | 1.25 | $ | 148.75 |
| Leasehold Improvements | 1202040000 | Seattle | 21779-Bodhi 1157 CAPITAL | 11/6/2023 | $ | 250.00 | $ | 2.08 | $ | 247.92 |
| Leasehold Improvements | 1202040000 | Seattle | 21779-Bodhi 1146 CAPITAL | 10/23/2023 | $ | 2,100.00 | $ | 17.50 | $ | 2,082.50 |
| Leasehold Improvements | 1202040000 | Seattle | 21779-Bodhi 1153 CAPITAL | 10/30/2023 | $ | 2,750.00 | $ | 22.92 | $ | 2,727.08 |
| Leasehold Improvements | 1202040000 | Seattle | 21780-Bodhi 1172 CAPITAL | 11/20/2023 | $ | 17,773.73 | $ | 148.11 | $ | 17,625.62 |
| Leasehold Improvements | 1202040000 | Seattle | Tenant Improvement Contribution  - MER-9009R-0 | 4/3/2019 | $ | 116,363.51 | $ | 99,159.23 | $ | 17,204.28 |
| Total  Leasehold Improvements | | | | | $ | 433,702.24 | $ | 126,799.23 | $ | 306,903.01 |
| Total general | | | | | $ | 974,918.19 | $ | 286,463.18 | $ | 688,455.02 |

**Schedule 2.1(b)(iv)**
**Assumed Lease**

None

*EXECUTION VERSION*

**Schedule 2.1(b)(v)**
**Acquired Intellectual Property**

*Trademarks*

| No. | Trademark | Country of registration | Status | Classes | Registration/Application info |
|-----|-----------|------------------------|--------|---------|------------------------------|
| 1 |  | USA | In process | **Class 35:** Advertising; business management, organization and administration; office work; marketing, distribution and sale of coffee products. | Date: 06/23/2023 Application No.: 98057057 |

*Other Marks*

The following unregistered marks are featured on the packaging of the exclusive signature flower series, which features specialty coffee from Guatemala, Honduras, Nicaragua, Vietnam, Columbia and Brazil.

| No. | Mark |
|-----|------|
| 1 |  |

7

| 2 |  |
| 3 |  |
| 4 |  |

*EXECUTION VERSION*

| | |
|---|---|
| **5** |  |
| **6** | |

*Social Media Accounts*

- Facebook: https://www.facebook.com/MerconSpecialtyCoffee
- Instagram: https://www.instagram.com/merconspecialty/
- LinkedIn: https://www.linkedin.com/company/mercon-specialty/
- Website: http://www.Merconspecialty.com

9

*EXECUTION VERSION*

### **Schedule 2.3(b)**
**Cure Costs**

None.

*EXECUTION VERSION*

### Schedule 2.5(a)
**Available Contracts**

1. Commercial and Industrial Lease Agreement, dated as of February 25, 2022, by and among K-Bell LLC and Seller, relating to the following premises: 3125 Bell Street, Kansas City, Missouri.

2. Lease Agreement, dated as of March 22, 2019, by and among Mead St. Building, LLC and Seller, as amended by the First Amendment to Lease, dated as of August 16, 2023, relating to the following premises: Mead Street Building Suite #204/208, Seattle, WA 98108.

3. See attached.

94416626.6

| COUNTERPART (SELL) | TRADE (SELL) | UOM (Sell) | BAGS |
|---|---|---|---|
| Airship Coffee | 2519643 | 70kbg | 2.00 |
| Airship Coffee | 2519644 | 70kbg | 4.00 |
| Airship Coffee | 2559194 | 69kbg | 3.00 |
| Airship Coffee | 2559811 | 60kbg | 3.00 |
| Andytown Coffee | 2514777 | 60kbg | 5.00 |
| Apolonia Coffee | 2500159 | 70kbg | 2.00 |
| Beyond Distributing | 2461327 | 60kbg | 12.00 |
| Beyond Distributing | 2512369 | 70kbg | 7.00 |
| Beyond Distributing | 2552560 | 60kbg | 21.00 |
| Beyond Distributing | 2561954 | 69kbg | 9.00 |
| Beyond Distributing | 2562061 | 60kbg | 11.00 |
| Beyond Distributing | 2562062 | 60kbg | 7.00 |
| Beyond Distributing | 2562726 | 69kbg | 20.00 |
| Beyond Distributing | 2563023 | 60kbg | 30.00 |
| Beyond Distributing | 2563024 | 60kbg | 43.00 |
| Black Rifle Coffee Company | 2471529 | 60kbg | 640.00 |
| Black Rifle Coffee Company | 2471530 | 60kbg | 640.00 |
| Black Rifle Coffee Company | 2471531 | 60kbg | 320.00 |
| Black Rifle Coffee Company | 2496695 | 60kbg | 640.00 |
| Blue Sail | 2481552 | 60kbg | 160.00 |
| Blue Sail | 2537242 | 60kbg | 100.00 |
| Boomtown Coffee | 2512273 | 70kbg | 5.00 |
| Boomtown Coffee | 2512274 | 70kbg | 6.00 |
| Boomtown Coffee | 2512275 | 70kbg | 6.00 |
| Boon Boona | 2514772 | 60kbg | 3.00 |
| Boon Boona | 2514773 | 60kbg | 2.00 |
| Brewed Public | 2518645 | 69kbg | 2.00 |
| Canyon Coffee LLC | 2522512 | 69kbg | 23.00 |
| Canyon Coffee LLC | 2559540 | 69kbg | 125.00 |
| Cascade Coffee, Inc. | 2443169 | 69kbg | 206.00 |
| Cascade Coffee, Inc. | 2492198 | 69kbg | 202.00 |
| Cascade Coffee, Inc. | 2495338 | 70kbg | 2.00 |
| Cascade Coffee, Inc. | 2495339 | 70kbg | 194.00 |
| Cascade Coffee, Inc. | 2495347 | 69kbg | 257.00 |
| Cascade Coffee, Inc. | 2495348 | 69kbg | 275.00 |
| Cascade Coffee, Inc. | 2497780 | 60kbg | 20.00 |
| Cascade Coffee, Inc. | 2527615 | 69kbg | 30.00 |
| Cascade Coffee, Inc. | 2527616 | 69kbg | 30.00 |
| Cascade Coffee, Inc. | 2527617 | 69kbg | 40.00 |
| Cascade Coffee, Inc. | 2527618 | 69kbg | 20.00 |
| Cascade Coffee, Inc. | 2527620 | 69kbg | 40.00 |
| Chattanooga | 2475438 | 70kbg | 2.00 |
| Chattanooga | 2529841 | 60kbg | 3.00 |
| Chattanooga | 2529842 | 60kbg | 3.00 |
| Chattanooga | 2529843 | 60kbg | 3.00 |
| Coda Coffee | 2226577 | 60kbg | 44.00 |

| | | | |
|---|---|---|---|
| Coda Coffee | 2226578 | 60kbg | 320.00 |
| Coda Coffee | 2226579 | 60kbg | 320.00 |
| Coda Coffee | 2361798 | 69kbg | 217.00 |
| Coda Coffee | 2371487 | 69kbg | 71.00 |
| Coda Coffee | 2371491 | 69kbg | 190.00 |
| Coda Coffee | 2371492 | 69kbg | 290.00 |
| Coda Coffee | 2496700 | 70kbg | 20.00 |
| Coda Coffee | 2513970 | 70kbg | 260.00 |
| Coda Coffee | 2531561 | 69kbg | 275.00 |
| Coda Coffee | 2531562 | 69kbg | 275.00 |
| Coda Coffee | 2531563 | 69kbg | 275.00 |
| Coda Coffee | 2531564 | 69kbg | 275.00 |
| Coffee Bean Corral | 2510396 | 70kbg | 1.00 |
| Coffee Bean Corral | 2510397 | 70kbg | 8.00 |
| Coffee Bean Corral | 2510398 | 70kbg | 8.00 |
| Coffee Bean Corral | 2510399 | 70kbg | 8.00 |
| Coffee Bean Corral | 2510404 | 70kbg | 8.00 |
| Coffee Bean Corral | 2510405 | 70kbg | 8.00 |
| Coffee Bean Corral | 2510406 | 70kbg | 8.00 |
| Coffee Bean Corral | 2510407 | 70kbg | 8.00 |
| Coffee Bean Corral | 2510408 | 70kbg | 8.00 |
| Coffee Bean Corral | 2512604 | 60kbg | 17.00 |
| Coffee Concepts INC dba Geva Premium Coffee | 2488528 | 69kbg | 30.00 |
| Coffee Concepts INC dba Geva Premium Coffee | 2488529 | 69kbg | 30.00 |
| Coffee Concepts INC dba Geva Premium Coffee | 2488530 | 69kbg | 30.00 |
| Coffee Concepts INC dba Geva Premium Coffee | 2488531 | 69kbg | 30.00 |
| Coffee Concepts INC dba Geva Premium Coffee | 2488532 | 69kbg | 30.00 |
| Coffeeholic House | 2474932 | 60kbg | 4.00 |
| Coffeeholic House | 2502700 | 60kbg | 4.00 |
| Coffeeholic House | 2503267 | 60kbg | 13.00 |
| Coffeeholic House | 2504296 | 60kbg | 5.00 |
| Coffeeholic House | 2504297 | 60kbg | 21.00 |
| Coffeeholic House | 2508490 | 60kbg | 7.00 |
| Coffeeholic House | 2509036 | 60kbg | 15.00 |
| Coffeeholic House | 2509672 | 60kbg | 10.00 |
| Coffeeholic House | 2509673 | 60kbg | 10.00 |
| Coffeeholic House | 2512603 | 60kbg | 20.00 |
| Coffeeholic House | 2532323 | 60kbg | 4.00 |
| Coffeeholic House | 2552545 | 60kbg | 5.00 |
| Coffeeholic House | 2552546 | 60kbg | 8.00 |
| Craig | 2559611 | 70kbg | 20.00 |
| Culture and Coffee | 2479904 | 60kbg | 2.00 |
| Culture and Coffee | 2479905 | 60kbg | 38.00 |
| Culture and Coffee | 2482377 | 69kbg | 45.00 |
| Culture and Coffee | 2482378 | 69kbg | 75.00 |
| Culture and Coffee | 2484069 | 69kbg | 2.00 |
| Culture and Coffee | 2484070 | 69kbg | 22.00 |

| | | | |
|---|---|---|---|
| Culture and Coffee | 2484071 | 69kbg | 22.00 |
| Culture and Coffee | 2495335 | 69kbg | 64.00 |
| Culture and Coffee | 2495336 | 69kbg | 105.00 |
| Culture and Coffee | 2495337 | 69kbg | 27.00 |
| Culture and Coffee | 2497306 | 60kbg | 10.00 |
| Culture and Coffee | 2497307 | 60kbg | 10.00 |
| Culture and Coffee | 2497308 | 60kbg | 15.00 |
| Culture and Coffee | 2497310 | 60kbg | 15.00 |
| Culture and Coffee | 2497317 | 60kbg | 5.00 |
| Culture and Coffee | 2497318 | 60kbg | 6.00 |
| Culture and Coffee | 2497321 | 60kbg | 10.00 |
| Culture and Coffee | 2497322 | 60kbg | 10.00 |
| Culture and Coffee | 2497323 | 60kbg | 10.00 |
| Culture and Coffee | 2497324 | 60kbg | 10.00 |
| Culture and Coffee | 2497326 | 69kbg | 40.00 |
| Culture and Coffee | 2497327 | 69kbg | 40.00 |
| Culture and Coffee | 2497328 | 69kbg | 40.00 |
| Culture and Coffee | 2497329 | 69kbg | 11.00 |
| Culture and Coffee | 2497339 | 69kbg | 20.00 |
| Culture and Coffee | 2497341 | 69kbg | 20.00 |
| Culture and Coffee | 2497342 | 69kbg | 20.00 |
| Culture and Coffee | 2497344 | 69kbg | 20.00 |
| Culture and Coffee | 2497345 | 69kbg | 34.00 |
| Culture and Coffee | 2497350 | 69kbg | 15.00 |
| Culture and Coffee | 2499102 | 69kbg | 130.00 |
| Culture and Coffee | 2504529 | 69kbg | 60.00 |
| Deadstock Coffee | 2506108 | 60kbg | 1.00 |
| Deadstock Coffee | 2506113 | 59kbg | 4.00 |
| DOMA Coffee Roasting | 2518149 | 69kbg | 40.00 |
| Eleva Coffee LLC | 2180514 | 69kbg | 10.00 |
| Eleva Coffee LLC | 2180515 | 69kbg | 10.00 |
| Eleva Coffee LLC | 2180516 | 69kbg | 10.00 |
| Eleva Coffee LLC | 2180522 | 59kbg | 10.00 |
| Eleva Coffee LLC | 2180524 | 59kbg | 10.00 |
| Eleva Coffee LLC | 2180525 | 59kbg | 10.00 |
| Eleva Coffee LLC | 2231428 | 69kbg | 5.00 |
| Eleva Coffee LLC | 2231429 | 60kbg | 5.00 |
| Eleva Coffee LLC | 2231430 | 69kbg | 10.00 |
| Eleva Coffee LLC | 2461248 | 69kbg | 2.00 |
| ESCR Co. | 2483418 | 60kbg | 4.00 |
| ESCR Co. | 2540366 | 70kbg | 12.00 |
| ESCR Co. | 2540367 | 60kbg | 18.00 |
| ESCR Co. | 2540368 | 69kbg | 4.00 |
| ESCR Co. | 2540369 | 69kbg | 6.00 |
| ESCR Co. | 2540375 | 60kbg | 3.00 |
| ESCR Co. | 2540382 | 60kbg | 28.00 |
| ESCR Co. | 2540449 | 60kbg | 20.00 |

| | | | |
|---|---|---|---|
| ESCR Co. | 2540450 | 60kbg | 1.00 |
| ESCR Co. | 2543449 | 69kbg | 22.00 |
| Fausto Coffee | 2562805 | 70kbg | 1.00 |
| Fundamental Coffee Company | 2508491 | 69kbg | 3.00 |
| Fundamental Coffee Company | 2512602 | 60kbg | 4.00 |
| Fundamental Coffee Company | 2526134 | 70kbg | 5.00 |
| Fundamental Coffee Company | 2552551 | 69kbg | 15.00 |
| Fundamental Coffee Company | 2552559 | 70kbg | 10.00 |
| Fundamental Coffee Company | 2559185 | 69kbg | 8.00 |
| Gerhart Coffee | 2490251 | 69kbg | 9.00 |
| Hacea Coffee Source | 2482589 | 70kbg | 10.00 |
| Happy Cup Coffee | 2556408 | 69kbg | 27.00 |
| Happy Cup Coffee | 2556409 | 60kbg | 1.00 |
| Happy Cup Coffee | 2556413 | 60kbg | 22.00 |
| Harvest Roasting LLC | 2095090 | 60kbg | 1,293.00 |
| Harvest Roasting LLC | 2095091 | 60kbg | 1,600.00 |
| Harvest Roasting LLC | 2095092 | 60kbg | 960.00 |
| Harvest Roasting LLC | 2095128 | 69kbg | 550.00 |
| Harvest Roasting LLC | 2214083 | 69kbg | 283.00 |
| Harvest Roasting LLC | 2214084 | 69kbg | 849.00 |
| Harvest Roasting LLC | 2214085 | 69kbg | 849.00 |
| Harvest Roasting LLC | 2214086 | 69kbg | 849.00 |
| Harvest Roasting LLC | 2400209 | 60kbg | 32.00 |
| Harvest Roasting LLC | 2400210 | 60kbg | 320.00 |
| Harvest Roasting LLC | 2400211 | 60kbg | 320.00 |
| Harvest Roasting LLC | 2400212 | 60kbg | 320.00 |
| Harvest Roasting LLC | 2400213 | 60kbg | 320.00 |
| Harvest Roasting LLC | 2400214 | 60kbg | 320.00 |
| Indah Coffee Company | 2559091 | 60kbg | 10.00 |
| Java Pura | 2512587 | 60kbg | 6.00 |
| Java Pura | 2512588 | 60kbg | 6.00 |
| Java Pura | 2512600 | 70kbg | 2.00 |
| Java Pura | 2512601 | 70kbg | 2.00 |
| JCR | 2356918 | 69kbg | 1.00 |
| JCR | 2461365 | 60kbg | 1.00 |
| JCR | 2514037 | 60kbg | 3.00 |
| JCR | 2556950 | 70kbg | 2.00 |
| JCR | 2557152 | 59kbg | 3.00 |
| JCR | 2557154 | 69kbg | 13.00 |
| JCR | 2557155 | 70kbg | 4.00 |
| JCR | 2557168 | 69kbg | 7.00 |
| JCR | 2557169 | 60kbg | 2.00 |
| JCR | 2557170 | 69kbg | 2.00 |
| JCR | 2557171 | 60kbg | 1.00 |
| JCR | 2558009 | 60kbg | 1.00 |
| JCR | 2559201 | 69kbg | 1.00 |
| Jot Labs | 2497865 | 70kbg | 90.00 |

| | | |
|---|---|---:|
| Lamppost Coffee Roasters LLC | 2510016 70kbg | 4.00 |
| Lighthouse Coffee | 2558752 69kbg | 1.00 |
| Lighthouse Coffee | 2563016 69kbg | 1.00 |
| Lighthouse Coffee | 2563017 70kbg | 1.00 |
| Little Penny Enterprises | 2556953 69kbg | 4.00 |
| Little Penny Enterprises | 2559380 60kbg | 1.00 |
| Little Penny Enterprises | 2561957 70kbg | 1.00 |
| Marigold Coffee | 2536698 69kbg | 10.00 |
| Mostra Coffee | 2177873 60kbg | 5.00 |
| Mostra Coffee | 2177874 60kbg | 10.00 |
| Mostra Coffee | 2177875 60kbg | 6.00 |
| Mudd Works | 2558850 60kbg | 3.00 |
| Mythic Coffee | 2563035 59kbg | 3.00 |
| Mythic Coffee | 2563037 70kbg | 3.00 |
| Mythic Coffee | 2563038 60kbg | 3.00 |
| Oughtred Coffee | 2488799 69kbg | 145.00 |
| Oughtred Coffee | 2496830 60kbg | 8.00 |
| Oughtred Coffee | 2497812 60kbg | 5.00 |
| Overview Coffee | 2561914 60kbg | 6.00 |
| Ozark Coffee Co LLC | 2474818 60kbg | 20.00 |
| Ozark Coffee Co LLC | 2474819 60kbg | 20.00 |
| Ozark Coffee Co LLC | 2474820 60kbg | 20.00 |
| Ozark Coffee Co LLC | 2474821 60kbg | 20.00 |
| Ozark Coffee Co LLC | 2474822 60kbg | 20.00 |
| Ozark Coffee Co LLC | 2563130 69kbg | 2.00 |
| Paper Tiger Coffee | 2562161 59kbg | 6.00 |
| Paper Tiger Coffee | 2563015 59kbg | 4.00 |
| Paradise Coffee | 2554308 69kbg | 2.00 |
| Paradise Coffee | 2557444 69kbg | 5.00 |
| PDX  Ca Phe Roasters | 2465420 60kbg | 2.00 |
| PDX  Ca Phe Roasters | 2465421 60kbg | 4.00 |
| PDX  Ca Phe Roasters | 2465422 60kbg | 4.00 |
| PDX  Ca Phe Roasters | 2465423 60kbg | 4.00 |
| PDX  Ca Phe Roasters | 2465424 60kbg | 4.00 |
| PDX  Ca Phe Roasters | 2465426 60kbg | 4.00 |
| PDX  Ca Phe Roasters | 2468489 60kbg | 2.00 |
| PDX  Ca Phe Roasters | 2468490 60kbg | 2.00 |
| PDX  Ca Phe Roasters | 2468491 60kbg | 2.00 |
| PDX  Ca Phe Roasters | 2468492 60kbg | 2.00 |
| PDX  Ca Phe Roasters | 2468493 60kbg | 2.00 |
| PDX  Ca Phe Roasters | 2468494 60kbg | 2.00 |
| PDX  Ca Phe Roasters | 2471896 60kbg | 2.00 |
| PDX  Ca Phe Roasters | 2471897 60kbg | 3.00 |
| PDX  Ca Phe Roasters | 2471898 60kbg | 3.00 |
| PDX  Ca Phe Roasters | 2471899 60kbg | 3.00 |
| PDX  Ca Phe Roasters | 2471900 60kbg | 3.00 |
| PDX  Ca Phe Roasters | 2471901 60kbg | 3.00 |

| | | | |
|---|---|---|---|
| PDX  Ca Phe Roasters | 2471902 | 60kbg | 3.00 |
| PDX  Ca Phe Roasters | 2471903 | 60kbg | 3.00 |
| PDX  Ca Phe Roasters | 2471904 | 60kbg | 3.00 |
| PDX  Ca Phe Roasters | 2471911 | 60kbg | 1.00 |
| PDX  Ca Phe Roasters | 2471912 | 60kbg | 2.00 |
| PDX  Ca Phe Roasters | 2471913 | 60kbg | 2.00 |
| PDX  Ca Phe Roasters | 2471914 | 60kbg | 2.00 |
| PDX  Ca Phe Roasters | 2471915 | 60kbg | 2.00 |
| PDX  Ca Phe Roasters | 2471916 | 60kbg | 2.00 |
| PEET'S COFFEE, INC | 2559592 | 60kbg | 296.00 |
| PEET'S COFFEE, INC | 2559594 | 60kbg | 146.00 |
| PEET'S COFFEE, INC | 2559595 | 60kbg | 113.00 |
| PEET'S COFFEE, INC | 2559619 | 69kbg | 125.00 |
| Peregrine Roasters | 2509380 | 59kbg | 9.00 |
| Post Coffee | 2256967 | 60kbg | 17.03 |
| Post Coffee | 2259393 | 60kbg | 12.00 |
| Publik Coffee | 2520828 | 59kbg | 10.00 |
| Publik Coffee | 2520829 | 59kbg | 10.00 |
| Publik Coffee | 2520830 | 59kbg | 10.00 |
| Publik Coffee | 2520831 | 59kbg | 10.00 |
| Publik Coffee | 2520832 | 59kbg | 10.00 |
| Publik Coffee | 2520833 | 59kbg | 10.00 |
| Publik Coffee | 2520834 | 59kbg | 10.00 |
| Publik Coffee | 2520835 | 59kbg | 10.00 |
| Publik Coffee | 2556951 | 69kbg | 6.00 |
| Pumphouse Coffee | 2153661 | 59kbg | 10.00 |
| Pumphouse Coffee | 2153662 | 59kbg | 10.00 |
| Pumphouse Coffee | 2474853 | 59kbg | 10.00 |
| Pumphouse Coffee | 2474854 | 59kbg | 10.00 |
| Push X Pull, Inc | 2545120 | 70kbg | 1.00 |
| Push X Pull, Inc | 2545124 | 60kbg | 4.00 |
| QED Coffee | 2559525 | 70kbg | 2.00 |
| QED Coffee | 2561956 | 69kbg | 3.00 |
| QED Coffee | 2561958 | 30kbg | 4.00 |
| QED Coffee | 2562794 | 70kbg | 1.00 |
| Reverie Roasters | 2476557 | 69kbg | 15.00 |
| Reverie Roasters | 2519271 | 69kbg | 14.00 |
| Reverie Roasters | 2519272 | 69kbg | 27.00 |
| Reverie Roasters | 2519273 | 69kbg | 27.00 |
| Reverie Roasters | 2519274 | 69kbg | 27.00 |
| Reverie Roasters | 2519277 | 70kbg | 10.00 |
| Reverie Roasters | 2519278 | 70kbg | 18.00 |
| Reverie Roasters | 2519279 | 70kbg | 18.00 |
| Reverie Roasters | 2519280 | 70kbg | 18.00 |
| Rimini Coffee | 2505329 | 59kbg | 10.00 |
| Rimini Coffee | 2505330 | 59kbg | 10.00 |
| Rimini Coffee | 2505331 | 59kbg | 10.00 |

| | | |
|---|---|---|
| Rimini Coffee | 2505332 59kbg | 10.00 |
| Rimini Coffee | 2505333 59kbg | 10.00 |
| Rimini Coffee | 2518169 69kbg | 10.00 |
| Rolling Hills Coffee | 2520782 60kbg | 3.00 |
| Rolling Hills Coffee | 2520804 69kbg | 17.00 |
| Single Speed Coffee | 2558601 50kbg | 6.00 |
| Stone Tower Coffee | 2515179 69kbg | 20.00 |
| Swiss Water Decaffeinated Coffee Inc | 2559372 59kbg | 252.00 |
| Thanksgiving Coffee | 2489025 69kbg | 21.00 |
| Thanksgiving Coffee | 2489026 69kbg | 35.00 |
| Thanksgiving Coffee | 2489029 60kbg | 6.00 |
| Thanksgiving Coffee | 2489030 60kbg | 10.00 |
| Thanksgiving Coffee | 2489031 60kbg | 10.00 |
| Thanksgiving Coffee | 2489032 60kbg | 10.00 |
| The Boy & The Bear | 2562101 60kbg | 10.00 |
| Theory Coffee | 2559029 59kbg | 4.00 |
| Top Pot Doughnuts | 2556952 60kbg | 2.00 |
| Top Pot Doughnuts | 2563039 60kbg | 7.00 |
| Top Pot Doughnuts | 2563041 60kbg | 9.00 |
| Top Pot Doughnuts | 2563042 70kbg | 9.00 |
| Top Pot Doughnuts | 2563043 69kbg | 9.00 |
| Upper Left Roasters | 2556949 70kbg | 2.00 |
| Water Ave. | 2508687 60kbg | 50.00 |
| Water Ave. | 2508688 60kbg | 50.00 |
| Water Ave. | 2508689 60kbg | 50.00 |
| Whats the Buzz | 2500443 60kbg | 3.00 |
| Whats the Buzz | 2500444 60kbg | 10.00 |
| Whats the Buzz | 2526639 60kbg | 1.00 |
| Whats the Buzz | 2526640 69kbg | 9.00 |

*EXECUTION VERSION*

### Schedule 5.3(b)
**Antitrust Regulations**

None.

*EXECUTION VERSION*

**Schedule 8.2**
**Actions Pending Closing**

(a)

(i)

| Sum of SALES | | SALE POSITION | | |
|---|---|---|---|---|
| **SALE COUNTERPART** | **BOOK** | **Mar 2024DLY** | **Apr 2024DLY** | **Grand Total** |
| **Airship Coffee** | SPOT | 2 | 15 | 17 |
| **Alma Coffee Roastery** | SPOT | 5 | | 5 |
| **Andytown Coffee** | SPOT | | 11 | 11 |
| **Apolonia Coffee** | SPOT | 2 | 2 | 4 |
| **Beyond Distributing** | SPOT | 30 | 74 | 104 |
| | Feb 2024 | | 320 | 320 |
| | Jan 2024 | 640 | | 640 |
| **Blue Sail** | Nov 2023 | 160 | | 160 |
| **Boomtown Coffee** | SPOT | 2 | 6 | 8 |
| **Boon Boona** | SPOT | 6 | 2 | 8 |
| **Caravan Coffee** | SPOT | 28 | | 28 |
| **Cascade Coffee, Inc.** | SPOT | 550 | 275 | 825 |
| **Chattanooga** | SPOT | | 3 | 3 |
| **Coda Coffee** | Feb 2024 | | 275 | 275 |
| | Jan 2024 | 550 | | 550 |
| **Coffee Bean Corral** | SPOT | | 6 | 6 |
| **Coffee Concepts INC dba Geva Premium Coffee** | SPOT | 30 | 30 | 60 |
| **Coffeeholic House** | SPOT | 10 | 30 | 40 |
| **Craig** | Feb 2024 | | 37 | 37 |
| | SPOT | 20 | 3 | 23 |
| **Deadstock Coffee** | SPOT | | 7 | 7 |
| **Eleva Coffee LLC** | SPOT | | 10 | 10 |
| **Fundamental Coffee Company** | SPOT | | 33 | 33 |
| | Jan 2024 | 640 | | 640 |
| **Indah Coffee Company** | SPOT | | 10 | 10 |
| **Java Pura** | SPOT | 8 | | 8 |
| **JCR** | SPOT | 1 | 8 | 9 |
| **Little Penny Enterprises** | SPOT | 1 | 5 | 6 |

13

*EXECUTION VERSION*

| | | | | |
|---|---|---|---|---|
| **Overview Coffee** | SPOT | | 6 | 6 |
| **Ozark Coffee Co LLC** | Feb 2024 | | 20 | 20 |
| | Jan 2024 | 20 | | 20 |
| **Paper Tiger Coffee** | Jan 2024 | 6 | | 6 |
| **PDX  Ca Phe Roasters** | SPOT | 11 | 9 | 20 |
| **Publik Coffee** | SPOT | | 16 | 16 |
| **Pumphouse Coffee** | SPOT | 10 | 10 | 20 |
| **QED Coffee** | SPOT | 2 | 6 | 8 |
| **Revel Coffee LLC** | SPOT | 50 | | 50 |
| **Reverie Roasters** | Feb 2024 | | 27 | 27 |
| | Jan 2024 | 27 | | 27 |
| | SPOT | 18 | 18 | 36 |
| **Rimini Coffee** | SPOT | 10 | 10 | 20 |
| **Rochester Brewing** | Jan 2024 | 1 | | 1 |
| **San Cristobal** | Jan 2024 | 1 | | 1 |
| **The Boy & The Bear** | SPOT | | 10 | 10 |
| **Theory Coffee** | SPOT | 4 | | 4 |
| **Top Pot Doughnuts** | SPOT | 4 | | 4 |
| **Vik Roasters** | SPOT | 1 | | 1 |
| **Whats the Buzz** | SPOT | | 10 | 10 |
| **Grand Total** | | **4450** | **1304** | **5754** |

(iii)

Seller does not intend to renew the following insurance policies:

| Type of Policy | Policy Description | Policy No. | Expiration Date |
|---|---|---|---|
| Kidnap & Ransom | Kidnap & Ransom | UM00115430SP21A | June 1 2024 |
| Workers Compensation | Workers Compensations and Employers Liability | WC 7 14829748 | June 1 2024 |

14

*EXECUTION VERSION*

| | | | |
|---|---|---|---|
| Domestic Comprehensive General Liability and Business Property | General and Products Liability for Bodily Injury / Property Damage including personal and advertising injury. Including Business Property, Employee Benefit Liability, and Stop Gap Liability | 7015107193 | June 1 2024 |
| Business Auto Policy | Hired/Non-Owned Coverage | BUA 7014829734 | June 1 2024 |
| International Comprehensive General Liability | General and Products Liability, Business Property, Employee Beneifits Liability, Auto Liability, Worker's Comp, and Business Travel Accidental Death & Disability | PTS 67 344 4347 | June 1 2024 |
| Excess liability | Excess limits over the underlying insurance | CX00M4823 | June 1 2024 |
| Commercial Crime | Erisa Bond | 46BDDIR4384 | June 1 2024 |
| Fiduciary | Fiduciary Liability Coverage | 652443379 | June 30 2024 |
| Directors & Officers Liability | Directors and Officers Liability | B079923LS000551 | June 29th 2024 |
| Excess Directors & Officers Liability | Excess limits over the underlying insurance | BO79923LS000827 | June 29th 2024 |
| Excess Directors & Officers Liability | Directors and Officers Liability | BO79923LS000530 | June 29th 2024 |
| Employment Practices Liability | Employment Practices Liability | B079923LS000531 | June 29th 2024 |
| Crime | Commercial Crim and Electronic and Computer Crime | B079923LS000529 | June 29th 2024 |
| Professional Liability | Professional Liability | B079923LS000532 | June 29th 2024 |
| Cyber Security | 1st & 3rd Party Cyber Coverage | C-4LPM-112533-CYBER-2023 | June 30th 2024 |

15

*EXECUTION VERSION*

**DISCLOSURE SCHEDULE**

**TO**

**ASSET PURCHASE AGREEMENT**

by and among

StoneX Commodity Solutions LLC,

as Purchaser,

and

Mercon Coffee Corporation

as Seller,

dated as of April 12, 2024

This Disclosure Schedule (this "<u>Disclosure Schedule</u>") is being provided pursuant to that certain Asset Purchase Agreement, dated as of April 12, 2024 (the "<u>Agreement</u>"), by and among StoneX Commodity Solutions LLC, a Delaware limited liability company ("<u>Purchaser</u>"), and Mercon Coffee Corporation, a New York corporation ("<u>Seller</u>"). All capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to them in the Agreement.

All references to the Agreement herein shall be deemed to refer to the entire Agreement, including this Disclosure Schedule and the Exhibits and Schedules attached to the Agreement. This Disclosure Schedule is incorporated into the Agreement and expressly made a part of the Agreement as though completely set forth therein. The headings contained in this Disclosure Schedule are for reference purposes only and shall not affect in any way the meaning or interpretation of this Disclosure Schedule.

Certain information set forth in this Disclosure Schedule is included solely for informational purposes and may not be required to be disclosed pursuant to the Agreement.

The disclosure of any matter in any section of this Disclosure Schedule shall be deemed to be a disclosure for purposes of the corresponding section of the Agreement and each other section of this Disclosure Schedule in which it is reasonably apparent on the face of such disclosure that the information (notwithstanding the omission of a reference or cross reference thereto) is applicable to such other section of this Disclosure Schedule. Any reference to any Contract in this Disclosure Schedule includes all amendments, purchase or work orders and exhibits, annexes and schedules thereto with respect to such Contract, <u>provided</u>, that such documents have been made available to Purchaser at least three (3) days prior to the date of the Agreement. The specification of any dollar amount in the representations and warranties contained in the Agreement or Ancillary Agreements or this Disclosure Schedule, or the inclusion of any specific item in this Disclosure Schedule, is not intended to imply that such amounts, or higher or lower amounts, or the items so included, are or are not material, are or are not outside of the ordinary course of business or are or are not required to be disclosed, and no party to the Agreement shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in this Disclosure Schedule in any dispute or controversy with the other parties to the Agreement as to whether any item or matter not described in the Agreement or Ancillary Agreements or included in this Disclosure Schedule is or is not required to be disclosed (including whether such amounts or items are required to be disclosed as material or outside of the ordinary course of business).

The information contained in this Disclosure Schedule is disclosed solely for the purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party to the Agreement or any of its Affiliates to any third party of any matter whatsoever, including of any violation of applicable Law or breach of any Contract. No disclosure in this Disclosure Schedule relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the listing of any matter in this Disclosure Schedule be deemed or interpreted to expand the scope of Seller's representations, warranties, or covenants set forth in this Agreement. All attachments to this Disclosure Schedule are incorporated by reference into the applicable section of this Disclosure Schedule in which they are directly or indirectly referenced.

94459643.4

The information contained in this Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement. In disclosing the information contained in this Disclosure Schedule, Sellers are not waiving, and expressly reserve any and all rights under, any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein.

3

## Section 5.3

## No Conflicts; Required Consents

(a)

1. Pursuant to the terms of the Sale Order, the Seller(s) will seek authority from the Bankruptcy Court to sell the Purchased Assets free and clear of all liens, claims and encumbrances with the consent of lienholders pursuant to Section 363(f)(2) of the Bankruptcy Code or otherwise under Section 363(f).

2. Seller utilizes the Green Coffee Association, Inc. – Contract Terms and Conditions in contracting with customers. After the filing of the Bankruptcy Case, all counterparties to outstanding contracts, including each contract set forth in Item 3 of Schedule 2.5(a), for the future sale and delivery of coffee based on the Green Coffee Association, Inc. – Contract Terms and Conditions have the right to terminate their respective contracts as a result of the filing of the Bankruptcy Case. As a result, each outstanding contract, including each contract set forth in Item 3 of Schedule 2.5(a), for the future sale and delivery of coffee based on the Green Coffee Association, Inc. – Contract Terms and Conditions requires counterparty consent in order to assign.

(b)

None.

4

94459643.4

**Section 5.4**

**<u>Title to Purchased Assets</u>**

(a)

None.

**Section 5.5**

**Material Contracts**

(b)

None.

94459643.4

**Section 5.6**

**<u>Litigation</u>**

None.

**Section 5.8**

**Company Plans**

(a)

Attachment to <u>Schedule 5.8(a)</u> is incorporated herein by reference.

(c)

None.

94459643.4

## BONUS POLICY

| Group | Individual Performance | | Financial Performance | |
|---|---|---|---|---|
| | Applies? | % | Applies? | % |
| Management - Others | X | 40% | X | 60% |

1. A target amount is defined per position.

2.    The employee must:

a.  Have at least 6 months of working for the Group for the specific crop year. In this case, the bonus payment will be proportional.

**Note:** The crop year starts October and ends in September of the next year.

b.  Be active at the date of bonus payment.

3.    For employees that have assigned the multiple of salaries policy, the bonus will be calculated according to the salary they had up to September 30th.

**Individual Performance**

4.    The individual performance component will be measured according to the objectives set each crop year.

5.    There will be two types of performance evaluations:

a.  Objectives and goals

b.  Qualitative Assessment

6.    There must be a Group's P&L budget compliance of at least 30%, so that the individual performance component applies.

7.    If the individual results of the employee are les than 65%, the individual proportion wouldn't b paid out.

8.    There must be at least a 30% of Group's P&L budget compliance so that the individual performance component applies.

9.    If the financial results are less than the established percentages in the table above, no bonus will apply.

**Financial Performance**

10.    The financial performance will be based on the compliance of the Group's P&L budget.

11.    There must be at least a 40% of Group's P&L budget compliance so that the financial performance component applies.

12.    The financial performance will be calculated according to the following chart:

| Range of financial performance compliance | Scale |
|---|---|
| 0% - 40% | 0 |
| 40.01% - 100% | 1.66:1 |
| 100.01% - 150% | Management - 0.5:1 Others - N/A |

13.    If the individual performance result of the employee is less than 65%, the financial performance component will go according to top management decision.

| Country | Plan Administrator | Description | Total enroled employees |
|---|---|---|---|
| USA | Nationwide\|FMI | All employee can participate, but it's elective.<br>Company matches up to 3% annual salary. If the employee receives a bonus, and they decide to contribute to the pension plan, the company matches accordingly.<br>If the employee contributes less than 6% of their salary, the company matches 50% of their contribution.<br>The maximum cap that can be contributed is defined each year by the IRS. Some employees can contribute more if they're older than 50 years old.<br>Contributions are made monthly. | 8 |

| Country | Hiring Company | Bussiness Unit | ID | Full Name | Job Title | Job Type | Participates in Pension Plan? | Plan Administrator | Type of contribution | Employee Contribution | | Company Contribution % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | % Pre-Tax | % Roth | |
| USA | MERCON COFFEE CORPORATION | IT | 00016006 | Felipe Cam | IT and Commercial Operations Director | Permanent | Yes | Nationwide\|FMI - Plan Administrator | Pre-Tax | 7.00% | 0.00% | 3.00% |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00030701 | Craig Russell | Managing Director Mercon Specialty | Permanent | Yes | Nationwide\|FMI - Plan Administrator | Pre-Tax | 9.00% | 0.00% | 3.00% |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00030702 | Jolene Zehnder | Sales & Operations Director | Permanent | Yes | Nationwide\|FMI - Plan Administrator | Pre-Tax/Roth | 2.00% | 2.00% | 2.00% |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00030775 | Neil Oney | QC Manager | Permanent | Yes | Nationwide\|FMI - Plan Administrator | Pre-Tax | 4.00% | 0.00% | 2.00% |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00040791 | Crystina Colleen McKenna | New Business Development | Permanent | Yes | Nationwide\|FMI - Plan Administrator | Pre-Tax | 5.00% | 0.00% | 2.50% |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00044949 | Cynthia Soreya Heng | Senior Marketing Specialist | Permanent | Yes | Nationwide\|FMI - Plan Administrator | Pre-Tax | 4.00% | 0.00% | 2.00% |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00045298 | Camila Topke | Sales Executive | Permanent | Yes | Nationwide\|FMI - Plan Administrator | Roth | 0.00% | 29.00% | 3.00% |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00045324 | Thomas John Kennett JR | QC Assistant (Brewed Behavior) | Permanent | No | Nationwide\|FMI - Plan Administrator | N/A | 0.00% | 0.00% | 0.00% |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00045299 | Serena Amelia Beze | Sales Executive | Permanent | Yes | Nationwide\|FMI - Plan Administrator | Roth | 0.00% | 6.00% | 3.00% |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00045445 | Noah Briannon Palomo Martin | QC Assistant | Permanent | No | Nationwide\|FMI - Plan Administrator | N/A | 0.00% | 0.00% | 0.00% |

| Country | Health Insurance | Dental Insurance | Vision Insurance | Life Insurance | Meal Allowance |
|---|---|---|---|---|---|
| USA | Coverage given to the employee with Aetna. International coverage. Cost is partially paid by the employee according to the following: Salary up to 50K 10% - Employee only 20% - Employee + dependents Salary between 50K-100K 20% - Employee only 40% - Employee + dependents Salary higher than 100K 50% - Employee only 50% - Employee + dependents Medical Expense Insurance with APL - Maximum $500 per covered person per calendar year. Maximum $1500 per calendar year for all covered persons combined Medical Transportation with MASA - For employees that travel more frequently | Coverage given to the employee with Metlife. Employee cost is assumed by the company if included alone, if dependents are included the employee pays according to the following: Salary up to 50K 20% - Employee + dependents Salary between 50K-100K 40% - Employee + dependents Salary higher than 100K 50% - Employee + dependents | Coverage given to the employee with Metlife. Employee cost is assumed by the company if included alone, if dependents are included the employee pays according to the following: Salary up to 50K 20% - Employee + dependents Salary between 50K-100K 40% - Employee + dependents Salary higher than 100K 50% - Employee + dependents | Coverage given to the employee with UNUM. Assured sum's vary from 100K to 750K. Coverage for Long Term Disability and Short Term Disability. Paid in total by the company. | Lunch provided at the office if the employee works in the office |

| Country | Hiring Company | Bussiness Unit | ID | Full Name | Job Title | Job Type | Full-time/Part-time | Health Insurance | Dental Insurance | Vision Insurance | Life Insurance | Meal Allowance |
|---------|----------------|----------------|-----|-----------|-----------|----------|---------------------|------------------|------------------|------------------|----------------|----------------|
| USA | MERCON COFFEE CORPORATION | IT | 00016006 | Felipe Cam | IT and Commercial Operations Director | Permanent | Full-time | X | X | X | X | X |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00030701 | Craig Russell | Managing Director Mercon Specialty | Permanent | Full-time | X | X | X | X | X |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00030702 | Jolene Zehnder | Sales & Operations Director | Permanent | Full-time | X | X | X | X | X |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00030775 | Neil Oney | Green Coffee Manager | Permanent | Full-time | X | X | X | X | X |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00040791 | Crystina Colleen McKenna | New Business Development | Permanent | Full-time | X | X | X | X | X |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00044949 | Cynthia Soreya Heng | Senior Marketing Specialist | Permanent | Full-time | X | X | X | X | X |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00045298 | Camila Topke | Sales Executive | Permanent | Full-time | X | X | X | X | X |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00045324 | Thomas John Kennett JR | QC Assistant (Brewed Behavior) | Permanent | Full-time | X | X | X | X | X |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00045299 | Serena Amelia Beze | Sales Executive | Permanent | Full-time | X | X | X | X | X |
| USA | MERCON COFFEE CORPORATION | MERCON SPECIALTY | 00045445 | Noah Briannon Palomo Martin | QC Assistant | Permanent | Full-time | X | X | X | X | X |

**Section 5.9**

**Labor Matters**

(a)

None.

(b)(i)

Attachment to <u>Schedule 5.9(b)(i)</u> is incorporated herein by reference.

(b)(ii)

| Name | Compensation Rate | Location | Services |
|------|-------------------|----------|----------|
| Marina Alvarez | USD 5,100 per month | Central America | Delivery orders, invoicing and washouts. |

9

**Employee information**

| Employee ID | Employee name | Position | Location | Hire date | Annual salary | Target Bonus | Total Comp Target | Vacation balance as of April 30th | Medical leave |
|---|---|---|---|---|---|---|---|---|---|
| 00045299 | Serena Beze | Sales Executive | Miami | 1-May-23 | $ 65,000.00 | $ 10,000.00 | $ 75,000.00 | 4.00 | NA |
| 00044949 | Cynthia Heng | Senior Marketing Specialist | Seattle | 3-Jan-23 | $ 80,000.00 | $ 7,000.00 | $ 87,000.00 | 4.00 | NA |
| 00045324 | Thomas Kennett | QC Assistant (Brewed Behavior) | Kansas | 1-May-23 | $ 60,000.00 | $ 5,000.00 | $ 65,000.00 | 4.00 | NA |
| 00045445 | Noah Briannon Martin | QC Assistant | Seattle | 10-Jul-23 | $ 54,000.00 | $ 5,000.00 | $ 59,000.00 | 4.00 | NA |
| 00040791 | Crystina McKenna | New Business Development | Seattle | 3-Jan-22 | $ 61,000.00 | $ 5,000.00 | $ 66,000.00 | 4.67 | NA |
| 00030775 | Neil Oney | QC Manager | Seattle | 1-Apr-19 | $ 70,000.00 | $ 6,000.00 | $ 76,000.00 | 6.67 | NA |
| 00045298 | Camila Topke | Sales Executive | Texas | 24-Apr-23 | $100,000.00 | $ 10,000.00 | $110,000.00 | 4.00 | Maternity leave - June 2023 to September 2023 |
| 00030702 | Jolene Zehnder | Sales & Operations Director | Seattle | 1-Feb-19 | $155,000.00 | $ 20,000.00 | $175,000.00 | 6.67 | NA |
| 00016006 | Felipe Cam | IT and Commercial Operations Director | Miami | 1-Apr-13 | $181,500.00 | $ 40,000.00 | $221,500.00 | 7.00 | NA |
| 00030701 | Craig Russell | Managing Director Mercon Specialty | Seattle | 1-Feb-19 | $175,000.00 | $    - | $175,000.00 | 6.67 | NA |

**Section 5.10**

**Broker Fee**

Engagement Letter by and among Seller, collectively with its direct and indirect subsidiaries and affiliates that are debtors and debtors in-possession in the Bankruptcy Case and Rothschild & Co. US Inc (the "Mercon Engagement Letter"). For the avoidance of doubt, Purchaser will not have any liability or obligation (contingent or otherwise) under the Mercon Engagement Letter following the Closing Date.

10