**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

In re: Chapter 11

MERCON COFFEE CORPORATION, *et al.*,[1] Case No. 23-11945 (MEW)

Debtors. Jointly Administered

______________________________________/

**DEBTORS' SUPPLEMENTAL MEMORANDUM
OF LAW IN SUPPORT OF LIMITED RELEASES UNDER CHAPTER 11 PLAN**

Paul J. Keenan Jr. (admitted *pro hac vice*)
John R. Dodd (admitted *pro hac vice*)
Reginald Sainvil (admitted *pro hac vice*)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: paul.keenan@bakermckenzie.com
john.dodd@bakermckenzie.com
reginald.sainvil@bakermckenzie.com

Blaire Cahn
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4100
Facsimile: 212-310-1600
Email: blaire.cahn@bakermckenzie.com

*Counsel for the Debtors and Debtors-in Possession*

Dated: July 2, 2024

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Mercon Coffee Corporation (1844); Mercon B.V. (N/A); Mercon Brasil Comércio de Café Ltda. (N/A); Agro International Holding B.V. (N/A); Mercapital de Nicaragua, S.A. (N/A); Distribuidora de Granos de Nicaragua S.A. (N/A); Cisa Export S.A. (N/A); Comercial Internacional de Granos de Honduras, S.A. de C.V. (N/A); Mercon Guatemala, S.A. (N/A); Comercial Internacional Exportadora, S.A. (N/A). The Debtors' mailing address is: 999 Ponce de Leon Blvd, Suite 910, Coral Gables, FL 33134.

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ........................................ 1

II. LEGAL ARGUMENT ........................................ 2

A. Section 503(c) of the Bankruptcy Code Governs the Allowance of Administrative Expenses and is Inapplicable to the Limited Releases ........................................ 2

B. Section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 Permit the Settlement of a Claim Belonging to the Debtors as Part of a Plan. ........................................ 5

C. Even if the Court Applies Section 503(c), the Limited Releases Should be Approved ........................................ 8

III. CONCLUSION ........................................ 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Charter Commc'ns*,
419 B.R. .... 5

*In re Chassix Holdings, Inc.*,
533 B.R. 64 (Bankr. S.D.N.Y. 2015) .... 6, 7

*In re Dana Corp.*,
358 B.R. 567 (Bankr. S.D.N.Y. 2006) .... 2, 3

*In re Endo Int'l PLC*,
No. 22-22549 (JLG), 2022 Bankr. LEXIS 3208 (Bankr. S.D.N.Y. Nov. 14, 2022) .... 10

*Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
554 U.S. 33 (2008) .... 2

*In re GBG USA, Inc. et al.*,
Case No. 21-11369 (MEW) [Doc. No. 518] .... 7

*In re Global Home Prods.*, LLC,
369 B.R. 778 (Bankr. D. Del. 2007) .... 3

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) .... 6, 7

*Protective Comm. for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) .... 6

*In re Stone Barn Manhattan LLC*,
405 B.R. 68 (Bankr. S.D.N.Y. 2009) .... 6

*In re Teltronics Servs., Inc.*,
762 F.2d 185 (2d Cir. 1985) .... 6

*In re Voyager Digital Holdings Inc. et al.*,
Case No. 22-10943 (MEW) [Doc. No. 1138] .... 7

**Statutes**

11 U.S.C. 541(a)(1) .... 5

11 U.S.C. § 503(b), (c) .... 2

11 U.S.C. § 503(c) .... *passim*

11 U.S.C. § 503(c)(1) .... 1, 2, 9

11 U.S.C. § 503(c)(3) ........ 10

11 U.S.C. § 1123(b)(3) ........ *passim*

11 U.S.C. § 1123(b)(3)(A) ........ 5, 7

Mercon Coffee Corporation and certain affiliated debtors, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), submit this supplemental memorandum of law in further support of the limited debtor releases (this "**Supplemental Memorandum**") of claims against certain directors and officers in excess of the amount of coverage under existing policies of insurance (the "**Limited Releases**") proposed in the Debtors' *Fourth Amended Joint Chapter 11 Plan of Liquidation for Mercon Coffee Corporation and Certain Affiliated Debtors* (the "**Plan**"),[2] and to address the Court's comments during the hearing held on June 28, 2024 (the "**Confirmation Hearing**"). The Debtors respectfully represent as follows:

## I. PRELIMINARY STATEMENT

1. This Supplemental Memorandum is in response to the Court's concerns expressed at the Confirmation Hearing that the Limited Releases as proposed in Section 12.03 of the Plan violate section 503(c)(1) of the Bankruptcy Code. Having been afforded the opportunity to review that section of the Code thoroughly since the Confirmation Hearing, the Debtors respectfully submit that the plain language, structure, legislative history, and case law all show that section 503(c) applies exclusively to the allowance of administrative expenses not to the granting of estate releases. Instead, section 1123(b)(3) governs the granting of debtor releases, and here, the uncontested record shows each of the seven factors for approval of the Limited Releases has been satisfied, as explained more fully below. Further, even if section 503(c) applies, the Limited Releases that are supported by the Holders of the Prepetition First Lien Claims and the Creditors' Committee, and were proposed in the Plan long after the proposed insider releasees have remained

[2] Capitalized terms used but not otherwise herein defined shall have the meaning ascribed to such terms in the Plan or the *Fourth Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for Mercon Coffee Corporation and Certain Affiliated Debtors* (the "**Disclosure Statement**"), as may be applicable.

at their posts and provided good and valuable consideration to the Debtors and their estates are not offered "for the purpose of inducing" those insiders to have remained with the Debtors' business. Accordingly, section 503(c)(1) is inapplicable or, if it does apply, it does not preclude the inclusion of the Limited Releases in the Plan.

## II. LEGAL ARGUMENT

### A. Section 503(c) of the Bankruptcy Code Governs the Allowance of Administrative Expenses and is Inapplicable to the Limited Releases.

2. Section 503(b) sets forth the circumstances in which "there shall be allowed administrative expenses," and section 503(c) provides specific exceptions to section 503(b). 11 U.S.C. § 503(b), (c). Section 503(c) of the Bankruptcy Code "on its face only limits the allowance and payment of *administrative* claims." *In re Dana Corp.*, 358 B.R. 567, 578 (Bankr. S.D.N.Y. 2006). The plain text of section 503(c) is "clear and unambiguous that *only administrative claims* are subject to section 503(c) restrictions." *In re Dana Corp.*, 358 B.R. at 578 (emphasis in original).

3. The language, structure, and legislative history of section 503 all support the conclusion that Section 503(c) of the Bankruptcy Code applies exclusively to the allowance of administrative expenses. Section 503 by its plain language applies exclusively to the "[a]llowance of administrative expenses" against a debtor's estate, as indicated not only by the title of section 503, but also by the language of section 503(b), which sets forth the requirements for allowance of "administrative expenses."[3] Section 503(c) is structured as a carveout to section 503(b)'s allowance of "administrative expenses" — it comes immediately after subsection 503(b), and its first two words are – "Notwithstanding subsection (b)." Had Congress wanted section 503(c) to apply "notwithstanding" section 1123 or other provisions of the Bankruptcy Code outside of

[3] *Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute.") (internal citation omitted).

section 503, it could have said so; instead, section 503(c) was enacted solely as an exception to section 503(b) and is thus limited to "administrative expenses."

4. That section 503(c) applies only to "administrative expenses " is further confirmed by an examination of the legislative history, which reveals that Congress considered several legislative proposals designed to protect employees and retirees following the *Enron* and *WorldCom* Chapter 11 cases (that stemmed from employee-related fraud), but ultimately decided only to revise the requirements for the allowance of administrative expenses. Notably, neither the language of 503(c) nor any of its failed predecessors is so broad as to preclude the grant of after-the-fact releases to insiders in consideration for the services they already have provided to a debtor and its estate.

5. Section 503(c) was originally proposed by Senator Edward Kennedy as a means to address perceived abuses in chapter 11 cases such as *Enron, WorldCom*, and *Polaroid*.[4] *Dana*, 358 B.R. at 575 ("Senator Edward Kennedy proposed the amendment to section 503 of the Bankruptcy Code as a last-minute addition to the bill, expressing his concern over the 'glaring abuses of the bankruptcy system by the executives of giant companies like Enron Corp. and WorldCom Inc. and Polaroid Corporation, who lined their own pockets, but left thousands of employees and retirees out in the cold.'" (quoting Statement of Senator Edward Kennedy on the Bankruptcy Bill (Mar. 1, 2005))).

6. The proposed addition of section 503(c) reemerged in 2003 when Representative Bill Delahunt, who had introduced Employee Abuse Prevention Act of 2002 ("**EAPA**") in the House in 2002, offered an amendment to the Bankruptcy Abuse Prevention and Consumer

[4] Section 503(c) was added to the Bankruptcy Code in 2005 to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process." *In re Global Home Prods.*, LLC, 369 B.R. 778, 784 (Bankr. D. Del. 2007). Section 503(c) was not added to the Bankruptcy Code to address releases in any manner.

Protection Act of 2003 (H.R. 975, 108th Cong. (2003)) that would have amended section 503 to include what is now subsection (c). H.R. REP. NO. 108-40(I), at 139 (2003). The proposed addition of section 503(c) was voted down by the House Committee on the Judiciary.

7. Section 503(c) was finally added to the Bankruptcy Code when Senator Kennedy in 2005 proposed an amendment to The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109–8, 119 Stat. 23, enacted April 20, 2005, that was eventually adopted by Congress. Unlike the prior legislation proposed by Senator Kennedy,[5] BAPCPA included only one amendment – a provision restricting the allowance of administrative expense claims for severance and retention payments. 11 U.S.C. § 503(c).

8. Congress did not adopt the other provisions of EAPA, nor did it enact any restriction on releases in connection with section 503(c) of the Bankruptcy Code. This decision was not arbitrary: In the specific cases cited by Senator Kennedy in proposing section 503(c) – *Polaroid, Enron*, and *WorldCom* – the relevant debtors sought to make significant "KERP" payments to executives during the pendency of their chapter 11 cases, and were not seeking to provide debtor releases in plans winding up those cases. Indeed, the BACPA and EAPA legislative history refers only to payments of the type in *Polaroid, Enron*, and *WorldCom,* and therefore section 503(c) was never intended to apply more broadly.

[5] Significantly, the amendment proposed by Senator Kennedy in 2005 that resulted in section 503(c) was originally part of a more comprehensive piece of legislation that was never enacted. *See* Employee Abuse Prevention Act of 2002, S. 2798, 107th Cong. (2002). In 2002 Senator Kennedy co-sponsored a bill to establish EAPA, the stated purpose of which was to "protect employees and retirees from corporate practices that deprive them of their earnings and retirement savings when a business files for bankruptcy under title 11, United States Code." EAPA at 1. Section 104 of EAPA provided for an amendment to section 503 of the Bankruptcy Code with proposed language nearly identical to what is now section 503(c). *Compare* EAPA § 104 with 11 U.S.C. § 503(c). EAPA was referred to the Senate Judiciary Committee, but faced substantial opposition and eventually died in Committee. *See* Steven L. Harris & Charles W. Mooney, *The Unfortunate Life and Merciful Death of the Avoidance Powers Under Section 103 of the Durbin-Delahunt Bill: What Were They Thinking?*, 25 Cardoza L. Rev. 1829, 1831 (2004).

9. Finally, in addition to the plain language, structure, and legislative history of section 503(c), the case law does not support that section 503(c) applies to releases. A diligent search by undersigned counsel has not revealed any instances in this District or in other districts where an estate release was evaluated under Section 503(c) of the Bankruptcy Code.

10. During the Confirmation Hearing, the Court thoughtfully inquired as to "why shouldn't [503(c)] apply" to the releases proposed by the Debtors in Section 12.03 of the Plan. The answer is that both the express terms and the placement of subsection (c) within section 503 reflect an intention to limit its application solely to the approval and payment of an administrative expense, and the strict test imposed by that section has no application to the grant of a release.

**B. Section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 Permit the Settlement of a Claim Belonging to the Debtors as Part of a Plan.**

11. Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate. Claims held by the debtor against third parties are property of the estate and may be released in exchange for settlement. 11 U.S.C. 541(a)(1) ("estate is comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case").

12. When reviewing debtor releases in a debtor's plan, courts consider "whether such releases are in the best interest of the estate." *In re Charter Commc'ns*, 419 B.R. at 257; *see also In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (explaining that debtor releases and discharges of claims and causes of action pursuant to section 1123(b)(3)(A) of the Bankruptcy Code are subject only to debtors' business judgment), *aff'd sub nom.*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds sub nom. DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am.)*, 634 F.3d 79 (2d Cir. 2011). Whether a settlement is proposed as part of a chapter 11 plan, or as an independent settlement outside of a

plan, approval of the settlement is governed by Rule 9019 of the Federal Rules of Bankruptcy Procedure. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 70 (Bankr. S.D.N.Y. 2015).

13. Relying on the guiding language of *Protective Comm. for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), courts in this Circuit have set forth the following factors regarding the reasonableness of such settlements:

> (1) a comparison between the possibility of success and the benefits offered by the settlement; (2) the likelihood of complex and protracted litigation in the absence of a settlement; (3) the interests of creditors, including the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting the settlement and the experience of the bankruptcy judge in reviewing the settlement; (6) the nature and breadth of the releases to be obtained by officers and directors; and (7) the extent to which the settlement is the result of arm's-length bargaining.

*See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007). In reviewing a settlement, the court must "canvass the issues raised by the parties" and determine whether the settlement is reasonable in light of the *Iridium* factors. *In re Teltronics Servs., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985). The *Iridium* standard does not require that the settlement be the very best the debtor could have obtained, but rather that the settlement does not "fall below the lowest point in the range of reasonableness." *Teltronics Servs.*, 762 F.2d. at 189.

14. Moreover, while the "approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored." *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009). Where a debtor release is proposed, courts in this District have universally applied the standards under Section 1123 and Bankruptcy Rule 9019 for approval of a

settlement.[6] *See* 11 U.S.C. § 1123(b)(3)(A); *see also In re Chassix*, 533 B.R. at 70 ("Section 1123(b)(3) of the Bankruptcy Code also permits the settlement of a claim belonging to the debtor as part of a plan of reorganization"). Ordinarily a settlement is reviewed under a 'business judgment' standard, and is approved so long as it does not fall below the lowest point in the range of reasonableness."); *see also In re Genesis Glob. Holdco, LLC*, LEXIS 1174 at *154- 157 and 165-174 (Bank. S.D.N.Y. May 17, 2024) (approving debtor releases of insiders after assessment of compliance with the business judgment rule pursuant to Section 1123(b)(3)(A) and Bankruptcy Rule 9019).

15. Applying the controlling *Iridium* factors, the Limited Release is appropriate:

a. *The benefits of the settlement embodied by Plan and the Limited Releases are significant in the context of these Chapter 11 Cases*. The benefits of the settlement to the Estate are outlined in detail the Declarations, and the settlement does not require a significant compromise for the Estate. For example, the estate is obtaining a 50/50 split of litigation proceeds and $2 million in funding for unsecured claims and the Liquidating Trust. The Liquidating Trustee will still have the power to investigate and, if appropriate, prosecute and monetize claims against the Released Mercon D&Os and recover up to the policy limits of the applicable D&O Policy, which are substantial. The Estate and Liquidating Trust are merely agreeing not to pursue the affected individuals for their personal assets.

b. *The likelihood of complex and protracted litigation in the absence of a settlement.* The Plan and the Limited Releases are part of a global settlement that has allowed the Estates and the Liquidating Trust to avoid protracted proceedings in Chapter 11, with concomitant savings in professional fees and creating certainty of result.

c. *The interests of creditors, including the degree to which creditors either do not object to or affirmatively support the proposed settlement*. Creditors voted overwhelmingly in favor of the Plan. In fact, 100% of the creditors who votes on the Plan voted in support of the Plan, which included a prominent disclosure of the Limited Releases.

---

[6] Indeed, this Court routinely addresses estate releases in the context of Plan confirmation. *See, e.g., In re Voyager Digital Holdings Inc. et al.*, Case No. 22-10943 (MEW) [Doc. No. 1138]; *In re GBG USA, Inc. et al.*, Case No. 21-11369 (MEW) [Doc. No. 518] ; *In JCK Legacy Company (f/k/a The McClatchy Company)*, Case No. 20-10418 (MEW) [Doc. No. 867].

d. *Whether other parties in interest support the settlement.* There has been no objection from any party in interest to the global settlement. While the U.S. Trustee filed an objection, no economic stakeholder in these Chapter 11 Cases has objected to the releases.

e. *The competency and experience of counsel supporting the settlement.* Three teams of experienced counsel, on behalf of the Debtor, the Holders of the Prepetition First Lien Claims, and the Creditors' Committee, were actively involved in the negotiations, plus experienced counsel advising other parties in interest who either voted in favor of the Plan, including the Limited Releases, or did not object.

f. *The nature and breadth of the releases to be obtained by officers and directors.* The releases are narrowly tailored. Most importantly, the Limited Releases do not interfere with the ability of the Liquidating Trust to pursue recoveries under the D&O Policies. In addition, the Limited Releases will not (a) affect the liability of any Entity from Causes of Action based on willful misconduct, gross negligence, or intentional fraud as determined by a Final Order, (b) release post-Effective Date obligations of any Entity under the Plan, or (c) affect any Releasing Parties' rights that remain in effect from and after the Effective Date to enforce the Plan.

g. *The extent to which the settlement is the result of arm's-length bargaining*. The Limited Release was negotiated among the Debtors, Prepetition First Lien Agent (on behalf of itself and the Holders of the Prepetition First Lien Claims), and the Creditors' Committee, all represented by competent and experienced counsel.

16. The Debtors respectfully submit that the Court's consideration of the Limited Releases in the Plan is properly evaluated under the foregoing standard of section 1123(b)(3) and Bankruptcy Rule 9019. The plain language of section 503(c) does not extend to the grant of insider releases under a Chapter 11 plan, and to hold otherwise creates an artificial conflict with section 1123(b)(3) that is not intended and simply does not exist.

**C. Even if the Court Applies Section 503(c), the Limited Releases Should be Approved.**

17. First, as the Supreme Court repeatedly has held, the starting point of interpreting a statute is to look to the plain meaning of its language. The requirement of a finding by the Court based on "evidence in the record" pursuant to section 503(c) only arises where the debtor seeks allowance or payment of "a transfer made to, or an obligation incurred for the benefit of, an insider

of the debtor *for the purpose of inducing such person to remain with the debtor's business* . . . ." 11 U.S.C. §503(c)(1) (emphasis added).

18. Whether focusing on a transfer or obligation, the key language is that the consideration or benefit be offered "for the purpose of inducing" the insider to remain with the debtor. Here, the timing is an important consideration, and consistent with the construction offered above that 503(c) applies only to the allowance or payment of an administrative expense. To "induce" is to persuade or influence, or to provide an incentive for another to undertake or decline to undertake some *future* act or behavior. One cannot "induce" another to do what that other already has done, only to reward or compensate them for having done it -- here, by granting an after-the-fact release, as the Plan proposes with the Limited Releases.

19. At the time they elected to remain at their posts with the Debtors (in some cases, even at great personal and family risk) from the earliest stages of these cases, there never was a "transfer made . . .or obligation incurred" to the officers and directors in respect of the Limited Releases provided in the Plan. The Limited Releases here are offered *after the fact* -- after the identified insiders conferred substantial benefit on the estate and creditors -- and not "for the purpose of inducing [them so] to remain"; in other words, the Declarations [Doc. Nos. 639 and 645] merely recite the consideration that these insiders *already have furnished, without promise or "an obligation incurred*" to grant them releases, and consequently the Debtor Releases do not run afoul of 503(c).[7]

20. Second, subsection (3) of section 503(c) speaks of "transfers" and "obligations" that are made outside of the ordinary course of business and not justified by the facts and circumstances

[7] It also is helpful to consider as well that these insiders are not people of means in a position to offer cash consideration to the estates in exchange for the Plan releases. Rather, all they had to offer was their good faith and hard labor -- sweat equity, invested in some instances at great personal risk. If that is not enough, then ordinary people in their position would never be able to furnish good and valuable consideration to obtain releases under a Plan.

of the case. The Limited Releases are neither, but even assuming the Limited Releases could be characterized as transfers or obligations, the Limited Releases should still be approved. The "terms of 11 U.S.C. § 503(c)(3) are conjunctive, prohibiting payments outside of the ordinary course of business only if the payments are not justified by the *facts and circumstances* of the case." *In re Endo Int'l PLC,* No. 22-22549 (JLG), 2022 Bankr. LEXIS 3208, at *1 (Bankr. S.D.N.Y. Nov. 14, 2022) (emphasis added). The "facts and circumstances" justification test creates a standard no different than the business judgment rule. As noted above, the business judgment rule is satisfied as to the Limited Releases. Thus, as here, where the Debtors have articulated a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously) and received overwhelming support from their stakeholders, this Court should not substitute its business judgment for that of the Debtors.

21. Finally, unlike the exorbitant KERP packages that section 503(c) was intended to curtail, the Limited Release will not unjustly enrich any insiders at the expense of creditors or any other parties in interest – all of whom have benefited tremendously from the efforts of the Released Mercon D&Os and, as Liquidating Trust beneficiaries, will benefit from the continued efforts of the Released Mercon D&Os. Overall, the Plan and Limited Releases constitute a comprehensive integrated transaction that are the product of intense and protracted negotiations and have the overwhelming support of all parties in interest. Accordingly, under these unique circumstances, the Court should approve the Limited Releases.

## III. CONCLUSION

22. The Debtors understand that, as described at the Confirmation Hearing, the Court may "feel stuck under 503(c)" in its consideration of the Limited Releases. Confirmation Hearing, Tr. at 35. Looking however to the plain meaning of the forward-looking language of that subsection, its placement in section 503 that applies solely and expressly to the allowance and

payment of administrative expenses and makes no mention whatsoever of post hoc releases or other consideration provided under a Chapter 11 plan, the absence of any mention of releases in the legislative history or case law, and to the discretion granted to a debtor as a matter of business judgment to settle or compromise claims belonging to the estate in that plan under section 1123(b)(3), the Debtors respectfully submit that it would be unnatural to stretch the language of section 503(c) to cover this situation.

23. As with so many other provisions of the consensual Chapter 11 Plan that has the support of the Prepetition First Lien Agent (on behalf of itself and the Holders of the Prepetition First Lien Claims) and Creditors' Committee and has been accepted by every Class that voted on the Plan, the Limited Releases were extensively negotiated and should be approved. Nothing in section 503(c) operates to preclude such approval. Accordingly, the Debtors respectfully request that the Court approve the Debtor Releases.

Dated: July 2, 2024

**BAKER & McKENZIE LLP**

By: *\/s/ Reginald Sainvil*

Paul J. Keenan Jr. (admitted *pro hac vice*)
John R. Dodd (admitted *pro hac vice*)
Reginald Sainvil (admitted *pro hac vice*)
1111 Brickell Avenue, 10th Floor
Miami, FL 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953
Email: paul.keenan@bakermckenzie.com
john.dodd@bakermckenzie.com
reginald.sainvil@bakermckenzie.com

Blaire Cahn
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4100
Facsimile: 212-310-1600
Email: blaire.cahn@bakermckenzie.com

*Counsel for the Debtors and Debtors-in-Possession*