UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re:                                              :       Chapter 11
                                                    :
MERCON COFFEE CORPORATION, et al.,[1]               :       Case No. 23-11945 (MEW)
                                                    :
                               Debtors.             :       Jointly Administered
------------------------------------------------------------x

### DECISION REGARDING OBJECTIONS BY THE UNITED STATES TRUSTEE TO CONFIRMATION OF THE DEBTORS' FOURTH AMENDED PLAN OF REORGANIZATION

The Debtors in these jointly administered cases seek confirmation of their Fourth Amended Plan of Reorganization (the "Plan"). *See* ECF No. 514. There are no objections except for those posed by the Office of the United States Trustee (the "UST"). The UST contends:

(a)   that the Plan permits the retention of equity interests even though some senior creditor classes are not being paid in full and have not accepted the Plan; and

(b)   that the Plan proposed to grant releases to certain parties without adequate consideration.

During a confirmation hearing on June 28, 2024, the Debtors stated that releases had been promised several months ago in response to threats by a number of officers and directors to terminate their employment and as inducements to continue their employment. I invited the parties to file additional submissions regarding the potential application of section 503(c) in light of these statements, and the parties have done so. *See* ECF Nos. 660, 664, 666.

---

[1]  The debtors and debtors in possession in these cases and the last four digits of their respective Employer Identification Numbers are: Mercon Coffee Corporation (1844); Mercon B.V. (N/A); Mercon Brasil Comércio de Café Ltda. (N/A); Agro International Holding B.V. (N/A); Mercapital de Nicaragua, S.A. (N/A); Distribuidora de Granos de Nicaragua S.A. (N/A); Cisa Export S.A. (N/A); Comercial Internacional de Granos de Honduras, S.A. de C.V. (N/A); Mercon Guatemala, S.A. (N/A); Comercial Internacional Exportadora, S.A. (N/A). The Debtors' mailing address is: 999 Ponce de Leon Blvd, Suite 910, Coral Gables, FL 33134.

**Cancellation of Equity Interests**

Debtor Mercon B.V. is a Dutch private company and is the ultimate parent company of the Debtors. Mercon B.V. has assets in The Netherlands and other European Union countries. The Netherlands has not adopted the UNCITRAL Model Law on Cross-Border Insolvency. In order to protect its assets, and to facilitate the liquidation that is being accomplished in this Court, Mercon B.V. commenced a proceeding in The Netherlands. The Plan in this Court describes how Mercon B.V.'s creditors are to be treated, and provides that the equity interests in Mercon B.V. will be cancelled and will receive no distributions. However, in accordance with Dutch law the formal cancellation of the equity interests will not occur until such time as Mercon B.V. is formally dissolved under Dutch law.

Not all classes of creditors voted to accept the Plan, so confirmation can only be granted in this Court pursuant to the cram-down provisions of section 1129(b). The UST argued at the confirmation hearing that the delayed cancellation of equity interests in Mercon B.V. amounts to a "retention" of interests by equity owners that is prohibited under section 1129(b) because creditors are not being paid in full and because not all creditor classes accepted the Plan.

I disagree with the contention that the equity owners of Mercon B.V. will "retain" any property under the Plan. The Plan provides for the cancellation of equity interests. In addition, the Plan provides that the Debtors will be liquidated; that the liquidation will be accomplished by court-appointed trustees; that the equity interest holders will have no continuing control over any part of that process; and that the equity interest holders will not be entitled to any distributions. The equity interest holders will receive nothing that should or could have been distributed instead to creditors. Any "interests" that the equity owners may nominally hold (until the former cancellation occurs) have been stripped of all rights and meaning; they will be "equity interests"

2

in name only but not in substance. Under the circumstances, the minor delay in the cancellation of the equity interests is not a "retention" of equity rights or property that runs afoul of section 1129(b).

### The Proposed Releases

Section 12.03 of the Plan provides for the release of the Debtors' claims against various parties, subject to certain exclusions. The proposed release applies to all claims of any kind except that (a) if any Released Party is an insured person under a D&O policy, the release is limited to "the liability of any such party or person that exceeds the proceeds of the D&O Policies," and (b) no release is granted for any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a court of competent jurisdiction. The "Released Parties" originally were to include all of "the current and former directors, officers, representatives, members of management and other employees of the Debtors" but would not have included any accountants or current or former equity holders. In a memorandum filed on June 25, 2024, however, the Debtors proposed to modify the relevant Plan provisions so as to substitute the phrase "Released Mercon D&Os" in place of the general reference to all past and present directors, officers, etc. ECF No. 638. The term "Released Mercon D&O's" includes 19 individuals who were listed in an Exhibit to the memorandum. *Id*. at Ex. A.

The explanations for the proposed releases have been somewhat difficult to pin down. When the releases were first proposed, the UST objected to the proposed Disclosure Statement on the ground that it failed to explain why the releases were being granted and what consideration the Debtors were receiving in return. ECF No. 425 at 24–26. At that time the proposed Disclosure Statement included only the following language:

> The Debtors believe that the Released Parties . . . have made substantial and valuable contributions before and during the Debtors' Chapter 11 Cases

3

> through efforts to negotiate and implement the Plan, which maximizes the value of the Debtors for the benefit of all parties in interest, and to pay down the amounts due under the Prepetition First Lien Credit Agreement. Accordingly, it is the Debtors' position that each of the Released Parties . . . warrants the benefit of the release . . . provisions.

ECF No. 378 at 7. At a hearing on May 14 the Debtors contended that issues regarding the propriety of the releases should be resolved at the confirmation hearing and that the Debtors did not need to offer further explanations and justifications in the Disclosure Statement. ECF No. 494, Tr., 5/14/2023 at 14:22-15:5. I said, though, that the Plan had incorporated a proposed release that would be subject to the requirements of Rule 9019 and that the Disclosure Statement was the only place where creditors could find information about that proposal so that they could decide whether to object to it. Accordingly, "your explanation of why you are proposing the grant such broad releases, and how they work, and what would be excluded really belongs in the disclosure statement." *Id*. at 15:12-16. I also stated that the Debtors should disclose "whether you have investigated potential claims or not and what you've concluded about them . . ." *Id*. at 15:24-16:1. I added:

> You don't get a release just because you worked and continued to get paid after the petition date. That's not going to be enough. You're going to have to explain that you've taken a look at it, that these are reasonable in your view, and give creditors some reason to understand why you want to do it, and what you think the effect would be, and whether the effect would be to release any claims that might have any merit. And if that's what you want to do, that's what you're going to have to say.

*Id*. at 16:3-11; *see also id.* at 22:2-16.

The Debtors made revisions to the Disclosure Statement following the hearing, and before the confirmation hearing the Debtors made many further submissions regarding the proposed releases, including three separate declarations by Harve Light, the Debtors' chief restructuring officer. The Debtors argued:

4

- The proposed release are not "full" releases because (a) if insurance is available, the proposed releases would apply only to the extent that a claim would exceed the available insurance coverage, and (b) the releases would not apply to the extent that a court found that a releasee was guilty of fraud, willful misconduct or gross negligence;
- The releases were the product of "hard-fought" and "arm's-length" negotiations among the Debtors, the secured lender and the Official Committee of Unsecured Creditors;
- The releases were critical to gaining support for the Plan and were "necessary and integral" components of the Plan;
- The beneficiaries of the proposed releases had contributed to the sale of the Debtors' remaining operating businesses, had maximized the values of the Debtors' assets, had made better creditor recoveries possible, and had prevented a conversion to chapter 7;
- The Debtors would receive reciprocal releases from the releasees;
- Certain of the parties to be released had continued to work despite facing personal risks following the seizure of the Debtors' assets in Nicaragua by Nicaraguan authorities;
- Some of the individuals who would receive releases did not have managerial control "outside of their local country" and did not handle corporate-level accounting and financing;
- Some of the proposed beneficiaries of the releases live in foreign countries, where it would be difficult and expensive to prosecute a claim and to collect on a claim;
- The Debtors (and Mr. Light in particular) had evaluated the potential claims against the released parties and had considered the relative merits and economic benefit of any potential claims, and in light of "the past and ongoing contributions" of the released

5

> parties and "efforts to maximize recovery for the creditors" the Debtors had concluded that the releases should be approved;

- No creditors objected to the proposed releases; and

- Debtors have considerable leeway in granting releases of their own claims and such releases should be approved so long as the Debtors exercise reasonable business judgment.

*See* Second Amended Disclosure Statement, ECF No. 489 at 97–98; Debtors' Memorandum of Law in Support of Confirmation, ECF No. 588 at ¶¶ 84–85; Declaration of Harve Light in Support of Plan Confirmation, ECF No. 589 at ¶¶ 29–32; Debtors' Memorandum in Opposition to the UST Objection, ECF No.638 at 2–3, 9–11; Supplemental Declaration of Harve Light, ECF No. 639 at ¶¶ 22–23; Supplemental Declaration of Harve Light, ECF No. 645 at ¶¶ 7, 8, 12. The Debtors stated that they recognized that releases would not necessarily be warranted just for doing a good job, but contended that the proposed releasees had done more in these cases:

> The Debtors recognize that releases are not necessarily warranted for a job well done, but the Released Parties have done more than meet expectations. The Released Parties continued to provide critical support even in the fact of serious risk to their own personal safety and risk to the personal safety of their families. While directors and officers often steer businesses through crises, that exercise does not typically require that those directors and officers subject themselves and their families to serious, personal harm. Under these specific circumstances, the Debtor Release is reasonable, particularly because it does not bar potential claims of the Debtors against the directors and officers, but only limits their personal liability. Given the circumstances of these Chapter 11 Cases, the Debtor Release and Release Limitation are reasonable and represent a sound exercise of the Debtors' business judgment.

Debtors' Memorandum in Opposition to the UST Objection, ECF No. 638 at 11.

In his most recent declaration (ECF No. 645), filed the day before the confirmation hearing, Mr. Light stated that the 19 individuals who would be the beneficiaries of releases fall into three categories: (a) those who did not have managerial control "outside of their local country" and did

6

not have direct responsibility or control of the global company or its finances; (b) individuals who "made significant contributions to the attempted sale and financing activities or went above and beyond in their efforts to maximize the value of assets as we liquidated them;" and (c) individuals as to whom Mr. Light believed "there would be no tangible economic benefit in pursuing them" because they are located outside the United States and the expense of obtaining and enforcing a judgment would not make sense. *Id.* at ¶¶ 7, 8, 12. Some individuals are listed in more than one category. *Id.* at Ex. A.

The confirmation hearing was held on June 28, 2024. During the hearing I asked for clarification of some of the arguments that the Debtors had made in their prior submissions.

The Debtors had contended (and continued to argue at the hearing) that the releases had been the result of "hard-fought" and "arm's-length" negotiations. I asked for clarification of why this was a "hard-fought" issue, and more particularly "[w]ho was arguing in favor of the releases and why?" ECF No. 669, Tr., 6/28/2024 at 15:10-13. Counsel stated that the Debtors had sought the releases, and that they did so in order to "keep the company from going into a Chapter 7 liquidation." *Id.* at 15:14-18.

I then posed the following question:

> Help me with – all of this is presented. At times it suggests that it was a trade-off, that they were promised releases in exchange for the work that they did or that they were promised releases before the sales occurred. What's the sequence here? I don't really know what to make of it because the plan was proposed after the sales were basically accomplished. Are they bonuses? Are they deals that you made beforehand? Help me with the sequence.

*Id.* at 15:19-16:1. Counsel responded by saying that during the case the promise of releases was an inducement to continue work and that "a critical mass" of employees had been prepared to leave the company in late February and early March, when asset sales had not yet been finished and when the terms of the Plan were being negotiated. *Id.* at 16:2-25. When I asked why releases

7

23-11945-mew    Doc 674    Filed 07/19/24    Entered 07/19/24 12:54:48    Main Document
Pg 8 of 14


were proposed for employees who were not working on the ongoing sales, counsel responded that it was "an integrated plan settlement." *Id.* at 17:17-18. I said that I remained confused as to whether the releases were being proposed as a suggested "bonus" for prior work or whether the Debtors were seeking the approval of releases in fulfilment of a prior deal. Counsel responded that the individuals in Category 2 (those working on ongoing sales) had said that if the releases weren't approved they would leave the company in late February/early March, and if that had happened the company could not have continued to operate and could not have completed the sales that occurred. *Id.* at 20:10-21:5.

Counsel to the Creditors' Committee confirmed the Debtors' counsel's account of the prior discussions, but said they had occurred in April and May rather than in February and March. *Id.* at 21:13-22. Rabobank (the secured lender) confirmed that it had believed there was a high risk that individuals would have departed and that Rabobank had agreed to support the releases "to get out of Chapter 11 and conclude this liquidation as quickly as possible, given the overall costs of the process." *Id.* at 22:22-23:8.

The Debtors' prior submissions contended that the Debtors had investigated the claims that were being released. I asked the Debtors' counsel, at the confirmation hearing, to explain what investigation had been done. The Debtors' counsel argued that Mr. Light had been involved with the Debtors since April 2023 and was involved in an investigation of certain accounting issues that had resulted in a default on bank debt, and that accountants had been excluded from the releases as a result. Counsel also stated that during the prior two years the proposed releasees had not received dividends or incentive compensation and had not had a significant increase in their base compensation. He also argued that the Debtors know the residences of the releasees and that in

8

some cases their foreign residence would complicate the pursuit and collection of claims. *Id.* at 26:14-21. But counsel then added:

> I'll be very candid with the Court. There wasn't an investigation in the sense of there being thousands and thousands of documents that were produced in discovery or reviewed internally. There certainly wasn't any of that kind of formal investigation. But there was a high level of familiarity with the overall facts and circumstances. And with the releases narrowed to what they are now, belief was when you – there wouldn't be a justification, any additional cost for creating such a call it formal investigation. Nor was there the belief that there would be authority to use cash collateral to conduct such an investigation.

*Id.* at 26:22-27:2. Committee counsel confirmed that the Committee also had done no investigation as to the claims being released. *Id.* at 22:5-17.

During the hearing I expressed reservations about the theory that was being offered in support of the proposed releases, at least to the extent that such releases were being proposed in favor of "insiders." The primary justification for the releases was that some of the recipients had threatened to terminate their employment if the parties did not commit to seek the releases. I asked whether the provisions of section 503(c) of the Bankruptcy Code should apply to the extent the releases were proposed in order to retain the services of insiders. *Id.* at 27:8-11. After I reviewed the requirements of section 503(c), Counsel acknowledged that if section 503(c) were applicable then the Debtors "won't be able to meet these other elements" for approval of the releases as to insiders. *Id.* at 29:9-12. I asked counsel to confirm whether the Debtors received any consideration for the releases other than the continued work by the proposed releasees, and counsel responded that "I don't know that we got anything else from them other than their continued services they were getting. But the estate certainly got a significant benefit." *Id.* at 29:20-30:3.

I expressed reluctance to renege on deals that had previously been made but I expressed concern that if the issue had been presented to me in February or March 2024 (when the agreements to include the proposed releases in the Plan had been reached), and if the explanation then had

9

been that the releases were necessary for the continued retention of the employees, I would have had to apply the standards of section 503(c) in deciding whether the releases could be granted. *Id.* at 30:4-14. After further argument I gave the Debtors "another chance" to identify whether "something other than the retention of the employees is the consideration for the releases -- or is there any other contention that there was anything else that's the consideration for the releases?" *Id.* at 35:6-10. Counsel responded that "the argument that I've made so far is that – our case." *Id.* at 35:11-12.

I noted that individuals who were not "insiders" would not be subject to some of the rigorous approval standards of section 503(c), that the "factual showing" as to the non-insiders was "to be honest, was a little thin," but that I would approve those releases. *Id.* at 35:13-25, 38:5-8. I also gave the parties the opportunity to make further submissions to me on the issue of whether section 503(c) would apply to the approval of the releases in favor of those releases who were "insiders." The parties have now made those submissions. ECF Nos. 660, 664, 666.

The Debtors argue in their post-hearing submission (ECF No. 660) that section 503(c) only applies to the allowance and payment of administrative expenses and that the grant of a release is not the payment of an administrative expense. *Id.* at 1–4. By its terms, however, section 503(c) states that a "transfer" or "obligation" for the benefit of an insider, made for the purpose of inducing such person to remain with the debtor's business, shall neither be "allowed" nor "paid" except in compliance with the requirements of section 503(c). 11 U.S.C. § 503(c). The statute applies to post-petition "transfers" and "obligations" generally, not just to cash payments. Surely nobody would contend, for example, that section 503(c) could be evaded just by agreeing to provide an insider with some form of property other than cash, such as a new home or a new car.

10

The grant of a release is a disposition of a party's interest in property (legal claims) and therefore is a "transfer." *See* 11 U.S.C. § 101(54) (defining a "transfer" as including any mode, direct or indirect, of disposing or parting with property or an interest in property). The Debtors' counsel conceded during the confirmation hearing that a release is a "transfer" of property rights, even if it is not a transfer of cash. ECF No. 669, Tr. 6/28/2024, at 31:8-22, 36:8-17. The proposed releases here would be post-petition "transfers" of claims that belong to the estate, and they are being proposed pursuant to a post-petition "obligation" that the parties undertook in order to induce the insiders' continued employment. Section 503(c) cannot be evaded simply by alleging that the relevant post-petition "transfer" and "obligation" involve the delivery of something other than money.

The Debtors also argue that section 1123(b)(3) and Rule 9019 generally permit the settlement of claims that belong to Debtors. ECF No. 660 at 5–8. However, there is no suggestion in sections 1123(b)(3) or Rule 9019 that a Debtor's general authority to seek the approval of a compromise can be used to circumvent the far more specific provisions of section 503(c). Certainly, for example, the Debtors could not argue that the "business judgment" standards that are ordinarily applied under Rule 9019 would have supplanted the provisions of section 503(c) if the Debtors had sought my approval of the releases several months ago. Nor is there anything in section 1123(b)(3) that implies that the provisions of section 503(c) can be ignored so long as the approval of a retention payment is sought, in hindsight, through a proposed plan. Judge Lane rejected a somewhat similar argument in the American Airlines bankruptcy, in which parties contended that a severance payment to an executive could be approved pursuant to section 1129(a)(4) of the Bankruptcy Code and without compliance with the terms of section 503(c). *In re AMR Corp.*, 497 B.R. 690, 696–97 (Bankr. S.D.N.Y. 2013) (holding that section 1129(a)(1)

11

requires that a plan comply with all applicable provisions of the Bankruptcy Code and that if that instruction "means anything, the Court cannot approve a payment that is clearly prohibited by another, more specific part of the Bankruptcy Code."). I agree. Section 1129(a)(1) states that the confirmation of a Plan can only be granted if the Plan "complies with the applicable provisions" of the Bankruptcy Code, 11 U.S.C. § 1129(a)(1), and that includes section 503(c).

Finally, the Debtors argue that the releases are being offered after the fact – months after the relevant agreements to include the releases in the Plan, after the relevant services have been performed and therefore after the insiders' consideration has already been provided. In the Debtors' view, this means that the releases are not being offered as forward-looking "inducements" for the continued future employment of the individuals. ECF No. 660 at 8–10. If I were to accept that theory, however, it would mean that a debtor could avoid the application of section 503(c) in its entirety by entering into a KERP agreement with insiders and just delaying the request for court approval of the KERP until plan confirmation, at which point the insiders would already have provided the continued service that the KERP contemplated. Section 503(c) would have little meaning if it could be so easily evaded.

There is no contention in this case that the proposed releases are in consideration of any post-confirmation work that the releasees might provide. Instead, the parties admittedly made a post-petition commitment to support the proposed releases in order to induce continued employment. The fact that the releases were meant to "induce" continued employment did not change just because the court approval of the releases is only being sought in hindsight.

I have sympathy for the insiders, who did good work and who did in many cases faced hardships and personal risks. But I am constrained by the terms of the Bankruptcy Code and I am not free to ignore its relevant provisions. The Debtors, with commendable honesty, have made

12

clear that the sole consideration for the proposed releases in favor of the insiders was their agreement to remain in the Debtors' employment, and that the other parties had agreed to seek such releases in order to induce such continued employment. Although the Debtors argue that the releases are supported by reasonable business judgments, they have conceded that the more exacting standards of section 503(c) have not been met. I have no choice in light of these concessions but to deny approval of the proposed releases insofar as they would apply to insiders.

In its post-hearing submission, the UST asserts that all 19 of the proposed beneficiaries of the release are "insiders," but that is not what the parties contended at the hearing and it is not what is stated in the supporting declarations (which were admitted into evidence without objection and without any request by the UST to conduct cross-examination). It was clear at the confirmation hearing that only some of the purported releasees were "insiders," and I ruled that I would grant the releases as to the non-insiders. ECF No. 669, Tr., 6/28/2024, at 38:4-8. However, the relevant portion of the transcript of the confirmation hearing, in which the Debtors' counsel identified the persons who were "insiders," is garbled. The transcript suggests that the Debtors' counsel identified all of the individuals whose names fall into categories 1 and 2 of Exhibit A to Mr. Light's June 27, 2024 Supplemental Declaration (ECF No. 645, Ex. A) as "insiders." *See Id.* at 34:7-12. However, Category 1 included individuals who allegedly had no management responsibilities, and my own recollection of the hearing is that the Debtors represented that the "insiders" were people whose names appeared in Category 2 but did *not* appear in Category 1. A clarification plainly is needed. The Debtors and the UST are hereby directed to confer as to the identification of those proposed releasees who were "insiders," and if they are unable to reach agreement I will make such further rulings as may be required.

13

During the confirmation hearing the Debtors suggested that they might propose a limitation of the releases in favor of insiders, so that instead of applying to claims of all kinds (with limitations for claims covered by insurance) the releases would apply only to those claims that are otherwise covered by insurance. The effect of such a limit would be that the releases would limit the individuals' personal liabilities for those claims for which insurance is available, without releasing other claims. In theory a more limited release of this kind might have other justifications in terms of facilitating the pursuit of claims that are covered by insurance. The Debtors have not made that proposed change, however, and I will make no rulings as to that possibility unless and until such a plan modification is actually proposed.

## Conclusion

For the foregoing reasons, the UST's objections to confirmation of the Plan are overruled, except that the proposed releases of the Debtors' claims in favor of those individuals who are "insiders" will be denied. This ruling is without prejudice to such further plan modifications as the Debtors may wish to propose or as to such different justifications for such modified release provisions that that the Debtors may wish to propose. The UST and the Debtors are directed to agree upon the list of individuals who are "insiders" for purposes of this ruling and on the terms of an Order incorporating the Court's rulings. If they cannot agree, the Court will schedule such further proceedings as may be appropriate.

Dated: New York, New York
       July 19, 2024

/s/ **Michael E. Wiles**
Honorable Michael E. Wiles
United States Bankruptcy Judge